# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | |
|---|---|
| JACABED RODRIGUEZ-COSS,<br><br>                Plaintiff,<br><br>    v.<br><br>LORETTA E. LYNCH, ATTORNEY GENERAL, UNITED STATES DEPARTMENT OF JUSTICE,<br><br>                Defendant. | Civil Action No. |

## COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Plaintiff Jacabed Rodriguez-Coss ("Rodriguez"), appearing *in propria persona*, hereby makes the following allegations against the defendant:

## JURISDICTION AND VENUE

1. This Court has original jurisdiction in this proceeding pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343, as this action is one arising under the federal civil rights laws prohibiting discrimination and other mistreatment in the employment context.

2. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e)(1)(A) and (C), as this is an action against the United States that does not involve real property, and Rodriguez resides in this judicial district.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

3.     Rodriguez has exhausted her administrative remedies.  Specifically, Rodriguez filed a timely formal EEO complaint with the United States Department of Justice on May 7, 2014, within 15 days of being advised of her right to file a formal complaint.  Rodriguez's formal complaint is attached as Exhibit A, and the preceding notice is attached as Exhibit B. Furthermore, Rodriguez files this action within 30 days of her receipt of the March 23, 2016 final agency decision, which gave her a right to sue as to her claims of discrimination based on gender, reprisal based on prior EEO activity, and parental status.  A copy of that final agency decision is attached hereto as Exhibit C.

## THE PARTIES

4.     Rodriguez is a citizen and resident of the State of Connecticut, County of Fairfield. Rodriguez is an attorney licensed to practice law since 1992.  At all times pertinent to the causes of action stated herein, Rodriguez was employed by the United States Department of Justice, Criminal Division, Capital Case Unit ("CCU"). Specifically, Rodriguez worked in the CCU as a Trial Attorney from June 2008 to March 2014, and she has worked continuously for the Department of Justice, Criminal Division since 1995.  Currently, Rodriguez is an Assistant United States Attorney in the District of Connecticut, Criminal Division.  Rodriguez and her family, which at all pertinent times alleged herein included her husband and three school age children, have all lived in Connecticut since November 2010.  Rodriguez is the primary care provider for her children.

5. Defendant Loretta E. Lynch ("Lynch") is the Attorney General of the United States and in that official capacity serves as the head of the United States Department of Justice. Lynch is sued in her official capacity and had no personal involvement in the acts alleged herein.

## FACTUAL ALLEGATIONS

6. When Rodriguez joined the CCU in June 2008, travel was not required for her position. In fact, at that time CCU did not even have a travel budget. Rodriguez's assignments through the end of December of 2011 required no travel at all. Because there was no travel involved, the CCU position was well-suited for Rodriguez, the mother of three school age children for whom she was the primary care provider. Rodriguez made her family circumstances and her inability to travel or be away from home for extended periods known to her supervisors prior to accepting the position of Trial Attorney, and accepted the position in reliance on their representation that she would not be required to travel extensively.

7. In November 2010, family circumstances required Rodriguez to move to Connecticut. Because she was such a valued member of the CCU, beginning in November 2010 Rodriguez was employed as a Trial Attorney with the CCU while working out of the Office of the United States Attorney for the District of Connecticut. Rodriguez's remote working arrangement with the CCU was pursuant to a flexi-place agreement.

8. Rodriguez's flexi-place agreement could only be terminated under specific circumstances that never occurred: (1) if her performance declined; (2) if her off-site work adversely affected other staff; or (3) if her off-site work failed to meet organizational needs. Between June 2012 and June 2013, Rodriguez's flexi-place agreement was renewed without any

problem three times by CCU. Thus, Rodriguez had a legitimate expectancy that her flexi-place agreement would continue and that she would be able to continue working from Connecticut.

9.      Approximately a year and a half after she moved to Connecticut, Rodriguez was assigned to a federal capital case in Fresno, California. Upon receiving this assignment, Rodriguez made it known to her supervisors that she could only work on this case on an interim basis and that under no circumstances could she conduct a lengthy capital trial in California. Rodriguez also pointed out that a long-tenured Caucasian male CCU member was not required to do any traveling, only to be told in response that she should not compare herself to him.

10.     During the same time period she was handling a California capital case, Rodriguez also handled capital trial cases in nearby jurisdictions, Rhode Island and Vermont. Rodriguez was willing to handle these assignments, as they did not require extensive travel or extended time away from her family.

11.     There are other compelling reasons why extensive travel and time away from home presented a severe hardship to Rodriguez after December 2012. Rodriguez lived very close to Sandy Hook Elementary School, where the tragic mass killing of 26 young students and teachers occurred. Rodriguez's husband was among the first responders to this tragedy and played a major role in the subsequent investigation of this horrific crime and for a month thereafter was among the supervisors coordinating the FBI investigation into this offense from an on-site command post. Rodriguez's daughters were also impacted by this tragedy, since Sandy Hook Elementary School was relocated next to their schools. Rodriguez's youngest daughter was particularly traumatized by these events and literally lived in daily fear of a possible repeat occurrence, especially when Rodriguez was away from home. Rodriguez placed her management on notice of

these circumstances as further reasons why she could not leave for extended periods to California to try a capital case.

12.    As the California capital case moved toward a possible trial date, Rodriguez became greatly concerned that her supervisors had done nothing to address her legitimate concerns, while another long-tenured male colleague was not being required to travel at all.  Rodriguez also informed her supervisors that it was becoming impossible for her to meet her professional obligations in three different capital cases being litigated simultaneously in three different jurisdictions, in addition to all her non-trial related responsibilities, while also meeting her family responsibilities.

13.    After being assigned the California capital case, Rodriguez continuously and consistently objected to this assignment as being contrary to the conditions of employment in place when her flexi-place agreement was offered, and these objections became more forceful and insistent as time passed and the California capital case moved closer to trial.  In addition to her complaints of unfairness and incompatibility with her parental obligations, Rodriguez also questioned why at least one other CCU attorney had been accommodated and was not being required to travel.  Rodriguez's supervisors refused to address her complaints.

14.    Rodriguez's unaddressed concerns about her travel assignments and workload led her to contact the Department of Justice's Office of Administration, on or about November 26, 2013. Rodriguez expressed all of the foregoing concerns and sought a resolution that would address her legitimate concerns.  Rodriguez was advised by the Office of Administration that her CCU supervisors would address her concerns, but that never happened.

15.    Instead of receiving a response to her complaints, Rodriguez began to experience retaliation.  In December 2013, Rodriguez's flexi-place agreement was extended for only two months, instead of the customary six months.  No reason was given for this short extension of Rodriguez's flexi-place agreement.  Rodriguez complained that this action was taken against her in retaliation for her prior complaints regarding the discriminatory and unfair nature of her travel assignments.  Rodriguez also requested meetings with both Human Resources and her CCU supervisors to address these issues, to no avail.

16.    On January 7, 2014, Rodriguez was issued a written reprimand for refusing to litigate the California capital case.  Rodriguez had never refused to litigate the California capital case and had performed all of her duties to the best of her ability to that point.  However, Rodriguez had complained to administration, as alleged above.  Rodriguez is informed and believes that this unjustified reprimand was issued in retaliation for her having made prior complaints of discrimination and unfairness, including her objection to the reduction of her flexi-place agreement in December 2013.

17.    Rodriguez is further informed and believes that the January 7, 2014 reprimand was in retaliation for her  having requested accommodation regarding her California capital case assignment, in light of her family obligations.  Other personnel in Rodriguez's office had received the very accommodations she had requested.  In issuing the reprimand and refusing Rodriguez's requested accommodation, her supervisors discriminated against her on the basis of gender, and parental status, and also as reprisal for her having made the aforementioned EEO complaints.

18. On January 22, 2014, Rodriguez filed a grievance objecting to the January 7, 2014 reprimand. Rodriguez also filed another EEO complaint alleging discrimination and retaliation on the basis of, *inter alia*, gender, parental status, and her prior EEO activity.

19. On or about February 28, 2014, a discriminatory and retaliatory decision was made not to renew Rodriguez's flexi-place agreement at all. As of March 31, 2014, Rodriguez was required to report to Washington, D.C. as a condition of her continued employment with CCU. The purported reason for terminating Rodriguez's flexi-place agreement was an alleged need to supervise her more closely. However, Rodriguez had uniformly received stellar performance reviews, and, given available technology and communication facilities, she could have been supervised to an equal extent regardless of her office location. The termination of Rodriguez's flexi-place agreement was, in effect, a material and retaliatory change in the conditions of her employment that made her continuing as a member of CCU impossible.

20. The continuing retaliation to which Rodriguez was subjected after March 31, 2014 affected every aspect of her employment. Concurrent with the termination of her flexi-place agreement, Rodriguez also was required to submit her legal pleadings for review henceforth 72 hours in advance of their due date. This was unprecedented in the CCU, and Rodriguez had never previously been required to make such submissions. Indeed, Rodriguez had never had her pleadings reviewed during her several years with the CCU. Rodriguez's request to conduct depositions in New York in April 2014, which were necessary for the pending Vermont capital litigation she was handling, was denied. Rodriguez's related request to attend a previously approved continuing legal education course that was needed to comply with the requirements of her law license was also denied.

21.     The increasingly stressful and hostile work environment created by Rodriguez's supervisors' discrimination and retaliation, significantly affected her physical and mental health and required her to seek treatment with a number of physicians in April 2014.   The physical and mental health problems Rodriguez experienced during this time period met the definition of a disability under applicable law, as they undoubtedly affected and impaired her in major life activities.   These conditions were both brought on and exacerbated by the stressful and hostile work environment created by Rodriguez's supervisors' discrimination and retaliation. Rodriguez is also informed and believes that her supervisors reasonably perceived her medical reports as establishing a disability under the above criteria.

22.     In light of her medical conditions, Rodriguez requested both medical leave and authorization to continue to work to the extent she was medically able from Connecticut, where she could be closely monitored by her health care providers.   Rodriguez repeatedly provided medical documentation to her supervisors in support of these medical leave and accommodation requests, only for capricious, nonexistent deficiencies to be cited as the bases for denial.   As a result of the capricious denial of her medical leave requests, Rodriguez was placed on AWOL status on April 1, 2014 for failing to report to Washington D.C.   Rodriguez was placed on AWOL status despite her having told her supervisors of the impossibility of her move to Washington, D.C. and the stress-related health problems that she was having.   Rodriguez was deemed AWOL, even though she was then following medical advice in taking medical leave of absence, due to the stress that her supervisors' discriminatory and retaliatory actions had caused her.   Rodriguez's pay also was reduced greatly as a result of the denials of her sick leave requests.   This unwarranted pay reduction caused Rodriguez significant financial hardship.

23.    It is clear from the foregoing that Rodriguez has been discriminated and retaliated against on the basis of her gender, parental status, and in retaliation for the above-described EEO activity she initiated.  Rodriguez was also denied her rights as a temporarily disable employee, which was also part of the pattern of retaliation to which she was subjected.  As a result of this discrimination and retaliation, and the related stress and health problems she experienced, Rodriguez was compelled to resign her position with CCU in March 2014.  A reasonable person in Rodriguez's situation could not have continued working under conditions where, due to discrimination and retaliation, she would have been unnecessarily forced to live away from her children, for whom she was the primary care provider, for several months at a time, forced to move away from her family, and forced to live under stress that was damaging her physical and mental health.

## DAMAGES

24.    As a result of the discrimination, retaliation and harassment she experienced, Rodriguez no longer works in the CCU and no longer does the work for which she had a great passion, i.e., the prosecution of capital cases.  The loss of this professional opportunity is irreplaceable, as there is no other position available to Rodriguez where she could perform commensurate work.  Rodriguez also has experienced and continues to experience physical, emotional, moral, and financial losses.

# CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### *Retaliation/Reprisal for Engaged in Conduct Protected by Title VII*

42 U.S.C. § 2000e-3(a).

25. All previous allegations are reaffirmed as if fully alleged herein.

26. The actions described herein constitute illegal retaliation and a hostile environment based on plaintiffs' prior EEO activity and her opposition to prohibited practices.

27. Plaintiff exhausted administrative remedies pursuant to Title VII of the 1964 Civil Rights Act.

28. In order to redress the retaliation suffered by the plaintiff, she is entitled to relief in the form of compensatory damages.

29. Plaintiff is also entitled to suitable equitable relief in order to assure that the Department of Justice complies with its obligations.

30. Plaintiff is also entitled to prejudgment interest, litigation expenses, costs and attorneys' fees.

## SECOND CAUSE OF ACTION

### *Discrimination Due to Gender and Parental Status in Violation of Title VII*

42 U.S.C. § 2000e-2(a), 42 U.S.C. § 2000e-2(b).

31. All previous allegations are reaffirmed as if fully alleged herein.

32. The actions described herein constitute illegal discrimination based on plaintiffs' gender and parental status.

33.     Plaintiff exhausted administrative remedies pursuant to Title VII of the 1964 Civil Rights Act.

34.     In order to redress the discrimination suffered by the plaintiff, she is entitled to relief in the form of compensatory damages.

35.     Plaintiff is also entitled to suitable equitable relief in order to assure that the Department of Justice complies with its obligations.

36.     Plaintiff is also entitled to prejudgment interest, litigation expenses, costs and attorneys' fees.

## THIRD CAUSE OF ACTION

### *Discrimination Due to Actual or Perceived Temporary Disability*

Section 501 of the Rehabilitation Act

37.     All previous allegations are reaffirmed as if fully alleged herein.

38.     The defendant failed in its obligation to provide reasonable accommodation to plaintiff pursuant to the 1973 Rehabilitation Act.

39.     The defendants also discriminated against plaintiff on the basis of her actual and/or perceived temporary disability, in violation of the Rehabilitation Act.

40.     Plaintiff exhausted administrative remedies for this cause of action.

41.     In order to redress the retaliation suffered by the plaintiff, she is entitled to relief in the form of compensatory damages.

42.     Plaintiff is also entitled to suitable equitable relief in order to assure that the Department of Justice complies with its obligations with respect to her temporary disability.

43.     Plaintiff is also entitled to prejudgment interest, litigation expenses, costs and attorneys' fees.

**PRAYER FOR RELIEF**

44.     Based on the foregoing, Rodriguez requests relief as follows:

a.      A declaration that the above-described actions were discriminatory and retaliatory, in violation of Title VII and the Rehabilitation Act.

b.      An award of compensatory non-economic damages in an amount no less than the statutory maximum of $300,000.00.

c.      An award of economic damages, including compensation for both past and future financial losses and out-of-pocket expenditures.

d.      Prejudgment interest.

e.      Attorney's fees.

f.      Cost of suit.

g.      Ancillary relief, including the expungement of any negative entries in Rodriguez' personnel file.

h.      Any further just and proper relief.

**DEMAND FOR JURY TRIAL**

Rodriguez demands a trial by jury, consistent with her rights under the Seventh Amendment, the 1991 Civil Rights Act, and other applicable law.

Dated:  April 21, 2016

/s/ Jacabed Rodriguez-Coss
Jacabed Rodriguez-Coss
Federal Bar No. phv04471
64 Mustang Lane
Monroe, CT 06468
Tel. (203) 584-0167
E-Mail:  jrodriguezcoss@gmail.com
Plaintiff *In Propria Persona*

**EXHIBIT A**

U.S. Department of Justice

## Complaint of Discrimination

*(See instructions on reverse)*

PRIVACY ACT STATEMENT 1. AUTHORITY- The authority to collect this information is derived from 42 U.S.C. Section 2000e-16, 29 CFR Sections .614.106 and 1614.108.
2. PURPOSE AND USE-This information will be used to document the issues and allegations of a complaint of discrimination based on race, color, sex (including sexual harassment), religion, national origin, age, disability (physical or mental), sexual orientation or reprisal.

The signed statement will serve as the record necessary to initiate an investigation and will become part of the complaint file during the investigation; hearing, if any; adjudication; and appeal, if one, to the Equal Employment Opportunity Commission. 3. EFFECTS OF NON-DISCLOSURE-Submission of this information is MANDATORY. Failure to furnish this information will result in the complaint being returned without action.

| | |
|---|---|
| **1. Complainant's Full Name**<br>Jacabed Rodriguez-Coss | **2. Your Telephone Number** *(including area code)*<br>Home 202-262-7243 (cell) |
| Street Address, RD Number, or Post Office Box Number<br>64 Mustang Drive | Work 203-696-3027 |
| City, State and Zip Code<br>Monroe, CT 06468 | |

| | |
|---|---|
| **3. Which Department of Justice Office Do You Believe Discriminated Against You?**<br><br>Capital Case Section, Criminal Division | **4. Current Work Address**<br>1000 Lafayette Blvd, 10th Floor, Bridgeport, CT 06604 |
| | A. Name of Agency Where You Work<br>Capital Case Section, Criminal Division, Department of Justice |
| **B. Street Address of Office**<br>1331 F Street NW | B. Street Address of Your Agency<br>1331 F Street NW |
| | C. City, State and Zip Code<br>Washington D.C. |
| **C. City, State and Zip Code**<br>Washington D.C. | D. Title and Grade of Your Job<br>Trial Attorney, 15-10 |

**5. Date on Which Most Recent Alleged Discrimination Took Place**

| Month | Day | Year |
|---|---|---|
| April | 29 | 2014 |

**6. Check Below Why You Believe You Were Discriminated Against?**

- ☐ Race or Color *(Give Race or Color)* _____
- ☐ Religion *(Give Religion)* _____
- ☐ Sex *(Give Sex)* ☐ Male ☒ Female
  - ☐ Sexual Harassment
- ☐ Age *(Give age)* _____
- ☒ National Origin *(Give National Origin)* Puerto Rican
- ☒ Disability ☒ Physical ☒ Mental

- ☐ Genetic Information
- ☐ Sexual Orientation
- ☐ Gender Identity
- ☒ Reprisal
- ☒ Parental Status
- ☐ Class Complaint

**7. Explain How You Believe You Were Discriminated Against** *(treated differently from other employees or applicants)* Because of Your Race, Color, Sex (including sexual harassment), Religion, National Origin, Age, Disability (physical or mental), Genetic Information, Sexual Orientation, Gender Identity, Parental Status, or Reprisal. Do not include specific issues or incidents that you have not discussed with your EEO Counselor. *(You may continue your answer on another sheet of paper if you need more space.)*

(1) I was treated differently than some male counterparts who were not required to travel extensively and for extended periods of time; (2) I was retaliated against after making an EEO complaint on January 22, 2014; (3) I was further retaliated against when the initial retaliation caused me to have physical and mental health problems; and (4) I was not accommodated as a parent and primary caregiver, as a Family Leave eligible worker, or as a temporarily disabled worker.
See Attached Statement and Exhibits for additional detail.

**8. What Corrective Action Do You Want Taken on Your Complaint?**

I request the withdrawal of the January 7, 2014 reprimand; the reassignment of U.S. v. Stone; the renewal of my flexi-place agreement retroactive to 3/1/14; the provision of written assurances that I will not be assigned to more than one litigation matter at a time, or be assigned litigation cases outside my geographical area; the removal of any AWOL status from my personnel record; the adjudication of my pending grievances and complaints without further retaliation; compensation for all attorney's fees incurred as a result of the unjust and discriminatory actions taken against me, and any further compensation that may be justified.

| | | |
|---|---|---|
| **9. A) I have discussed my complaint with an Equal Employment Opportunity Counselor and/or other EEO Official.** | | |
| DATE OF FIRST CONTACT WITH EEO OFFICE: | DATE OF RECEIPT OF NOTICE OF FINAL INTERVIEW WITH EEO COUNSELOR: | B) Name of Counselor<br>Cheryl Angeletti-Harris |
| January 22 2014 | 4 29 2014 | ☐ I Have Not Contacted an EEO Counselor |
| **10. Date of This Complaint:**<br>Month Day Year<br>May 6 2014 | **11. Sign Your Name Here:**<br>Jacabed Rodriguez-Coss | Exhibit ___ Page ___ |

FORM DOJ-201A
APR. 2011

25

# READ CAREFULLY

• This form should be used only if you, as an applicant for Federal Employment or as a Federal Employee, think you have been discriminated against because of race, color, sex (including sexual harassment), religion, national origin, age, disability (physical or mental), genetic information, sexual orientation, gender identity, parental status or reprisal by a FEDERAL agency, and have presented the matter for informal resolution to an Equal Employment Opportunity (EEO) Counselor within 45 calendar days of the date the incident occurred or, if a personnel action, within 45 calendar days of its effective date.

• Your complaint must be filed within 15 calendar days of the date of your receipt of the Notice of Final Interview with the EEO Counselor. If the matter has not been resolved to your satisfaction within 30 calendar days of the date you contacted the EEO office and the final counseling interview has not been completed within that time, you have the right to file a complaint at any time thereafter up to 15 calendar days after your receipt of the Notice of Final Interview. These time limits will only be extended under limited circumstances.

• The EEO Counselor or the EEO Officer will assist you in preparing your complaint, upon request.

• Your written complaint should be filed by you with the EEO Officer for the Bureau where the alleged discrimination occurred.

• You may have a representative at all stages of the processing of your complaint.

• You will have an opportunity to talk with an impartial investigator and present all facts which you believe support your complaint of discrimination.

• After the investigation of your complaint has been completed, you will be furnished a copy of the investigative file. You will then be given an opportunity to request a final agency decision by the Department of Justice's Complaint Adjudication Officer (CAO) or a hearing before the Equal Employment Opportunity Commission (EEOC), which will be conducted by an Administrative Judge of the EEOC. At the hearing, which will be held at a convenient time and place, you may present witnesses and other evidence in your behalf.

• If your complaint is based upon sexual orientation, gender identity, or parental status, your investigative file will be reviewed by the Department of Justice's CAO and a final decision will be rendered with no entitlement for further administrative review.

• If a hearing is held on your complaint and a decision is rendered, the CAO will take final action on your complaint by issuing a final order. The final order will notify you whether or not the agency will fully implement the Administrative Judge's decision and it will explain your appeal rights. If you elect to have an immediate final agency decision without having a hearing, the CAO will take final action on your complaint by issuing a final agency decision which consists of findings on the merits of each issue in the complaint. The final agency decision will also include an explanation of your appeal rights.

• If you are not satisfied with the final order or final agency decision, you have the right to file a written appeal with the EEOC, Washington, DC, within 30 calendar days after your receipt of the final order or final agency decision. A copy of your appeal must be provided to the agency at the same time it is filed with the EEOC.

• If your complaint is based upon race, color, sex (including sexual harassment), religion, national origin, age, disability (physical or mental), genetic information or reprisal, you also have the right to file a civil action in the appropriate Federal District Court:

(a) Within 90 days of receipt of the final action on an individual or class complaint if no appeal has been filed;

(b) After 180 days of filing an individual or class complaint if an appeal has not been filed and final action has been taken;

(c) Within 90 days of receipt of the Commission's final decision on an appeal; or

(d) After 180 days from the date of filing an appeal with the Commission if there has been no final decision by the Commission.

NOTE: Special statutory provisions (PL 93-259) relating to the right to file a civil action apply to age discrimination complaints. Please consult with your EEO Officer for assistance.

Exhibit ___ Page ___

**EXHIBIT A 002**

After a little over two years at CCU in D.C., my husband was selected for a supervisory position in the FBI New Haven Field Office, CT. I gave Chief Carwile notice that I would be moving to Connecticut and pursuing a position with the U.S. Attorney's Office in that district. We agreed that I would be granted a reasonable amount of time to interview with that office and transfer. However, approximately a week or so before I was scheduled to leave Washington D.C., I was asked if I would assist in the capital prosecution of *U.S. v. Azibo Aquart*, then scheduled for trial in March of 2011 in Connecticut. I agreed since I would be living in that district. The understanding and expectation was that I would continue under CCU for the duration of the trial in *U.S. v. Azibo Aquart* and would transfer to the U.S. Attorney's Office for the District of Connecticut at the conclusion of the trial. A flexi-place agreement was not discussed at that time.

I moved to Connecticut in October of 2010, and continued to work exclusively for CCU, preparing the case of *U.S. v. Azibo Aquart* for trial. The trial lasted from March until June of 2011. In the interim, I had received, and rejected, an offer from the U.S. Attorney's Office for the District of Connecticut. At the conclusion of the *Azibo Aquart* trial, I requested a few months to find other employment. Chief Carwile then advised that if I left CCU, he actually would not be able to replace me in light of the federal hiring freeze and asked if I would remain with CCU on a full-time tele-commuting basis. When the flexi-place agreement memorializing those terms was offered and accepted by me, I had already relocated my family to Connecticut and established residence in that State. Therefore, there was an understanding that my continued employment with the Capital Case Unit after that time would entail my working full time from the State of Connecticut. Moreover, at that time, Chief Carwile also was well aware of my continued objections to traveling on a full-time basis.

Contrary to the assertion in the reprimand, I was not informed at that time that "[my] duties would include traditional policy and review work as well as acting as co-counsel in prosecutions in other parts of the country." In fact, at that time CCU did not have a travel budget that would have permitted such travel and my assignments through the end of December of 2011 required no travel. Nor did Chief Carwile advise CCU trial attorneys of an alleged "change in mission" upon his arrival in August 2010. During his first staff meeting, he stated that he would like to see CCU involved in more litigation, but did not state that there would be "a change in mission" that would require all CCU trial attorneys to engage in litigation, and thus travel on a full time basis. On the contrary, the expectation of the CCU trial attorneys after Mr. Carwile's initial staff meeting was that there would be some attorneys who would litigate full time, some attorneys who would do only capital review work, and some attorneys who would do a combination of both. In fact, at least one CCU trial attorney hired after August 2010 was told that she would not have engaged in extensive travel.

My concerns about my case assignments and the continued travel requirements led me to contact Karl Machino, Executive Officer for the Office of Administration, on or about November 26, 2013. I discussed with Mr. Machino my concerns about the case assignments within CCU



EXHIBIT A 003

Statement in Support of EEOC Formal Complaint by Trial Attorney Jacabed Rodriguez-Coss
Page 3

and my inability to travel on a full time basis. I requested assistance with either reaching an accommodation within CCU or securing a transfer to another unit within the Criminal Division. Mr. Machino indicated that he would discuss the matter with Mr. Carwile and get back to me. He did not.

On December 19, 2013, I received my next proposed flexi-place agreement. For the previous three years, since my relocation to Connecticut, my flexi-place agreement had been renewed every six months. However, the agreement forwarded on December 19, 2013, provided for only a two-month extension. I objected and questioned the reasons why my flexi-place agreement was reduced to two months in light of the fact that my performance had not declined. I also reiterated my objections to my case assignments. Cancellation of my flexi-place agreement, as I had indicated to Chief Carwile in the past, would be tantamount to a constructive firing, as I am physically unable to report to work at 1331 F Street NW, Washington D.C. on a daily basis.

The flexi-place agreement states that management has the right to terminate the agreement if the employee's performance declines; if the off-site work adversely affects the work of the staff remaining in the office; or if the arrangement fails to meet organizational needs. None of these scenarios was cited by my management. My performance had not declined as evidenced by my performance evaluations over the last three years. In 2012, I was one of the recipients of the Assistant Attorney General's Award for Distinguished Service. In addition, my field work has been consistently praised by the U.S. Attorney's Offices where I have handled cases. Nor has my off-site work adversely affected the work of the staff remaining in the office. I am able to communicate with my co-workers and management effectively and expeditiously via e-mail or telephone. The only time I was asked to come to Washington this past year was to participate in a unit meeting with the Deputy Attorney General. Otherwise I am able to carry out my duties from my off-site office in Connecticut or in the districts where I am currently litigating cases. Therefore, neither termination of my flexi-place agreement, and thus termination of my employment with the Department, or reduction of the same to two months was justified.

Nonetheless, my flexi-place agreement has been used as a tool to coerce me into continuing with a case assignment that I have made clear I could not continue to handle, specifically *U.S. v. Samuel Stone*. In November 2011 I received a call from Chief Carwile during which he asked whether I was willing to litigate another case after *Aquart*. I told him that as long as the case was "not in Alaska," meaning not far away from my home, I would be willing to do so. He stated that the case he had in mind was not in Alaska and hung up. I was thereafter assigned to *U.S. v. Samuel Stone*, Eastern District of California, Fresno Division. When I questioned the assignment I was asked if I could please indict the case because the U.S. Attorney's Office had waited over 8 years to present the case to the Attorney General's Committee for the Review of Capital cases, the Attorney General had authorized the case as a



Exhibit 1 Page 5

Statement in Support of EEOC Formal Complaint by Trial Attorney Jacabed Rodriguez-Coss
Page 4

---

capital prosecution and it needed to be indicted as soon as possible. I indicted the case in March 2012.

In June 2012 I agreed to assist with the case of *U.S. v. Jason Pleau*, District of Rhode Island, because I am about two hours away from Providence, where the U.S. Attorney's Office in Rhode Island is located and could travel there and back home in a day. *Pleau* was then scheduled for trial in April of 2013. I also expected that *Stone* would be eventually reassigned.

During my performance evaluation in July 2012, despite being rated "Outstanding," I was cited for not spending more time in the districts where I was litigating cases and was told that we needed to "put in some face time" even if no court appearance was scheduled.[1] I made clear at that time that I would only travel when necessary, and again raised objections to being forced to handle a case in the Eastern District of California. I explained that I could not spend three to four months away from my home, which a trial in *U.S. v. Stone* would require given that there are no direct flights from New York to Fresno. Travel to Fresno cannot be completed within regular working hours. I questioned why at least one other CCU attorney had been accommodated and was not being required to travel, but my management refused to address that issue.

I have at different times proposed a number of alternatives that would allow me to continue working for the newly renamed Capital Case Section ("CCS"). (The Capital Case Unit was converted to the Capital Case Section this past year) I honestly believe that I can remain an asset to CCS, even if I am not a full-time litigating attorney. I am willing to see the case of *Donald Fell v. U.S.* to its conclusion. This is a complex post-conviction litigation from the District of Vermont that I have handled as lead counsel since August 2011, that is, prior to my assignment to *Stone*. Although it also requires a significant amount of travel, I was willing to continue to do so, just not on a full time basis. Travel from Connecticut to Vermont does not present nearly as great a burden as does travel to Fresno, and an evidentiary hearing does not typically require my continuous presence out of the jurisdiction to the same extent as does a jury trial. I am also willing to continue doing capital review work, which previously entailed 90% of my workload. Further, I am willing to continue providing litigation support to *U.S. v. Stone* by providing assistance with pleadings, preliminary jury selection as I have in at least two other cases (*U.S. v. Edison Burgos-Montes* and U.S. v. Alexis *Candelario-Santana*), and otherwise being available to provide guidance to lead counsel. However, current management has steadfastly refused to explore any alternatives.

---

1 This directive was in direct conflict with Department policy that expenses be kept to a minimum given the expected budget cuts.

Exhibit ___ Page ___

**EXHIBIT A 005**

Despite my objections to my assignment in *U.S. v. Samuel Stone*, I continued to comply with my case assignments and perform the work required in *Stone* in order to prepare the case for trial, which was scheduled for trial on September 15, 2014.[2] I also assisted in preparing *U.S. v. Jason Pleau* for trial and *Fell v. U.S.* for an evidentiary hearing. The U.S. Attorney for the District of Rhode Island was authorized to enter into a plea agreement with Jason Pleau and in July 2013, less than two months prior to trial, Pleau pled guilty to life. *Fell* is scheduled for an evidentiary hearing in June 2014.

Over the last six months my ability to continue preparing *U.S. v. Stone* for trial has been complicated by the departure of my assigned co-counsel from the U.S. Attorney's Office; and the need to also prepare *Fell v. U.S.* for an evidentiary hearing in March and June 2014. As a result of the departure of my assigned co-counsel from the U.S. Attorney's Office in August 2013, I have been single-handedly handling all pleadings and hearings in *Stone* for the past six months. Capital cases are routinely staffed with two or more attorneys from the U.S. Attorney's Office, in addition to the support provided by CCS. *U.S. v. Stone* was staffed with only one attorney from the U.S. Attorney's Office, who had a full case load. As a result, upon her departure, the entire responsibility for the case fell upon my shoulders until newly assigned counsel was able to familiarize himself with the case sufficiently to assist. That did not happen until at least March 2014.

In addition, as I stated earlier, I am also lead counsel in *Fell v. U.S.*, a post-conviction matter that I was assigned in August of 2011. For four continuous months I was tasked with preparing the response to the 350 page post-conviction motion filed by Donald Fell pursuant to 18 U.S.C. 2255. This required me to become fully familiar with the trial and appellate record. The response to this motion was filed in December of 2011. In May of 2013 the Court issued an Order denying the Government's motion for summary judgment as to most issues and scheduling an evidentiary hearing for June 2014. The Court also scheduled a juror inquiry pursuant to allegations of juror misconduct for August and September 2013. In addition, the Court permitted discovery. Over the last several months I and Assistant U.S. Attorney Bill Darrow of the District of Vermont have been actively litigating the juror misconduct issues as well as numerous discovery issues. We have had significant success in persuading the Court to compel Fell to provide extensive discovery of his trial attorney and expert files to enable the Government to prepare for the evidentiary hearing in June 2014. We have also had significant success persuading the Court to allow the Government to depose Petitioner Fell, his trial attorneys, trial experts, post-conviction experts, mitigation specialist and mitigation witnesses. We have to date received over 60,000 documents in compliance with the Court's discovery orders. However, given my responsibilities in *U.S. v. Stone*, I have been unable to begin a review of the discovery received. Further, because review of the discovery provided is

---

2 This trial has recently been continued to September 15, 2015.

still pending, depositions of Fell's trial attorneys and jury selection expert were taken in March 2011 without the benefit of a complete review of discovery. An evidentiary hearing on the juror misconduct allegation was also held in March 2011.

Upon the Court's May 10, 2013, Order scheduling an evidentiary hearing for June 2014, I advised my management of the conflict between the evidentiary hearing in *Fell v. U.S.* and the trial in *U.S. v. Stone*. Management advised that such conflicts were generally not addressed unless they still existed approximately two months prior to trial. No modification of my assignments was made.

The difficulties of managing *U.S. v. Stone* and *Fell v. U.S.* simultaneously increased dramatically as of September 2013 due to the numerous pleadings that were required to be filed in both cases. Almost all of my time since September 2013 has been dedicated to preparing and responding to pleadings in these two cases, leaving no time for any field work. During that same period, any capital review work I have conducted was done during weekends as I have had no time during the week to dedicate to that part of my workload. During a case review in either late September or early October 2013 I advised management that I could no longer continue to represent the United States adequately in both cases. Since at least the end of October 2013 I have continuously informed of my inability to review the discovery in *Fell v. U.S.* given my responsibilities in *U.S. v. Stone*.

I also reiterated that I could not try *U.S. v. Stone* in California, for reasons I had voiced for over a year and a half, but there are additional and even more compelling reasons why this assignment presents a severe hardship to me and my family. I live very close to Sandy Hook Elementary School, where the tragic mass killing of 26 young students and teachers occurred in December 2012. This tragedy directly affected my family. My husband was a first responder and for a month thereafter supervised the FBI investigation into this offense. This required him to report to the command center maintained next to the Sandy Hook School for approximately a month. The horrific nature of this experience affected him immensely and led to his decision to retire from service in April 2013. Moreover, after the tragedy, Sandy Hook Elementary School was relocated next to my daughters' schools, which has significantly affected my youngest daughter and required her to see the elementary school psychologist. She literally lives in daily fear of a repeat occurrence, and her anxiety is even worse when I, the person with whom she has the closest attachment, am away from home. I advised my management that, especially due to these conditions, I simply could not separate myself from my family for three to four months, but again they have been unwilling to modify my case assignments.

On or about October 23, 2013, I was asked for a case analysis of *U.S. v. Stone*, expecting that a reassignment of that case would be made. Thereafter, while a status conference was held with new co-counsel and his supervisor in *Stone*, I was advised that no reassignment would be made. During a subsequent telephone conference with management I again advised that I could not adequately continue to represent the Government in both *Stone* and *Fell* as they both needed



31

to be prepared for a trial and evidentiary hearing in June and September of this year. Despite my repeated objections to trying a case in the EDCA, management advised that they would reassign *Fell* since post-conviction litigation was no longer a priority for CCS. However, neither case was reassigned and I continued as lead counsel in *Fell*.

As stated above, my growing concerns with my ability to ethically and adequately continue to handle my caseload led me to contact Karl Machino on or about November 26, 2013, to see if he could assist in reaching a fair resolution to my current situation, specifically the reduction of the term of my flexi-place agreement and my current case assignments.   Mr. Machino advised that in similar situations attorneys have been moved to other units within the Criminal Division requiring less travel, but that he would hate to take an attorney away from Mr. Carwile. Therefore, he stated that he would speak to Mr. Carwile to see if a resolution could be reached, particularly regarding the *Stone* assignment. I never heard back from Mr. Machino, but was eventually advised by Ms. Rene Caputo that management had discretion to reduce the term of the flexi-place agreement and enforce the new mission of the section. Ms. Caputo expressed a willingness to discuss my concerns. I replied to Ms. Caputo on January 6, 2014, setting forth my concerns more fully, as I had no prior opportunity to speak with her. I was reprimanded on January 7, 2014.

On January 22, 2014, I filed a grievance objecting to the reprimand issued on January 7, 2014. I also filed an EEO complaint alleging discrimination on the basis of gender, national origin and parental status.

As evidenced by my resume, I have been committed to public service and to the Department since 1995. *See* Copy of resume attached hereto as Exhibit A. I have worked tirelessly, giving one hundred percent of my effort each year. I am willing to continue to do so, but not at the expense of my family or my profession. The change in mission of CCS constitutes a fundamental change to the personal lives of the attorneys hired under a no travel policy. These changes do not just affect the character of our work, but also our personal lives in an extraordinary manner as capital trials generally last no less than three to six months. CCS accommodated the inability to travel of at least one other white male attorney; I simply requested similar accommodation. Moreover, the current work assignments by CCS do not permit me to discharge my functions as the legal representative of the Government as required under the Rules of Professional Conduct as I do not have sufficient time to handle all pleadings and engage in other trial preparation work.

I do not believe I should be forced out of the career I have built for the last 19 years because I am unable to try a case in California, particularly since I voiced this concern as soon as the assignment was made and offered my current management a number of reasonable alternatives to address the situation. In this regard, threats to constructively end my employment with the Department by terminating my flexi-place agreement were not conducive to a fair resolution. *See* E-Mail from Kevin Carwile dated January 3, 2014, attached hereto as Exhibit B.

Exhibit __1__ Page __6__

EXHIBIT A 008

As stated above, until recently, at least one CCS white male trial attorney, Stanley Rothstein, was permitted to do only capital review work on a full-time basis and was not required to travel or litigate. Stan recently retired. I offered to assume that position, but to this date my management has been unwilling to discuss this possibility. CCS certainly has sufficient capital review work to keep more than one trial attorney busy on a full time basis. Indeed, prior to this unforeseen change in CCS's mission, capital review work comprised most of our workload. I understand that the districts generate sufficient capital review work to justify several full time capital review positions as we routinely must rely on other Criminal Division trial attorneys willing to work for CCS on detail to complete this work in a timely manner. CCS currently has two such detailees, in addition to requiring that all CCS trial attorneys also conduct capital review work. Notwithstanding, management has refused to accommodate my request as they did Trial Attorney Rothstein.

Rather than engaging in any dialogue that could lead to a fair resolution of the above-described situation, and despite the fact that both my grievance and EEO complaint were still pending, on February 24, 2014, I was notified that my flexi-place agreement would not be renewed. I was authorized to continue to work from Connecticut until March 28, 2014, so that I could complete a number of depositions and handle an evidentiary hearing scheduled in *Fell v. U.S.*, on March 18, 19 and 20. I was then instructed to report to work in Washington D.C. withing 30 days, beginning on March 31, 2014, though my management was well aware that I do not maintain a residence in Washington D.C. *See* e-mail from Kevin Carwile dated February 24, 2014, attached hereto as Exhibit C.

The termination of my flexi-place agreement constitutes retaliation for my having filed a grievance against the reprimand issued on January 7, 2014; filed an EEO complaint alleging discrimination; and complained about the case assignments within CCS, which do not allow me to adequately or ethically represent the Government in either of the litigation matters to which I am currently assigned. The termination of my flexi-place agreement is also tantamount to a termination of employment, as CCS management is well aware that I am a resident of the State of Connecticut and would not able to relocate or report to work in Washington, D.C. on a daily basis by March 31, 2014. There is no factual justification for this proposed relocation based on my exemplary record with CCS.

I am a career prosecutor with the United States Department of Justice who has served as an Assistant U.S. Attorney in the Districts of Puerto Rico and Maryland, and as a Trial Attorney for the Capital Case Section, Criminal Division, for the past 19 years. Upon graduation from law school, I served as law clerk to the Hon. Juan R. Torruella of the United States Court of Appeals for the First Circuit. Since then I have authored more than a dozen appellate briefs and appeared for oral argument before the First Circuit Court of Appeals on nine occasions.

Exhibit \_\_ Page \_\_

**EXHIBIT A 009**



During my tenure with the United States Attorney's Office and the Capital Case Section I have represented the United States in 27 jury trials, including a number of complex and high profile trials, with integrity and high ethical standards. As the prosecutor responsible for overseeing investigation, pretrial and trial strategies, I have consistently developed productive relationships with law enforcement agents and with co-counsel to achieve the best results for the Department. The last trial where I participated as co-counsel, U.S. v. Azibo Aquart, Crim. 06-160 (ABA) (D.CT.), resulted in a death verdict against the defendant. My work in the *Aquart* case was strongly praised by David Fein, then U.S. Attorney for the District of Connecticut. In an e-mail to Lanny Breuer, then Assistant Attorney General for the Criminal Division, USA Fein stated:

> This was my first time working with CCU, and I'm glad to report that the experience was superb. They detailed an experienced AUSA to Connecticut to work with our team, and she was so helpful and skilled that we included her in the guilt phase, as well as the sentencing phase (where she delivered a great jury address, among many witness presentations).

*See* e-mail from David Fein attached hereto as Exhibit D. My work for CCU had also been previously praised by AAG Breuer pursuant to a letter of commendation from Gregory J. Fouratt, then U.S. Attorney for the District of New Mexico. *See* e-mail from Lanny Breuer attached hereto as Exhibit E; and Letter from USA Gregory J. Fouratt attached hereto as Exhibit F.

As indicated above, following the trial in *U.S. v. Aquart*, I continued to work from the District of Connecticut under a flexi-place agreement. That agreement states that management has the right to terminate the agreement if the employee's performance declines, if the off-site work adversely affects the work of the staff remaining in the office, or if the arrangement fails to meet organizational needs. CCS Management cites the first listed reason -decline in performance - as their basis for terminating my flexi-place agreement. But the quality of my performance has not declined over the last three years while I have been working from the District of Connecticut under my flexi-place agreement. On the contrary, the performance of my duties over the last three years, first with the Capital Case Unit (CCU), and more recently with the newly named Capital Case Section (CCS), has been outstanding. *See* Performance Evaluations for 2010-2011, 2011-2012 and 2012-2013 attached hereto as Exhibits G, H and I, respectively. As evidenced by the comments that accompany each of my performance evaluations, I have effectively and efficiently discharged by duties. The work that I have conducted for the different field offices where I have been assigned over the last two years has also been outstanding, and has been consistently praised by the U.S. Attorneys and the Assistant U.S. Attorneys with whom I have worked. *See* e-mail from Adi Goldstein, Chief, Criminal Division, District of Rhode Island attached hereto as Exhibit J; e-mails from Maria Dominguez, First Assistant U.S. Attorney, District of Puerto Rico, attached hereto as Exhibit K.

**EXHIBIT A 010**

From Kevin G Little Attorney at Law 1:333.420.0039 Wed May    7 17:44:39 2014 MST    Page 13 of 30

Also, in 2012 my outstanding work was recognized by the Assistant Attorney General for the Criminal Division, who bestowed upon me the Attorney General's Award for Distinguished Service for my work in *U.S. v. Edison Burgos-Montes*, Crim. No. 06-09 (JAG) (D.P.R.). *See* e-mail from Kevin Carwile attached hereto as Exhibit L. Further, the capital review work that I have performed over the last three years has also been outstanding and has also been praised by both CCS management ("Jackie has contributed significantly to the Protocol review process, handling a number of review cases while also attending to her litigation workload."), as well as by members of the Office of the Deputy Attorney General. *See* Exhibit I, Performance Evaluation for 2012-2013. *See also* e-mail from Scott Schools, then Assistant Deputy Attorney General, attached hereto as Exhibit M; e-mail from Matt Cohen, then Assistant Deputy Attorney General, attached hereto as Exhibit N.

My performance also did not decline in the first half of 2013, as evidenced by my Performance Evaluation for 2012-2013 attached as Exhibit I, covering from July 1, 2012 to June 30, 2013. During my end of the performance period review, Deputy Chief Charlie Kinsey indicated that he was giving me a very good evaluation. Mr. Kinsey stressed that he was not rating me as "Outstanding" overall because under the new rating system the Department wanted supervisors to reserve the "Outstanding" rating for truly exceptional individuals. However, Mr. Kinsey indicated that my evaluation was in fact a very good evaluation under the new rating system and that I should be pleased. Mr. Kinsey provided no indication that my performance had in any way declined. On the contrary, he conveyed positive feedback CCS had received from the U.S. Attorney's Offices for both the Districts of Rhode Island and Vermont. William Ferland, Senior Litigation Counsel, District of Rhode Island, spoke with Mr. Carwile personally and conveyed how grateful and pleased his district was for my work in *U.S. v. Jason Pleau*, Crim. No. 10-184-S (D.R.I.), a case where I served as co-counsel from June 2012 to July 2013.[3] Regarding my capital review work, Mr. Kinsey stressed that I had one of the fastest turn-around times in the office.

Despite my outstanding performance as summarized above, on February 24, 2014, I was advised that my flexi-place agreement would not be renewed. *See* Exhibit C, e-mail from Kevin Carwile. *See also* Copy of Flexi-place Agreement attached hereto as Exhibit O. Mr. Carwile alleges that a number of missed deadlines and other deficiencies in *U.S. v. Samuel Stone*, Crim. No. 12-72 (E.D.CA.), allegedly brought to his attention over the last two weeks, led him to

---

[3] The defendant in *U.S. v. Pleau* pled guilty on July 31, 2013, approximately one month prior to the beginning of jury selection.

Exhibit I    Page 12

EXHIBIT A 011

Statement in Support of EEOC Formal Complaint by Trial Attorney Jacabed Rodriguez-Coss
Page 11

conclude that I was in need of closer supervision. I was further advised that I would be allowed to work from the District of Connecticut until I conclude the upcoming evidentiary hearing in *Fell v. U.S.*, Crim. No. 01-12 (D.VT.), scheduled for March 18-20, 2014, and then I will be required to report to work in Washington D.C., beginning March 31, 2014. This action violates my flexi-place agreement as my performance over the last eight months since my last performance evaluation has not declined in any way. There is no justification for terminating my flexi-place agreement, which will be the equivalent of a termination of employment given that I am resident of the State of Connecticut and cannot report to work in Washington D.C. on a daily basis.

Over the last eight months I have continued to represent the Government in *U.S. v. Samuel Stone*, Crim. No. 12-72 as effectively as possible given the magnitude of my work assignments over the last year. While some of the pleadings in this case were indeed filed past the court imposed deadline, such late pleadings were filed from 14 to 8 months ago. I have since received an excellent performance evaluation. Moreover, even after such late filings my flexi-place agreement was renewed for a period of eight months, an acknowledgment on the part of CCS management that the referenced filings did not warrant the reduction or termination of my flexi-place agreement.

Even considering the pretext cited by CCS management for the termination of my flexi-place agreement on its merits, that several pleadings in the case of *U.S. v. Stone* were filed late, none such late filings were due to any negligence on my part and thus they do not reflect on my performance. By way of example, the first pleading filed passed its court imposed deadline was the Government's Response to the Defendant's First Motion to Compel Discovery, Dkt. No. 41. It was agreed that my co-counsel from the EDCA, Elana Landau, would respond to this motion given that she had been responsible for the production of discovery in the case.[4] I was on annual leave until January 2, 2013. After I returned to the office, on January 3, 2013, I was informed by Ms. Landau that she had been busy preparing for a trial and had not been able to review the motion. She apologized and asked if I would respond. *See* Copy of e-mail attached hereto as Exhibit P. I asked my co-counsel the due date for our response and she advised that we had 30 days to respond, thus until January 7th, 2013. However, the due date of the Government's response actually had been January 4th, 2013, not January 7th as my co-counsel had indicated. I was thus placed in a position where I had to prepare a lengthy and important capital case pleading in an extremely limited time. I immediately began drafting a response to the

_____

4 During this time period I was actively preparing the case of *U.S. v. Pleau* for trial, which at the time was scheduled for April 2013.


Exhibit 1 Page 12

36

**EXHIBIT A 012**

defendant's 49-page motion, and while I had a draft by January 7th, I felt that more time would afford the Government an opportunity to supplement the Memorandum of Law that should accompany our response. I requested a short extension of time on the indicated January 7th due date, which was denied without prejudice because it was untimely. After receiving the Court's denial on January 8th, I worked assiduously to complete the pleading and filed it on January 9th. This delayed filing was not my fault, and I did what was necessary to get it filed promptly after I returned from leave. But more importantly, the delay in the filing of the Government's response in no way prejudiced the Government.

Mr. Carwile's claim that the late filings in *U.S. v. Stone*, though made from 14 to 8 months ago, have only recently come to his attention, is not true. Deputy Chief Charlie Kinsey regularly verifies PACER with regard to every case pending in CCS, including cases that are pending capital review. *See* E-mail re *U.S. v. Antonio Fuller* attached hereto as Exhibit O. Moreover, he always checks PACER regarding each case pending in CCS prior to finalizing his performance evaluations of each of the trial attorneys in CCS. My performance evaluation for 2013 reflects the quality of my work for that year. Immediately following that performance evaluation my flexi-place agreement was renewed for another six months. Soon thereafter, I complained that I could not continue to handle both *U.S. v. Stone* and *Fell v. U.S.* simultaneously and adequately and ethically represent the interest of the Government in both cases. As a result, I was threatened with the termination of my flexi-place agreement, and in December 2013, the term of my flexi-place agreement was reduced to two months. When I complained about the reduction of my flexi-place agreement and my caseload, I was reprimanded on January 7, 2013. I subsequently filed a grievance against the reprimand and an EEO complaint alleging discrimination, and while both of these matters were still pending, my flexi-place agreement was terminated. In short, my flexi-place agreement has not been terminated because the Government filed a few pleadings past their deadlines in *U.S. v. Stone*, more than eight months ago.

In fact, over the last eight months, when I have been single-handedly responsible for all pleadings filed in this case given that Ms. Landau left the U.S. Attorney's Office for the EDCA in the first week of August 2013, the Government has only filed two pleadings passed their deadlines in *U.S. v. Stone*.[5] Most pleadings filed within this time period have dealt with capital issues or penalty related discovery. Given that over 15,000 pages have been turned over in discovery as of date, and full familiarization with these documents was necessary to respond to discovery related pleadings, I have been tasked with all such filings. Even so, the only pleadings filed late over the last eight months were an opposition to a motion for extension of time, and a response in compliance that was filed one day late due to an inadvertent miscalculation of time. An explanation was filed and accepted by the court. When considering that over this same time

---

[5] While the U.S. Attorney's Office assigned new co-counsel, he has not had sufficient opportunity to familiarize himself with the case to assist in responding to pleadings.


Exhibit ____ Page ____

37

**EXHIBIT A 013**

period, the undersigned filed approximately 27 substantive pleadings in *U.S. v. Stone*, the late filings were clearly an anomaly.

Over the same time period, I have also been responsible for representing the Government in *Fell v. United States*, Crim. No. 01-12-S (D.VT.), where, together with co-counsel Bill Darrow, I have been actively litigating a number of juror misconduct claims as part of the Petitioner's 2255 Petition. In addition, I have also been actively litigating discovery in this case. Two evidentiary hearings were held in August and September of 2013, which required significant preparation and follow-up briefing. *See* Dkt. Nos. 424, 426, 435, 440, 445, 450, 465 and 469. Moreover, I was successful in persuading the Court that the Government was entitled to discover a significant amount of information, including the Petitioner's trial Attorney's files. 60,000 pages of discovery were delivered to the Government in October 2013, but I have been unable to begin the review of this discovery because of the many pleadings that I have had to draft and file in *U.S. v. Stone*. I have obtained disclosure of Petitioner's expert reports, but have been unable to review the same. The Court granted my request to examine the Petitioner, but I have yet to coordinate his examination with our mental health expert because I simply have not had time. My repeated and constant complaints to management over the last 6 months that my case assignments do not allow me to adequately or ethically represent the interests of the United States in either *U.S. v. Stone* or *Fell v. U.S.* have gone completely unaddressed. During one of my conversations with CCS management about this subject I was told that *Fell v. U.S.* would be taken off my case assignments as post-conviction litigation was no longer a priority for CCS. However, to date, no change has been made to my case assignments. Upon information and belief, Tristam Coffin, U.S. Attorney for the District of Vermont, recently met with the Assistant Attorney General for the Criminal Division, and the Chief and Deputy Chief of the Capital Case Section to attempt to impress upon them not only the need to have me continue assigned to, but also to focus on *Fell v. U.S.* This request too has gone unaddressed.

While I have been able to file all required pleadings over the last eight months in *U.S. v. Stone*, minimal affirmative trial preparation has been conducted given my responsibilities in *Fell v. U.S.* Similarly, other than filing the necessary pleadings in *Fell v. U.S.*, minimal discovery has been conducted given my responsibilities in *U.S. v. Stone*, and my capital review work.

The termination of my flexi-place agreement is a clear act of retaliation for my consistent complaints regarding my current case assignments and my having filed an EEO complaint, alleging discrimination on the basis of gender, national origin and parental status. Indeed, the request that I relocate to Washington, the focus on the few, remote late filings in *U.S. v. Stone*, and also the new demand that I submit my pleadings for review henceforth 72 hours in advance, are all recent and closely follow my lodging formal complaints.[6]

[6] I had never before been required to submit draft pleadings for review, in *U.S. v. Stone* or in any other case. The only exception was the response to the 2255 Petition in *Fell v. U.S.* I have filed numerous pleadings since then in *U.S. v. Stone*, *U.S. v. Pleau* and *Fell v. U.S.*, many of which have been referenced in my weekly reports and no request for those pleadings was made.

Exhibit ___ Page ___

38

**EXHIBIT A 014**

The case assignments of CCS are unsustainable long-term. Upon information and belief, each and every one of the trial attorneys currently working for CCS will testify that their case assignments currently do not permit them to adequately represent the Government in all cases. The allegation that over the last two weeks missed deadlines in *U.S. v. Stone* have come to the attention of Mr. Carwile and thus he understands I am in need of closer supervision is but a pretext to end my flexi-place agreement and constructively terminate my employment. I am informed and believe that I am hardly unique in terms of struggles with conflicting deadlines and overwhelming case assignments as well as capital review work.

The fact that I am being permitted to continue working from the District of Connecticut until the end of March 2014 is evidence of two important factors. First, it is not correct that the quality of my work has declined so that I need closer supervision. If I were in fact in need of closer supervision, I would not have been permitted to continue preparing the case of *Fell v. U.S.* for an important evidentiary hearing in March 2014, from the District of Connecticut. Preparation for this hearing required me to conduct several depositions, including the depositions of trial defense counsel and their jury consultant. Certainly if a trial attorney is in need of closer supervision, preparation for actual in court litigation would be a crucial time for such supervision to take place. Instead, on February 26, 2014, I traveled to the District of Vermont to handle a pre-hearing conference with the Court. I was successful in persuading the Court that it needs to rule on the Petitioner's motion to amend the original 2255 petition and permit the Government to respond prior to proceeding to an evidentiary hearing. My co-counsel from the District of Vermont, Senior Litigation Counsel Bill Darrow, was out of the office; therefore, Mr. Coffin, U.S. Attorney for the District of Vermont, attended the hearing with me. Upon information and belief, both Mr. Darrow and Mr. Coffin have repeatedly praised my work in *Fell v. U.S.* I also traveled to Vermont in March 2011 to prepare witnesses and represent the Government in an evidentiary hearing.

Second, assuming arguendo that I am in need of closer supervision because of the late filing of a number of pleadings in *U.S. v. Stone* several months ago, which I dispute, such supervision can be achieved while I remain working from the District of Connecticut under my flexi-place agreement. If management was concerned about the late filings made in *U.S. v. Stone*, there are less drastic measures that could have been taken to address such concerns. I can alert them of the future due dates for all pleadings in that case. In fact, this was done as part of the case analysis they requested in October 2013. Given that the court's expressed concern was more with the untimeliness of the Government's filings, than with their quality, these measures would suffice to address the alleged deficiency in my work.

Exhibit ____ Page ____

**EXHIBIT A 015**

The above assumes for purposes of argument that there is a deficiency in my performance. In truth and in fact, my performance has not declined in any way. The e-mail from Mr. Carwile attached hereto as Exhibit L, congratulating me for the Assistant Attorney General's Award is quite telling in this regard. "Keep up the good work--the award is well deserved. The Criminal Division really needs you to lead by example as our capital litigation mission expands." Mr. Carwile wished for me to help lead the Capital Case Unit into a full litigation section under his direction. I voiced objections from the beginning as I was not available to travel on a full time basis. I requested that my inability to travel be accommodated as it had been for at least one other white male trial attorney. Mr. Carwile refused. Therefore, I complained of discrimination. I have also repeatedly voiced serious objections to his case assignments as I believe that they do not adequately permit me, or my co-workers to adequately and ethically represent the Government in all matters. As a result I was threatened with termination of my flexi-place agreement and reprimanded. I then filed a complaint of discrimination and a grievance against my reprimand. As a result my flexi-place agreement was terminated.

Termination of my flexi-place agreement was tantamount to a termination of employment as of March 31, 2014. Such a firing was unjustified given my level of performance and constituted an act of retaliation for my having filed a complaint of discrimination and a grievance regarding an unjust reprimand issued because of my inability to try a case in the EDCA. Therefore, I supplemented my EEO complaint to add retaliation for the termination of my flexi-place agreement. I also filed a second grievance challenging the termination of my flexi-place agreement.[7] *See* e-mail dated March 10, 2014, attached hereto as Exhibit R.

The evidentiary hearing in *Fell v. U.S* was not concluded on March 20, 2014, as expected, because of the petitioner's obstruction of a deposition taken by the Government. I sought and obtained an order from the court to compel the continuation of the deposition prior to concluding the Government's evidence at the hearing. The hearing was continued. I requested authorization to remain in Connecticut for an additional 30 days to complete the deposition, which would be taken in New York; travel to an already scheduled training at the National Advocacy Center in South Carolina; and complete the evidentiary hearing, which was expected to be scheduled in April 2014 in Burlington, Vermont. Authorization was denied. *See* e-mail from Kevin Carwile attached hereto as Exhibit S.

Although I had been approved and authorized to attend a training at the NAC, credit for which I needed to comply with my Bar's CLE requirement, I was told I would not be permitted to travel from Connecticut, though that is still my state of residence and travel would have taken place on a Monday. Despite my specific request to be permitted to attend this training, my

---

[7] My first grievance was denied on March 14, 2014. My second grievance was never acknowledged, nor has it been addressed.

Exhibit ___ Page ___ 

EXHIBIT A 016

Statement in Support of EEOC Formal Complaint by Trial Attorney Jacabed Rodriguez-Coss
Page 16

attendance was cancelled the Friday before I was scheduled to travel because I was placed on AWOL status for failing to report to Washington D.C.[8]

The increasingly stressful and hostile work environment created by the cancellation of my flexi-place agreement and the continued demand that I report to work in Washington D.C. on a daily basis significantly affected my physical and mental health. I suffered an anxiety attack on March 25, 2014, for which I had to seek emergency medical care. I have since been under the care of my generalist and cardiologist, both of whom have prescribed medication to help me deal with my health condition. I was also referred to a mental health provider and have been under the care of a psychiatrist since April 21, 2014. I am also under the care of an ophthalmologist for a medical condition aggravated by stress.

In light of my medical condition I requested authorization to continue to work from Connecticut, where I could be closely monitored by my health care providers, and I provided medical documentation to my management in support of my request. My request was denied and I was placed on AWOL status for failing to report for work in Washington D.C. *See* e-mail from Charlie Kinsey dated April 1, 2014, attached hereto as Exhibit T.

All of my medical providers have highly recommended that I remain out of work until my health improves. Despite having provided my management with a letter from both my generalist and cardiologist to this effect, my sick leave request for the week of April 14-18, 2014, was denied for lack of supporting medical documentation, and I was again placed on AWOL status. The request for additional medical documentation was sent to me on Friday, April 18, 2014, at 1:56 p.m., though my request for sick leave had been made on Sunday, April 13, 2014; and I had addressed the matter on Wednesday, April 16, 2014. This resulted in my receiving only one week's pay on April 25, 2014, which caused me severe financial hardship. Management's actions in this regard were punitive and retaliatory in nature. I subsequently obtained additional medical documentation and my request for sick leave was approved retroactively.

It is clear from the above chronology that I have been discriminated against on the basis of my gender, national origin and parental status. At least one white male CCS trial attorney was never required to travel, though I have been required to handle litigations in California, Rhode Island and Vermont. When I complained of discrimination and my inability to ethically and adequately represent the Government in all cases assigned, my flexi-place agreement was

---

[8] I actually was on sick leave on March 31, 2014; I requested annual leave on April 1, 2014, which request was denied despite my following the normal procedure for requesting leave, and after I had already taken the leave - I was placed on AWOL status for that day; I reported to work in Connecticut on April 2 and April 3, 2014; and I requested sick leave on April 4, 2014. At approximately 11:40 a.m. on April 3, 2014, I was instructed to stop working and go home. I was placed on AWOL status for the entire day on April 3, 2014.

Exhibit ___ Page 17

EXHIBIT A 017

reduced from six to two months. When I complained about the reduction of my flexi-place agreement, I was reprimanded. After I filed a grievance and an EEO complaint for being reprimanded, my flexi-place agreement was terminated and I was ordered to report to Washington D.C. on a daily basis. Management's pattern of retaliation continued by cancelling previously approved training and denying properly made requests for annual and sick leave, thus causing me significant financial hardship and emotional stress.

The actions of management have been completely unjustified. Therefore, I request that the reprimand issued to me on January 7, 2014, be withdrawn; the case of *U.S. v. Stone* be reassigned for trial; my flexi-place agreement be renewed; written assurances be provided that I will not be assigned to more than one litigation matter at a time, and further that I will not be assigned litigation cases outside my geographical area; compensation for all attorney fees incurred as a result of the unjust and discriminatory actions taken against me; and any further compensation that may be justified.

Exhibit 1 Page 17

42

EXHIBIT A 018

Exhibit A – Resume

Exhibit B – January 3, 2014 e-mail from Kevin Carwile

Exhibit C – February 24, 2014 e-mail from Kevin Carwile

Exhibit D – E-mail from David Fein

Exhibit E – E-mail from Lanny Breuer

Exhibit F – Letter from Gregg Fouratt

Exhibit G – Performance Evaluation 2010-2011

Exhibit H – Performance Evaluation 2011-2012

Exhibit I – Performance Evaluation 2012-2013

Exhibit J – E-mail from Adi Goldstein

Exhibit K – E-mail from Maria Dominguez

Exhibit L – E-mail from Kevin Carwile re AAG Award

Exhibit M – E-mail from Scott Schools

Exhibit N – E-mail from Matt Cohen

Exhibit O – Flexi-place Agreement

Exhibit P – E-mail from Elana Landau

Exhibit Q – E-mail from Charlie Kinsey re Fuller Case

Exhibit R – E-mail re second grievance

Exhibit S – E-mail from Kevin Carwile denying request to remain in CT

Exhibit T – E-mail dated April 1, 2014 from Charlie Kinsey

Exhibit ___ Page ___

43

**EXHIBIT A 019**

# Jacabed Rodríguez-Coss

64 Mustang Drive
Monroe, CT 06468

(Cell)
203-696-3027 (Off.)
jacabed.rodriguez-coss@usdoj.gov

## Professional Highlights

I am a career prosecutor with the United States Department of Justice who has served as an Assistant U.S. Attorney in the Districts of Puerto Rico and Maryland, and as a Trial Attorney for the Capital Case Section, Criminal Division, for the past 19 years.

Upon graduation from law school, I served as law clerk to the Hon. Juan R. Torruella of the United States Court of Appeals for the First Circuit. Since then I have authored more than a dozen appellate briefs and appeared for oral argument before the First Circuit Court of Appeals on nine occasions.

During my tenure with the United States Attorney's Office and the Criminal Division I have represented the United States in 27 jury trials, including a number of complex and high profile trials. I have advanced strategies and participated in high-impact initiatives aimed at eradicating violent, drug trafficking and white collar crime. As the prosecutor responsible for overseeing investigation, pretrial and trial strategies, I have developed productive relationships with law enforcement agents that promoted the United States Department of Justice's policies and goals for reducing criminal activity. My leadership, coupled with the outstanding work of law enforcement agents, has led to multiple indictments, hundreds of arrests and over 200 successful prosecutions.

**EDUCATION**    **HARVARD LAW SCHOOL,** Cambridge, Massachusetts.
J.D., June 1991.

**YALE UNIVERSITY,** New Haven, Connecticut.
B.A., May 1988, *cum laude.*

**EXPERIENCE**    **CAPITAL CASE SECTION**
Criminal Division, United States Department of Justice
Trial Attorney
August 2008 to the present.

Responsible for analyzing factual and legal issues pertaining to potential capital cases as required by statute and Department of Justice policy; preparing memoranda for the Attorney General's Committee for the Review of Capital Cases; providing pretrial and trial guidance and litigation support to federal prosecutors on capital prosecutions and actively litigating capital cases. Professional experience includes one completed jury trial. Assisted in the jury selection of two additional capital trials. *See* attached list of significant cases and awards.

Exhibit \_\_\_ Page \_\_\_

44

EXHIBIT A 020

Jacabed Rodriguez-Coss
Page 2

**UNITED STATES ATTORNEY'S OFFICE**, District of Puerto Rico
Assistant United States Attorney
Major Crimes Unit, October 2006 to June 2008
White Collar Unit, October 2004 to September 2006
Criminal Division, January 1995 to December 2000

Managed complex white collar, violent crime, narcotic, money laundering and immigration cases and investigations. White collar cases included bank fraud and health care fraud. Violent crime cases included bank robbery and carjacking/murders, Hobbs Act robberies and capital prosecutions. Narcotic cases included the investigation and prosecution of violent street gangs involved in the distribution of narcotics as well as the investigation and prosecution of large scale drug trafficking organizations that import narcotics (including OCDEFT and Title III investigations). Immigration cases included human smuggling, harboring and illegal reentry cases. Professional experience includes 19 completed jury trials, including a capital trial, as well as numerous plea, sentencing and evidentiary hearings. In addition, I conducted extensive grand jury work; researched and drafted appellate briefs; and presented oral arguments before the First Circuit Court of Appeals. Further, I served as the Professional Responsibility Officer for the Criminal Division and as mentor for new AUSAs. *See* attached list of significant cases and awards.

**UNITED STATES ATTORNEY'S OFFICE**, District of Maryland
Assistant United States Attorney
Southern Division, Greenbelt, January 2001 to December 2001
Northern Division, Baltimore, January 2002 to October 2003

Managed multi-defendant narcotic, violent crime, money laundering and fraud prosecutions and investigations. White collar cases included mail fraud. Violent crime cases included carjacking, bank robbery and firearm violations and prosecutions. Narcotic cases included the investigation and prosecution of individuals involved in the distribution of narcotics and the investigation and prosecution of large scale drug trafficking organizations that import narcotics (including Title III investigations). Professional experience includes seven (7) jury trials, as well as plea, sentencing and evidentiary hearings. In addition, I authored several appellate briefs and conducted extensive grand jury work. *See* attached list of significant cases and awards.



Exhibit ___ Page 22

45

**EXHIBIT A 021**

Jacabed Rodriguez-Coss
Page 3

**O'NEILL & BORGES**, Hato Rey, P.R.
Litigation Associate
October 1992 to December 1994.

Assisted partners with civil litigation matters. Represented clients at pretrial conferences, conducted hearings, discovery, legal research, and prepared legal documents, including complaints, answers, pre-trial orders and appellate briefs. Also handled some bankruptcy matters.

**UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT**
Judicial Clerk for the Honorable Juan R. Torruella
September 1991 to September 1992.

Reviewed appellate briefs and trial records, researched and wrote legal memoranda, drafted court opinions and assisted judge during oral arguments.

**BAR ADMISSION** **PUERTO RICO**, 1992. Active.

**CT. ADMISSIONS** Federal District Court, District of Puerto Rico, 1992.
United States Court of Appeals for the First Circuit, 1993.
Federal District Court, District of Maryland, 2001.
United States Court of Appeals for the Fourth Circuit, 2002
Federal District Court, District of Connecticut, 2010
Federal District Court, District of Vermont, 2011
Federal District Court, Eastern District of CA, 2012

**LANGUAGES** Fuent in English and Spanish, including legal terminology.



Exhibit 1 Page

**EXHIBIT A 022**

From: "Carwile,Kevin"<Kevin.Carwile@crm.usdoj.gov>

To: "Rodriguez-Coss,Jacabed"<Jacabed.Rodriguez-Coss@crm.usdoj.gov>

Date: 1/3/2014 11:51:08 AM

Subject: flexiplaceagreement

Jackie,

Unless your document was lost during transmission, neither Charlie nor I have received the new Flexiplace agreement, signed by you, which would authorize you continuing to temporarily work for the Capital Case Section from Connecticut. You were asked to sign the new document and return it to us before the expiration of the prior agreement (December 31st). As a result, you are currently no longer covered by such an agreement and, therefore, your workstation is 1331 F Street, N.W., Washington, D.C. Please sign the agreement and return it to my attention (via fax or as a scanned document attached to an email) **no later than noon on Monday, January 6, 2014**. If the signed agreement has not been returned by this date and time, I expect you will report to work at 9:00 a.m. on Tuesday, January 7, 2014 at the Capital Case Section, 1331 F Street, N.W. Washington, D.C.

P. Kevin Carwile
Chief, Capital Case Section
U.S. Department of Justice

Exhibit ___ Page ___

EXHIBIT B


**EXHIBIT A 023**

From: "Carwile,Kevin"<Kevin.Carwile@crm.usdoj.gov>

To: "Rodriguez-Coss,Jacabed"<Jacabed.Rodriguez-Coss@crm.usdoj.gov>

Date: 2/24/2014 12:19:49 PM

Subject: Flexiplace Work Agreement

Jackie,

I am writing to inform you that I have reviewed the flexiplace work agreement you currently have in effect with the Capital Case Section in order to determine whether to execute a new flexiplace work agreement which would cover your work arrangement in the coming months. The current agreement expires on February 28, 2014. As you know, use of the flexiplace agreement is within management's discretion and is not an entitlement. Due to revelations over the last 2 weeks that were brought to my attention which relate to missed deadlines and other deficiencies in court filings, I have determined that more direct supervision of your work is needed. As a result, I do not intend to renew your flexiplace agreement up on its expiration.

I am aware that you have a hearing scheduled in the U.S. v. Fell case on March 18 which is expected to last several days. By way of this email I am granting you authorization to continue to work from the United States Attorney's Office in the District of Connecticut in order to prepare for and handle the Fell hearing as long as it is completed in March. Thereafter, your duty station will resume being 1331 F Street, N.W., 3rd Floor, Washington, D.C. 20530. For simplicity's sake, and to allow you adequate flexibility to deal with any post hearing matters, you should plan to report to work at 1331 F Street on Monday, March 31, 2014.

I have also decided to add staffing in the two litigation matters you are currently handling. Specifically, I am adding Rich Burns to the trial team in the U.S. v. Stone case and Jeff Kahan to the U.S. v. Fell case. Please contact these CCS attorneys today in order to coordinate the process of bringing them up to speed on all facets of these ongoing matters. Thank you.

P. Kevin Carwile
Chief, Capital Case Section
U.S. Department of Justice

Exhibit ___ Page ___

EXHIBIT C

**EXHIBIT A 024**

From:    Fein, David (USACT)
Sent:    Wednesday, June 15, 2011 2:05 PM
To:      Rodriguez-Coss, Jacabed (USACT); Reynolds, Alina (USACT); Markle, Peter
(USACT); Dayton, Tracy (USACT)
Cc:      Gustafson, Mike (USACT); Daly, Deirdre (USACT)
Subject:       FW: Aquart Jury


-----Original Message-----
From: Fein, David (USACT)
Sent: Wednesday, June 15, 2011 2:04 PM
To: Breuer, Lanny A. (CRM); Weinstein, Jason (CRM); Wilkinson, Monty (OAG)
(SMO); Grindler, Gary (OAG) (SMO); Cole, James (SMO)
Subject: RE: Aquart Jury

This was my first time working with CCU, and I'm glad to report that the
experience was superb. They detailed an experienced AUSA to Connecticut to
work with our team, and she was so helpful and skilled that we included her in

the guilt phase, as well as the sentencing phase (where she delivered a great
jury address, among many witness presentations). CCU was always there for us
providing timely and thoughtful advice, from complex pre-trial litigation
(including serial severance motions), through jury selection (which lasted 5
weeks and produced a fair, diverse and responsible jury), the guilt phase
(also 5 weeks) and the sentencing phase, including as recently as yesterday,
which is a perfect example of how helpful they are. At 3pm, our AUSA sought
advice on what to suggest as to how the Court should answer a critical jury
note, and by 3:07pm, Kevin Carwile personally responded with a great
suggestion, which we adopted in full. Please be assured I will recommend that

my fellow USAs voluntarily and enthusiastically partner with CCU in any
capital cases in their districts.

-----Original Message-----
From: Breuer, Lanny A. (CRM)
Sent: Wednesday, June 15, 2011 1:06 PM
To: Fein, David (USACT); Weinstein, Jason (CRM); Wilkinson, Monty (OAG) (JMD);

Grindler, Gary (OAG) (JMD); Cole Jr., James (LEO)
Subject: RE: Aquart Jury

This is really something. Once again, great team effort, David.

-----Original Message-----
From: Fein, David (USACT) [mailto:David.Fein@usdoj.gov]
Sent: Wednesday, June 15, 2011 11:06 AM
To: Breuer, Lanny A.; Weinstein, Jason; Wilkinson, Monty (OAG) (JMD);
Grindler, Gary (OAG) (JMD); Cole Jr., James (LEO)
Subject: Aquart Jury

Found death on 4 of 6 counts (2 of 3 defendants, the ones this defendant
personally killed). First such finding in our district at least since
reinstitution of the death penalty in 1988.



Exhibit __ Page __

49

From: "Breuer,Lanny A."<Lanny.Breuer@crm.usdoj.gov>

To: "Rodriguez-Coss,Jacabed"<Jacabed.Rodriguez-Coss@crm.usdoj.gov>

Date: 1/27/20104:09:22PM

Subject: RE:ThankYou

Jackie, it was a pleasure meeting you yesterday and the whole team. Thanks for all your efforts. Lanny

**From:**Rodriguez-Coss,Jacabed
**Sent:**Friday,January15,201010:12AM
**To:**Breuer,LannyA.
**Cc:**Raman,Mythili
**Subject:**RE:ThankYou

Mr.Breuer,

Thank you so much for your kind words and encouragement. I enjoyed working with Greg and his team. It was a particularly rewarding experience for me to provide Greg with the same type of support that CCU provided me in the past when I walked into court to try my first capital case. Thank you for taking the time to recognize CCU's efforts. Looking forward to meeting you personally on the 26th.

Jackie

**From:**Breuer,LannyA.
**Sent:**Thursday,January14,20108:49PM
**To:**Rodriguez-Coss,Jacabed
**Cc:**Raman,Mythili
**Subject:**ThankYou

Jackie, I want you to know how proud I am to be associated with you and your excellent work. Greg clearly feels so thankful for your terrific work with his office. You bring great pride to CRM and obviously have been a tireless worker. Thank you for all you do for DOJ and CRM. Please know that I am very appreciative. Best, Lanny

Exhibit __1__ Page __27__

EXHIBIT E

**EXHIBIT A 026**



## U.S. Department of Justice

*United States Attorney*
*District of New Mexico*

| | |
|---|---|
| *Post Office Box 607* | *505/346-7274* |
| *Albuquerque, NM 87103* | *505/346-7224* |
| | *FAX 505/346-7296* |

December 29, 2009

The Honorable Lanny A. Breuer
Assistant Attorney General
Criminal Division
Department of Justice
Main Justice Building
950 Penn Ave.
Washington, DC 20530

Dear Mr. Breuer:

I write to commend Trial Attorney Jacabed Rodriguez-Coss of the Capital Case Unit for her assistance to my office in *United States v. Donald Scott Taylor*, CR 07-1244 WJ (D.N.M.). Mr. Taylor snuck up on a 71-year-old rancher and executed him with a high-powered hunting rifle in exchange for anhydrous ammonia with which Mr. Taylor intended to manufacture methamphetamine and thereby become a "patched" member of the Aryan Brotherhood. As I explain in more detail below, Ms. Rodriguez-Coss' contributions to the government's litigation of this capital case were instrumental in convicting Mr. Taylor and ensuring that he spends the rest of his life in the Bureau of Prisons.

This case was indicted in 2007 and followed the familiar path of most capital racketeering cases: appointment of defense counsel, a spirited debate over whether the government's exhaustive disclosures had been exhaustive enough, and navigation of the whirls and eddies of the Attorney General's death penalty protocol. In all capital cases, the filing of the notice of intent to seek the death penalty touches off a motion practice that is unmatched in criminal litigation in terms of its intensity, duration, and stakes. In those respects, this case was no different.

But what distinguished this case from other capital cases is what happened to the government's trial team just as the motion practice was heating up. The government's lead counsel was appointed a federal magistrate judge and his co-counsel was busy preparing for two other Aryan Brotherhood murder trials, the dates of which conflicted squarely and intractably with the trial in *Taylor*. Finding suitable replacements was a difficult task, particularly considering the Department's "opt-out" provision for matters of conscience and the monumental undertaking that prosecuting a capital case otherwise represents. As things turned out, the government's replacement trial team consisted of the United States Attorney himself and two AUSAs with significant litigation experience but who had been AUSAs less than one year each.

Exhibit __1__ Page __218__.

51

EXHIBIT F
**EXHIBIT A 027**

Sensing vulnerability, the defense team pounced. They filed more than 800 pages of affirmative motions and replies challenging, *inter alia*, the constitutionality of the Federal Death Penalty Act (in nearly a dozen respects). Resisting the urge to panic, I reached out to your Capital Case Unit to determine whether they could be of assistance to us. I had prosecuted capital cases before and recalled fondly the help that the Capital Case Unit had provided to me and my team in the earlier cases. What ensued, however, exceeded my every expectation.

Ms. Rodriguez-Coss politely asked that I e-mail her all of the defense's death penalty-related motions. Then she proceeded to draft the government's response to *all of them*. She sent us nearly 200 pages of briefing requiring nothing more than a few minutes of editing before we filed them. Not only did she rescue her colleagues out in the hinterlands of the western United States from a deluge of research and writing, she also educated a federal district judge about the current state of death penalty jurisprudence. Her briefs were so convincing that the judge's opinions – some of which are soon to be memorialized in Federal Supplement 2nd – borrowed from them heavily. And we prevailed on every motion.

Having Ms. Rodriguez-Coss to turn to on the death penalty motions freed up the trial team to focus on the rest of the motion practice, jury selection, and trial preparation. Though she remained in the 202 area code at all relevant times, she was as important a member of the government's team as any of us in the courtroom itself. It is enough to say that, but for the contributions that Ms. Rodriguez-Coss made to our side of this case, the probability that Mr. Taylor would have signed up to spend the rest of his life in prison would have been seriously reduced. I would have her on my team any day. She is a gem. And it is important to me that you know that.

I wish you the best during the holiday season and in the year ahead.

Sincerely,

Gregory J. Fouratt
United States Attorney
District of New Mexico

Exhibit ___ Page ___

**EXHIBIT A 028**

**U.S. DEPARTMENT OF JUSTICE**

**Criminal Division**

**Performance Work Plan and Appraisal Record**
Form 430 (October 1, 2004)

*DISCLOSURE STATEMENT*: This information is personal. It must be appropriately safeguarded from improper disclosure.

## PART A. EMPLOYEE DATA

| Name of Employee: Jacabed Rodriguez-Coss | SSN: |
|---|---|
| Position Title: Attorney | Pay Plan/Series/Grade: GS-905-15 |
| Section/Office: Capital Case Unit | |
| Rating Period (from/to):  July 1, 2010 through June 30, 2011 | |

**PART B. PERFORMANCE WORK PLAN** (Rating and reviewing official signatures document review and approval of the work plan. The employee signature documents that he/she has received a copy of the work plan.)

| Employee's Signature | Rating Official's Signature | Reviewing Official Signature |
|---|---|---|
| Date    9/7/10 | Date   9/8/10 | Date   9/9/10 |

This work plan describes performance expectations for Criminal Division Non-SES employees. Please refer to the Criminal Division Performance Appraisal Program for GS Employees dated October 1, 2004 for a complete description of the Division's program.

The employee's signature on this work plan cover sheet acknowledges receipt. Any concerns, questions, or suggestions about the work plan should be discussed with the supervisor.

The performance standards in this work plan describe performance at the "Successful" level. Failure to meet the standard in any bulleted item may be the basis for failure of the entire element. The employee is expected to perform as described on a consistent, routine or usual basis. Perfection is not expected and circumstances will be taken into account in assessing performance.

**Rating Levels**

<u>Outstanding</u>: The employee's work *significantly exceeds on a regular basis* the performance standards of this work plan (appropriate for the employee's grade level).

<u>Successful</u>: The employee's work *consistently meets and on occasion exceeds* the performance standards of this work plan (appropriate for the employee's grade level).

<u>Unacceptable</u>: The quantity, quality, and/or timeliness of the employee's work, and/or manner in which the employee performs that work *fails to meet* the standards.

**NOTE**: If the employee's performance is "Unacceptable" in one or more elements at any time during the appraisal cycle, the supervisor should contact the Human Resources Management Unit.

**PART C. PROGRESS REVIEW** (Signatures document a discussion of employee performance.)

| Employee's Signature | Rating Official's Signature | Date   3/4/11 |
|---|---|---|

Exhibit ___  Page 7

## PART D. INDIVIDUAL RATING ELEMENTS

**Performance Element 1: Accountability for Organizational Results**

**Performance Standards: Successful Level**

- Written and oral presentations are timely, concise, clearly communicate the intended message, and are factually accurate, logically ordered, and substantially free of grammar and syntax errors.
- The extent and depth of treatment and style and tone are appropriate to the scope of the assignment and to the intended audience.
- Arguments/conclusions are fully supported and all significant issues (e.g., policy, constitutional, statutory, regulatory, treaty, procedural, and case law), are analyzed and effectively addressed.
- Written products are in compliance with Court, Department, Division and office policy/procedures. Substantive revisions needed are usually minor and result primarily from policy issues not communicated to the writer.
- Anticipates likely questions and maintains composure, and demonstrates resourcefulness when faced with unexpected and difficult situations.
- Independently handles the volume and complexity of assignments consistent with the employee's grade level.
- Uses sound judgment in determining which issues should be brought to the supervisor's attention and when.
- Manages Litigation/Investigations/Programs efficiently and effectively (e.g., witness use and preparation; rules of procedure and evidence, and court deadlines).

Exhibit 1  Page 31

54

EXHIBIT A 030

Links
I. Department of Justice Strategic Plan (FYs 2007-2012):
   DOJ Strategic Goal 1:    Prevent Terrorism and Promote the Nation's Security.
      Objectives:   1.3 Prosecute those who have committed, or intend to commit, terrorist acts in the United States.

   DOJ Strategic Goal 2: Prevent Crime, Enforce Federal Laws, and Represent the Rights and Interests of the American People
      Objectives:   2.1 Strengthen partnerships for safer communities and enhance the Nation's capacity to prevent, solve and
                       control crimes.
                    2.2 Reduce the threat, incidence, and prevalence of violent crime.
                    2.3 Prevent, suppress and intervene in crimes against children.
                    2.4 Reduce the threat, trafficking, use, and related violence of illegal drugs.
                    2.6 Uphold the civil and constitutional rights of all Americans.
                    2.7 Vigorously enforce and represent the United States in all matters for which the Department has
                       jurisdiction.

II. Attorney General Management Goals (11/8/01)
                 Goal 1: Develop Performance-Based, Mission-Focused Leadership.
                 Goal 2: Streamline, Eliminate or Consolidate Duplicative Functions.
                 Goal 3: Focus Resources on Front-Line Positions.
                 Goal 7: Coordinate Internal and External Communications and Outreach.
                 Goal 8: Improve Department-wide financial performance.
                 Goal 10: Utilize Technology to Improve Government.

III. President's Management Agenda (2002)
                 Chapter 1: Strategic Management of Human Capital.
                 Chapter 2: Competitive Sourcing.
                 Chapter 3: Improved Financial Performance.
                 Chapter 4: Expanded Electronic Government.
                 Chapter 5: Budget and Performance Integration.

IV. Assistant Attorney General Goals: Provide leadership to develop and implement strategic plans and priorities set by the
                 Assistant Attorney General.

VI. CCU Mission
                 Ensure that federal prosecutors who are prosecuting capital cases have enhanced access to the expertise and resources needed
                 to do so effectively.

                 Facilitate the review of all capital cases by the Attorney General's Review Committee on Capital Cases and the Attorney
                 General's decision whether to seek the death penalty in each instance as required by U.S.A.M. 9-10.000 et seq.

| No. | Goals |
|-----|-------|
| 1.  | Facilitates the Department's review and decision-making process for potential death penalty cases, U.S.A.M. § 9-10.000 et seq. Facilitates the review process in particular cases both substantively, through timely and thorough analysis of relevant facts and issues, and procedurally, by monitoring the review process to see that deadlines are met. |
|     | Measure: Written and oral presentations are thorough and persuasive. Target for successful: 90% - 95%. |
|     | Measure: Consults/forwards timely and accurate documents to all appropriate personnel. Target for successful: 90% - 95%. |

Exhibit 1 Page 33

55

EXHIBIT A 031

| 2. | Provides constitutional, substantive, procedural, and technical training, guidance, assistance, and resources to United States Attorneys' Offices (USAOs) in capital case investigations and prosecutions, including the cases where the employee supports the review process under goal 1, above. Provides notice of developing strategic trends and arguments through group or individual emails in a timely, accurate, well-reasoned, and articulately-stated manner. |
|---|---|
| | Measure: Percentage of instances in which employee is cooperative and proactive in providing accurate and effective advice, training, or assistance. Promptly alerts supervisors if components are not complying. Measure for successful: 90% - 95%. Measure: Feedback from customers and stakeholders is positive. Target for Successful: 90% - 95%. Measure: Makes substantial contributions to outreach activities. Target for Successful: Proactive efforts increase by 10% from the previous year. |
| 3. | Assists in developing policy and procedures for federal capital prosecutions. |
| | Measure: Percentage of instances in which employee provided timely, accurate, and cogent assistance in developing policy and procedures for federal capital prosecutions. Target for Successful: 90% to 95%. |
| 4. | Coordinates pre-execution litigation. |
| | Measure: Percentage of instances in which employee provided timely, accurate, and responsive assistance and advice in coordinating pre-execution litigation when needed, anticipating contingencies and challenges likely to be presented in the course of the litigation. Target for Successful: 90% to 95%. |
| 5. | As assigned by CCU's Chief, directly represents the government in capital cases at trial, on direct appeal, and on collateral review |
| | Measure: Percentage of instances in which employee effectively meets goals and timetables of Unit Supervisors in handling prosecutions; no failure to meet timetables results in irreparable harm to the substantive position of the government. Target for Successful: 90% - 95%. Measure: Percentage of instances in which the employee's written and oral presentations were timely, concise, clearly communicated the intended message, and were factually accurate, logically ordered, and substantially free of grammar and syntax errors. Target for Successful: 90% - 95%. Measure: Percentage of instances in which employee anticipates questions, maintains composure and demonstrates resourcefulness when faced with unexpected and difficult situations. Target for Successful: 90% - 95%. |
| 6. | Maintains an up-to-date electronic pleading bank and electronic resource library. |
| | Measure: Percentage of instances in which employee contributed to maintaining the electronic pleading bank and electronic resource library with materials that are practical, useful, and well-reasoned and researched. Target for Successful: 90% to 95%. |
| 7. | Prepares timely, accurate, well-reasoned, and articulately-stated information for the CCU Chief to relay to OAAG, ODAG, and OAG regarding developments affecting capital prosecutions generally. |
| | Measure: Percentage of instances in which employee effectively provided timely and accurate information as described. Target for Successful: 90% to 95%. |

**Employee's Accomplishments**

see attached comments

**Rating:**

☑ Outstanding  ☐ Successful  ☐ Unacceptable

Exhibit 1 Page 3

EXHIBIT A 032

**Rating Official's Comments:**

See attached comments

Exhibit ___ Page 39

**EXHIBIT A 033**

Rating official's comments
Jacabed Rodriguez-Coss, Trial Attorney, Capital Case Unit
Rating period: 07/01/10 to 06/30/11

**Element 1**: ("Accountability for Organizational Results")

My overall appraisal of Jackie Rodriguez's performance under this element is "outstanding."

Jackie's work during the rating period significantly exceeded the standards and goals of this Element. Jackie made major contributions in both of the two principal components of the CCU's workload: (1) directly participating in litigation of death penalty prosecutions; and (2) conducting the analysis and assessment that inform the review of capital cases by the Attorney General's Review Committee on Capital Cases and the decision of the Attorney General whether to seek the death penalty. Jackie also made significant contributions to the following additional goals listed under this Element: providing guidance, assistance, and resources to USAOs litigating particular death penalty prosecutions; disseminating timely and accurate information to USAOs in anticipation of shifting strategies and tactics employed by defense counsel nationwide; and assisting in creating and maintaining an online electronic resource library.

By way of overall assessment, Jackie is an experienced trial litigator and she grasps quickly the factual and tactical issues at play in potential death penalty cases. Jackie's factual, legal, and strategic analysis is thoughtful and well-reasoned. She readily undertakes new tasks, working independently and seeking input from others as appropriate.

During the rating period, Jackie served as co-counsel in the successful prosecution of a high-profile capital case, *U.S. v. Azibo Aquart* (D. Conn.), which concluded with imposition of a death sentence in June of this year. Jackie has also performed well in providing supporting advice and expertise for pending capital prosecutions where she is not formally a member of the prosecution team. She has provided valuable research, samples, and other guidance to AUSAs and fellow CCU attorneys in a number of cases where the death penalty is being sought. Her guidance and assistance have been well received in all of the cases where her input was sought or volunteered.

In addition to the foregoing responsibilities Jackie carries as one of CCU's trial litigators, Jackie also shepherded numerous cases through the Department's internal death penalty review process, several of which involved very high-visibility prosecutions with significant death penalty issues.

In a prior rating period at CCU Jackie was advised to review her written work to ensure that it was free of grammatical and typographical errors. She showed marked improvement on this score during this rating period. She should continue these efforts with the goal of creating written product on which no errors will be found by those reviewing her work.

Finally, with regard to the related goals of maintaining an electronic resource library, and

Exhibit 1 Page 35

58

**EXHIBIT A 034**

Rating official's comments
Jacabed Rodriguez-Coss, Trial Attorney, Capital Case Unit
Rating period: 07/01/10 to 06/30/11

providing timely and accurate information to USAOs in anticipation of shifting strategies and
tactics employed by defense counsel nationwide, Jackie stays abreast of defense litigation trends
and helps to ensure that the CCU's resource materials are up to date, as indicated above. In
particular, Jackie provided initial assistance and coordination for CCU's soon-to-be launched
Listserve.

Exhibit 1   Page 36

59

**EXHIBIT A 035**

**Performance Element 2: Accountability for People/Workforce**

**Performance Standards: Successful Level**

- Interacts with superiors, co-workers, and support staff in a courteous and constructive manner. Extends the same positive attitude to other Department and Government employees.
- Demonstrates commitment to the collaborative process and assesses, plans, and completes work dependably and effectively.
- Maintains professional skills by keeping current with pertinent legal and professional developments and participating in appropriate continuing legal education.
- Demonstrates knowledge of the professional rules of conduct requirements in the employee's State of licensing and any other professional rules of conduct to which employee may be subject.
- Ensures personal and professional integrity by complying with Standards of Conduct, ethics requirements, and the Merit System Principles.
- Interactions foster a work environment free from unlawful discrimination and harassment.

**Links:**

I. <u>Department of Justice Strategic Plan</u> (FYs 2007-2012):

    DOJ Strategic Goal 1: Prevent Terrorism and Promote the Nation's Security.

        Objectives: 1.3 Prosecute those who have committed, or intend to commit, terrorist acts in the United States.

    DOJ Strategic Goal 2: Prevent Crime, Enforce Federal Laws, and Represent the Rights and Interests of the American People.

        Objectives: 2.1 Strengthen partnerships for safer communities and enhance the Nation's capacity to prevent, solve and control crime.

                    2.2 Reduce the threat, incidence, and prevalence of violent crime.

                    2.3 Prevent, suppress and intervene in crimes against children.

                    2.4 Reduce the threat, trafficking, use, and related violence of illegal drugs.

                    2.6 Uphold the civil and constitutional rights of all Americans.

                    2.7 Vigorously enforce and represent the United States in all matters for which the Department has jurisdiction.

II. <u>Assistant Attorney General Goals</u>: Provide leadership to develop and implement strategic plans and priorities set by the Assistant Attorney General.

III. <u>DOJ Human Capital Strategic Plan</u> (September 2002):

        Goal 1: Design an effective organization and workforce that aligns with the overall DOJ mission and Strategic Plan.

        Goal 2: Reduce skill gaps through recruitment, training, and succession planning.

        Goal 3: Develop an organization culture that clearly identifies and communicates performance expectations to employees, reports and assesses results, and provides incentives/penalties/remedial training.

VI. <u>CCU Mission</u>

    Ensure that federal prosecutors who are prosecuting capital cases have enhanced access to the expertise and resources needed to do so effectively.

    Facilitates the review of all capital cases by the Attorney General's Review Committee on Capital Cases and the Attorney General's decision whether to seek the death penalty in each instance as required by U.S.A.M. 9-10.000 et seq.

VII. <u>AG Guidelines on Victim-Witness Responsibilities</u>

| No. | Goals |
|-----|-------|
| 1. | Actively participates in discussion and implementation of effective ways to accomplish the Criminal Division's mission.<br><br>Measure: Provides constructive feedback to supervisors in a timely and courteous manner.<br><u>Target for Successful:</u> 95% |

Exhibit ___ Page 37

60

2. Supports the Capital Case Unit's efforts to improve workforce competencies by:
   - identifying operational and procedural issues that impede achievement and implementing changes within own sphere and making suggestions to supervisor for improvements with wider application;
   - being available for consultation at all reasonable times;
   - striving to improve skills/volunteering to learn new office functions;
   - participating in training recommended by supervisor;
   - participating in cross-training to enhance staff capabilities when employees with primary responsibilities are away from the office;
   - participating in Division-sponsored programs; and
   - considering Division priorities and workload in planning and scheduling.

   Measure: Percentage of instances in which employee was cooperative and proactive in providing support and available when needed.
   Target for Successful: 90% to 95%.

3. Supports EEO principles of fairness and equity and promotes diversity by:
   - fostering a collegial work environment; and
   - participating in mentoring new employees.

   Measure: Percentage of instances in which employee was cooperative and proactive in fostering an effective work environment.
   Target for Successful: 95% to 98%.

4. Supports the CCU's efforts to improve communication, teamwork, and partnerships between employees and collaborating organizations by
   - consulting with supervisors on major problems and issues, keeping supervisors informed on work status, and advising supervisors when available for new assignments; and
   - demonstrating an ability to effectively communicate, team, and partner with fellow employees and collaborating organizations (USAOs, DOJ components, other Federal agencies, etc.).

   Measure: Percentage of instances in which employee was proactive in providing support and communicating effectively.
   Target for Successful: 95% to 98%.

5. Supports the Capital Case Unit's efforts to implement effective conflict resolution mechanisms to resolve personnel and organizational issues by responding positively to constructive criticism.

   Measure: Percentage of instances in which employee made effective change at the first opportunity.
   Target for Successful: 95% to 98%.

6. Supports the CCU, Division, and Department requirements of personal and professional integrity by complying with Standards of Conduct, ethics requirements, and Merit System Principles.

   Measure: Percentage of instances in which the employee's actions were in accordance with requirements.
   Target for Successful: 95% to 98%.

7. Supports Victim-Witness laws and policies through the identification and notification of victims and witnesses, and coordinates with the victim-witness liaison(s) to effectuate the "Attorney General Guidelines for Victim and Witness Assistance" and the "Crime Victims' Rights Act."

   Measure: Percentage of instances in which the employee's actions were in accordance with requirements. Target for Successful: 95% - 98%.

**Employee's Accomplishments:**   See attached comments

**Rating:**

☐ Outstanding      ☑ Successful      ☐ Unacceptable

EXHIBIT A 037

**Rating Official's Comments:** See attached comments

Rating official's comments
Jacabed Rodriguez-Coss, Trial Attorney, Capital Case Unit
Rating period: 07/01/10 to 06/30/11

Element 2: ("Accountability for People/Workforce")

My overall appraisal of Jackie's performance under this element is "successful." Jackie's work during the rating period satisfied the standards and goals of this Element. Jackie made significant contributions in the following areas: she "actively participates in discussion and implementation of effective ways to accomplish the Criminal Division's mission" (Goal 1), "supports the CCU's efforts to improve workplace competencies" (Goal 2), "supports the CCU's principles of fairness and equity" (Goal 3), "supports the CCU's efforts to improve communication, teamwork, and partnerships between employees and collaborating organizations" (Goal 4), and "supports the CCU's efforts to implement effective conflict resolution" (Goal 5).

Jackie has worked collaboratively with other CCU attorneys and provided them with thoughtful advice and insight on their cases, without prior request by the Chief or Deputy Chief. Jackie engages fellow CCU attorneys in discussions about legal principles of their cases, trying to achieve agreement on how to best approach various situations that arise during the course of litigating a case. With AUSAs, Jackie makes herself available to review their work, write pleadings on their behalf, and discuss strategy. Jackie also served as co-coordinator for recruitment and supervision of CCU's law student interns.

In the courtroom and similar formal professional settings, Jackie is a zealous advocate, which in general is a point of significant strength for any attorney. Jackie can leverage this generally positive attribute by tempering it with the wisdom of realizing that her position, even though entirely meritorious, nevertheless may be rejected. Such situations occur frequently, more than daily in the context of a trial, and are best received magnanimously and, where appropriate, with humor.

Jackie has worked to support the CCU's principles of fairness, equity, and diversity by fostering a collegial work environment and mentoring interns.

Exhibit 1 Page 41

63

**Performance Element 3: Ensuring Accountability for Taxpayer Value**

**Performance Standards: Successful Level**

- Safeguards government material, financial and personnel resources from unauthorized use or disposition.
- Adheres to laws, regulations, and Department security requirements and policies regarding the use, handling, and protection of sensitive and classified information.
- Ensures the proper and appropriate use of telecommunications and other government issued equipment.
- Ensures that procurement and contracting actions are best-value and meet requirements.
- Timely and correctly prepares appropriate travel, leave requests, time sheets, and other administrative reports and tasks.
- Works with the supervisor to ensure that periodic assessments are conducted to assess proper adherence to all financial, budget, procurement, facilities, and real property policies and procedures and implements and completes identified corrective actions on a timely basis.
- Provides prompt and accurate information.

**Links:**

I. Department of Justice Strategic Plan (FYs 2007-2012):
    DOJ Strategic Goal 1: Prevent Terrorism and Promote the Nation's Security.
        Objectives: 1.3 Prosecute those who have committed, or intend to commit, terrorist acts in the United States.
    DOJ Strategic Goal 2: Prevent Crime, Enforce Federal Laws, and Represent the Rights and Interests of the American People
        Objectives: 2.1 Strengthen partnerships for safer communities and enhance the Nation's capacity to prevent, solve and control crime.
                2.2 Reduce the threat, incidence, and prevalence of violent crime.
                2.3 Prevent, suppress and intervene in crimes against children.
                2.4 Reduce the threat, trafficking, use, and related violence of illegal drugs.
                2.6 Uphold the civil and constitutional rights of all Americans.
                2.7 Vigorously enforce and represent the United States in all matters for which the Department has jurisdiction.

II. Attorney General Management Goals (11/8/01)
        Goal 1: Develop Performance-Based, Mission-Focused Leadership.
        Goal 2: Streamline, Eliminate or Consolidate Duplicative Functions.
        Goal 3: Focus Resources on Front-Line Positions.
        Goal 7: Coordinate Internal and External Communications and Outreach.
        Goal 8: Improve Department-wide financial performance.
        Goal 10: Utilize Technology to Improve Government.

III. President's Management Agenda (2002)
        Chapter 1: Strategic Management of Human Capital.
        Chapter 2: Competitive Sourcing.
        Chapter 3: Improved Financial Performance.
        Chapter 4: Expanded Electronic Government.
        Chapter 5: Budget and Performance Integration.

IV. Assistant Attorney General Goals: Provide leadership to develop and implement strategic plans and priorities set by the Assistant Attorney General.

V. DOJ Human Capital Strategic Plan (September 2002):
        Goal 1: Design an effective organization and workforce that aligns with the overall DOJ mission and Strategic Plan.
        Goal 2: Reduce skill gaps through recruitment, training, and succession planning.
        Goal 3: Develop an organization culture that clearly identifies and communicates performance expectations to employees, reports and assesses results, and provides incentives/penalties/remedial training.

VI. CCU Mission
    Ensure that federal prosecutors who are prosecuting capital cases have enhanced access to the expertise and resources needed to do so effectively.

    Facilitate the review of all capital cases by the Attorney General's Review Committee on Capital Cases and the Attorney General's decision whether to seek the death penalty in each instance as required by U.S.A.M. 9-10.000 et seq.

Exhibit \_\_\_ Page 41

**EXHIBIT A 040**

| No. | Goals |
|-----|-------|
| 1 | Complies with safeguards to ensure that resources are used effectively and appropriately in support of official business by adhering to all financial, budget, procurement, facilities, and real property policies and procedures.<br><br>Measure: Frequency of compliance. Target for Successful: 95% - 98% with:<br>• no failures that resulted in significant unwarranted costs to the government,<br>• no funds are expended for travel without prior authorization,<br>• accurate travel and expense records are maintained and submitted/processed in a timely manner. |
| 2 | Submits timely and accurate data regarding expenditures of government funds and location tracking of government equipment<br><br>Measure: Frequency of compliance. Target for Successful: 95%-98%. |
| 3 | Complies with laws, regulations, and policies on the use of telecommunications and other government-issued equipment, including PCs, laptops, Blackberrys, cell phones, etc.<br><br>Measure: Frequency of compliance.<br>Target for Successful: 95% to 98% with:<br>• equipment used appropriately and securely,<br>• any charges for minor personal use are paid in a timely manner,<br>• timely completes mandatory computer security training and rules of behavior training. |
| 4 | Proactively uses information technology systems.<br><br>Measure: Frequency of compliance. Target for Successful: 98% and:<br>• uses information technology systems to provide information to customers and stakeholders for decision making,<br>• uses are in accordance with component and Department guidelines,<br>• timely, thoroughly, and accurately provides information to information technology staff to develop/improve systems |

65

Exhibit 1 Page 42

EXHIBIT A 041

| **Employee's Accomplishments:** | *See attached comments* | |
|---|---|---|
| **Rating:** ☑ Outstanding | ☐ Successful | ☐ Unacceptable |
| **Rating Official's Comments:** | *See attached comments* | |

Exhibit 1 Page 43

**EXHIBIT A 042**

Rating official's comments
Jacabed Rodriguez-Coss, Trial Attorney, Capital Case Unit
Rating period: 07/01/10 to 06/30/11

**Element 3**: ("Ensuring Accountability for Taxpayer Value")

My overall appraisal of Jackie's performance under this element is "outstanding." The
CCU operates on an extremely lean budget with minimal waste. CCU attorneys are required to
comply with all requirements and safeguards relating to budget, facilities, electronic and
communications equipment, travel, training, and credit cards. Jackie is aware of these
requirements and she has committed to continue to observe and comply with these requirements.
Jackie also complies with the applicable security requirements to the best of my knowledge.

Exhibit ___ Page 44

EXHIBIT A 043

## PART G. APPRAISAL TYPE AND RATING

☑ Annual          ☐ Interim

NOTE: For rated elements, place an "X" in the appropriate column. If there is insufficient data to rate an employee for an element, mark "N/A" in the "Successful" column.

| | Performance Elements | Outstanding | Successful | Unacceptable |
|---|---|---|---|---|
| 1 | Accountability for Organizational Results | ✓ | | |
| 2 | Accountability for People/Workforce | | ✓ | |
| 3 | Ensuring Accountability for Taxpayer Value | ✓ | | |

| OVERALL RATING: | ☑ Outstanding | ☐ Successful | ☐ Unacceptable |
|---|---|---|---|

**Overall Rating Official's Comments:** See attached comments

**Overall Reviewing Official's Comments:**

## PART H. SIGNATURES DOCUMENTING OFFICIAL RATING

| Rating Official's Signature | Reviewing Official's Signature | Employee's Signature |
|---|---|---|
| | | |
| Date 9/14/11 | Date 9/15/11 | Date 9/15/11 |

NOTE: The employee signature on this form is simply an acknowledgment of receipt, and does not affect the right to file a grievance. Employees are responsible for contacting the Human Resource Management Unit for specific procedures for filing a grievance. Any grievance must be filed in writing within 15 days of receipt of the rating.

Exhibit 1 Page 45

68

EXHIBIT A 044

**U.S. DEPARTMENT OF JUSTICE**

**Criminal Division**

**Performance Work Plan and Appraisal Record**
Form 430 (October 1, 2004)

**PART A. EMPLOYEE DATA**

| Name of Employee: Jacobed Rodriguez-Cors | SSN: |
| Position Title: Attorney | Pay Plan/Series/Grade: GS-905-15 |
| Section/Office: Capital Case Unit | |

Rating Period (from/to): July 1, 2011 through June 30, 2012

**PART B. PERFORMANCE WORK PLAN** (Rating and reviewing official signatures document review and approval of the work plan. The employee signature documents that he/she has received a copy of the work plan.)

| Employee's Signature | Rating Official's Signature | Reviewing Official's Signature |
| Date 10/6/11 | Date 10/11/11 | Date 10/11/11 |

This work plan describes performance expectations for Criminal Division Non-SES employees. Please refer to the Criminal Division Performance Appraisal Program for GS Employees dated October 1, 2004 for a complete description of the Division's program.

The employee's signature on this work plan cover sheet acknowledges receipt. Any concerns, questions, or suggestions about the work plan should be discussed with the supervisor.

The performance standards in this work plan describe performance at the "Successful" level. Failure to meet the standard in any bulleted item may be the basis for failure of the entire element. The employee is expected to perform as described on a consistent, routine or usual basis. Perfection is not expected and circumstances will be taken into account in assessing performance.

**Rating Levels**

*Outstanding:* The employee's work *significantly exceeds on a regular basis* the performance standards of this work plan (appropriate for the employee's grade level).

*Successful:* The employee's work *consistently meets and on occasion exceeds* the performance standards of this work plan (appropriate for the employee's grade level).

*Unacceptable:* The quantity, quality, and/or timeliness of the employee's work, and/or manner in which the employee performs that work *fails to meet* the standards.

NOTE: If the employee's performance is "Unacceptable" in one or more elements at any time during the appraisal cycle, the supervisor should contact the Human Resources Management Unit.

**PART C. PROGRESS REVIEW** (Signatures document a discussion of employee performance.)

| Employee's Signature | Rating Official's Signature | Date 2/29/12 |

Exhibit 1 Page 46

EXHIBIT H

69

EXHIBIT A 045

PART D. INDIVIDUAL RATING ELEMENTS

**Performance Element 1: Accountability for Organizational Results**

Links

I. Department of Justice Strategic Plan (FYs 2007-2012):
   DOJ Strategic Goal 1:     Prevent Terrorism and Promote the Nation's Security.
        Objectives:  1.3  Prosecute those who have committed, or intend to commit, terrorist acts in the United States.

   DOJ Strategic Goal 2: Prevent Crime, Enforce Federal Laws, and Represent the Rights and Interests of the American People
        Objectives:  2.1 Strengthen partnerships for safer communities and enhance the Nation's capacity to prevent, solve and
                          control crime.
                     2.2 Reduce the threat, incidence, and prevalence of violent crime.
                     2.3 Prevent, suppress and intervene in crimes against children.
                     2.4 Reduce the threat, trafficking, use, and related violence of illegal drugs.
                     2.6 Uphold the civil and constitutional rights of all Americans.
                     2.7 Vigorously enforce and represent the United States in all matters for which the Department has
                          jurisdiction.

II. Attorney General Management Goals (11/8/01)
                     Goal 1: Develop Performance-Based, Mission-Focused Leadership.
                     Goal 2: Streamline, Eliminate or Consolidate Duplicative Functions.
                     Goal 3: Focus Resources on Front-Line Positions.
                     Goal 7: Coordinate Internal and External Communications and Outreach.
                     Goal 8: Improve Department-wide financial performance.
                     Goal 10: Utilize Technology to Improve Government.

III. President's Management Agenda (2002)
                     Chapter 1: Strategic Management of Human Capital.
                     Chapter 2: Competitive Sourcing.
                     Chapter 3: Improved Financial Performance.
                     Chapter 4: Expanded Electronic Government.
                     Chapter 5: Budget and Performance Integration.

IV. Assistant Attorney General Goals: Provide leadership to develop and implement strategic plans and priorities set by the
        Assistant Attorney General.

V. CCU Mission
        Ensure that federal prosecutors who are prosecuting capital cases have enhanced access to the expertise and resources needed
        to do so effectively.

        Facilitate the review of all capital cases by the Attorney General's Review Committee on Capital Cases and the Attorney
        General's decision whether to seek the death penalty in each instance as required by U.S.A.M. 9-10.000 et seq.

**Performance Standards: Successful Level**
- Written and oral presentations are timely, concise, clearly communicate the intended message, and are factually accurate, logically ordered, and substantially free of grammar and syntax errors.
- The extent and depth of treatment and style and tone are appropriate to the scope of the assignment and to the intended audience.
- Arguments/conclusions are fully supported and all significant issues (e.g., policy, constitutional, statutory, regulatory, treaty, procedural, and case law), are analyzed and effectively addressed.
- Written products are in compliance with Court, Department, Division and office policy/procedures. Substantive revisions needed are usually minor and result primarily from policy issues not communicated to the writer.
- Anticipates likely questions and maintains composure, and demonstrates resourcefulness when faced with unexpected and difficult situations.
- Independently handles the volume and complexity of assignments consistent with the employee's grade level.
- Uses sound judgment in determining which issues should be brought to the supervisor's attention and when.
- Manages Litigation/Investigations/Programs efficiently and effectively (e.g., witness use and preparation; rules of procedure and evidence, and court deadlines).

| No. | Goals |
|---|---|
| 1. | As assigned by CCU's Chief, directly represents the government in capital cases at trial, on direct appeal, and on collateral review. <br><br> Measure: Percentage of instances in which employee effectively meets goals and timetables of Unit Supervisors in handling prosecutions; no failure to meet timetables results in irreparable harm to the substantive position of the government. Target for Successful: 90% - 95%. <br> Measure: Percentage of instances in which the employee's written and oral presentations were timely, concise, clearly communicated the intended message, and were factually accurate, logically ordered, and substantially free of grammar and syntax errors. Target for Successful: 90% - 95%. <br> Measure: Percentage of instances in which employee anticipates questions, maintains composure and demonstrates resourcefulness when faced with unexpected and difficult situations. Target for Successful: 90% - 95%. |
| 2. | Facilitates the Department's review and decision-making process for potential death penalty cases, U.S.A.M. § 9-10.000 et seq. Facilitates the review process in particular cases both substantively, through timely and thorough analysis of relevant facts and issues, and procedurally, by monitoring the review process to see that deadlines are met. <br><br> Measure: Written and oral presentations are thorough and persuasive. Target for successful: 90% - 95%. <br> Measure: Consults/forwards timely and accurate documents to all appropriate personnel. Target for successful: 90% - 95%. |
| 3. | Provides constitutional, substantive, procedural, and technical training, guidance, assistance, and resources to United States Attorneys' Offices (USAOs) in capital case investigations and prosecutions, including the cases where the employee supported the review process under goal 2, above. Provides notice of developing strategic trends and arguments through group or individual emails in a timely, accurate, well-reasoned, and articulately-stated manner. <br><br> Measure: Percentage of instances in which employee is cooperative and proactive in providing accurate and effective advice, training, or assistance. Promptly alerts supervisors if components are not complying. Measure for successful: 90% - 95%. <br> Measure: Feedback from customers and stakeholders is positive. Target for Successful: 90% - 95%. <br> Measure: Makes substantial contributions to outreach activities. Target for Successful: Proactive efforts increase by 10% from the previous year. |
| 4. | Assists in developing policy and procedures for federal capital prosecutions. <br><br> Measure: Percentage of instances in which employee provided timely, accurate, and cogent assistance in developing policy and procedures for federal capital prosecutions. <br> Target for Successful: 90% to 95%. |

| 5. | Coordinates pre-execution litigation as directed by CCU management. |
|---|---|
| | Measure: Percentage of instances in which employee provided timely, accurate, and responsive assistance and advice in coordinating pre-execution litigation when needed, anticipating contingencies and challenges likely to be presented in the course of the litigation.<br>Target for Successful: 90% to 95%. |
| 6. | Maintains an up-to-date electronic pleading bank and electronic resource library. |
| | Measure: Percentage of instances in which employee contributed to maintaining the electronic pleading bank and electronic resource library with materials that are practical, useful, and well-reasoned and researched.<br>Target for Successful: 90% to 95%. |
| 7. | Prepares timely, accurate, well-reasoned, and articulately-stated information for the CCU Chief to relay to OAAG, ODAG, and OAG regarding developments affecting capital prosecutions generally. |
| | Measure: Percentage of instances in which employee effectively provided timely and accurate information as described.<br>Target for Successful: 90% to 95%. |

**Employee's Accomplishments**

See attached comments

**Rating:**

☑ Outstanding   ☐ Successful   ☐ Unacceptable

**Rating Official's Comments:**

See attached comments

Exhibit ___ Page 49

72

Rating official's comments
Jacabed Rodriguez-Coss, Trial Attorney, Capital Case Unit
Rating period: 07/01/11 to 06/30/12

**Element 1**: ("Accountability for Organizational Results")

My overall appraisal of Jackie Rodriguez's performance under this element is "outstanding."

Jackie's work during the rating period significantly exceeded the standards and goals of this Element. Jackie made major contributions in both of the two principal components of the CCU's workload: (1) directly participating in litigation of death penalty prosecutions; and (2) conducting the analysis and assessment that inform the review of capital cases by the Attorney General's Review Committee on Capital Cases and the decision of the Attorney General whether to seek the death penalty. Jackie also made significant contributions to the following additional goals listed under this Element: providing guidance, assistance, and resources to USAOs litigating particular death penalty prosecutions; disseminating timely and accurate information to USAOs in anticipation of shifting strategies and tactics employed by defense counsel nationwide; and assisting in creating and maintaining an online electronic resource library.

By way of overall assessment, Jackie is an experienced trial litigator and she grasps quickly the factual and tactical issues at play in potential death penalty cases. Jackie's factual, legal, and strategic analysis is thoughtful and well-reasoned. She readily undertakes new tasks, working independently and seeking input from others as appropriate.

During the rating period, Jackie served as co-counsel in the successful prosecution of a high-profile capital case, *U.S. v. Azibo Aquart* (D. Conn.). Although the capital penalty hearing in that case concluded with imposition of a death sentence just before the rating period, Jackie also participated in the guilty plea and sentencing of a non-capital co-defendant during the rating period and assisted with the response to a motion to vacate the one death sentence. Jackie has also performed well in providing supporting advice and expertise for pending capital prosecutions where she is not formally a member of the prosecution team. She has provided valuable research, samples, and other guidance to AUSAs and fellow CCU attorneys in a number of cases where the death penalty is being sought. Her guidance and assistance have been well received in all of the cases where her input was sought or volunteered.

Jackie also joined the prosecution team for two other capital cases pending trial: *U.S. v. Stone* (E.D. Cal.), and *U.S. v. Pleau* (D.R.I.). She traveled to the districts on several occasions to meet with other members of the trial team and investigators and to interview witnesses. In *Stone*, moreover, she presented the case to the grand jury and secured an indictment. She has been well-received by her co-counsel.

Although CCU has been reducing its emphasis on capital post-conviction litigation, Jackie provided substantial direct representation in a major, high-profile Section 2255 case during the rating period. *U.S. v. Fell* (D. Vt.) is an ongoing, complex matter in which Jackie


Exhibit 1 Page 50

**EXHIBIT A 049**

Rating official's comments
Jacabed Rodriguez-Coss, Trial Attorney, Capital Case Unit
Rating period: 07/01/11 to 06/30/12

took the lead role in preparing the government's 300+ page principal response to Fell's
equally-voluminous Section 2255 motion. She worked exclusively on the case from late August
2011 through the end of the year, and she estimates her time contribution comprised about 75%
of the total prosecutor hours spent responding to the 2255 case (AUSA Bill Darrow and FAUSA
Paul Van de Graaf contributed the remaining estimated 25%).

In addition to the foregoing responsibilities Jackie carries as one of CCU's trial litigators,
Jackie also shepherded numerous cases through the Department's internal death penalty review
process, several of which involved very high-visibility prosecutions with significant death
penalty issues.

Finally, with regard to the related goals of maintaining an electronic resource library, and
providing timely and accurate information to USAOs in anticipation of shifting strategies and
tactics employed by defense counsel nationwide, Jackie stays abreast of defense litigation trends
and helps to ensure that the CCU's resource materials are up to date, as indicated above. In
particular, Jackie provided initial assistance and coordination for CCU's soon-to-be launched
Listserve.

74

**EXHIBIT A 050**

**Performance Element 2: Accountability for People/Workforce**

Links:

I. Department of Justice Strategic Plan (FYs 2007-2012):

    DOJ Strategic Goal 1: Prevent Terrorism and Promote the Nation's Security.

        Objectives: 1.3 Prosecute those who have committed, or intend to commit, terrorist acts in the United States.

    DOJ Strategic Goal 2: Prevent Crime, Enforce Federal Laws, and Represent the Rights and Interests of the American People.

        Objectives: 2.1 Strengthen partnerships for safer communities and enhance the Nation's capacity to prevent, solve and control crime.

                2.2 Reduce the threat, incidence, and prevalence of violent crime.

                2.3 Prevent, suppress and intervene in crimes against children.

                2.4 Reduce the threat, trafficking, use, and related violence of illegal drugs.

                2.6 Uphold the civil and constitutional rights of all Americans.

                2.7 Vigorously enforce and represent the United States in all matters for which the Department has jurisdiction.

II. Assistant Attorney General Goals: Provide leadership to develop and implement strategic plans and priorities set by the Assistant Attorney General.

III. DOJ Human Capital Strategic Plan (September 2002):

        Goal 1: Design an effective organization and workforce that aligns with the overall DOJ mission and Strategic Plan.

        Goal 2: Reduce skill gaps through recruitment, training, and succession planning.

        Goal 3: Develop an organization culture that clearly identifies and communicates performance expectations to employees, reports and assesses results, and provides incentives/penalties/remedial training.

IV. CCU Mission

Ensure that federal prosecutors who are prosecuting capital cases have enhanced access to the expertise and resources needed to do so effectively.

Facilitate the review of all capital cases by the Attorney General's Review Committee on Capital Cases and the Attorney General's decision whether to seek the death penalty in each instance as required by U.S.A.M. 9-10.000 et seq.

V. AG Guidelines on Victim-Witness Responsibilities

**Performance Standards: Successful Level**

- Interacts with superiors, co-workers, and support staff in a courteous and constructive manner. Extends the same positive attitude to other Department and Government employees.
- Demonstrates commitment to the collaborative process and assesses, plans, and completes work dependably and effectively.
- Maintains professional skills by keeping current with pertinent legal and professional developments and participating in appropriate continuing legal education.
- Demonstrates knowledge of the professional rules of conduct requirements in the employee's State of licensing and any other professional rules of conduct to which employee may be subject.
- Ensures personal and professional integrity by complying with Standards of Conduct, ethics requirements, and the Merit System Principles.
- Interactions foster a work environment free from unlawful discrimination and harassment.

| No. | Goals |
|-----|-------|
| 1. | Actively participates in discussion and implementation of effective ways to accomplish the Criminal Division's mission. <br><br> Measure: Provides constructive feedback to supervisors in a timely and courteous manner. <br> Target for Successful: 95% |

Exhibit 1 Page 59

EXHIBIT A 051

2. Supports the Capital Case Unit's efforts to improve workforce competencies by:
   - identifying operational and procedural issues that impede achievement and implementing changes within own sphere and making suggestions to supervisor for improvements with wider application;
   - being available for consultation at all reasonable times;
   - striving to improve skills/volunteering to learn new office functions;
   - participating in training recommended by supervisor;
   - participating in cross-training to enhance staff capabilities when employees with primary responsibilities are away from the office;
   - participating in Division-sponsored programs; and
   - considering Division priorities and workload in planning and scheduling.

   Measure: Percentage of instances in which employee was cooperative and proactive in providing support and available when needed.
   Target for Successful: 90% to 95%.

3. Supports CCU's goal of maintaining accurate, up-to-date electronic management information by timely entering data in the Capital Case Tracking System regarding all assigned matters and cases.

   Measure: Percentage of instances in which employee maintained accurate, up-to-date electronic databases by timely entering information in the Capital Case Tracking System regarding all assigned matters and cases.
   Target for Successful: 95% to 98%.

4. Supports EEO principles of fairness and equity and promotes diversity by:
   - fostering a collegial work environment; and
   - participating in mentoring new employees.

   Measure: Percentage of instances in which employee was cooperative and proactive in fostering an effective work environment.
   Target for Successful: 95% to 98%.

5. Supports the CCU's efforts to improve communication, teamwork, and partnerships between employees and collaborating organizations by
   - consulting with supervisors on major problems and issues, keeping supervisors informed on work status, and advising supervisors when available for new assignments; and
   - demonstrating an ability to effectively communicate, team, and partner with fellow employees and collaborating organizations (USAOs, DOJ components, other Federal agencies, etc.).

   Measure: Percentage of instances in which employee was proactive in providing support and communicating effectively.
   Target for Successful: 95% to 98%.

6. Supports the Capital Case Unit's efforts to implement effective conflict resolution mechanisms to resolve personnel and organizational issues by responding positively to constructive criticism.

   Measure: Percentage of instances in which employee made effective change at the first opportunity.
   Target for Successful: 95% to 98%.

7. Supports the CCU, Division, and Department requirements of personal and professional integrity by complying with Standards of Conduct, ethics requirements, and Merit System Principles.

   Measure: Percentage of instances in which the employee's actions were in accordance with requirements.
   Target for Successful: 95% to 98%.

8. Supports Victim-Witness laws and polices through the identification and notification of victims and witnesses, and coordinates with the victim-witness liaison(s) to effectuate the "Attorney General Guidelines for Victim and Witness Assistance" and the "Crime Victims' Rights Act."

   Measure: Percentage of instances in which the employee's actions were in accordance with requirements. Target for Successful: 95% - 98%

Exhibit 1 Page 53

**EXHIBIT A 052**

**Employee's Accomplishments:** See attached comments

**Rating:**
☐ Outstanding    ☑ Successful    ☐ Unacceptable

**Rating Official's Comments:** See attached comments

77

EXHIBIT A 053

Rating official's comments
Jacabed Rodriguez-Coss, Trial Attorney, Capital Case Unit
Rating period: 07/01/11 to 06/30/12

**Element 2**: ("Accountability for People/Workforce")

My overall appraisal of Jackie's performance under this element is "successful." Jackie's work during the rating period satisfied the standards and goals of this Element. Jackie made significant contributions in the following areas: she "actively participates in discussion and implementation of effective ways to accomplish the Criminal Division's mission" (Goal 1), "supports the CCU's efforts to improve workplace competencies" (Goal 2), "supports the CCU's principles of fairness and equity" (Goal 3), "supports the CCU's efforts to improve communication, teamwork, and partnerships between employees and collaborating organizations" (Goal 4), and "supports the CCU's efforts to implement effective conflict resolution" (Goal 5).

Jackie has worked collaboratively with other CCU attorneys and provided them with thoughtful advice and insight on their cases, without prior request by the Chief or Deputy Chief. Jackie engages fellow CCU attorneys in discussions about legal principles of their cases, trying to achieve agreement on how to best approach various situations that arise during the course of litigating a case. With AUSAs, Jackie makes herself available to review their work, write pleadings on their behalf, and discuss strategy. Jackie also served as co-coordinator for recruitment and supervision of CCU's law student interns.

Jackie has worked to support the CCU's principles of fairness, equity, and diversity by fostering a collegial work environment and mentoring interns.

One way in which Jackie can enhance her effectiveness as a CCU litigator is to spend greater amounts of time in the districts where her cases are being prosecuted. Past experience has shown that a Criminal Division attorney is more fully integrated and accepted as a member of the trial team when the attorney is present in the district on a regular and ongoing basis.

Exhibit 1 Page 55



**EXHIBIT A 054**

**Performance Element 3: Ensuring Accountability for Taxpayer Value**

Links:

I. Department of Justice Strategic Plan (FYs 2007-2012):

DOJ Strategic Goal 1: Prevent Terrorism and Promote the Nation's Security.

Objectives: 1.3 Prosecute those who have committed, or intend to commit, terrorist acts in the United States.

DOJ Strategic Goal 2: Prevent Crime, Enforce Federal Laws, and Represent the Rights and Interests of the American People.

Objectives: 2.1 Strengthen partnerships for safer communities and enhance the Nation's capacity to prevent, solve and control crime.

2.2 Reduce the threat, incidence, and prevalence of violent crime.

2.3 Prevent, suppress and intervene in crimes against children.

2.4 Reduce the threat, trafficking, use, and related violence of illegal drugs.

2.6 Uphold the civil and constitutional rights of all Americans.

2.7 Vigorously enforce and represent the United States in all matters for which the Department has jurisdiction.

II. Attorney General Management Goals (11/8/01)

Goal 1: Develop Performance-Based, Mission-Focused Leadership.

Goal 2: Streamline, Eliminate or Consolidate Duplicative Functions.

Goal 3: Focus Resources on Front-Line Positions.

Goal 7: Coordinate Internal and External Communications and Outreach.

Goal 8: Improve Department-wide financial performance.

Goal 10: Utilize Technology to Improve Government.

III. President's Management Agenda (2002)

Chapter 1: Strategic Management of Human Capital.

Chapter 2: Competitive Sourcing.

Chapter 3: Improved Financial Performance.

Chapter 4: Expanded Electronic Government.

Chapter 5: Budget and Performance Integration.

IV. Assistant Attorney General Goals: Provide leadership to develop and implement strategic plans and priorities set by the Assistant Attorney General.

V. DOJ Human Capital Strategic Plan (September 2002):

Goal 1: Design an effective organization and workforce that aligns with the overall DOJ mission and Strategic Plan.

Goal 2: Reduce skill gaps through recruitment, training, and succession planning.

Goal 3: Develop an organization culture that clearly identifies and communicates performance expectations to employees, reports and assesses results, and provides incentives/penalties/remedial training.

VI. CCU Mission

Ensure that federal prosecutors who are prosecuting capital cases have enhanced access to the expertise and resources needed to do so effectively.

Facilitate the review of all capital cases by the Attorney General's Review Committee on Capital Cases and the Attorney General's decision whether to seek the death penalty in each instance as required by U.S.A.M. 9-10.000 et seq.

Exhibit ___ Page ___

EXHIBIT A 055

**Performance Standards: Successful Level**
- Safeguards government material, financial and personnel resources from unauthorized use or disposition.
- Adheres to laws, regulations, and Department security requirements and policies regarding the use, handling, and protection of sensitive and classified information.
- Ensures the proper and appropriate use of telecommunications and other government issued equipment.
- Ensures that procurement and contracting actions are best-value and meet requirements.
- Timely and correctly prepares appropriate travel, leave requests, time sheets, and other administrative reports and tasks.
- Works with the supervisor to ensure that periodic assessments are conducted to assess proper adherence to all financial, budget, procurement, facilities, and real property policies and procedures and implements and completes identified corrective actions on a timely basis.
- Provides prompt and accurate information.

| No. | Goals |
|---|---|
| 1. | Complies with safeguards to ensure that resources are used effectively and appropriately in support of official business by adhering to all financial, budget, procurement, facilities, and real property policies and procedures. <br><br> Measure: Frequency of compliance. Target for Successful: 95% - 98% with: <br> • no failures that resulted in significant unwarranted costs to the government, <br> • no funds are expended for travel without prior authorization, <br> • accurate travel and expense records are maintained and submitted/processed in a timely manner. |
| 2. | Submits timely and accurate data regarding expenditures of government funds and location tracking of government equipment <br><br> Measure: Frequency of compliance. Target for Successful: 95%-98%. |
| 3. | Complies with laws, regulations, and policies on the use of telecommunications and other government-issued equipment, including PCs, laptops, Blackberrys, cell phones, etc. <br><br> Measure: Frequency of compliance. <br> Target for Successful: 95% to 98% with: <br> • equipment used appropriately and securely, <br> • any charges for minor personal use are paid in a timely manner, <br> • timely completes mandatory computer security training and rules of behavior training. |
| 4. | Proactively uses information technology systems. <br><br> Measure: Frequency of compliance. Target for Successful: 98% and: <br> • uses information technology systems to provide information to customers and stakeholders for decision making, <br> • uses are in accordance with component and Department guidelines, <br> • timely, thoroughly, and accurately provides information to information technology staff to develop/improve systems |

Exhibit 1 Page 51

EXHIBIT A 056

Rating official's comments
Jacabed Rodriguez-Coss, Trial Attorney, Capital Case Unit
Rating period: 07/01/11 to 06/30/12

**Element 3**: ("Ensuring Accountability for Taxpayer Value")

My overall appraisal of Jackie's performance under this element is "outstanding." The CCU operates on an extremely lean budget with minimal waste. CCU attorneys are required to comply with all requirements and safeguards relating to budget, facilities, electronic and communications equipment, travel, training, and credit cards. Jackie is aware of these requirements and she has committed to continue to observe and comply with these requirements. Jackie also complies with the applicable security requirements to the best of my knowledge.

Exhibit 1 Page 58

81

EXHIBIT A 057

| Employee's Accomplishments: | See attached comments |
|---|---|

**Rating:**

☑ Outstanding     ☐ Successful     ☐ Unacceptable

| Rating Official's Comments: | See attached comments |
|---|---|

## PART G. APPRAISAL TYPE AND RATING

☑ Annual     ☐ Interim

NOTE: For rated elements, place an "X" in the appropriate column. If there is insufficient data to rate an employee for an element, mark "N/A" in the "Successful" column.

| | Performance Elements | Outstanding | Successful | Unacceptable |
|---|---|---|---|---|
| 1 | Accountability for Organizational Results | ✓ | | |
| 2 | Accountability for People/Workforce | | ✓ | |
| 3 | Ensuring Accountability for Taxpayer Value | ✓ | | |

| **OVERALL RATING:** | ☑ Outstanding | ☐ Successful | ☐ Unacceptable |
|---|---|---|---|
| **Overall Rating Official's Comments:** | See attached comments | | |

| **Overall Reviewing Official's Comments:** |
|---|

## PART H. SIGNATURES DOCUMENTING OFFICIAL RATING

| Rating Official's Signature | Reviewing Official's Signature | Employee's Signature |
|---|---|---|
| *[signature]* | | *[signature]* |
| Date 8/24/12 | Date | Date 8/27/12 |

NOTE: The employee signature on this form is simply an acknowledgment of receipt, and does not affect the right to file a grievance. Employees are responsible for contacting the Human Resources Management Unit for specific procedures for filing a grievance. Any grievance must be filed in writing within 15 days of receipt of the rating.

Exhibit 1 Page 59

**EXHIBIT A 058**



EXHIBIT 1

Exhibit 1 Page 60

EXHIBIT A 059

U.S. DEPARTMENT OF JUSTICE
Criminal Division

Performance Work Plan and Appraisal Record

---

### Performance Work Plan Development
#### Linking Organizational Mission to Individual Performance

---

#### DOJ's Strategic Plan Links to Your Position:

Goal 2: Prevent Crime, Protect the Rights of the American People, and Enforce Federal Law
2.1 Combat the threat, incidence, and prevalence of violent crime

---

#### Criminal Division Mission:

The Criminal Division's mission is to develop, enforce, and supervise the application of all federal criminal laws, except those specifically assigned to other divisions, ensuring fair and impartial justice.

---

#### Section Mission:

The Capital Case Unit (CCU) was created in response to the Department of Justice's increased involvement in capital litigation. CCU's mission is two-fold:

First, CCU is responsible for assisting the Attorney General's Review Committee on Capital Cases in its evaluation of potential death penalty matters. CCU conducts an analysis of all cases in which a United States Attorney charges a crime punishable by death. CCU advises the Committee in relation to the factual and legal issues relevant to the Committee's recommendation to the Attorney General regarding whether to seek the death penalty. CCU attorneys also provide legal, procedural, and policy guidance to United States Attorneys' Offices handling capital investigations and prosecutions.

Additionally, CCU provides direct litigation support to USAOs handling capital cases. This support takes various forms depending upon the needs in a given case. CCU employs prosecutors who have previously tried capital cases and are available to serve as co-counsel with AUSAs in their pending capital prosecutions. CCU attorneys may also assist in a more limited fashion. CCU supports all phases of pre-trial litigation, provides guidance in selecting death qualified juries and helps construct penalty phase evidentiary presentations.

CCU also provides training and resource materials to federal prosecutors handling capital cases. CCU maintains trial and appellate materials related to federal capital prosecutions which are shared with USAOs across the United States.

---

#### Performance Elements:

| | |
|---|---|
| 1. Case Handling | 7. Productivity |
| 2. Oral Communication & Advocacy | 8. N/A |
| 3. Writing | 9. N/A |
| 4. Program/Process/Project Management | 10. N/A |
| 5. Professionalism & Teamwork | 11. N/A |
| 6. Problem-solving & Judgment | |

---

#### Performance Element Rating Level Definitions

The Rating Official completes the appraisal record by assigning performance element rating levels for each performance element. Each element will be rated at one of the five levels.

| | |
|---|---|
| *Exceptional* (5 points): | Demonstrates the highest standards of performance; provides precedent-setting results or performs at a level that significantly surpasses organizational expectations in every aspect of the element. |
| *Exceeds Expectations* (4 points): | Frequently exceeds major requirements and expectations; accomplishments noteworthy and highly valued; typically demonstrates higher standards of performance. |
| *Satisfactory* (3 points): | Consistently performs all major requirements satisfactorily; accomplishes all objectives; occasionally exceeds the expectations of the major job functions. |
| *Needs Improvement* (2 points): | Occasionally fails to meet minimum requirements in one or more key aspects of major job functions; demonstrates one or more performance deficiencies. |
| *Unacceptable* (0 points): | Consistently fails to meet minimum requirements in critical aspects of major job functions and performance expectations. |

Note: If the employee's performance is *Unacceptable* in one or more elements at any time during the appraisal period, the Rating Official should contact the Office of Administration, Human Resources Management Staff.

Exhibit 1 Page 6

EXHIBIT A 060

| Performance Element: | Definition: |
|---|---|
| Case Handling | Demonstrates the ability to complete significant case work, including any of the following: (1) direct, conduct, and monitor investigations; (2) make charging decisions and propose dispositions; (3) prepare and conduct trials and appeals; (4) review the use of law enforcement tools (e.g., Title IIIs, RICO, mutual legal assistance, extradition requests); and/or (5) advise on pleadings and other court filings. |

To achieve a *Satisfactory* rating in this element, the employee must consistently meet ALL of the following expectations:

• Correctly identifies pertinent legal issues and conducts comprehensive research to find relevant authorities. Demonstrates resourcefulness in developing legal authority or evidence from sources that are not obvious. No significant issue or authority is overlooked.

• Identifies correctly the factual issues and develops a complete factual record. Determines and addresses strengths and weaknesses in the record. No significant information is overlooked.

• Develops analyses that are clear, thorough, and well-documented. Prepares analyses that properly distinguish between critical and peripheral issues. Case, legal, and operational recommendations demonstrate a sound understanding of the law, the facts, and the ramifications of particular strategies.

• Develops sound strategic and tactical plans for classified hearings, operations, and cases that reflect the critical issues and the Government's interests. Considers alternate views and responds appropriately.

• Recommends case and operational strategy that makes efficient use of resources, including attorney time and expert witnesses, and identifies cases and issues that are appropriate for disposition.

• Conducts discovery analysis in a manner appropriate to the issues and the case. Discovery motions are prepared correctly and in a timely manner.

• Identifies and interviews potential witnesses, sufficient to cover the issues. Coordinates witness conferences to ensure the protection and availability of relevant testimony and evidence.

• Applies the rules of procedure and evidence correctly and effectively. Demonstrates effective analysis of and response to procedural and evidentiary litigation problems.

• Obtains appropriate evidence efficiently and effectively through interviews, written discovery and e-discovery, depositions, document examination, physical inspection where appropriate, and motions to compel.

• Uses automated litigation support tools, other technologies, and information resources, effectively and cost-efficiently to improve case development and presentation.

• Makes appropriate evidentiary objections to advance the case and properly preserve issues for appeal, including the handling of post-trial matters.

• Effectively prepares for and conducts grand jury proceedings.

• Appropriately safeguards classified information.

• Notifies supervisors, and other appropriate personnel of significant requests and other issues.

---

### Rating Official Evaluation for Element

A written summary narrative is <u>required</u> to support an overall Summary Rating of *Exceptional* (Level 5). If any one element is rated *Unacceptable* (Level 1), written comments that specifically address how the performance was deficient are <u>required</u> for each individual element rated *Unacceptable* and must be supported by concrete examples of unacceptable performance. No *Unacceptable* ratings can be issued without first consulting with the Human Resources Management Staff and Agency Counsel.

*Use this space to describe the employee's accomplishments and strengths for this element during this appraisal period and any development opportunities for the next appraisal period.*

If you would prefer to only write <u>one summary</u> evaluation for <u>all elements</u>, check here and provide your narrative on the *"Rating Official Summary Evaluation"* on the final page.

## – Please Select a Rating Level On the Coversheet –

Exhibit _____ Page _____

85

**EXHIBIT A 061**

U.S. DEPARTMENT OF JUSTICE                                    Performance Work Plan and Appraisal Record
Criminal Division

| Performance Element: | Definition: |
|---|---|
| Oral Communication & Advocacy | Clearly and effectively articulates, presents, and promotes varied ideas and issues before a wide range of audiences; makes clear and convincing oral presentations or arguments; represents the interests of the Criminal Division in conflict resolution, negotiations, and/or cooperative efforts (e.g. working groups). |

To achieve a *Satisfactory* rating in this element, the employee must consistently meet ALL of the following expectations:

• Represents the government's or Capital Case Unit's position clearly, concisely, and effectively.
• Effectively presents evidence at trials and evidentiary hearings, reflecting an organization that is both logical and compelling.
• Conducts direct examinations to enhance the credibility of the witness' testimony and cross examines adverse witnesses in a manner that is precise and accurate, establishing, as appropriate, limitations to the scope of the witness' testimony, bias, and mistakes.
• Responds accurately and clearly to judges' questions during oral arguments, while presenting the facts and arguments necessary to advance the government's position, consistent with the overall strategy.
• Anticipates questions likely to arise in oral presentations, including during training, and maintains composure when confronted with unexpected or difficult questions.
• Handles negotiations well; arguments are clear, concise, further the Division's position, and are consistent with Division policy and supervisory direction.
• Tactical advantages are generally recognized and acted upon appropriately. Included in this measure is satisfactory use of available procedural tactics to further the Division's position.
• Interacts with others (e.g., special agents) fairly and with impartiality. Responses are consistently satisfactory, support the Division's position, and are appropriate in tone.
• Handles conflict with sensitivity to the issues and with diplomacy, and explores options for the mutual satisfaction of the parties (i.e., those involved in a classified project) involved.

### Rating Official Evaluation for Element

A written summary narrative is required to support an overall Summary Rating of *Exceptional* (Level 5). If any one element is rated *Unacceptable* (Level 1), written comments that specifically address how the performance was deficient are required for each individual element rated *Unacceptable* and must be supported by concrete examples of unacceptable performance. No *Unacceptable* ratings can be issued without first consulting with the Human Resources Management Staff and Agency Counsel.

*Use this space to describe the employee's accomplishments and strengths for this element during this appraisal period and any development opportunities for the next appraisal period.*

☑ If you would prefer to only write one summary evaluation for all elements, check here and provide your narrative on the *"Rating Official Summary Evaluation"* on the final page.

### – Please Select a Rating Level On the Coversheet –

86

Exhibit ___ Page ___

EXHIBIT A 062

U.S. DEPARTMENT OF JUSTICE
**Criminal Division**

Performance Work Plan and Appraisal Record

| Performance Element:<br>Writing | Definition:<br>Writes to convey information in a clear, concise, organized, and convincing manner for the intended audience. Persuasively and effectively communicates thoughts to reinforce message retention. |
| --- | --- |

To achieve a *Satisfactory* rating in this element, the employee must consistently meet ALL of the following expectations:

• Writes documents (e.g., policy inquiries, letters, memoranda, pleadings, briefing papers, reports, and other written materials) that are concise, logically organized, and substantially free from spelling and grammatical errors.
• Writes documents that reflect sound judgment regarding determination of which issues to address, appropriate depth of treatment, and the most effective style and tone for the intended audience.
• Ensures that documents are in compliance with applicable laws and regulations, as well as Department, Division, and Section/Offices policies and procedures.
• Produces professional work products characterized by neat and orderly presentation.
• Arguments/conclusions are correctly reasoned and well supported.
• Concisely articulates complex material issues of fact and law in written products. Documents cite the best available record evidence or legal authority in support of arguments.
• Prepares substantive and legal materials (e.g., transmittals, letters, and memos) that are complete, appropriate to the subject matter, and effective.

### Rating Official Evaluation for Element

A written summary narrative is required to support an overall Summary Rating of *Exceptional* (Level 5). If any one element is rated *Unacceptable* (Level 1), written comments that specifically address how the performance was deficient are required for each individual element rated *Unacceptable* and must be supported by concrete examples of unacceptable performance. No *Unacceptable* ratings can be issued without first consulting with the Human Resources Management Staff and Agency Counsel.

*Use this space to describe the employee's accomplishments and strengths for this element during this appraisal period and any development opportunities for the next appraisal period.*

If you would prefer to only write one summary evaluation for all elements, check here and provide your narrative on the *"Rating Official Summary Evaluation"* on the final page.

## - Please Select a Rating Level On the Coversheet –

Exhibit Page 64

**EXHIBIT A 063**

U.S. DEPARTMENT OF JUSTICE
Criminal Division

Performance Work Plan and Appraisal Record

| Performance Element: | Definition: |
|---|---|
| Program/Process/Project Management | Structures and directs work on projects or programs. Effectively manages programs or projects to meet intended outcomes and stated deadlines. |

To achieve a *Satisfactory* rating in this element, the employee must consistently meet ALL of the following expectations:

• In order to process capital case review submissions, identifies the correct factual issues, determines and addresses strengths and weaknesses in the submission, and obtains appropriate information efficiently and effectively through verbal and written communication with the field.
• Anticipates issues that are likely to arise when reviewing submissions and raises those issues with the field; provides comprehensive guidance to the field.
• Identifies and documents applicable legal authorities that reflect thorough research, clear understanding of the points of law and fact involved, and rely upon current case law.
• Prepares review memoranda that are clear, concise, and well-documented: analyses properly distinguish between critical and peripheral issues; memoranda demonstrate a sound understanding of the law and the facts of the case.
• Keeps current and well-organized files, including written and electronic records, which include a complete record of the documents and events of a particular submission and Department action.
• Assists CCU's training-related outreach to USAOs (e.g., participating in training programs as requested and contributing materials to CCU's intranet site and Listserv).

### Rating Official Evaluation for Element

A written summary narrative is required to support an overall Summary Rating of *Exceptional* (Level 5). If any one element is rated *Unacceptable* (Level 1), written comments that specifically address how the performance was deficient are required for each individual element rated *Unacceptable* and must be supported by concrete examples of unacceptable performance. No *Unacceptable* ratings can be issued without first consulting with the Human Resources Management Staff and Agency Counsel.

*Use this space to describe the employee's accomplishments and strengths for this element during this appraisal period and any development opportunities for the next appraisal period.*

☒ If you would prefer to only write one summary evaluation for all elements, check here and provide your narrative on the *"Rating Official Summary Evaluation"* on the final page.

### - Please Select a Rating Level On the Coversheet -

Exhibit 1 Page 5

EXHIBIT A 064

U.S. DEPARTMENT OF JUSTICE
**Criminal Division**

Performance Work Plan and Appraisal Record

| Performance Element: | Definition: |
|---|---|
| Professionalism & Teamwork | Promotes cooperation and commitment within a team to achieve goals and objectives. Interacts with others in a courteous and respectful manner. Addresses the needs of internal and external customers (e.g. partners, the public, co-workers, supervisors, and managers). |

Use the expectations provided below. Make **MINOR** changes (if necessary) to make the expectations more meaningful and specific.

To achieve a *Satisfactory* rating in this element, the employee must consistently meet ALL of the following expectations:

1. Professionalism
• Responds positively to constructive criticism from supervisors, coworkers, reviewers, and customers, incorporating, as appropriate, their comments and advice in work products.
• Interacts with others in a courteous and respectful manner even in intense and difficult circumstances, demonstrating sensitivity to the needs of others and the ability to work cooperatively.
• Provides accurate advice (in consultation with attorneys when needed), guidance, or information that comports with applicable rules, regulations, and law in a timely manner.

2. Teamwork
• Demonstrates awareness of priorities and actively contributes to the achievement of Unit & Division goals.
• Establishes and maintains collaborative partnerships to enhance organizational capacity to reach mission goals.
• Readily accepts assignments from supervisors and volunteers to assist co-workers in completing their assignments when necessary and in meeting emergencies or critical office priorities.

3. Customer Service (applies to interactions with U.S. Attorneys' Offices and other agencies)
• Promptly responds to inquiries from customers.
• Manages customer expectations by clearly communicating timelines (and any adjustments), solutions and possibilities and any action item needed to resolve the request.
• Writes emails that are concise, organized, and substantially free of errors.

## Rating Official Evaluation for Element

A written summary narrative is required to support an overall Summary Rating of *Exceptional* (Level 5). If any one element is rated *Unacceptable* (Level 1), written comments that specifically address how the performance was deficient are required for each individual element rated *Unacceptable* and must be supported by concrete examples of unacceptable performance. No *Unacceptable* ratings can be issued without first consulting with the Human Resources Management Staff and Agency Counsel.

*Use this space to describe the employee's accomplishments and strengths for this element during this appraisal period and any development opportunities for the next appraisal period.*

☑ If you would prefer to only write one summary evaluation for all elements, check here and provide your narrative on the *"Rating Official Summary Evaluation"* on the final page.

## - Please Select a Rating Level On the Coversheet –

Exhibit 1 Page 66

89

**EXHIBIT A 065**

U.S. DEPARTMENT OF JUSTICE
Criminal Division

Performance Work Plan and Appraisal Record

| Performance Element: | Definition: |
| --- | --- |
| Problem-solving & Judgment | Anticipates problems and conflicts and makes constructive and realistic suggestions to resolve them. Demonstrates sound decision-making. |

Use the expectations provided below. Make **MINOR** changes (if necessary) to make the expectations more meaningful and specific.

To achieve a *Satisfactory* rating in this element, the employee must consistently meet **ALL** of the following expectations:

- Identifies problems by using appropriate resources and information.
- Generates and effectively evaluates alternative solutions.
- Recognizes when to notify the supervisor regarding issues that impact the organization and makes appropriate recommendations.
- Handles sensitive situations or critical assignments in an independent and competent manner that reflects favorably on the organization.
- Carries out duties and responsibilities in an ethical manner consistent with the law, the Standards of Ethical Conduct for Executive Branch Employees, and pertinent Department regulations and policies.

### Rating Official Evaluation for Element

A written summary narrative is required to support an overall Summary Rating of *Exceptional* (Level 5). If any one element is rated *Unacceptable* (Level 1), written comments that specifically address how the performance was deficient are required for each individual element rated *Unacceptable* and must be supported by concrete examples of unacceptable performance. No *Unacceptable* ratings can be issued without first consulting with the Human Resources Management Staff and Agency Counsel.

*Use this space to describe the employee's accomplishments and strengths for this element during this appraisal period and any development opportunities for the next appraisal period.*

☑ If you would prefer to only write **one summary** evaluation for **all elements**, check here and provide your narrative on the *"Rating Official Summary Evaluation"* on the final page.

### – Please Select a Rating Level On the Coversheet –

Exhibit 1 Page 67

EXHIBIT A 066

U.S. DEPARTMENT OF JUSTICE
**Criminal Division**

Performance Work Plan and Appraisal Record

| Performance Element: | Definition: |
|---|---|
| Productivity | Handles workload in a timely and effective manner. |

Use the expectations provided below. Make **MINOR changes (if necessary)** to make the expectations more meaningful and specific.

To achieve a *Satisfactory* rating in this element, the employee must consistently meet **ALL** of the following expectations:

- Produces quality results with sufficient attention to detail.
- Completes assignments within established deadlines.
- Considers office priorities when carrying out assignments.
- Sets timetables to achieve goals and seeks assistance for prioritization of competing assignments.
- Maintains a workload appropriate for grade level and position.

### Rating Official Evaluation for Element

A written summary narrative is required to support an overall Summary Rating of *Exceptional* (Level 5). If any one element is rated *Unacceptable* (Level 1), written comments that specifically address how the performance was deficient are required for each individual element rated *Unacceptable* and must be supported by concrete examples of unacceptable performance. No *Unacceptable* ratings can be issued without first consulting with the Human Resources Management Staff and Agency Counsel.

*Use this space to describe the employee's accomplishments and strengths for this element during this appraisal period and any development opportunities for the next appraisal period.*

☑ If you would prefer to only write **one summary** evaluation for **all elements**, check here and provide your narrative on the *"Rating Official Summary Evaluation"* on the final page.

**- Please Select a Rating Level On the Coversheet –**

Exhibit 1 Page 68

**EXHIBIT A 067**

U.S. DEPARTMENT OF JUSTICE
Criminal Division

Performance Work Plan and Appraisal Record

### Rating Official Summary Evaluation

If you chose not to write evaluations for each element, use this space to summarize the employee's accomplishments and strengths for all elements during this appraisal period and any development opportunities for the next appraisal period.

A written summary narrative is required to support an overall *Exceptional* rating (Level 5). If any one element is rated *Unacceptable* (Level 1), written comments that specifically address how the performance was deficient are required for each individual element rated *Unacceptable*, and must be supported by concrete examples of unacceptable performance. No unacceptable ratings can be issued without first consulting with the Human Resources Management Staff and Agency Counsel. Written narratives are not required to support individual element ratings of *Satisfactory* (Level 3) and *Exceeds Expectations* (Level 4). However, a summary narrative is encouraged for every appraisal.

See attached comments of Rating Official.

### Reviewing Official Summary Evaluation

A written narrative to support the Rating Official's final evaluation of employee performance is optional.

*Use this space to summarize the employee's accomplishments and strengths for all elements during this appraisal period and any development opportunities for the next appraisal period.*

To calculate the final rating, please complete Parts D, E, and F on the coversheet. Please discuss the appraisal with the employee and issue a summary rating.

Jacabed Rodriguez-Coss
Trial Attorney, Capital Case Unit
Rating period: 7/1/12 to 6/30/13

**Element 1**: ("Case handling")

During the rating period, Jackie was actively involved in several major capital litigation cases
and matters. Her caseload included *U.S. v. Stone* (E.D. Cal.), and *U.S. v. Pleau* (D.R.I.). She
traveled to the district and other locations on a number of occasions to meet with other members
of the trial team and investigators and to interview witnesses. She was actively involved in
pretrial motions practice in both cases. She has been well-received by her co-counsel.
Additionally, she provided invaluable on-site support and advice to fellow CCU attorney Bruce
Hegyi during the jury selection in the *Candelario-Santana* capital prosecution.

Although CCU has been reducing its emphasis on capital post-conviction litigation, Jackie
provided significant direct representation in one such case. She represented the government in
opposing the death-sentenced inmate's motion to vacate sentence under 28 U.S.C. § 2255 in *U.S.
v. Fell* (D. Vt.). This is a complex matter and Jackie has provided thoughtful representation in
opposing the post-conviction motion.

**Element 2**: ("Oral communication and advocacy")

Jackie is a effective and capable oral advocate both in and out of the courtroom. She conveys
concerns and viewpoints articulately in the office setting.

**Element 3**: ("Writing")

Jackie's written work product is good. She has shown significant improvement in this regard.

**Element 4**: ("Program/Process/Project management")

Jackie has contributed significantly to the Protocol review process, handling a number of review
cases while also attending to her litigation workload.

**Element 5**: ("Professionalism and teamwork")

In working with others within CCU and elsewhere, Jackie is responsive, respectful, and
constructive in all interactions.

**Element 6**: ("Problem-solving and judgment")

Jackie shows commendably sound judgment and maturity in seeking out advice in subject matter
areas in which she lacks experience. She also acts independently to an appropriate extent.

1

Exhibit 1 Page 70

**EXHIBIT A 069**

Jacabed Rodriguez-Coss
Trial Attorney, Capital Case Unit
Rating period: 7/1/12 to 6/30/13

**Element 7**: ("Productivity")

Jackie's productivity is quite good, as reflected by the foregoing comments.

2

94

Exhibit 1 Page 71

**EXHIBIT A 070**

From: "Goldstein.Adi\(USARI\)"<Adi.Goldstein@usdoj.gov>
To: "Rodriguez-Coss.Jacabed"<Jacabed.Rodriguez-Coss@crm.usdoj.gov>
Date: 7/31/20135:09:36PM
Subject: PleauGuiltyPlea

Jacky,

Ijustwantedtoletyouknowthat JasonPleau'schangeofpleahearingtookplacetodayanditwent
smoothly. TheCourtconfirmedatleast8separatetimesthatdefendantunderstoodthattheplea
agreementwasbinding,thathewaswaivinghisappellaterights,andthatthecourtwillsentencehimto
lifewithoutparole.

Theentirefamilywaspresentin Court.
**Thefamily'sstatementtothepresswasasfollows:"OurfamilyisverygratefultoPeter Neronha,AdiGoldstein
andallthefederalandstatelawenforcementofficialswhobroughtJason Pleautojustice. Ourfamilyis
comfortedinknowinghewillneverbeabletohurtanotherlawabidingcitizen."**

Iwanted tothankyouand thecapitalcaseunitforyoursupportduringtheprosecutionofthiscase. You
putinagreatdealoftimeandeffortintothiscaseandyou wereatremendouspartner.

Iknowwewillspeakpersonallywhenyou returnfromyourtrip,butIimagineyouwantedtoknow
rightaway.

Adi

ADIGOLDSTEIN
AssistantU.S.Attorney
U.S.Attorney'sOffice
DistrictofRhodeIsland
100 KennedyPlaza,8thFl.
Providence,RI02903
(401)709-5050(tel)
(401)709-5001(fax)

EXHIBIT J
Exhibit 1 Page 72

**EXHIBIT A 071**

From: "Carwile,Kevin"<Kevin.Carwile@crm.usdoj.gov>

To: "Dominguez,MariaA.\(USAPR\)"<MDominguez@usa.doj.gov>

Date: 2/2/20132:59:18PM

Subject: Re:LaTómbolaCase

Maria,
Thankyouverymuch!

P.KevinCarwile
Chief,CapitalCaseUnit
U.S.DepartmentofJustice

OnFeb1,2013,at6:01PM,"Dominguez,MariaA.(USAPR)"<Maria.A.Dominguez@usdoj.gov>wrote:

Goodeveningtobothofyou.IjustwantedtofillyouinonmymeetingthiseveningwiththetrialTeam.Everything
wentverysmoothly,andIdidnotsenseanyanimosity.

Iinstructedtheteamtoworkonawitnesslist,whichincludestheprojectedorderofwitnesses,overtheweekend,so
thatwecandistributewitnessresponsibilitiesamongstthethree.WealsoagreedtocontractaninterpreterforBruce,
toassisthimwiththewitnesspreparationofnon-bilingualwitnesses.Heseemedtobeverypleasedwiththat
alternative.Ofcourse,anagentwillalsoaccompanyhiminthewitnessinterviews.

Iwillbehandlingthehearingtomorrowmorningdealingwiththeallegedwitnessharassmentissue,inordertoallow
themtoconcentrateonmoreimportantmatters.Theywillbepreparingwitnessesovertheweekend.

Pleasebeassuredthatlwillcontinuetocloselymonitorthesituationtoensurethateverythingprogressessmoothly.
Jacabed,itwasgreathavingyoubackinourdistrict,andwitnessesyourableadvocacyskills.

Thankstobothofyou.

*MariaA.Dominguez-Victoriano*
FirstAssistantU.S.Attorney
UnitedStatesAttorney'sOffice
DistrictofPuertoRico
TorreChardon,Suite1201
350ChardónAvenue
HatoRey,PuertoRico00918
(787)282-1806,(787)766-5632(fax),(787)340-1681(Cellular)
E-mail: Maria.A.Dominguez@usdoj.gov

<Picture(DeviceIndependentBitmap)1.jpg>

Unlessexpresslystatedotherwise,thismessageisconfidentialandmaybeprivileged.Itisintendedfor
theaddressee(s)only.Accesstothise-mailbyanyoneelseisunauthorized.Ifyouarenotanaddressee,any
disclosureorcopyingofthecontentsofthise-mailoranyactiontaken(ornottaken)inrelianceonitisnot
authorizedandmaybeunlawful.Ifyouarenotanaddressee,pleaseinformthesenderimmediately.

EXHIBIT K-1

Exhibit ___ Page 73

**EXHIBIT A 072**

From: "Dominguez,MariaA.\(USAPR\)"<Maria.A.Dominguez@usdoj.gov>
To: "Rodriguez-Coss,Jacabed"<Jacabed.Rodriguez-Coss@crm.usdoj.gov>
Date: 3/10/20133:48:54PM
Subject: Re:Instructionspenaltyphase

Jackiewewantedtothankyouforallyourhelpwiththisdifficultcase.Wewerefortunatetohavethe benefitofyourtalentandexperience.

SentfrommyiPhone

OnMar10,2013,at4:41PM,"Rodriguez-Coss,Jacabed"<Jacabed.Rodriguez-Coss@usdoj.gov> wrote:

Bruce,

Notsurethisisthebestset,butthesearetheproposedpenaltyphaseinstructionswefiledinAquart.Note thatouraggravatingfactorsmaydiffer.NoideawhyI'mnotlocatingourproposedpreliminaryinstructions, butIamincludingourMotiontoStrikecertainmitigatingfactors(youshouldhavefiledamotionfor disclosureofthesebynow),andourresponsetothedefendant'sobjectionstothecourt'spreliminary charge,whichcontainssomeobjectionsbythegovernment.Someoftheissuesbriefedmaycomeupin yourcase.I'llforwardourproposedpreliminaryinstructionsassoonasIfindthem.

J

**From:**Hegyi,Bruce
**Sent:**Sunday,March10,201311:12AM
**To:**Kinsey,Gwynn-Charlie;Kahan,Jeffrey;Rodriguez-Coss,Jacabed
**Cc:**Carwile,Kevin;'MDominguez@usa.doj.gov';Mateo,MarcelaC.(USAPR)
**Subject:**Fw:Instructionspenaltyphase

All:

Per:JudgeFuste'srequest,below,IamassumingwehavegoodpreliminaryandfinalpenaltyinstructionsT withwhichCCUandAppellatearecomfortable.

Wouldyoumindforwardingusthe"best"set?

Bruce

**From:** Jose Fuste@prd.uscourts.gov [mailto:Jose Fuste@prd.uscourts.gov]
**Sent:**Sunday,March10,201310:44AMEasternStandardTime
**To:**DavidA.Ruhnke<davidruhnke@ruhnkeandbarrett.com>
**Cc:** Diana Villavicencio@prd.uscourts.nov < Diana Villavicencio@prd.uscourts.gov>;Hegyi,Bruce;frc@onelinkpr.net <frc@onelinkpr.net>;joseraguayo@              <        ;    >;jracaussade@
:                     ;marcela.c.mateo@usdoj.gov<mmateo1@usa.doj.gov>;maria.a.dominguez@usdoj.gov
<MIDominguez@usa.doj.gov>;vmchico+court@
**Subject:**Re:Instructionspenaltyphase

Goodmorning.IamaskingbothsidestoproposeASAPpreliminary/finalinstructionsforthepenaltyphase.I wanttohaveampletimetofigurethisout.Thanks.

SentfrommyiPhone

OnMar7,2013,at10:09AM,"DavidA.Ruhnke"<davidruhnke@ruhnkeandbarrett.com>wrote:

Exhibit ___ Page: 74

Your Honor –

The redacted indictment has references to 21 USC sec. 848 (e) (1) (A) and
forfeiture in the description of the charges at p. 1, both of which
are now out of the case. There is also no reference in that section,
I just noted, to 21 USC sec. 846; nor is there a reference to 924 (j).
Sometimes jurors focus in on surprising things. We should probably
simply remove all those references since it is simply a guide and not
part of the indictment.

David A. Ruhnke

**From:** Diana_Villavicencio@prd.uscourts.gov [mailto:Diana_Villavicencio@prd.uscourts.gov]
**Sent:** Thursday, March 07, 2013 9:07 AM
**To:** bruce.hegyi@usdoi.nov; Jose_Fuste@prd.uscourts.gov; David Ruhnke; frc@onelinkpr.net;
joseraguayo@          jracaussade@          ; marcela.c.mateo@usdoj.gov;
maria.a.dominguez@usdoj.gov; vmchico+court@
**Subject:** Indictment for Jury


Cordially,

Diana Villavicencio
Courtroom Deputy Clerk
to Judge Jose A. Fuste
U.S. District Court for the District of Puerto Rico
diana_villavicencio@prd.uscourts.gov
(787) 772-3024

<AquartProposedPenaltyPhaseInstructions6111.wpd>

<MotiontoStrikeCertainMitigatingFactorsandModifyOthersAquart.wpd>

<ResponsetoDefendantObjectionstoCourtProposedPreliminaryPenaltyInstructions.wpd>



Exhibit ___ Page 75

**EXHIBIT A 074**

From:     "Carwile, Kevin"<Kevin.Carwile@crm.usdoj.gov>

To:       "Rodriguez-Coss, Jacabed"<Jacabed.Rodriguez-Coss@crm.usdoj.gov>

Date:     11/16/2012 7:12:27 PM

Subject:  Re:Congratulations!


No need for thanks. Keep up the good work -- the award is well deserved. The Criminal Division really needs you to lead by example as our capital litigation mission expands.

P. Kevin Carwile
Chief, Capital Case Unit
U.S. Department of Justice

**From:** Rodriguez-Coss, Jacabed
**Sent:** Friday, November 16, 2012 06:57 PM Eastern Standard Time
**To:** Carwile, Kevin
**Cc:** Kinsey, Gwynn-Charlie
**Subject:** Re: Congratulations!

Kevin,

I am stunned I I definitely think this case is deserving of recognition. Thank you for including me in the nomination.

Jackie

**From:** Carwile, Kevin
**Sent:** Friday, November 16, 2012 03:52 PM Eastern Standard Time
**To:** Burns, Richard; Carwile, Kevin; Cox, John; De La Cruz, Robert; Hannan, Bonnie; Hegyi, Bruce; Kahan, Jeffrey; Kinsey, Gwynn-Charlie; Mellin, Steve; Mosley, Julie; Qureshi, Stephen; Rodriguez-Coss, Jacabed; Rothstein, Stanley; Warbel, Michael; Mateo, Marcela C. (USAPR)
**Subject:** Congratulations!

Congratulations to Julie, Jeff, Jackie and their AUSA partner Marcela Mateo from Puerto Rico...they just won the Assistant Attorney General Award for their efforts in the successful prosecution of Edison Burgo-Montes I Job well done I

P. Kevin Carwile
Chief, Capital Case Unit
U.S. Department of Justice

Exhibit ____ | Page 76

EXHIBIT L

**EXHIBIT A 075**

From: "Schools.Scott\(ODAG\)"<Scott.Schools@usdoj.gov>

To: "Rodriguez-Coss.Jacabed"<Jacabed.Rodriguez-Coss@crm.usdoj.gov>

Date: 2/22/20135:50:24PM

Subject: RE:BestWishes!

Thanks,Jackie. You are a fabulous public servant and the Department is lucky to have you on its team. Best wishes for all that comes next, and thanks for everything.

**From:**Rodriguez-Coss,Jacabed(CRM)
**Sent:**Friday,February22,20132:18PM
**To:**Schools,Scott(ODAG)
**Subject:**BestWishes!

Scott,

I am so completely surprised and sad to hear about your departure. It has been a pleasure working with you over the last few years. I will miss your presence in the Committee, ODAG and Department. My very best wishes to you wherever you go next.

Jackie

Exhibit ___ Page 77

EXHIBIT M

EXHIBIT A 076

From: "Cohen,Matthew\(ODAG\)"<Matthew.Cohen@usdoj.gov>

To: "Rodriguez-Coss,Jacabed"<Jacabed.Rodriguez-Coss@crm.usdoj.gov>

Date: 10/22/20136:28:09PM

Subject: Re:YourFarewell

ThanksJackie.ItwasgreattoworkwithyoutoobothinthecurrentjobandasanAUSA.Youdoagreatjobthere andareareal assettoDOJ.

From:Rodriguez-Coss,Jacabed(CRM)
Sent:Tuesday,October22,201305:22PMEasternStandardTime
To:Cohen,Matthew(ODAG)
Subject:YourFarewell

Matt,

I'msosorrytohearthatyourareleaving.Unfortunately,Iwillnotbeabletomakeyourfarewellreception, butIwantedtoletyouknowthatitwasgreatworkingwithyouandIwishyouthebest.

Jackie

Exhibit __1__ Page 78

EXHIBIT N

EXHIBIT A 077

## Employee/Supervisor Flexiplace Agreement

The following constitutes an agreement between the supervisor and the employee on the terms and conditions of the Flexiplace Arrangement as stipulated herein.

| 1. EMPLOYEE<br>Jacobed Rodriguez-Coss | 2. SECTION CHIEF/OFFICE DIRECTOR<br>Kevin Carwile |
|---|---|

| Employee agrees to participate in the arrangement for an initial period as specified in the agreement period. Employee is expected to report back to the official duty station on the work day following the expiration of the agreement period unless other arrangements have been agreed upon prior to that date. Agreement period is for agreed upon number of months and is effective beginning of the pay period following approval. | 3. AGREEMENT PERIOD<br>01/01/2014 - 02/28/2014 |
|---|---|

| 4. OFFICIAL DUTY STATION (OFFICE) ADDRESS | 5. ALTERNATE WORKSITE ADDRESS |
|---|---|
| 1331 F Street, N.W.<br>3rd Floor<br>Washington, D.C. 20530 | U.S. Attorney's Office, District of Connecticut<br>1000 Lafayette Boulevard, 10th Floor<br>Bridgeport, CT 06604 |

### 6. DESIGNATED WORK AREA

The employee's designated work area must be a single area, either a room or a portion of a room at the alternate worksite that is designated for the performance of the employee's official duties. It is the responsibility of the employee to ensure that a proper work environment is maintained (e.g. dependent care arrangements are made so as to not interfere with the work, personal disruptions such as non-business telephone calls and visitors are kept to a minimum, etc.) The employee and his/her family should understand that the home office is just that, a space set aside for the employee to work. Family responsibilities must not interfere with work time at home.

*Describe in detail the designated work space including the exact location, layout, etc.*

The employee will be provided office space in the U.S. Attorney's Office, District of Connecticut.

During the period of this arrangement, the employee will be assigned to handle all phases of litigating capital cases (pre-trial, trial, and post-conviction matters) as well as conduct case review and policy work as assigned by the Capital Case Section. At the end of the agreement period, the Chief of the Capital Case Section will evaluate if an extension of this agreement is warranted and a new agreement will be required if an extension is granted.

### 7. TOUR OF DUTY

For the duration of the agreement period, the employee will work the hours of duty specified below. The employee is expected to be either at the official duty station or the alternate worksite during the employee's designated hours of duty.

| HOURS AT THE OFFICIAL DUTY STATION | | | HOURS AT ALTERNATE WORKSITE | | |
|---|---|---|---|---|---|
| MON | From: | To: | MON | From: 8:30am | To: 5:00pm |
| TUE | From: | To: | TUE | From: 8:30am | To: 5:00pm |
| WED | From: | To: | WED | From: 8:30am | To: 5:00pm |
| THR | From: | To: | THR | From: 8:30am | To: 5:00pm |
| FRI | From: | To: | FRI | From: 8:30am | To: 5:00pm |

Exhibit ___ Page ___

EXHIBIT O

**EXHIBIT A 078**

## TERMS AND CONDITIONS OF AGREEMENT

### 8. PAY, LEAVE AND TRAVEL

a. All pay, leave and travel entitlements will be based on the employee's official duty station.

b. Employee agrees to pay all of the travel expenses to and from the employee's official and alternate duty stations, including return trips to this official duty station for emergency meetings.

c. Employee's leave record will be maintained at the official duty station. Employee's time and attendance will be coded to record the telework arrangement. Employee must obtain supervisor's approval before taking leave, in accordance with established office procedures.

d. Employee will continue to be entitled to reimbursement for authorized expenses incurred while conducting business for the Government, as provided for by statute and implementing regulations.

e. Employee understands that he/she will be compensated only for overtime work that is explicitly ordered and approved in advance by the supervisor.

### 9. WORK ASSIGNMENTS AND PERFORMANCE

a. Employee will complete all assigned work according to work procedures mutually agreed upon between employee and supervisor and according to guidelines and standards stated in the employee's performance work plan.

b. Employee's performance evaluation will take into account the norms derived from past performance and the reasonableness of the employee's work output for the time spent under this Flexiplace experiment.

c. In addition to the on-going assignment and review of the employee's work, the employee and the Section Chief/Office Director will meet at regular intervals, to evaluate the impact of this arrangement on the employee, the employee's performance, and the office.

d. Employees may be required to attend meetings, conferences, or training or to otherwise come to the official duty station on days normally scheduled for the alternate work site.

### 10. FACILITY

a. Employee will submit to the Section Chief/Office Director the exact location, layout, etc. of the employee's designated work area. This space must be a single area, either a room or a portion of a room at the alternate worksite that is designated for the performance of the employee's official duties.

b. Employee is required to complete and return to the supervisor a self-certification checklist on home safety. Employee is responsible for ensuring that the home is clean; free of obstructions or potential safety hazards; in compliance with all building codes; and free of hazardous materials. The supervisor may deny the request to participate or may rescind a Flexiplace agreement based on safety problems in the home.

c. Provided the employee is given at least 24 hours advance notice, the supervisor reserves the right to inspect personally, or through a designee, the at-home work space at periodic intervals during the employee's normal working hours to ensure proper maintenance of Government-owned property (if applicable) and worksite conformance with safety standards and other specifications of these guidelines.

d. Employee agrees to limit the performance of officially assigned duties to the employee's approved alternate duty station.

e. The Division will not be responsible for operating costs, home maintenance, or any other incidental costs (e.g. utilities) associated with the use of the employee's residence as an alternate duty station.

f. The Division is not liable for damages to employee's personal or real property during the course of performing official duties or while using any Government equipment in the employee's residence, except to the extent the Government is held liable by the Federal Tort Claims Act or claims arising under the Civilian Employees Claims Act.

- 2 -

Exhibit 1 Page 80

EXHIBIT A 079

11. **EQUIPMENT AND SUPPORT SERVICES**

   a. The Criminal Division will not expend funds for computer equipment to enable the employee to perform government work at the alternate worksite. The employee's home PC must be fully compatible with the technology used in the office. As changes in computer technology are made, the employee may be required to purchase software and/or hardware upgrades or compatible equipment at his/her expense.

   b. In addition, the employee may not violate licensing agreements entered into by the Employer ████████████████ ██████ If the participant will have other individuals (e.g., family members) using the software at home while the employee is at work, he/she must purchase a copy of the software in order to comply with the license agreement.

   c. Employee will also be responsible for providing own fax machine, printer and expendable products such as fax paper and carbon roll, if needed.

   d. Employee will be responsible for having a telephone line available at the alternate worksite for the conduct of official duties. Employee will provide this telephone number to the supervisor. The Division will not be responsible for any telephone line or use charges, including long distance charges for calls to the official duty station, that would not otherwise be incurred if duties were being performed at the primary work site.

   e. If, in the course of his/her duties, the employee is authorized to use long distance telecommunications, whether voice, computer, or fax, for work-related purposes, the costs should be charged to the employee's government-issued telephone credit card. The costs of communications with the primary work-site are solely the responsibility of the employee, and the assigned phone card cannot be used for this purpose.

   f. If necessary, employee will make arrangements for photocopying work-related documents through a vendor. The Division will reimburse costs, up to a maximum of 10 cents per page. Employee will be responsible for keeping accurate records of these expenses, and submitting requests for reimbursement to the supervisor on a monthly basis.

   g. The Division will pay for the cost of postage and Federal Express services employee incurs in the conduct of official business during the agreement period. Employee may obtain an initial supply of envelopes, preprinted Federal Express shipping labels, and Federal Express mailing envelopes from the office. Employee may obtain additional supplies as needed on trips to the official duty station. Employee will return unused supplies to the office when this agreement expires. The use of all Government-provided mail services is for official DOJ business only.

   h. Employee is responsible for protecting any assigned property in accordance with the procedures outlined in FIRMR Bulletin 30, dated October 15, 1985. If employee is assigned any Government property for use at the alternate worksite, employee will be held responsible for the assigned property.

   i. Employee will be responsible for the installation, service and maintenance of any equipment or software employee chooses to provide for the alternate worksite.

12. **INJURY ON THE JOB**

   a. Employee is covered under the Federal Employee's Compensation Act if injured in the course of actually performing official duties at the official duty station or within the designated space of the alternate duty station.

   b. Any accident or injury occurring at the alternate duty station must be brought to the supervisor's immediate attention.

   c. Because an employment-related accident sustained by a Flexiplace employee will occur outside the premises of the official duty station, the supervisor must investigate all reports immediately following notification.

13. **SECURITY**

   a. Employee will apply approved safeguards to protect Division computer and paper records from unauthorized disclosure or damage.

   b. Employee will comply with the Privacy Act requirements set forth in the Privacy Act of 1974, Public Law 93-579, codified at Section 552a, Title 5 U.S.C.

   c. Classified data may NOT be removed from the employee's official duty station to the alternate worksite.

- 3 -

Exhibit __ Page 81

**EXHIBIT A 080**

14. **TERMINATION OF AGREEMENT**

    a. Employee may terminate participation in this arrangement at any time.

    b. Management also has the right to end this arrangement at any time prior to the conclusion of the agreement period if the employee's performance declines, if the employee's off-site work adversely affects the work of the staff remaining in the office, or if the arrangement fails to meet organizational needs.

    c. Failure to comply with the terms of this agreement may result in loss of pay, termination of the Flexiplace arrangement, or other administrative action.

15. **REPORTING REQUIREMENTS:** As required by the Department, employee and supervisor agree to complete surveys, appraisals or reports which summarize the impact of the Flexiplace on the office, the employee, the supervisor, and other organizational elements.

| SUPERVISOR (SIGNATURE) | DATE 12/19/13 |
| EMPLOYEE (SIGNATURE) | DATE 1/3/14 |

105

**EXHIBIT A 081**

From: "Landau.Elana\(USACAE\)"<Elana.Landau@usdoj.gov>

To: "Rodriguez-Coss.Jacabed"<Jacabed.Rodriguez-Coss@crm.usdoj.gov>

Date: 1/3/20131:18:33PM

Subject: Re:DiscoveryMotion

Discoverywentout.

**From:**Jacabed.Rodriguez-Coss@usdoj.gov[mailto:Jacabed.Rodriguez-Coss@usdoj.gov]
**Sent:**Thursday,January03,201312:37PM
**To:**Landau,Elana(USACAE)
**Subject:**Re:DiscoveryMotion

I'lltakealookatittoday,butweneedtosetsometimeasidetodiscuss.Wouldtomorrowat10:00amyourtime
workforyou?Didyougetthediscoverypackageout?

**From:**Landau,Elana(USACAE)[mailto:Elana.Landau@usdoj.gov]
**Sent:**Thursday,January03,201312:34PMEasternStandardTime
**To:**Rodriguez-Coss,Jacabed
**Subject:**DiscoveryMotion

Ihavetoapologizebut Ihavebeensobusywithtrialprepthat Ihavenotevenlooked atthemotion. Ithink
yousaidyouwouldbeabletogettoitwhenyougotbackintheoffice.

Letmeknow...

**ElanaLandau|AssistantUnitedStatesAttorney|EasternDistrictofCalifornia**

RobertE.CoyleUnitedStatesCourthouse

2500TulareStreet,Suite4401 |Fresno,CA93721

(559)497-4083|fax(559)497-4099

*CONFIDENTIALITYNOTICE:Thiscommunicationwithitscontentsandattachments,ifany,may
containconfidential,lawenforcementsensitive,privilegedattorney/clientcommunicationsorwork
products,andisnotsubjecttodisclosure.Itissolelyfortheuseoftheintendedrecipients.
Unauthorizedinterception,review,useordisclosureisprohibited. Ifyoubelievethatyouhavereceived
thisemailinerror,pleasenotifythesenderimmediately,andpermanentlydeletetheemail,any
attachments,andallcopiesfromyourcomputer.*

EXHIBIT P
Exhibit 1 Page 83
**EXHIBIT A 082**

From: "Kinsey,Gwynn-Charlie"<Gwynn-Charlie.Kinsey@crm.usdoj.gov>

To: "Rodriguez-Coss,Jacabed"<Jacabed.Rodriguez-Coss@crm.usdoj.gov>

Date: 2/19/2014 8:33:55 PM

Subject: RE:WeeklyReport

Can you check on the Fuller deadline? PACER shows no movement re the deadline. Thanks.

**From:** Rodriguez-Coss, Jacabed
**Sent:** Wednesday, February 19, 2014 5:35 PM
**To:** Kinsey, Gwynn-Charlie
**Cc:** Carwile, Kevin
**Subject:** WeeklyReport

## I. CCS Litigation Update

In *Fell*, the defense has produced what they claim are the entire trial attorney's files (more than 60,000 pages have been received). For the past few weeks we've had a paralegal working on an index to these documents. We have been unable to begin review of these files due to the ongoing litigation related to the juror misconduct claims. As a result, no follow-up requests have been made.

Defense counsel produced their initial summaries of Juror 162's questionnaire. We requested voir dire and jury consultant documents relating to this juror. We received two pages and are in talks to obtain more documents and/or depose the jury consultant prior to the hearings scheduled for March 18-20, 2014. The defense has forwarded about a 1000 pages worth of documents that they would like to introduce at the March hearing; we have a paralegal working on an Index to these documents and will divide and review.

A telephone conference with counsel is scheduled for tomorrow to discuss upcoming depositions. A pre-hearing conference is scheduled for Feb. 26.

There are some additional pleadings that we would like to file, specifically a motion to unseal all sealed pleadings; and a motion for compliance with Rule 17; however, we have not been able to prepare these.

In *Stone*, the government's response to the defendant's motion requesting two juries was filed on February 4. The defendant's reply is due today, February 19, 2014.

A joint statement to the court on resolved discovery issues was filed on Jan. 31, together with the Government's brief addressing unresolved discovery requests. The Government objected to six of the defendant's requests. The defendant replied in opposition, making a series of allegations that we understand and warrant a reply. We are coordinating with BOP counsel to obtain a declaration in support of our reply. We have been granted until Feb. 26 to file a sur-reply.

We filed a timely motion for extension of time to respond to the motion for prosecutorial misconduct, with a concurrence from the defendant. Our opposition was due on Feb. 10. The Court did not act on our motion; therefore, we filed our opposition with a request to

Exhibit ___ Page 84

supplement. The Court granted us until Feb. 20 to supplement. We had hope to obtain a declaration, or at least corroborating statements from Felicia's case worker, evidencing contacts by defense counsel in an attempt to find Felicia, prior to her arrest. However, the case worker is refusing to speak with the Government. We obtained some helpful information from a Program Manager at Child Protective Services. She agreed to follow up on some additional requests, but we have been unable to reach her since last week. We are working on our supplemental response while we wait for this information.

The Court granted the defendant until Feb. 28 to file a Motion to Dismiss the Indictment for Pre-Indictment delay and destruction of evidence. The Government's response is due 30 days later. A hearing on that motion has been scheduled for June 2.

## II. Death Penalty Review Submissions Received in the Past Week

## III. Deadlines for Death Penalty Review Submissions Pending in ODAG/OAG

## IV. Recent Final AG Decisions on Death Penalty Review Submissions

Mustafah Muhammad (EDVA)
The AG authorized the USA not to seek the DP on February 14, 2014.

## V. Cases Pending with the Committee (noting overdue actions where appropriate):

Fuller, Antonio (EDVA)
Deadline for Committee votes: September 18, 2013. Committee Conference held on Wednesday, February 12, 2014.
Draft to Charlie deadline:
Cert deadline:
AG decision deadline: The Court has requested a decision by March 10, 2014. In light of the rescheduling of the Committee Conference, the USAO will move for an extension of the death penalty decision deadline until the end of March.

Exhibit 1 Page 85

**EXHIBIT A 084**



| From: | "Rodriguez-Coss,Jacabed"<Jacabed.Rodriguez-Coss@crm.usdoj.gov> |
| To: | "Blanco,Kenneth"<Kenneth.Blanco@crm.usdoj.gov> |
| Date: | 3/10/20145:17:14PM |
| Subject: | Grievance |
| Attachments: | StatementinSupportofSecondGrievance31014.pdf |
| | ExhibitFPerformanceAppraisal(2012-2013)-Rodriguez-Coss.pdf |
| | ExhibitEPerformanceEvaluation2011-2012.pdf |
| | ExhibitDPerformanceEvaluation2010-2011.pdf |
| | ExhibitCUSA-NMLetterreRodriguez-Coss.pdf |
| | ExhibitAFeinemailtoAAG.txt |
| | RE:ThankYou.msg |

Mr.Blanco,

Enclosedpleasefindagrievancetotheterminationofmyflexi-placeagreement. Iwillforwardtheadditional
exhibitsinsupportofmystatementseparately.Thankyou.

Jacabed

Exhibit ___ Page 86

EXHIBIT R

**EXHIBIT A 085**

From:    "Breuer.LannyA.,"<Lanny.Breuer@crm.usdoj.gov>

  To:    "Rodriguez-Coss.Jacabed"<Jacabed.Rodriguez-Coss@crm.usdoj.gov>

Date:

Subject:  RE: ThankYou

Jackie, It was a pleasure meeting you yesterday and the whole team. Thanks for all your efforts.
Lanny

From: Rodriguez-Coss, Jacabed
Sent: Friday, January 15, 2010 10:12 AM
To: Breuer, Lanny A.
Cc: Raman, Mythili
Subject: RE: ThankYou

Mr. Breuer,

Thank you so much for your kind words and encouragement. I enjoyed working with Greg and his
team. It was a particularly rewarding experience for me to provide Greg with the same type of support
that CCU provided me in the past when I walked into court to try my first capital case. Thank you for
taking the time to recognize CCU's efforts. Looking forward to meeting you personally on the 26th,

Jackie

———

From: Breuer, Lanny A.
Sent: Thursday, January 14, 2010 8:49 PM
To: Rodriguez-Coss, Jacabed
Cc: Raman, Mythili
Subject: ThankYou

Jackie, I want you to know how proud I am to be associated with you and your excellent work. Greg
clearly feels so thankful for your terrific work with his office. You bring great pride to CRM and
obviously have been a tireless worker. Thank you for all you do for DOJ and CRM. Please know that
I am very appreciative. Best, Lanny

Exhibit ___ Page 87

EXHIBIT A 086

From: "Carwile,Kevin"<Kevin.Carwile@crm.usdoj.gov>
To: "Rodriguez-Coss,Jacabed"<Jacabed.Rodriguez-Coss@crm.usdoj.gov>
Date: 3/24/2014 12:47:53 PM
Subject: RE:FlexiplaceWorkAgreement

Given there is no telling how long the Fell litigation may drag on, I cannot agree that work on that matter justifies you continuing to work from Connecticut. Your Flexiplace Work Agreement expired weeks ago and I agreed for you to work from Connecticut to get through the March hearings. For the reasons stated in our earlier email communications, your duty station starting next Monday will be 1331 F Street in Washington, D.C. If you need to travel to cover depositions, future hearings or training in South Carolina, you can travel from Washington, D.C. (after receiving proper authorizations from Charlie or myself).

P.Kevin Carwile
Chief,Capital Case Section
U.S.Department of Justice

From:Rodriguez-Coss,Jacabed
Sent:Monday,March 24,2014 11:31AM
To:Carwile,Kevin
Cc:Kinsey,Gwynn-Charlie
Subject:RE:FlexiplaceWorkAgreement

Kevin,

As you are probably aware by now, the evidentiary hearing in *Fell v. U.S.* will continue in April. While the Court has not yet set a date, it looks like it will be continued the week of April 21. In the meantime, we expect to be permitted to continue the deposition of the jury consultant, which we hope to complete next week in NY. I am thereafter scheduled to attend the Evidence for Experienced Criminal Litigators Seminar at the NAC the week of April 7, traveling out of NY. Aside from the clear obstacles of my reporting to work in DC on March 31 given my current residence, it would be highly impractical given my commitments over the next month. Thus I'm requesting authorization to continue to work from the USAO-CT until at least April 30. USA-CT Deidre Daly stopped by my office on Friday and assured me that my continued stay in USAO-CT would not be a problem. Please advise. Thanks.

Jackie

From:Carwile,Kevin
Sent:Monday,February 24,2014 12:20PM
To:Rodriguez-Coss,Jacabed
Cc:Kinsey,Gwynn-Charlie
Subject:FlexiplaceWorkAgreement

Jackie,
    I am writing to inform you that I have reviewed the flexiplace work agreement you currently have in effect with the Capital Case Section in order to determine whether to execute a new flexiplace work agreement which would cover your work arrangement in the coming months. The current agreement expires on February 28, 2014. As you know, use of the flexiplace agreement is within management's discretion and is not an entitlement. Due to revelations over the last 2 weeks that were brought to my attention which relate to missed deadlines and other deficiencies in court filings, I have determined that more direct supervision of your work is needed. As a result, I do not intend to renew your flexiplace agreement upon its expiration.
    I am aware that you have a hearing scheduled in the U.S. v. Fell case on March 18 which is expected to last several days. By way of this email I am granting you authorization to continue to work from the United States Attorney's Office in the District of Connecticut in order to prepare for and handle the Fell hearing as long as it is completed in March. Thereafter, your duty station will resume being 1331 F Street, N.W., 3rd Floor, Washington, D.C. 20530. For simplicity's sake, and to allow you adequate flexibility to deal with any posthearing matters, you should plan to report to work at 1331 F Street on Monday, March 31, 2014.
    I have also decided to add staffing in the two litigation matters you are currently handling. Specifically, I am adding Rich Burns to the trial team in the U.S. v. Stone case and Jeff Kahan to the U.S. v. Fell case. Please contact these CCS attorneys today in order to coordinate the process of bringing them up to speed on all facets of these ongoing matters. Thank you.

P.Kevin Carwile
Chief,Capital Case Section
U.S.Department of Justice

Exhibit ___ Page 88

EXHIBIT S

**EXHIBIT A 087**

| From: | "Kinsey,Gwynn-Charlie"<Gwynn-Charlie.Kinsey@cam.usdoj.gov> |
|---|---|
| To: | "Rodriguez-Coss,Jacabed"<Jacabed.Rodriguez-Coss@crm.usdoj.gov> |
| | "Carwile,Kevin"<Kevin.Carwile@crm.usdoj.gov> |
| | "Rodriguez-Coss,Jacabed\(USACT\)"<jrodriguez-coss@usa.doj.gov> |
| Date: | 4/1/20143:27:16PM |
| Subject: | RE:MyDutyStation |

Jackie,

GiventhatyouhavenotreportedtoDCasinstructed,youwillbeplacedinAWOLstatusbeginningtomorrow.Youwillalsobe chargedAWOLforMonday,March31,2014,ifyouarenotabletoproduceacceptablemedicaldocumentationsupportingyour requestforsickleave.

YoushouldnotethatyouhaveworkedtodayfromConnecticutwithoutproperapprovaltodoso.Thisisclearlynotinlinewith theinstructionthathasbeenprovidedtoyou.Goingforward,youarereinstructednottoworkfromConnecticutandyouwillbe chargedAWOLforanyunauthorizedabsences.

Youhaveindicatedthatyouhaveamedicalconditionthatisimpactingyourperformance.Assoonaspossible,pleaseprovide uswithadditionalinformationregardingthenature,severity,anddurationofthecondition,andhowitlimitsyourabilityto performyourjob.

CharlieKinsey
DeputyChief
CapitalCaseSection
CriminalDivision
U.S.DepartmentofJustice
202-353-9721


CharlieKinsey
DeputyChief
CapitalCaseSection
CriminalDivision
U.S.DepartmentofJustice
202-353-9721


**From:**Rodriguez-Coss,Jacabed
**Sent:**Monday,March31,201410:35PM
**To:**Carwile,Kevin
**Cc:**Kinsey,Gwynn-Charlie
**Subject:**MyDutyStation

Kevin,

Unfortunately,thestressfromthecurrentdisputespertainingtothestatusofmyflexi-placeagreementhashadamarkedand detrimentaleffectonmyhealth,tothepointwhereIamnowunderthecontinuingcareofphysiciansandtakingmedication.WhileI amsufferingmedicallyfromthissituationandunderthecareofphysicians,Isimplycannotactcontrarytotheiradviceandreportfor dutyinWashington.IwillbeprovidingyouwithmedicaldocumentationthattherequestedtransferisdetrimentaltomyhealthandthatIcanonlycontinueworkingwiththelimitationthatIremainintheircare.

Furthermore,IhavefiledEEOcomplaints,apersonnelactiontotheMeritSystemsProtectionBoard,anOSC-IRAcomplaint,andan impendingfederaltortclaimrelatedtothesedisputes,whichIbelievetobediscriminatoryandretaliatoryinnature.Duetothe pendencyofthesematters,andtotheextentthatIammedicallyable,itismyintentiontoattempttomaintainthestatusquoby continuingtoreporttomycurrentdutystation,theUSAO-CT.

Jackie

Exhibit 1 Page 89

EXHIBIT T

**EXHIBIT A 088**



**U.S. Department of Justice**

*Equal Employment Opportunity Staff*

---

*Washington, D.C. 20530*

APR 2 3 2014

<u>**Sent Via Certified Mail #7005 3110 0000 3798 0482**</u>

Kevin G. Little, Esq.
P.O. Box 8656
Fresno, CA 93747

## NOTICE OF FINAL INTERVIEW AND
## RIGHT TO FILE A FORMAL COMPLAINT

Dear Mr. Little:

This will serve as notice that on April 22, 2014, a final counseling interview was conducted for your client, Jacabed Rodriguez-Coss. Ms. Rodriguez-Coss initially contacted the Department of Justice (DOJ), Justice Management Division, Equal Employment Opportunity Staff (EEOS) on January 22, 2014. During Ms. Rodriguez-Coss's interview with the EEO Counselor on January 31, 2014, she alleged that the management of the Capital Case Section (CCS), Criminal Division, discriminated against her based on her sex, national origin (Puerto Rican), parental status and by subjecting her to reprisal when she was issued a written reprimand and the time period for her flexi-place agreement was shortened from six months to two months.

Specifically, Ms. Rodriguez-Coss alleges that she moved to Connecticut from the Washington, D.C. Metro area in October 2010. Prior to moving, CCS management asked if Ms. Rodriguez-Coss would assist in a case then scheduled for trial in March of 2011 in Connecticut. Ms. Rodriguez-Coss agreed since she would be living in that district. At the conclusion of the trial, Ms. Rodriguez-Coss requested a few months to find other employment. Kevin Carwile, Section Chief, then asked if she would remain with CCS on a telecommuting basis. Ms. Rodriguez-Coss agreed and a flexi-place agreement was put into place that allowed her to work for CCS from Connecticut. The flexi-place agreement was renewed every six months until December 2013, when it was renewed for two months. Ms. Rodriguez-Coss objected to the reduction of her flexi-place agreement. Additionally, Ms. Rodriguez-Coss had raised concerns with issues relating to workload and case management. Ms. Rodriguez-Coss had also requested as an accommodation that she not be required to travel to California for a trial in light of her family obligations. CCS management did not consider this request, even though there is a male

attorney in CCS who is not required to travel. On January 7, 2014, CCS management issued Ms. Rodriguez-Coss a written reprimand for refusing to litigate the case in California. [1]

The Responding Official, Marc Salans, Acting Assistant Agency Counsel, was initially contacted on February 3, 2014. Mr. Salans responded that the Criminal Division, CCS, denied each allegation of discrimination and retaliation. Additionally, Mr. Salans stated that the decision to reprimand Ms. Rodriguez-Coss was made by Mr. Carwile based on her conduct, namely her refusal to travel to California for a September 2014 trial and her refusal to regularly travel in the months preceding the trial to carry out necessary trial preparation. Mr. Salans responded that neither the refusal to grant her personal preference not to travel for the trial, nor the decision to reprimand her, was made because of Ms. Rodriguez-Coss's gender, national origin or status as a parent. Lastly, Mr. Salans responded that Ms. Rodriguez-Coss's allegation of retaliation were not viable retaliation claims under EEO law because they do not involve an allegation that she was retaliated against for engaging in EEO activity or opposing a discriminatory employment practice.[2]

If Ms. Rodriguez-Coss believes that she has been discriminated against on the basis of race, color, religion, sex, age, national origin, or physical or mental disability, and/or reprisal for participating in protected EEO activity, she has the right to file a formal complaint **within 15 calendar days after your receipt of this notice**. If she files a formal complaint **after 15 calendar days** from the date of your receipt of this notice, her complaint may be dismissed as untimely. **A Formal Complaint of Discrimination form is enclosed. You can access the Form 201A at the following website www.usdoj.gov/jmd/eeos.**

If Ms. Rodriguez-Coss files a Formal Complaint of Discrimination, it must be filed in person, by mail or by fax to the following official who is authorized to receive employment discrimination complaints:

> Richard Toscano, Director
> Equal Employment Opportunity Staff
> Justice Management Division
> Two Constitution Square
> 145 N Street, N.E., Suite 1W.801
> Washington, D.C. 20530
> (202) 616-4800
> (202) 616-4823 (fax)

The formal complaint must be specific and contain only those issues either specifically discussed with the Counselor or issues that are "like or related to" the issues that Ms. Rodriguez-Coss discussed with the Counselor. It must also state whether she has filed a grievance under a negotiated grievance procedure **or** an appeal to the Merit Systems Protection Board on the same

---

[1] In an email dated March 10, 2014, Ms. Rodriguez-Coss alleged that CCS management had subjected her to additional acts of reprisal when they terminated her flexi-place agreement effective February 28, 2014.

[2] Mr. Salans did not address the reprisal claim that Ms. Rodriguez-Coss made on March 10, 2014, since that allegation was made after he had already responded to the original claims.

claims. If she adds issues on which she has not been counseled, these issues will be returned to her for further counseling.

Once the EEO Staff receives Ms. Rodriguez-Coss's formal complaint, you both will receive a written acknowledgment of the formal complaint.

If you have any questions, please contact me at (202) 616-4809.

Sincerely,

Cheryl Angeletti-Harris
EEO Specialist
Justice Management Division

Enclosure

cc:    Jacabed Rodriguez-coss (w/encl.)
       64 Mustang Drive
       Monroe, CT 06468
       (via certified mail #7005 3110 0000 3798 0499)

EXHIBIT B 003



Agency Complaint Number OBD-2014-00281
DJ Number 187-5-361

# EXHIBIT C

*950 Pennsylvania Avenue, N.W.*
*Patrick Henry Building, Room A4810*
*Washington, DC 20530*

Ms. Jacabed Rodriguez-Coss
64 Mustang Drive
Monroe, CT   06468

**MAR 2 3 2016**

Dear Ms. Rodriguez-Coss:

This is in reference to the discrimination complaint that you filed against the Criminal Division, United States Department of Justice. Under the Department of Justice's equal employment opportunity regulations, the Complaint Adjudication Officer, Department of Justice, renders the final DOJ decision on your complaint. Enclosed is the final DOJ decision which concludes that you were not subjected to discrimination based on your sex, national origin, disability, prior EEO activity, or parental status.

### Rights of Appeal

First, there is no right to appeal the DOJ's decision with respect to your claims of discrimination based on parental status. Under Executive Order 13152 and DOJ implementing regulations, DOJ Human Resource Order 1200.1, Chapter 4-1(B)(7)(j), claims based on parental status are investigated under the informal EEO process, and a complainant is entitled to received a final agency decision on those claims. However, the DOJ regulations make clear that the DOJ final decision on parental status claims may not be appealed.

Second, because this case involves the issue of constructive discharge, you have the right to appeal this decision to the Merit Systems Protection Board, Washington, D.C, regional Office, 1901 S. Bell Street, Suite 950, Arlington, Virginia 22202, Facsimile No.: (703) 756-7112. You may also file an appeal on-line athttp://www.mspb.gov. Please note that your appeal must be filed within 30 days of the date you receive this notification.

Third, you have the right to file a complaint in the appropriate United States District Court within 30 days of the

**EXHIBIT C 001**

date you receive this notification. If you decide to file a civil action and do not have or are unable to obtain the services of an attorney to act on your behalf, you may request the court, in its discretion, to appoint an attorney to represent you. The court may also permit you to file the civil action without payment of fees, costs, or security. If you want to request appointment of an attorney, your request must be filed with the court within thirty days of the date you receive this decision.

Sincerely,

Mark L. Gross
Complaint Adjudication Officer

cc: Kevin G. Little
Richard Toscano
Jill Weissman

2

**EXHIBIT C 002**



# MERIT SYSTEMS PROTECTION BOARD
# APPEAL FORM (MSPB FORM 185)

## INSTRUCTIONS FOR COMPLETING YOUR APPEAL

### MSPB's Authority to Review Employment Related Actions or Decisions

The MSPB (the Board)'s legal authority (jurisdiction) to review employment-related actions or decisions is limited to those matters specifically entrusted to it by law, rule, or regulation. A listing of matters over which the Board has jurisdiction can be found in the Board's regulations at 5 C.F.R. § 1201.3. The administrative judge assigned to your case will determine whether the Board has jurisdiction over the particular circumstances of your appeal.

### Where to Obtain Additional Information

Much more information about the adjudication of appeals before the MSPB, including the Board's regulations, may be found at the Board's website: www.mspb.gov. The Board's regulations are also published in the Code of Federal Regulations, 5 C.F.R. Part 1200 et seq., available in many libraries.

### Time Limits for Filing an Appeal

You must file your appeal within 30 calendar days of the effective date, if any, of the action or decision you are appealing, or the date you received the agency's decision, whichever is later. (Please note that Individual Right of Action (IRA), Uniformed Services Employment and Reemployment Rights (USERRA), and Veterans Employment Opportunities Act (VEOA) appeals have different time limits, as described in Appendix A). In limited circumstances, the 30-day filing time limit may be extended if you and the agency mutually agree in writing to try to resolve your dispute through an alternative dispute resolution process before you file an appeal. See 5 C.F.R. § 1201.22(b)-(c). The 30-day time limit may also be extended if you have previously filed a formal equal employment opportunity (EEO) complaint regarding the same matter, as described in Appendix A. The date of filing is the date your appeal is postmarked, the date of the facsimile (fax) transmission, the date it is delivered to a commercial overnight delivery service, the date of receipt in the regional or field office if you personally deliver it, or the date of submission if you file your appeal electronically. **Do not delay filing your appeal merely because you do not currently have the documents requested in this form.**

### Where to File an Appeal

You must file your appeal of the agency's action or decision with the Board's regional or field office responsible for your actual or potential duty station. If you are appealing a retirement or suitability decision by the Office of Personnel Management (OPM), you must file your appeal with the Board's regional or field office responsible for where you live. See 5 C.F.R. § 1201.4(d) and 1201.22(a). For a list of regional and field offices, see Appendix B.

### Attachments

Please submit only the attachments requested in this form. The filing of an appeal is just the beginning of the adjudication process, and you will have additional opportunities to submit evidence and argument before a decision is issued. Further, the agency will submit all the documents contained in its record of the action. 5 C.F.R. § 1201.25(c).

# If you prefer to file your appeal electronically, please visit
# MSPB e-Appeal Online — https://e-appeal.mspb.gov

EXHIBIT C 003

## PART 1 - Appellant and Agency Information

## Everyone must complete Part 1.

*Please type or print legibly.*

**1. Name** *(last, first, middle)*

Last: _____ First: _____ M. Initial: _____

Please list your first name as it appears in your official personnel records. For example, if your first name is "William" on your official personnel records, please list it that way on the appeal form, not "Bill" or "Willy."

**2. Present address** *(number and street, city, State, and Zip code)*
You must promptly notify the Board in writing of any change in your mailing address while your appeal is pending.

Address: _____

City: _____ State: _____ Zip Code: _____

**3. Telephone Numbers** *(include area code)* **and E-Mail Address**
You must promptly notify the Board in writing of any change in your telephone number(s) or e-mail address while your appeal is pending.

Home: _____ Work: _____ Fax: _____ Cell: _____

e-Mail Address: _____

**4. Name and address of the agency that took the action or made the decision you are appealing** *(include bureau or division, street address, city, State and Zip code)*

Agency Name: _____

Bureau: _____

Address: _____

City: _____ State: _____ Zip Code: _____ Phone Number: _____

**5. Your Federal employment status at the time of the action or decision you are appealing:**

☐ Permanent  ☐ Temporary  ☐ Term

☐ Seasonal  ☐ Applicant  ☐ Retired

☐ None

**6. Type of appointment** *(if applicable)*:

☐ Competitive  ☐ Excepted

☐ Postal Service  ☐ SES

☐ Other *(describe)*:

**7. Your position, title, grade, and duty station at the time of the action or decision you are appealing** *(if applicable)*:

Occupational Series or Cluster: _____  Position Title: _____

Grade or Pay Band: _____  Duty Station: _____

**8. Are you entitled to veteran's preference?** See 5 U.S.C. § 2108.

☐ Yes  ☐ No

**9. Length of Federal service** *(if applicable)*:

_____ Years  _____ Months

**10. Were you serving a probationary, trial, or initial service period at the time of the action or decision you are appealing?**

☐ Yes  ☐ No

**11. HEARING:** You may have a right to a hearing before an administrative judge. If you elect not to have a hearing, the administrative judge will make a decision on the basis of the submissions of the parties. Do you want a hearing?

☐ Yes  ☐ No

**EXHIBIT C 004**

## PART 2 - Agency Personnel Action or Decision (non-retirement)

Complete this part if you are appealing a Federal agency personnel action or decision other than a decision directly addressing your retirement rights or benefits. This includes certain actions that might not otherwise be appealable to the Board: individual right of action (IRA) appeals under the Whistleblower Protection Act (WPA), appeals under the Uniformed Services Employment and Reemployment Rights Act (USERRA), or appeals under the Veterans Employment Opportunities Act (VEOA). An explanation of these three types of appeals is provided in **Appendix A**.

12. Check the box that best describes the agency **personnel action or decision** you are appealing. (If you are appealing more than one action or decision, check each box that applies.)

☐ Removal (termination after completion of probationary or initial service period)

☐ Termination during probationary or initial service period

☐ Reduction in grade, pay, or band

☐ Suspension for more than 14 days

☐ Failure to restore/reemploy/reinstate or improper restoration/reemployment/reinstatement

☐ Negative suitability determination

☐ Involuntary resignation

☐ Involuntary retirement

☐ Denial of within-grade increase

☐ Furlough of 30 days or less

☐ Separation, demotion or furlough for more than 30 days by reduction in force (RIF)

☐ Other action (describe):

13. Date you received the agency's final decision letter (if any) *(MM/DD/YYYY)*:

14. Effective date (if any) of the agency action or decision *(MM/DD/YYYY)*:

15. Prior to filing this appeal, did you and the agency mutually agree in writing to try to resolve the matter through an alternative dispute resolution (ADR) process?

☐ Yes *(attach a copy of the agreement)*          ☐ No

16. Explain briefly why you think the agency was wrong in taking this action, including whether you believe the agency engaged in harmful procedural error, committed a prohibited personnel practice, or engaged in one of the other claims listed in **Appendix A**. Attach the **agency's proposal letter, decision letter, and SF-50, if available.** Attach additional sheets if necessary (bearing in mind that there will be later opportunities to supplement your filings).

17. With respect to the agency personnel action or decision you are appealing, have you, or has anyone on your behalf, filed a grievance under a negotiated grievance procedure provided by a collective bargaining agreement?

☐ Yes  ☐ No

If "Yes," **attach a copy of the grievance**, enter the date it was filed, and enter the place where it was filed if different from your answer to question 4 in Part 1.

Agency Name: [ ]  Date Filed (*MM/DD/YYYY*): [ ]

Bureau: [ ]

Address: [ ]

City: [ ]  State: [ ]  Zip Code: [ ]

If a decision on the grievance has been issued, **attach a copy of the decision** and enter the date it was issued *(MM/DD/YYYY)*:

Date Issued (*MM/DD/YYYY*): [ ]

---

**Answer Question 18 ONLY if you are filing an IRA appeal.**

18. If you filed a whistleblowing complaint with the Office of Special Counsel (OSC), provide the date on which you did so and the date on which OSC made a decision or terminated its investigation, if applicable. **Attach copies of your complaint and OSC's termination of investigation letter**, notifying you of your right to seek corrective action from the Board.

Date Filed (*MM/DD/YYYY*): [ ]

Date of OSC decision or termination of investigation (*MM/DD/YYYY*): [ ]

---

**Answer Question 19 ONLY if you are filing a USERRA or VEOA appeal.**

19. If you filed a complaint with the Department of Labor (DOL), list the date on which you did so, and **attach a copy of your complaint**. If DOL has made a decision on your complaint, list the date of this decision, and **attach a copy of it**. If DOL has not made a decision on your complaint within 60 days from the date you filed it, state whether you have notified DOL of your intent to file an appeal with the Board, and **attach a copy of such notification**.

Date Filed (*MM/DD/YYYY*): [ ]

Has DOL made a decision on your complaint?

☐ Yes  ☐ No

If "Yes," enter the date it was made. If "No", state whether you have notified DOL of your intent to file an appeal with the Board, and **attach a copy of such notification**.

Date of DOL decision (*MM/DD/YYYY*): [ ]  ☐ Notified DOL of your intent to file an appeal with the Board?

**EXHIBIT C 006**

## PART 3 - OPM or Agency Retirement Decision

Complete this part if you are appealing a decision of the Office of Personnel Management (OPM) or other Federal agency directly addressing your retirement rights or benefits.

20. In which retirement system are you enrolled?

☐ CSRS    ☐ CSRS Offset    ☐ FERS

☐ Other, *describe:*

21. Are you a:

☐ Current Employee    ☐ Annuitant

☐ Surviving Spouse

☐ Other, *describe:*

22. If retired, date of retirement, or if unknown, approximate date:

Date Retired (*MM/DD/YYYY*):

23. Describe the retirement decision you are appealing.

24. Have you received a final or reconsideration decision from OPM or another Federal agency?

☐ Yes *(attach a copy)*    ☐ No

If "Yes," on what date did you receive the decision?

Date Received (*MM/DD/YYYY*):

Provide the OPM processing (CSA or CSF) number in your appeal:

OPM Claim Number:

25. Explain briefly why you think OPM or another Federal agency was wrong in making this decision.

**EXHIBIT C 007**

26. Has an individual or organization agreed to represent you in this proceeding before the Board? (You may designate a representative at any time. However, it is unlikely that the appeals process will be delayed for reasons related to obtaining or maintaining representation. Moreover, you must promptly notify the Board in writing of any change in representation.)

☐ Yes *(Complete the information below and sign)*      ☐ No

**DESIGNATION:**

"I hereby designate _____ to serve as my representative during the course of this appeal. I understand that my representative is authorized to act on my behalf. In addition, I specifically delegate to my representative the authority to settle this appeal on my behalf. I understand that any limitation on this settlement authority must be filed in writing with the Board."

Representative's address *(number and street, city, State and Zip code)*

Address: _____

City: _____

State: _____    Zip Code: _____

Representative's telephone numbers *(include area code)* and e-mail address

Office: _____

Fax: _____    Other: _____

e-Mail Address: _____

**SIGN BELOW TO MAKE YOUR DESIGNATION OF REPRESENTATIVE EFFECTIVE**

_____          _____

Appellant's Signature                          Date *(MM/DD/YYYY)*

## PART 5 - Certification

27. I certify that all of the statements made in this form and any attachments are true, complete, and correct to the best of my knowledge and belief.

_____          _____
Signature of Appellant or Representative                  Date *(MM/DD/YYYY)*

### Privacy Act Statement

This form requests personal information that is relevant and necessary to reach a decision in your appeal. The Merit Systems Protection Board collects this information in order to process appeals under its statutory and regulatory authority. Because your appeal is a voluntary action, you are not required to provide any personal information to the Merit Systems Protection Board in connection with your appeal. Consequently, failure to provide all information essential to reaching a decision in your case could result in the dismissal or denial of your appeal.

Decisions of the Merit Systems Protection Board are available to the public under the provisions of the Freedom of Information Act and are posted to the Merit Systems Protection Board's public website. Some information about the appeal also is used in depersonalized form for statistical purposes. Finally, information from your appeal file may be disclosed as required by law under the provisions of the Freedom of Information Act and the Privacy Act. See 5 U.S.C. §§ 552, 552a.

### Public Reporting Burden

The public reporting burden for this collection of information is estimated to vary from 20 minutes to 4 hours, with an average of 30 minutes per response, including time for reviewing the form, searching existing data sources, gathering the data necessary, and compiling and reviewing the collection of information. Send comments regarding the burden estimate or any other aspect of the collection of information, including suggestions for reducing this burden, to Office of the Clerk of the Board, Merit Systems Protection Board, 1615 M Street, N.W., Washington, DC 20419 or by e-mail to mspb@mspb.gov.

# APPENDIX A

## ADDITIONAL CLAIMS

**Harmful Procedural Error:** Error by the agency in the application of its procedures that is likely to have caused the agency to reach a conclusion different from the one it would have reached in the absence or cure of the error. The burden is upon the appellant to show that the error was harmful, i.e., that it caused substantial harm or prejudice to his or her rights. 5 C.F.R. § 1201.56(c)(3).

**Prohibited Personnel Practices:** A claim that the agency action or decision you are challenging was the result of one of the personnel practices prohibited by 5 U.S.C. § 2302(b). Among the prohibited personnel practices most likely to be relevant as an affirmative defense in an MSPB proceeding are: unlawful discrimination under subsection (b)(1); retaliation for protected whistleblowing under subsection (b)(8); and retaliation for other protected activity under subsection (b)(9).

- **Unlawful Discrimination:** A claim that the agency action was the result of prohibited discrimination based on race, color, religion, sex, national origin, disability, age, marital status, political affiliation, genetic information, and retaliation for prior EEO activity. See 5 U.S.C § 2302(b)(1) and 7702; 5 C.F.R. Part 1201, Subpart E; 29 C.F.R. Part 1630 and Appendix to Part 1630; 42 U.S.C. § 2000ff et seq.; 29 C.F.R. § 1614.302-.308. If you filed a formal discrimination complaint, give the date on which you did so, state whether and when the agency issued a final decision on your discrimination complaint, and provide copies of both.

- **Retaliation for whistleblowing activity** under 5 U.S.C. § 2302(b)(8) and (b)(9)(A)(i), (B), (C), or (D): A claim that the agency action was taken in retaliation for the disclosure of information the individual reasonably believes demonstrates a violation of law, rule, or regulation, gross mismanagement, gross waste of funds, abuse of authority, or substantial and specific danger to public health or safety, or in retaliation for exercise of the right to appeal, complain, or grieve an alleged violation of Subsection (b)(8); for testifying or otherwise lawfully assisting another's right to appeal, complain, or grieve such an alleged violation; for cooperating with or disclosing information to the Inspector General or Special Counsel in accordance with applicable provisions of law; or for refusing to obey an order that would require a violation of law. See 5 C.F.R. § 1209.4(b).

- **Retaliation for other protected activity** under 5 U.S.C. § 2302(b)(9)(A)(ii): A claim that the agency action was taken in retaliation for the exercise of a right, other than with regard to remedying an alleged violation of 5 U.S.C. § 2302(b)(8), such as the filing of an appeal, complaint, or grievance.

**Violation of Rights under the Uniformed Services Employment and Reemployment Rights Act (USERRA):** A claim that the agency action violated rights and benefits under 38 U.S.C. Chapter 43, by denying initial employment, reemployment, retention in employment, promotion, or any benefit of employment on the basis of membership, application for membership, performance of service, application for service, or obligation to perform service in a uniformed service. See 5 C.F.R. § 1208, Subpart B.

**Violation of a Law or Regulation relating to Veterans' Preference pursuant to the Veterans Employment Opportunities Act (VEOA):** A claim that the agency action violated rights related to veterans' preference under any statute or regulation. See 5 C.F.R. § 1208, Subpart C; 5 U.S.C. § 3330(a).

**Not in accordance with law:** A claim that the agency's action was unlawful in its entirety, that is, there is no legal authority for the action.

## IRA, USERRA, and VEOA APPEALS

The law provides for three types of appeals in certain situations that might not otherwise be appealable to the MSPB (See 5 C.F.R. § 1201.3(a) for a list of otherwise appealable actions): Individual Right of Action (IRA) appeals under the Whistleblower Protection Act (WPA) and Whistleblower Protection Enhancement Act (WPEA) pursuant to 5 U.S.C. § 1221; appeals under the Uniformed Services Employment and Reemployment Rights Act (USERRA) pursuant to 38 U.S.C. § 4324; and appeals under the Veterans Employment Opportunities Act (VEOA) pursuant to 5 U.S.C. § 3330a.

**Note:** As previously set forth, allegations of retaliation for whistleblowing, as well as allegations under USERRA and VEOA, may be brought as additional claims in cases that are otherwise appealable to the Board.

**IRA Appeals under the WPA and WPEA.** Subsection (b)(8) of <u>5 U.S.C. § 2302</u> makes it a prohibited personnel practice to threaten, propose, take, or not take a personnel action listed in <u>5 U.S.C. § 2302</u>(a)(2) because of an individual's disclosure of information that he or she reasonably believes shows a violation of law, rule, or regulation, gross mismanagement, gross waste of funds, abuse of authority, or substantial and specific danger to public health or safety. <u>Subsections</u> (b)(9)(A)(i), (B), (C), and (D) make it a prohibited personnel practice to threaten, propose, take, or not take a personnel action because an individual exercised the right to appeal, complain, or grieve an alleged violation of Subsection (b)(8); testified or otherwise lawfully assisted another's right to appeal, complain, or grieve such an alleged violation; cooperated with or disclosed information to the Inspector General or Special Counsel in accordance with applicable provisions of law; or refused to obey an order that would require a violation of law. *See* <u>5 C.F.R. § 1209.4</u>. If the personnel action allegedly taken in reprisal for making a protected disclosure or engaging in protected activity is not otherwise appealable to the Board, you must first file a whistleblower complaint with the Office of Special Counsel (OSC) and exhaust the procedures of that office, *see* <u>5 U.S.C. § 1214</u>(a)(3), before you may file an IRA appeal with the Board under <u>5 U.S.C. § 1221</u>.

**USERRA Appeals.** In USERRA appeals, appellants allege that agencies have violated their rights and benefits under <u>38 U.S.C. Chapter 43</u>, by denying initial employment, reemployment, retention in employment, promotion, or any benefit of employment on the basis of their membership, application for membership, performance of service, application for service, or obligation to perform service in a uniformed service. *See* <u>5 C.F.R. § 1208, Subpart B</u>. To pursue redress for a USERRA violation, you may either file a USERRA complaint with the Department of Labor (DOL) or file an appeal with the Board. However, if you first file a USERRA complaint with DOL, you must exhaust DOL procedures before you may file an appeal with the Board. *See* <u>5 C.F.R. § 1208.11</u>.

**VEOA Appeals.** A VEOA appeal is one in which a preference eligible (defined in <u>5 U.S.C. § 2108</u>) or veteran described in <u>5 U.S.C. § 3304</u>(f)(1) alleges that a Federal agency violated his or her rights under any statute or regulation relating to veterans' preference. *See* <u>5 C.F.R. § 1208, Subpart C</u>. Unless you are making a VEOA claim in an otherwise appealable action, you must file a VEOA complaint with DOL and allow DOL at least 60 days to try to resolve the matter before filing an appeal with the Board.

## <u>Time Limits for filing IRA, USERRA, and VEOA Appeals,</u><br><u>and following the filing of a Formal EEO Complaint</u>

**IRA Appeals.** If you are filing an IRA appeal, you must file no later than 65 days after the date of the Office of Special Counsel (OSC) notice advising you that the Special Counsel will not seek corrective action, or within 60 days after the date you received the OSC notice, whichever is later. *See* <u>5 C.F.R § 1209.5</u>.

**USERRA Appeals.** If you are filing a USERRA appeal, there is no time limit for filing. *See* <u>5 C.F.R. § 1208.12</u>. If you file a USERRA complaint with the Department of Labor (DOL) first, you must exhaust the procedures of DOL before you may file an appeal with the Board.

**VEOA Appeals.** If you are filing a VEOA appeal, you must file it within 15 days after the date you received notice that the Department of Labor (DOL) was unable to resolve the matter. *See* <u>5 C.F.R. § 1208.22</u>. Note: Before filing with the Board, you must file a VEOA complaint with the DOL, which is allowed at least 60 days to try to resolve the matter.

**Formal EEO Complaints.** If you have previously filed a formal Equal Employment Opportunity (EEO) complaint regarding the same matter, you must file your Board appeal within 30 days after receiving the agency's resolution or final decision as to that complaint, or you may file at any time after 120 days have elapsed from the filing of the complaint in the absence of such an agency resolution or decision. *See* <u>5 C.F.R. § 1201.154</u>(b).

# APPENDIX B

## MSPB Regional and Field Offices

**Atlanta Regional Office:** 401 West Peachtree Street, N.W., 10th floor, Atlanta, GA 30308-3519
Tel No.: (404) 730-2751; Fax No.: (404) 730-2767
*Geographic Area:* Alabama; Florida; Georgia; Mississippi; South Carolina; and Tennessee.

**Central Regional Office:** 230 South Dearborn Street, 31st floor, Chicago, IL 60604-1669
Tel No.: (312) 353-2923; Fax No.: (312) 886-4231
*Geographic Area:* Illinois; Indiana; Iowa; Kansas City, Kansas; Kentucky; Michigan; Minnesota; Missouri; Ohio; and Wisconsin.

**Dallas Regional Office:** 1100 Commerce Street, Room 620, Dallas, TX 75242-9979
Tel. No.: (214) 767-0555; Fax No.: (214) 767-0102
*Geographic Area:* Arkansas; Louisiana; Oklahoma; and Texas.

**Denver Field Office:** 165 South Union Blvd., Suite 318, Lakewood, CO 80228-2211
Tel. No.: (303) 969-5101; Fax No.: (303) 969-5109
*Geographic Area:* Arizona; Colorado; Kansas (except Kansas City); Montana; Nebraska; New Mexico; North Dakota; South Dakota; Utah; and Wyoming.

**New York Field Office:** 26 Federal Plaza, Room 3137-A, New York, NY 10278-0022
Tel. No.: (212) 264-9372; Fax No.: (212) 264-1417
*Geographic Area:* New Jersey counties of Bergen, Essex, Hudson, and Union; New York; Puerto Rico; and Virgin Islands.

**Northeastern Regional Office:** 1601 Market Street, Suite 1700, Philadelphia, PA 19103
Tel. No.: (215) 597-9960; Fax No.: (215) 597-3456
*Geographic Area:* Connecticut; Delaware; Maine; Maryland (except the counties of Montgomery and Prince George's) Massachusetts; New Hampshire; New Jersey (except the counties of Bergen, Essex, Hudson, and Union); Pennsylvania; Rhode Island; Vermont; and West Virginia.

**Washington Regional Office:** 1901 S. Bell Street, Suite 950, Arlington, VA 22202
Tel. No.: (703) 756-6250; Fax No.: (703) 756-7112
*Geographic Area:* Maryland counties of Montgomery and Prince George's; North Carolina; Virginia; Washington, DC; and all overseas areas not otherwise covered.

**Western Regional Office:** 201 Mission Street, Suite 2310, San Francisco, CA 94105-1831
Tel. No.: (415) 904-6772; Fax No.: (415) 904-0580
*Geographic Area:* Alaska; California; Hawaii; Idaho; Nevada; Oregon; Washington; and Pacific overseas.




**U.S. Department of Justice**

Complaint Adjudication Office

Agency Complaint No. OBD-2014-00281
DJ Number 187-5-361

*950 Pennsylvania Avenue, NW*
*Patrick Henry Building, Room A4810*
*Washington, DC 20530*

**MAR 2 3 2016**

DEPARTMENT OF JUSTICE FINAL AGENCY DECISION

in the matter of

<u>Jacabed Rodriguez-Coss v. Criminal Division, United States
Department of Justice</u>

On May 6, 2014, complainant Jacabed Rodriguez-Coss, a
former Trial Attorney with the Capital Case Section (CCS),
Criminal Division, United States Department of Justice (DOJ),
filed an employment discrimination complaint against DOJ,
pursuant to Section 717 of the Civil Rights Act of 1964, as
amended, 42 U.S.C. § 2000e-16 (Title VII), as amended 29 U.S.C.
§ 791, Section 501 of the Rehabilitation Act of 1973, as amended
29 U.S.C. § 791, Executive Order 13152 (65 FR 26115), amending
Executive Order 11478, and 29 C.F.R. § 1614.101(a) & (b).

The issues presented in this case are:

1. Whether complainant was subjected to discrimination
because of her sex, race/ national origin (Hispanic/ Puerto
Rico), parental status, and prior EEO activity when, on December
19, 2013, CCS management renewed complainant's flexi-place
agreement for two months instead of six-months;

2. Whether complainant was subjected to discrimination
because of her sex, race/ national origin (Hispanic/ Puerto
Rico), parental status, and prior EEO activity when, on January
7, 2014, CCS management issued complainant a letter of
reprimand;

3. Whether complainant was subjected to discrimination
because of her sex, race/ national origin (Hispanic/ Puerto
Rico), parental status, and prior EEO activity when, on February
24, 2014, management refused to renew complainant's flexi-place
agreement, constructively discharging complainant;

**EXHIBIT C 013**

4. Whether complainant was subjected to discrimination because of her sex, race/ national origin (Hispanic/ Puerto Rico), parental status, and prior EEO activity when, on April 1, 2014, CCS management denied complainant annual leave and placed her in absent without leave (AWOL) status and when, on April 3, 2014, CCS management again placed complainant in AWOL status despite the fact that complainant worked part of the day in Connecticut, her former duty location;

5. Whether complainant was subjected to discrimination because of her sex, race/ national origin (Hispanic/ Puerto Rico), parental status, and prior EEO activity when, on April 2, 2014, CCS management refused to allow complainant to attend training at the National Advocacy Center the following week;

6. Whether complainant was subjected to discrimination because of her sex, race/ national origin (Hispanic/ Puerto Rico), parental status, and prior EEO activity when, on April 13, 2014, CCS management denied complainant's sick leave request for April 14-18, 2014, and placed complainant in AWOL status, causing her to lose a week's worth of pay; and

7. Whether complainant was subjected to disability discrimination when, in April 2014, complainant was denied a reasonable accommodation for a temporary disability.

This case was received by the Complaint Adjudication Office for issuance of a final Department of Justice decision on August 31, 2015.

### Facts

#### A. Complainant's Allegations

Complainant stated that she began her career with CCS in Washington, D.C., in approximately 2008 and in October 2010 relocated with her family to Connecticut. Ex. 1 at 4-5. Complainant said that she remained with CCS working in Connecticut for a trial that took place from March 2011 to June 2011 and expected to transfer to the United States Attorney's Office (USAO) for the District of Connecticut thereafter. Id. Complainant stated that in 2011 she received an offer from the USAO, but rejected it. Id. According to complainant, CCS Chief Paul Kevin Carwile (white) offered to allow her to remain with

2

EXHIBIT C 014

CCS and to telecommute from the USAO in Bridgeport, Connecticut, full time. Id. Complainant stated that she and CCS management entered into a "flexi-place" agreement that provided written authorization for her telecommuting and that between March 2011 and December 2013 that agreement was renewed every six months. Id. Complainant detailed that the agreement could be terminated only if complainant failed to perform her duties adequately. Ex. 7 at 22-23.

Complainant explained that work in the CCS was divided into two types of responsibilities - review of potential capital cases and litigation support to capital cases. Ex. 7 at 9-10. Complainant stated that beginning in 2010, when Kinsey became the Section Chief, CCS attorneys were expected to participate more fully in the litigation of capital cases around the country. Id. Complainant said that in summer 2012 she began to complain to Carwile and CCS Deputy Chief Gwynn "Charlie" Kinsey (white) that she was being treated differently than Stanley Rothstein, who, according to complainant, was a white attorney with no minor children. Ex. 7 at 17-19. According to complainant, Rothstein was not required to travel and litigate cases outside of the Washington, D.C. area, but she was. Id.

Complainant stated that beginning in October 2013 her CCS litigation case load became increasingly difficult to manage. Ex. 7 at 4-9. Complainant said that she began to suffer from a "mental condition" that got progressively worse and which caused difficulty sleeping, an inability to concentrate, and chest pains. Id. Complainant stated that she sought medical treatment with her "generalist" and cardiologist in 2014. Ex. 1 at 18. Complainant said that in April 2014 she also sought care from a psychiatrist and was taking medicine to manage her condition. Ex. 1 at 18; ex. 7 at 10-11.

Complainant said that on December 19, 2013, she received the renewal of her flexi-place agreement from CCS management and that the renewal term was for only two months, not the customary six months. Ex. 7 at 23-32. According to complainant, she immediately questioned and objected to the short duration of the agreement, but management gave her no reason for shortening the timeframe of the agreement. Id. Complainant stated that, at that time, she believed that CCS management was contemplating terminating her flexi-place agreement, which, to complainant, was tantamount to a constructive discharge because she could not report to Washington, D.C., on a daily basis given that she and

3

EXHIBIT C 015

her family lived in Connecticut. Id. Complainant said that, as a result, her stress levels increased a great deal. Id. Complainant stated that she believed that her flexi-place agreement was truncated because of her race/ national origin, sex, and parental status as evidenced by the fact that Rothstein, a white male with no minor children, was not required to travel and in retaliation for her complaint about the disparate treatment to which she was subjected. Id. at 28-32.

Complainant stated that on January 7, 2014, CCS management issued her a letter of reprimand. Ex. 7 at 32-37. Complainant explained that between December 2013 and January 2014, she complained "loudly" to CCS management and DOJ Human Resources about her flexi-place agreement being truncated without justification and her being overwhelmed with litigation cases in California and Vermont. Id. Complainant said that immediately after she had contact with Human Resources, she was reprimanded. Id. Complainant stated that management gave her the reprimand because she allegedly refused to litigate a case in California. Id. Complainant denied that she refused to litigate the case, noting that she investigated the case, prepared witnesses, and responded to every motion. Id. Complainant stated that she repeatedly objected to having to try the California case because it would cause a "severe hardship" for her and her family and repeatedly asked management to reassign the case to another CCS attorney. Ex. 1 at 5-6, 8-9. According to complainant, she informed her managers that she "simply could not separate [her]self from [her] family for three to four months" for trial. Id. Complainant stated that she also informed her managers that she would travel for cases only when she believed it was necessary. Id.

Complainant said that on January 24, 2014, CCS management notified her that they would not renew her flexi-place agreement and that she was required to report to the CCS offices in Washington, D.C., on a daily basis beginning March 31, 2014. Ex. 7 at 38-42. Complainant stated that she viewed the failure to renew the agreement as a constructive termination of her employment. Id. Complainant explained that she was a resident of Connecticut and could not sell her home and remove her three minor children from school within the 30 days allotted to her. Id. Complainant said that management failed to renew the agreement because her performance allegedly declined and she allegedly needed closer supervision. Id. Complainant denied that her performance declined over the three years her flexi-

4

EXHIBIT C 016

place agreement was in place. Ex. 1 at 11-17. Complainant stated that her performance reviews for 2010 to 2013 and her 2012 Assistant Attorney General for Criminal Division Distinguished Service Award were evidence that she maintained outstanding performance throughout her flexi-place agreement. Id. Complainant conceded that she had "some" late filings in the California case, but said that the number of those filings "paled" in comparison to the number of filings she filed on time and the overall quality of her work and that none of the delayed filings were due to her negligence. Id.

Complainant stated that management's actions between February 2014 and March 2014 were inconsistent with the stated reasons for terminating her flexi-place agreement. Ex. 7 at 38-42. Complainant explained that management let her remain in Connecticut for a month, handle an important hearing in a case in Vermont, and handle other matters in New York without supervision. Id. Complainant stated that she did not believe that management could supervise her more closely from an office in Washington, D.C, than they could from an office in Connecticut. Id. Complainant said that she believed management terminated her flexi-place agreement in retaliation for having protested disparate treatment within CCS, namely that she was treated differently than Rothstein, and in retaliation for seeking EEO counseling in this case. Id. at 41.

Complainant said that she informed Kinsey of her "mental condition" in April 2014 and requested that she be allowed to continue to work from Connecticut as a reasonable accommodation of her condition. Ex. 7 at 10-11, 41. According to complainant, she provided documentation to CCS management that she could not move to Washington, D.C., because of her impairment, but CCS management summarily denied her request for reasonable accommodation. Id.

Complainant stated that Kinsey denied her request for annual leave for April 1, 2014, and placed her in AWOL status. Ex. 7 at 42-48. According to complainant, Kinsey denied complainant's leave request because complainant failed to report for work in Washington, D.C., the day before. Id. Complainant said that, in the past, leave for attorneys had always been approved without question. Id. Complainant stated that Kinsey placed her in AWOL status again on April 3, 2014, despite the fact that she worked part of the day from the USAO in Connecticut. Id. Complainant explained that although she had

5

EXHIBIT C 017

been ordered to report to Washington, D.C., on March 31, 2014, there were important case related matters in Connecticut with which she had to contend and her working from the USAO in Connecticut was justified. Id.

Complainant said that on April 2, 2014, CCS management canceled her participation in a training class at the National Advocacy Center (NAC) in South Carolina. Ex. 7 at 48-52. Complainant stated that she needed the course to meet her continuing legal education (CLE) requirements for her bar membership, which DOJ required that she maintain. Id. Complainant said that CCS management informed her that she was not allowed to attend the training because she failed to report to Washington, D.C., for duty. Id. Complainant added that management also stated that complainant could attend the training if she first reported to Washington, D.C., and traveled from there, but could not attend if she traveled directly from Connecticut. Id. Complainant said that not attending the training jeopardized her bar membership because she could not fulfill the bar's CLE requirements by the deadline of April 30, 2014. Id. Complainant stated that three other CCS attorneys were allowed to attend the training class at issue. Id. Complainant said that she believed that management canceled her participation in the training class in retaliation for her opposing the disparate treatment to which she was subjected in CCS and as a means to further discriminate against her because of her race/ national origin, sex, and parental status. Id.

Complainant stated that on April 13, 2014, Kinsey denied her request for sick leave from April 14 to 18, 2014, and placed her in AWOL status for that week. Ex. 7 at 52-55. Complainant said that she submitted medical documentation from two of her medical providers regarding her need to be out for the week. Id. According to complainant, Kinsey requested clarification of the medical documentation, which complainant submitted on April 21, 2014. Id. Complainant stated that Kinsey retroactively approved the leave after receiving the additional documentation. Id. Complainant added that she believed that management denied her leave because of her race/ national origin, sex, and parental status and in retaliation for her opposing the discriminatory conduct she faced and seeking EEO counseling in this case. Id.

6

EXHIBIT C 018

## B. Management's Response

1. CCS Chief Paul Kevin Carwile stated that he became complainant's second-line supervisor in August 2010. Ex. 8 at 4-6. Carwile said that he became aware of complainant's claims of unequal treatment compared to Rothstein in fall 2013 after the section management urged complainant to fulfill her job responsibilities. Id. at 7-8. Carwile stated that complainant never complained of stress related issues until she was ordered to report for work in Washington, D.C., in March 2014. Id.

Carwile confirmed that in 2010 complainant and CCS entered into a flexi-place agreement that allowed complainant to work remotely from Connecticut full time as long as complainant fulfilled her job responsibilities and the needs of the section were met. Ex. at 8-16. Carwile added that the arrangement was very unusual and that the section had no other similar agreements with any section personnel. Id. According to Carwile, in late 2013, when complainant's flexi-place agreement was up for its periodic review, complainant informed her managers that she was unwilling to try the California case assigned to her. Id. Carwile stated that complainant said that "[she was] not going to try that case" and that they "need[ed] to reassign it to someone else." Id. Carwile said that because of complainant's refusal to try the California case, he and Kinsey decided to renew complainant's flexi-agreement for two months, instead of the customary six months, to allow management time to persuade complainant to agree to conduct the trial in California and to reassess whether, if complainant continued to refuse to try the case, the agreement still met the section's needs. Id.

Carwile stated that complainant was issued the letter of reprimand for the same reasons the flexi-place agreement was renewed for only a short duration. Ex. 8 at 16-18. Carwile explained that after complainant informed him and Kinsey that she refused to conduct the trial of the California case, he and Kinsey had several calls and email communications with complainant to express the fact that the California case was part of complainant's job responsibilities and that she must fulfill those duties. Id. Carwile said that he and Kinsey made it very clear to complainant that complainant had to try the case in question or be subject to potential adverse action. Id.

7

EXHIBIT C 019

Carwile said that after complainant's refusal to handle the trial in the California case, CCS management learned of deficiencies in complainant's handling of matters in the California case. Ex. 8 at 18-24. According to Carwile, the United States Attorney for the Eastern District of California called to inform him about problems with complainant's performance in the California case. Id. Carwile stated that the United States Attorney told him that from fall 2013 to the beginning of 2014, complainant missed numerous deadlines for court filings and that the United States District Court Judge on the matter was so displeased with complainant that the Judge "rebuked" complainant in open court "in very harsh terms" and in writing in the Court's written order. Id. Carwile stated that thereafter Kinsey gathered the judge's written order and a transcript of the hearing for review by CCS management. Id. According to Carwile, the judge's statements towards complainant were "shocking." Id. Carwile said that complainant had not informed either him or Kinsey of the late filings or the Court's reaction to complainant, which he expected complainant to have done. Id. Carwile stated that he found complainant's lack of candor about her delinquencies and the judge's rebukes "troubling." Id.

Carwile explained that complainant's refusal to handle the trial in the California case and her inadequate performance over a long period of time led management to believe that complainant was in need of closer supervision, which could not be accomplished with complainant working remotely in Connecticut full time. Ex. 8 at 18-24. Carwile said that he therefore refused to renew complainant's flexi-place agreement and informed complainant that, beginning March 31, 2014, she needed to report daily to the CCS offices in Washington, D.C. Id.

Carwile denied that any of the actions taken involving complainant were motivated by complainant's race/ national origin, sex, parental status, or prior EEO activity. Ex. 8.

2. Deputy Section Chief Gwynn "Charlie" Kinsey stated that he had been complainant's first-line supervisor since complainant was hired by CCS in 2008. Ex. 9 at 4-5. Kinsey explained that CCS attorneys reviewed potential capital cases for merit and litigated capital cases along with the various USAOs around the country. Id. at 5-7. Kinsey said that as of 2010 management emphasized the litigation job duties and expected CCS attornies to travel to build relationships with the

8

EXHIBIT C 020

USAOs and properly handle the capital cases. Id. at 7-9. Kinsey stated that, in 2013, he and Carwile had many conversations with complainant regarding the need for her to travel more because her cases needed her physical presence in the districts in order to fulfill her responsibilities. Id. According to Kinsey, complainant was "very resistant" to traveling more on her cases, especially the California case. Id. Kinsey stated that the travel issue was "brought to a head" in November 2013 when complainant announced that she refused to try the California case. Id. at 11-18. Kinsey said that complainant repeated her refusal to try the case and that management shortened the period of the flexi-place agreement to give management and complainant more time to come to an agreement about the California case trial. Id. at 20-22. Kinsey stated that CCS management also issued complainant a letter of reprimand for her refusal to try the case in California. Id.

Kinsey confirmed Carwile's descriptions of the revelations in February 2014 about complainant's performance on the California case. Ex. 9 at 22-33. Kinsey stated that CCS management learned from the United States Attorney and another attorney that the judge in the California case chastised complainant for repeatedly missing deadlines for filings and for filing insufficient pleadings. Id. Kinsey also stated that complainant never informed her CCS supervisors of the problems with the California case and, when Kinsey confronted complainant about the late filings, complainant denied that any late filings occurred. Id. Kinsey said that because of complainant's shortcomings on the California case, CCS management decided not to renew complainant's flexi-place agreement. Id. Kinsey stated that management gave complainant 30 days to make necessary arrangements to transfer to Washington, D.C., because they knew that the transition would be "inconvenient" for complainant because her family lived in Connecticut. Id.

Kinsey said that after complainant was ordered to report to Washington, D.C., for work, complainant reported that she was under a great deal of stress and needed to take sick leave. Ex. 9 at 11. Kinsey stated that complainant requested, as a reasonable accommodation for the stress, to remain working in Connecticut. Id. Kinsey said that management declined to extend the accommodation because complainant had refused to and did not perform the essential functions of her job while working from Connecticut. Id.

9

EXHIBIT C 021

Kinsey stated that on April 1, 2010, he learned that complainant was working from Connecticut, which, according to Kinsey, she had been instructed not to do. Ex 8 at 34-38. Kinsey stated that complainant was actually paid for her work on April 1st. Id. According to Kinsey, complainant was placed on AWOL status for April 2nd and 3rd because complainant failed to report to Washington, D.C., for work and did not take some form of leave for either of those days. Id. Kindsey said that thereafter complainant took an extended amount of leave, some of which was retroactively approved, and was paid for the remainder of her time with CCS. Id.

Kinsey confirmed that he initially approved complainant's request to attend an evidence course at the NAC and that complainant intended for that course to satisfy her CLE requirements for her bar license. Ex. 9 at 38-44. Kinsey denied that he cancelled complainant's registration in the NAC course. Id. Kinsey explained that he informed complainant that she was not allowed to attend the course if she was on leave or in AWOL status. Id. Kinsey said that he told complainant that she was not allowed to attend the course unless she first reported to work in Washington, D.C, and complied with the conditions of her employment. Id. Kinsey stated that, to him, "it was evident that [complainant] was trying to find ways to be in paid work status, but not be in Washington." Id.

Kinsey stated that complainant submitted a sick leave request for April 14-18, April 21-25, and April 28, 2014, but did not provide medical documentation to support the request for extended sick leave. Ex. 9 at 44-48. Kinsey said that, in keeping with the DOJ leave policy, he asked complainant for medical documentation to support her requests for sick leave. Id. According to Kinsey, complainant provided the documentation on April 24, 2014, and, on April 29, 2014, Kinsey retroactively approved complainant's requests for sick leave. Id. Kinsey stated that the only days for which complainant was not paid were April 2-3, 2014, because complainant was AWOL. Id.

Kinsey denied that any of the actions involving complainant were taken because of complainant's race/ national origin, sex, parental status, or prior EEO activity. Ex. 9. Kinsey further denied that Rothstein, the only other regular CCS attorney, was not required to travel. Ex. 8 at 13-15. According to Kinsey, Rothstein had far less recent litigation experience than

10

EXHIBIT C 022

complainant and had a broken joint in his leg, but CCS
management still required him to travel and conduct litigation.
Id.

## C. Relevant Additional Statements

1. Assistant United States Attorney Kevin Rooney stated
that he was assigned to the Eastern District of California
during the relevant timeframe and supervised the California case
that complainant was assigned when with CCS. Supplemental
Report of Investigation (Supp.) Ex. 1 at 3-5. Rooney said that
although complainant "put her heart and soul" into the case, he
questioned complainant's objectivity and judgment about the case
several times. Id. at 6, 8-9. Rooney explained that one
instance was when complainant requested the government take
possession of more physical evidence than what was required and
another was in complainant's dealings with defense counsel. Id.
at 6-7. Rooney stated complainant and defense counsel got into
an argument that "nearly came to a physical altercation" and
that he found complainant's conduct to be very unprofessional.
Id.

2. Former Trial Attorney Stanley Rothstein stated that he
served in the CCS along with complainant from 2008 to September
2013. Supp. Ex. 2 at 1-3. Rothstein said that his assignments
for CCS included reviewing potential capital cases and
litigating capital cases. Id. at 4-5. Rothstein stated that he
traveled to the District of Vermont to litigate a capital case
when assigned to CCS. Id.

3. Trial Attorney Richard Burns stated that he was
assigned to CCS and his work location was Washington, D.C.
Supp. Ex. 3 at 2-3. Burns said that in 2014 he was assigned in
place of complainant on the California case and became aware of
"issues" with the case. Id. at 6-8. Burns explained that the
judge on the case was justifiably displeased with some of
complainant's work. Id. According to Burns, complainant missed
several filing deadlines for pleadings and failed to file proper
documentation with the pleadings. Id. Burns added that
complainant also failed to follow proper procedures for filing
late pleadings. Id. Burns stated that the judge commented
about complainant's shortcomings on the record and "threatened
to contact supervisors back in Washington to voice his
displeasure with the work that was being done." Id. Burns said
that complainant acknowledged that she missed some deadlines,

11

EXHIBIT C 023

but believed that she had "overcome the problems with the Court" and was "on the right track." Id. Burns stated that he was not sure that the Court shared those beliefs. Id.

## D. Relevant Documentary Evidence

The record contained a list of personnel for CCS. Ex. 10. CCS had 10 trial attorneys, seven men and three women. Id. All the trial attorneys are white, except complainant who is Hispanic. Id.

The record contained the CCS trial attorney position description. Ex. 12. CCS attorneys were tasked with reviewing cases involving crimes punishable by death to determine if the cases should be brought as capital cases. Id. CCS attorneys were also charged with litigating "all phases of federal capital cases," including pre-trial and trial processes. Id. CCS attorneys were also tasked with providing training to other DOJ entities on capital case litigation and assisting in the development of DOJ policies and procedures regarding capital cases. Id.

The record contained the Criminal Division's July 16, 2010, Worklife Program Policy. Ex. 23 at 1-13. According to the policy, Section Chiefs could suspend or terminate a worklife agreement for business and mission-critical reasons, including an employee's non-compliance with the terns of the agreement. Id. The policy stated that, in cases of performance deficiencies, an employee must be given notice of the deficiency and the fact that the agreement could be terminated. Id. The policy required Section Chiefs to given an employee a minimum of two pay periods notice that the agreement would be changed or terminated, and the notice was required to be in writing. Id.

The record contained several of the flexi-place agreements that complainant entered into with CCS management. Ex. 16. The June 2013 to December 2013 agreement assigned complainant all phases of litigation in capital cases, including pre-trial, trial, and post-conviction matters, and conducting reviews of potential capital cases. Id. The agreement said that, at the end of the agreement, the CCS Section Chief would evaluate if an extension of the agreement was warranted. Id. The agreement stated that the arrangement could be terminated early if the employee's performance declined, if the employee's off-site work adversely affected the work of the remaining staff in the

12

EXHIBIT C 024

office, or if the agreement failed to meet organizational needs. Id. The January 2014 to February 2014 agreement was identical to the immediately preceding agreement. Id.

The record contained a November 20, 2013, order from the United States Magistrate Judge in the California case. Ex. 18 at 33-34. In the order, the Court stated that the United States was "again cautioned that future late filings in th[e] case w[ould] not be tolerated and [would] likely result in the imposition of sanctions." Id. The Court also noted that "[t]he government's pattern of late filings ha[d] been noted by both the undersigned" and the United States District Court Judge. Id.

The record contained a January 8, 2014, order from the United States District Court in the California case. Ex. 18 at 38. The Court granted the government's motion for an extension to file a response to defendant's motion for two juries. Id. The record also contained complainant's February 4, 2014, motion to request acceptance of the government's untimely filed reply pleading regarding the jury selection process in the California case. Id. at 39-40.

The record contained the January 6, 2014, reprimand that Carwile issued complainant as well as Carwile's cover email to the reprimand. Ex. 19 at 1-2. In the cover email, Carwile stated that he regretted to have to issue the attached reprimand to complainant for complainant's refusal to prosecute the California case. Id. Carwile said that the reprimand was necessary, as numerous previous discussions with complainant had not "impressed upon [her] that [she] c[ould] not unilaterally decline to accept assignments from [her] supervisors." Id. Carwile went on to say that the reprimand had nothing to do with an email correspondence that complainant had sent to Human Resources the previous day, as the decision to issue the reprimand was made prior to complainant's email. Id. In the reprimand, Carwile stated that as part of complainant's flexi-place agreement with CCS beginning in 2011, complainant was tasked, in part, with litigating capital cases around the country. Id. Carwile explained that in a conference call on November 26, 2013, between him, complainant, and Kinsey, he instructed complainant to handle all pre-trial preparation and the trial in the California case assigned to complainant. Id. According to Carwile, complainant stated that she "refused to handle the matter." Id. Carwile said that complainant also

13

EXHIBIT C 025

refused to handle any of the pre-trial preparation of the case and requested that the case be reassigned to another attorney. Id. Carwile stated that complainant's refusal to handle the California case was the basis of the reprimand. Id.

The record contained a February 24, 2014, email from Carwile to complainant regarding complainant's flexi-place agreement. Ex. 17 at 2. Carwile stated that renewal of the flexi-place agreement was within management's discretion and was not an entitlement. Id. Carwile said that because of recent revelations about complainant missing filing deadlines and filings deficient pleadings in the California case, he determined that "more direct supervision of [complainant's] work [was] needed." Id. Carwile stated that he therefore would not renew complainant's flexi-place agreement and directed complainant to report for work in Washington, D.C., as of March 31, 2014. Id. Carwile said that the March 31st date would allow complainant adequate time to handle matters in a CCS case near complainant's home in Connecticut. Id. Carwile also said that he was adding staffing to two cases, including the California case, that complainant was handling. Id.

The record contained a March 24, 2014, email exchange between complainant and Carwile regarding complainant's work location. Ex. 17 at 1. Complainant requested that Carwile allow her to continue to work in Connecticut until April 30, 2014, due to work commitments and her Connecticut residence. Id. Carwile denied complainant's request, noting that if complainant needed to travel for case related matters or for training, she could do so from Washington, D.C. Id.

The record contained complainant's payroll records for March 2014 through May 2014. Ex. 13. According to the records, complainant was paid for work on April 1, 2014. Id. at 6. Complainant's request for annual leave for April 2, 2014, was denied and complainant was marked AWOL for April 2, 3, 2014. Id. The records indicated that although complainant's initial request for sick leave for April 14-18, 2014, was denied, it was subsequently approved and complainant was paid for that week. Id. at 1.

The record contained several letters from complainant's treating physicians. Ex. 15. A March 25, 2014, emergency discharge instructions from St. Vincent's Medical Center indicated that complainant reported to the hospital suffering

14

EXHIBIT C 026

from chest pains caused by an undetermined reason. Id. The hospital physician diagnosed complainant with anxiety and atypical chest pain, prescribed medicine for complainant, and recommended that complainant seek additional medical care from her primary care doctor if the chest pains returned. Id. A March 31, 2014, note confirmed that complainant was a patient at Connecticut Heart and Vasuclar Center. Id. An April 2, 2014, letter from Soundview Medical Associates indicated that complainant was a patient and was suffering from chest pains. Id. The treating physician noted that complainant's chest pain "was believed to be related to anxiety and increased stress related to changes at work and travel requirements." Id. The physician stated that complainant was prescribed medication and instructed to take time off of work and travel. Id. An April 8, 2014, letter from Connecticut Heart and Vascular center stated that complainant was undergoing a cardiac work-up for chest pains and that complainant should not work until all of the tests were completed and reviewed. Id. An undated letter from Soundview Medical Associates stated that complainant was under a doctor's care for "stress and anxiety related to conditions at work" and that complainant had been under the doctor's care since March 21, 2014. Id. The letter indicated that complainant was also referred to a cardiologist for evaluation and that complainant should not return to work until the cardiac evaluation could be completed. Id. An April 22, 2014, letter from the Waynik Group indicated that complainant was receiving "therapy" from one of the group's providers and that complainant should be excused from work on April 21st because of treatment received. Id.

The record contained an April 29, 2014, letter from Kinsey to complainant regarding her sick leave requests for April 14-18, 2014, April 21-25, 2014, and April 28, 2014. Ex. 14. According to the letter, complainant requested sick leave for a "stress-related medical condition." Id. Kinsey said that complainant submitted a letter from one of her treating physicians on April 8, 2014, to substantiate her request for sick leave from April 7 to 11, 2014, but that CCS management requested additional medical documentation to support complainant's subsequent requests for sick leave. Id. Kinsey stated that, on April 24, 2014, complainant provided five letters from her treating physicians excusing complainant from work on various dates between April 14, 2014, and April 25, 2014. Id. Kinsey said that based on the medical documentation submitted, complainant's leave requests for April 14-18, 2014,

15

EXHIBIT C 027

April 21-25, 2014, and April 28, 2014, were approved. Id. Kinsey also informed complainant of her right to apply for Family and Medical Leave Act (FMLA) leave if complainant's condition continued and gave complainant instructions on how to apply for FMLA leave. Id.

The record contained a May 14, 2014, Certification of Employee's Serious Health Condition completed by a psychiatrist with the Waynik Group. Ex. 14. The doctor stated that, on April 6, 2014, complainant began to suffer from depressed mood, poor concentration, decreased energy, decreased sleep, decreased appetite, and increased anxiety. Id. The doctor diagnosed complainant with experiencing a "major depressive episode" and anticipated that complainant's condition would last until June 2014. Id. The doctor indicated that complainant was unable to perform job functions, but did not list which functions that complainant could not perform. Id.

## Analysis

### A. Issues One through Six

#### 1. Legal Standard

Section 717 of Title VII makes it unlawful for a federal employer to discriminate against an individual because of that person's race, national origin, sex, or EEO activity. 42 U.S.C. § 2000e-16. To establish a plausible case of race, national origin, or sex discrimination, a complainant must first demonstrate that: 1) complainant belonged to a protected group; 2) complainant was qualified for her position; 3) complainant was subjected to an adverse employment action; and 4) similarly situated individuals not in complainant's protected group were treated differently. See Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981). To establish a retaliation claim, the record must show that: (1) complainant engaged in protected EEO activity; (2) complainant experienced a materially adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse action. See Jackson v. United Parcel Serv., 548 F.3d 1137, 1142 (8th Cir. 2008); Enica v. Principi, 544 F.3d 328, 343 (1st Cir. 2008).

Executive Order 13152 (65 FR 26115), amending Executive Order 11478, prohibits a federal employer from discriminating

16

**EXHIBIT C 028**

based on, among other things, an individual's status as a parent. Executive Order 11478 Section 1 states:

> It is the policy of the government of the United States to provide equal opportunity in federal employment for all persons, to prohibit discrimination in employment because of . . . status as a parent, and to promote the full realization of equal employment opportunity through a continuing affirmative program in each executive department and agency. This policy of equal opportunity applies to and must be an integral part of every aspect of personnel policy and practice in the employment, development, advancement, and treatment of civilian employees in the federal government, to the extent permitted by law.

Under Executive Order 13152, Section 6, "status as a parent" "refers to the status of an individual who, with respect to an individual who is under the age of 18" is, a biological, adoptive, or foster parent. Through regulations, DOJ has established an internal procedure for review of parental status claims, and the last step in the process is issuance of a final DOJ decision. See DOJ Human Resource Order 1200.1, Chapter 4-1(B)(7)(j).

To establish a plausible parental status claim, a complainant must demonstrate that she was a parent, that she was subjected to an adverse employment action, and that similarly situated individuals who were not parents were treated differently. Regardless of the basis of discrimination, where management offers non-discriminatory reasons for its action, the record must show that management's proffered reasons were a pretext for discrimination. See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 519-25 (1993); Burdine, 450 U.S. at 256. Without the requisite showing of pretext, a complainant cannot prevail. See Hicks, 509 U.S. at 519-25; Burdine, 450 U.S. at 256.

### 2. Issue One: Reduced Duration of Flexi-place Agreement

Complainant claimed that she was subjected to discrimination because of her sex, race/ national origin (Hispanic/ Puerto Rico), parental status, and prior EEO activity

17

EXHIBIT C 029

when, on December 19, 2013, CCS management renewed her flexi-place agreement for two months instead of six-months.

CCS management offered legitimate, non-discriminatory reasons for renewing the flexi-place agreement for only two months. Carwile and Kinsey stated that in November 2013 complainant informed then that she was unwilling to try the case in California and demanded that the case be reassigned to another CCS attorney. Carwile and Kinsey explained that complainant's flexi-place agreement was up for renewal shortly after complainant refused to try the California case. Carwile and Kinsey said that they contemplated terminating complainant's flexi-place agreement at that time, but decided to renew it for two months to give them time to persuade complainant to try the California case as well as to assess whether, in the event complainant continued to refuse to try the case, the agreement still met CCS's needs. Therefore, CCS management provided legitimate non-discriminatory reasons for renewing complainant's flexi-place agreement for only two months instead of the customary six months.

There is no evidence that management's reasons were a pretext for discrimination or retaliation. There is no direct evidence of discrimination, such as statements by Carwile or Kinsey that might reveal prejudices based on race/ national origin, gender, parental status, or participation in EEO activities. There is no circumstantial evidence of discrimination. No other CCS employee had the benefit of telecommuting on a full time basis. Complainant claimed that she was treated worse than Rothstein, a CCS attorney who was a parent, because CCS management did not require Rothstein to travel outside the Washington, D.C., vicinity. However, the record evidence does not support this assertion. Kinsey stated, and Rothstein confirmed, that he was required to litigate cases and traveled to at least the District of Vermont to litigate a case. The only evidence of discrimination is complainant's unsupported allegations that she was subjected to discrimination and retaliation, which is insufficient to support her claim. Therefore, the record does not show that complainant was subjected to discrimination because of her race/ national origin, sex, parental status, or prior EEO activity.

18

**EXHIBIT C 030**

### 3. Issue Two: Letter of Reprimand

Complainant alleged that she was subjected to discrimination because of her sex, race/ national origin (Hispanic/ Puerto Rico), parental status, and prior EEO activity when, on January 7, 2014, CCS management issued her a letter of reprimand.

CCS management provided legitimate, non-discriminatory reasons for issuing complainant the letter of reprimand. As discussed, Carwile and Kinsey stated that in November 2013 complainant informed them that she refused to try the California case and that the case needed to reassigned. Carwile and Kinsey said that between November 2013 and January 2014 they had several discussions with complainant to impress upon her that preparing the California case for trial and trying that case were part of complainant's job responsibilities that complainant must fulfill. According to Carwile and Kinsey, the discussions were to no avail, and complainant continued to refuse to conduct the forthcoming trial in the California case. Carwile and Kinsey stated that given complainant's unilateral refusal to perform an essential part of her job, they issued complainant the letter of reprimand. Thus, CCS management provided legitimate, non-discriminatory reasons for issuing complainant a letter of reprimand.

There is no evidence that management's reasons were a pretext for discrimination or retaliation. As discussed, there is no direct evidence of bias. There is also no circumstantial evidence of discrimination. There is no allegation or indication that similarly situated non-Hispanic male attorneys who were not parents and did not have prior EEO experience were not disciplined for their failure to perform the essential duties, either litigation or case review work, of the attorney position. Again, complainant claimed that Rothstein was not required to travel, but the record does not support this assertion. Rothstein might not have been as ked to travel far, but he did travel. The only evidence of discrimination and retaliation is complainant's uncorroborated claims, which alone cannot serve as a basis for a finding of discrimination. Accordingly, the record does not demonstrate that complainant was subjected to discrimination because of race/ national origin, parental status, or prior EEO activity.

19

EXHIBIT C 031

## 4. Issue Three: Constructive Discharge

Complainant asserted that she was subjected to discrimination because of her sex, race/ national origin (Hispanic, Puerto Rico), parental status, and prior EEO activity when, on February 24, 2014, CCS management refused to renew complainant's flexi-place agreement, which complainant claimed was a "constructive discharge."

"A constructive discharge occurs only when an employer, through unlawful acts, makes working conditions so intolerable that a reasonable person in the employee's position would feel forced to resign." Fischer v. Forestwood Co., 525 F.3d 972, 980 (10th Cir. 2008); see also Pennsylvania State Police v. Suders, 542 U.S. 129, 147 (2004) ("A hostile-environment constructive discharge claim entails something more [than conduct that amounts to actionable harassment]"). Clearly, the standard is quite high for finding constructive discharge. See Fischer, 525 F.3d at 980.

In this case, the record fails to show that management discriminated against complainant and thus fails to demonstrate that complainant was constructively discharged. Carwile and Kinsey explained that in February 2014, as the short duration flexi-place agreement was coming to end, they learned of complainant's performance deficiencies in the California case. Carwile and Kinsay stated that complainant missed several filing deadlines and was chastised by the Court several times for doing so. Carwile and Kinsey added that complainant never informed either of them about the missed deadlines or the Court's displeasure with her performance, which they believed she should have done. Carwile and Kinsey stated that they decided not to renew complainant's flexi-place agreement because of complainant's late-discovered performance deficiencies on the California case.

Management's assessment of complainant's performance errors were corroborated by the remainder of the record. According to Burns, the CCS attorney who replaced complainant on the California case, complainant missed several filing deadlines, failed to follow proper procedure for filing late pleadings, and failed to file necessary documentation with pleadings. According to Burns, the Court was so displeased that the Court commented about complainant's shortcomings on the record in open

20

EXHIBIT C 032

court and threatened to contact complainant's supervisors to discuss the issues. The documentary evidence indicated that by November 2013 complainant had filed pleadings late and that the Court warned complainant that continued late filings might result in sanctions against the government. The documentary evidence also indicated that in January 2014 and February 2014 complainant continued to file pleadings late. In addition, complainant conceded that she missed some filing deadlines but asserted that it was not because of her negligence. The evidence, including complainant's concession that she filed some pleadings late, provides a reasonable, non-discriminatory basis for management to revoke complainant's flexiplace agreement. Thus, the record support's management's assessment of the shortcomings in complainant's performance and reasons for declining to renew the flexi-place agreement.

Complainant was not entitled to indefinite continuation of the flexi-place agreement. From the initiation of the flexi-place agreements in 2011, the terms of the agreements made clear that management would not commit to more than a six-month duration and would reassess the viability of the agreement every six months to ensure that the agreement met CCS's needs. Thus, complainant had no guarantee that the agreement would be extended·for another term. The agreements allowed for early termination in the event that complainant's performance declined, complainant's work off-site adversely affected other CCS employees, or the agreement failed to meet organizational needs. Therefore, complainant was aware that if management perceived that her performance declined, the agreement could be terminated.

Management followed proper procedure in not renewing complanant's flexi-place agreement. CCS management provided complainant four-week's written notice that her flexi-place agreement would not be renewed. Management also explained to complainant that the decision not to renew the agreement was based on complainant's performance regarding the California case that indicated that complainant was in need of closer supervision that could not be accomplished with complainant working in Connecticut. Moreover, management gave complainant 30 days to make arrangements to move at least herself to Washington, D.C., so that she could remain employed with CCS. Based on this record, management's actions are not discriminatory and do not rise to the level of intolerability to establish constructive discharge.

21

EXHIBIT C 033

## 5. Issue Four: AWOL for April 1,3, 2014

Complainant claimed that she was subjected to discrimination because of her sex, race/ national origin (Hispanic/ Puerto Rico), parental status, and prior EEO activity when, on April 1, 2014, CCS management denied her annual leave and placed her in AWOL status and when, on April 3, 2014, CCS management again placed her in AWOL status despite the fact that she worked part of the day in Connecticut.

CCS management provided legitimate, non-discriminatory reasons for marking complainant AWOL for two days in the first week of April 2014. Carwile and Kinsey stated, and the documentary evidence confirmed, that complainant's flexi-place agreement was not renewed and complainant was ordered to report to work in Washington, D.C., starting March 31, 2014. Kinsey said that complainant took sick leave on March 31, 2014, but failed to take leave on April 1-3, 2014. According to Kinsey, complainant was instructed that she could no longer work from the USAO in Connecticut, but, on April 1, 2014, she did so anyway. Kinsey stated that complainant was paid for work on April 1st, but was marked AWOL for April 2nd and 3rd because complainant did not report to Washington, D.C., for work or take leave for either of those days. Therefore, management provided legitimate reasons for placing complainant in AWOL status for days in the first week of April 2014.

There is no evidence that management's reasons were a pretext for discrimination. It is undisputed that complainant was instructed to report to Washington, D.C., for work effective March 31, 2014. It is also undisputed that complainant never did so. According to the pay records, complainant did not request leave for April 1, 2014; however, complainant was paid for work that day. Complainant admitted that although she worked on April 3, 2014, she did so from the USAO in Connecticut and not from the CCS offices in Washington, D.C., as she was previously ordered to do. Thus, the record supports management's reasons for marking complainant AWOL for April 3. 2014. As to April 2, 2014, the pay records indicated that Kinsey denied complainant's request for annual leave and marked complainant AWOL for that day. Although the record is unclear as to why Kinsey denied complainant's request for annual leave for the day, there is no indication that management's denial was motivated by complainant's race/ national origin, sex, parental

22

EXHIBIT C 034

status, or prior involvement in the EEO process. Clearly, there was some back and forth between complainant and management as to whether complainant could be on leave status, and the record makes clear that management believed complainant's claim to be · on leave to be a ruse for not reporting to Washington, D.C. With the exception of complainant's assertions, the record is devoid of any evidence of discriminatory and retaliatory intent by management. Accordingly, the record does not demonstrate that complainant was subjected to discrimination or retaliation when she was placed in AWOL status on April 2, 3, 2014.

## 6. Issue Five: Denial of Training

Complainant alleged that she was subjected to discrimination because of her sex, race/ national origin (Hispanic/ Puerto Rico), parental status, and prior EEO activity when, on April 2, 2014, CCS management refused to allow her to attend training at the NAC the following week.

CCS Management provided a legitimate, non-discriminatory reason for not allowing complainant to attend the NAC training course. Kinsey stated that he instructed complainant that she was not allowed to attend the course if she was on leave or AWOL. Kinsey said that he instructed complainant that she could attend the course if she first reported to Washington, D.C., for work and fulfilled her duty requirements. Kinsey added that he believed that complainant was trying to get out of the requirement to report for work in Washington, D.C., by attending the training, which he did not believe was appropriate. Thus, CCS management provided a legitimate reason for not allowing complainant to attend the training at issue.

There is no evidence that management's reason was a pretext for discrimination or retaliation. There is no evidence that similarly situated employees not in complainant's protected groups were treated more favorably than complainant. It is undisputed that complainant was on leave or AWOL for the week preceding the training and that complainant never reported to work in Washington, D.C., prior to or after the training class. There is no indication that the other CCS employees were allowed to attend the training even though they were in AWOL status prior to the class. Again, the only evidence of discrimination and retaliation is complainant's uncorroborated assertions, which, without more, are insufficient to support her claims. Thus, the record does not show that complainant was subjected to

23

EXHIBIT C 035

discrimination and retaliation when she was directed not to attend the NAC training unless she first reported to Washington, D.C., for work.

### 7. Issue Six: AWOL April 14-18, 2015

Complainant asserted that she was subjected to discrimination because of her sex, race/ national origin (Hispanic/ Puerto Rico), parental status, and prior EEO activity when, on April 13, 2014, CCS management denied her sick leave request for April 14-18, 2014, and placed her in AWOL status, causing her to lose a week's worth of pay.

Regardless of the basis of discrimination, a complainant must have suffered an adverse action to assert a possible claim. In the context of a substantive claim, e.g. race, sex, or parental status, an adverse action is an act that affects the terms, conditions, and status of employment. See Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 61-64 (2006). "Termination, cuts in pay or benefits, and changes that affect an employee's future career prospects are significant enough to meet the standard." Higgins v. Gonzales, 481 F.3d 578, 584 (8th Cir. 2007). However, "[m]inor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage do not satisfy the prong." Id. at 584-85.

In the context of a retaliation claim, an adverse action includes acts that a "reasonable employee" would consider "materially adverse" to his employment, which means an act that might "dissuade a reasonable worker from making . . . a charge of discrimination." Burlington, 548 U.S. at 67-68. The "materially adverse" requirement distinguishes significant, actionable harm from trivial, non-actionable harm, such as "petty slights, minor annoyances, and [] lack of good manners," that every employee encounters. Id. at 68.

In this case, complainant did not suffer an adverse action sufficient to serve as a basis for either her discrimination or retaliation claims. Kinsey stated that complainant requested leave for April 14-18, 2014, but did so without proper documentation to support the request. Kinsey said that complainant provided the documentation on April 24, 2014, and at that time he retroactively approved complainant's leave request and complainant was compensated for the week. Complainant

24

EXHIBIT C 036

stated that she submitted her request for leave with some medical documentation, but that management requested clarification of the documentation. According to complainant, she submitted that additional documentation the week after her leave and was retroactively paid for the week. Pay records indicated that complainant was paid for the week of April 14-18, 2014, approximately two weeks after the leave request was originally denied. Given that complainant was eventually paid for the week in question, complainant did not suffer an adverse action on which to base her claim. Therefore, this allegation will not be further addressed.

## B.  Issue Seven: Denial of Reasonable Accommodation

Complainant claimed that she was subjected to disability discrimination when, in April 2014, she was denied a reasonable accommodation for her temporary disability. The Rehabilitation Act of 1973 makes it unlawful for a federal employer to discriminate against a person because of that person's qualified disability or to fail to make a reasonable accommodation for a "qualified person with a disability." See 29 U.S.C. § 791. To establish a case of disability discrimination based on an alleged failure to accommodate, the record must demonstrate that: (1) complainant was a person with a disability within the meaning of the Rehabilitation Act and made her physical limitations known to the agency; (2) complainant was capable of performing the essential duties of her job; (3) complainant requested the agency to accommodate her disability; and (4) complainant suffered an injury because of the agency's failure to accommodate her disability. See Smith v. Midland Brake, 180 F.3d 1154, 1179 (10th Cir. 1999). Once a prima facie case is established, the agency has the burden to produce evidence rebutting the prima facia case or to establish an affirmative defense, such as undue hardship. See ibid.

In analyzing federal employees' disability discrimination claims, the requirements of the American with Disabilities Act are applied. See Mahon v. Crowell, 295 F.3d 585, 589 (6th Cir. 2002). The American with Disabilities Act Amendments Act of 2008 (ADAAA), effective January 1, 2009, broadened the definition of a disability under the Rehabilitation Act, and the question of whether an individual's impairment is a disability "should not demand extensive analysis." 42 U.S.C. §§ 12102(2)(b), 12102(4)(a).

25

EXHIBIT C 037

In any disability discrimination claim, a complainant must first meet the threshold requirement of being a person with a disability. The ADAAA defines a disability as (1) a physical or mental impairment that substantially limits a major life activity; or (2) a record of a physical or mental impairment that substantially limited a major life activity; or (3) when an employer takes an action prohibited by the ADA based on an actual or perceived impairment. 42 U.S.C. § 12102(4)(a)(1); see also EEOC Guidance on the ADAAA of 2008. A "major life activity" is defined as a basic activity that most people in the general population can perform with little or no difficulty. The ADAAA's list of major life activities is non-exhaustive and includes caring for oneself, performing manual tasks, sleeping, walking, speaking, learning, thinking, communicating, and working. Determination of whether an individual is experiencing a "substantial limitation" in performing a major life activity is a "common-sense assessment" based on comparing an individual's ability to perform a specific major life activity with that of most people in the general population. See EEOC Guidance on the ADAAA of 2008.

Here, the record does not show that complainant was a person with a disability. Complainant stated that she suffered from a "mental condition" that her caused difficulty sleeping and concentrating and chest pains. According to complainant, in 2014 she sought care from her "generalist," a cardiologist, and psychiatrist. In March 2014 and April 2014, complainant's treating physicians stated that complainant suffered from anxiety, stress, and chest pains. In May 2014, complainant's psychiatrist stated that complainant suffered a "major depressive episode" that would last until June 2014.[1] Based on the scant evidence of complainant's medical conditions and the extent to which those conditions may or may not have affected complainant's major life activities, the record does not establish that complainant had a disability as defined by the ADAAA.

Even assuming complainant had a disability and was a "qualified individual with a disability," there is no indication that complainant informed her CCS supervisors of her conditions and the limitations that those conditions placed on complainant. Under the Rehabilitation Act, an agency must attempt to

---

[1]    This latter medical record was not available to CCS management when complainant requested her reasonable accommodation.

EXHIBIT C 038

reasonably accommodate the known physical or mental limitations
of a qualified person with a disability unless the agency can
show that doing so would result in an "undue hardship" on the
operation of its program. See 29 C.F.R. 1614.203(c)(1). In
order to craft a reasonable accommodation, an employer must
engage in an interactive process with the employee to explore in
good faith all possible accommodations. See 42 U.S.C.
§ 12112(b)(5)(A); 29 C.F.R. § 1630.2(o)(3). While engaging in
the interactive process, both the employer and employee must
communicate directly and exchange essential information, and
neither party may delay or obstruct the process. See Barnett v.
U.S. Air, 228 F.3d 1105, 1114-15 (9th Cir. 2000). Complainant
did not file a written request for reasonable accommodation that
communicated the conditions that she suffered, the limitations
of those conditions, the requested accommodations for those
limitations, and how the accommodations would allow her to
perform the essential functions of her position. Likewise,
complainant did not provide her supervisors with medical
documentation that validated the conditions and limitations and
documented how the requested accommodations would allow
complainant to perform the essential functions of her position.
The only medical evidence that complainant provided to her
supervisors to support her request for reasonable accommodation
was documentation that stated that complainant should not return
to work until her cardiac work-up was completed and reviewed.
Given that complainant provided incomplete information to her
supervisors, CCS management acted within its discretion to deny
the request for reasonable accommodation.

Furthermore, in the event that complainant provided the
necessary documentation to CCS management, it is not certain
that complainant would have received her desired accommodation.
It is well-established that an employer is obligated to provide
a qualified individual with a disability a reasonable
accommodation, but not necessarily the employee's preferred
accommodation. See Rehling v. City of Chicago, 207 F.3d 1009,
1014 (7th Cir. 2000). Although complainant wanted to continue
to work remotely from Connecticut full time, the Rehabilitation
Act does not require a management official to accept whatever
reasonable accommodation complainant might desire, so long as
she is offered a reasonable accommodation. See Williams v. City
of Charlotte, N.C., 899 F.Supp. 1484, 1489 (W.D.N.C. 1995). "An
employee cannot make his employer provide a specific
accommodation if another reasonable accommodation is instead
provided." Hankins v. The Gap, 84 F.3d 797, 802 (6th Cir.

27

**EXHIBIT C 039**

1996). As long as CCS management accommodated complainant's condition adequately, it would not have been required to allow complainant to continue to work remotely from Connecticut full time. Accordingly, the record does not establish that CCS management improperly denied complainant a reasonable accommodation.

## Decision

For the forgoing reasons, the record does not support complainant's allegations that she was subjected to discrimination based on her race/ national origin, sex, parental status, or prior EEO activity. The record also does not support complainant's assertion that she was improperly denied a reasonable accommodation.

Mark L. Gross
Complaint Adjudication Officer

Kathleen J. Monaghan
Attorney
Complaint Adjudication Office

28

**EXHIBIT C 040**