## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JACABED Rodriguez-Coss,

               **Plaintiff,**

v.

JEFF B. SESSIONS, ATTORNEY
GENERAL, UNITED STATES
DEPARTMENT OF JUSTICE,

               **Defendant.**

Honorable Vanessa L. Bryant

Civil Action No. 3:16-cv-00633 (VLB)

December 22, 2017

## PLAINTIFF JACABED Rodriguez-Coss' LOCAL RULE 56(A)2
## STATEMENT OF FACTS IN OPPOSITION TO SUMMARY JUDGMENT;
## STATEMENT OF ADDITIONAL MATERIAL FACTS

      Plaintiff Jacabed Rodriguez-Coss, through her undersigned counsel, files this Local Rule 56(a)2 Statement of Facts in Opposition to the Defendant's Motion for Summary Judgment, as well as her Statement of Additional Material Facts.  As demonstrated herein, there are key facts regarding which there are genuine and material disputes, and those facts preclude the defendant's requested grant of summary judgment.  Plaintiff's claims therefore must be resolved at the trial scheduled for August 6, 2018.  Rodriguez-Coss concurrently submits points and authorities in opposition to the defendants' motion, as well as supporting exhibits.

      (1) Plaintiff joined the Department of Justice's Criminal Division ("the Division") on August 3. 2008, as an attorney in what was then known as the Capital Case Unit ("CCU").  Prior to joining the Division. she had served as an Assistant United States Attorney ("AUSA") In the District of Maryland and the

District of Puerto Rico. Ex. A (SF-52); Ex. B (Deposition of Jacabed Rodriguez-Coss) at 16-19; 25.

Plaintiff's Response: Admit

(2) In or around August 2010, Kevin Carwile was appointed as the Chief of the CCU, with a directive to expand the mission of the unit to include litigation of capital cases. Ex. C (Kevin Carwile Deposition at 158). The name of CCU was changed to the Capital Case Section ("CCS"). Mr. Carwile explained the expanded mission of the CC8 to the staff, including Plaintiff, in a meeting held shortly after his arrival. Ex. C (Carwile Dep.) at 166; Ex. B (Rodriguez- Coss Dep.) at 47-48. Plaintiff expressed no concerns about the change to Mr. Carwile at the time this was announced. Ex. B (Rodriguez-Coss Dep.) at 49.

Plaintiff's Response: Deny. There has been no evidence submitted of any directive, and according to staff who were present at the meeting, no such directive was stated. Carwile stated that his future objective was to hire capital litigators, but, as to existing staff, Carwile indicated that some could do litigation, some could do protocol review work, and some could do a combination of the two. Stanley Rothstein Decl., ¶ 3. Carwile did not state that moving forward all Capital Case Unit attorneys would be required to travel. Stanley Rothstein Decl., ¶ 3.

There was no travel in the Capital Case Unit, as it was then called, from 2008 until end of 2010. Rodriguez-Coss Depo. 40:8-11. During the meeting in the fall of 2010 after Carwile became Chief, no official changes were announced; instead, Carwile stated that he hoped to turn the CCU into a litigating section. 47:7-19. However, Carwile indicated that some attorneys would continue to do review work, some would litigate, and some would do a combination of both. 47:20-48:2. There also was no indication that this was a direction being dictated by Main Justice, only that it was Carwile's personal goal. Rodriguez-

Coss Depo. 48:14-24.  After the fall 2010 meeting, there was never a meeting where a change in the mission of Capital Case Section, as it came to be called, was announced.  Rodriguez-Coss Depo. 52:16-53:2.

Until *Stone*, Rodriguez-Coss did not view her litigation assignments to reflect a mission change or adverse, since the *United States v. Aquart* (Connecticut) *United States v. Fell* (Vermont) and *United States v. Pleau* (Rhode Island) assignments were manageable, because they were all close to home. Rodriguez-Coss Depo. 54:9-15; 58:7-16.

Even after the fall 2010 meeting, there were male CCS attorneys unaffected by the alleged mission change and who still did primarily protocol review work, which required virtually no travel, Stanley Rothstein and John Cox. Rodriguez-Coss Depo. 172:2-173:6. Now retired CCS Trial Attorney Stanley Rothstein only traveled three to six days in his five-year tenure.  Rothstein Decl. ¶ 4.

(3) The fall of 2010, Plaintiff's husband was transferred to Connecticut, so Plaintiff applied for a position with the United States Attorney's Office ("USAO") in the District of Connecticut. Plaintiff testified that she was offered a position as an AUSA, but declined because the salary offered was less than her salary with the C08. Ex. B (Rodriguez-Coss Dep.) at 26-27.

Plaintiff's Response:  Admit.

(4) Later in fall of 2010, Plaintiff notified management that her husband had accepted a job in Connecticut that she would be relocating there and would have to resign her position with the CCS. In response, management offered Plaintiff the opportunity to continue working for the CCS from Connecticut, and she accepted that offer. Ex. B (Rodriguez-Coss Dep.) at 9, 30, 53. Plaintiff testified that she "didn't think at the time that [she] would be allowed to work for the Capital Case United from Connecticut," she "had assumed that [she] would

be required to resign [her] position" and she wasn't aware of that "alternative work agreement" existed. Id. at 28:26-20.

Plaintiff's Response: Deny. This asserted fact erroneously suggests that there was some break in the plaintiff's employment, and that she was rehired in 2010 under new terms and conditions.

In 2008, Rodriguez-Coss took the CCU position because she was assured that the unit attorneys did not travel. Rodriguez-Coss Depo. 23:1-6. Indeed, Rodriguez-Coss turned down an offered position with the Department of Justice, Criminal Division's Gang Unit (then headed by Carwile) because that position would have required her to travel half the time. Rodriguez-Coss Depo. 21:3-16. CCS management acknowledges that when Rodriguez-Coss was hired by Carwile's predecessor, she made it known that a consideration for her was less travel. Kinsey Depo. 38:8-39:5.

In late 2010, a week before Rodriguez-Coss was scheduled to move to Connecticut and end her employment with CCS, she was asked to handle a Connecticut capital trial proceeding, *United States v. Aquart*, as a CCS attorney. Rodriguez-Coss Depo. 53:10-16. After finishing the *Aquart* trial, Rodriguez-Coss was informed that she could continue in the CCS based on a Flexiplace agreement. Rodriguez-Coss Depo. 29:16-30:2.

(5) On October 27, 2010, Plaintiff and Carwile signed a Flexiplace Agreement, effective November 8, 2010 through February 28, 2011, allowing her to continue to work for the Criminal Division from Connecticut. Ex. D (Plaintiff's Flexiplace Agreements). Plaintiff remained in a Flexiplace status through February 2014; several Flexiplace Agreements of varying duration were entered into during that time: November 8, 2010-February 28, 2011 (3.5 months); February 27, 2013-June 29, 2013 (4 months); June 30, 2013- December 31, 2013 (6 months); January 1, 2014-February 28, 2014 (2 months). Id. Plaintiff asserts

that the agreement provided to her in December 2013 was "the first agreement that was less than 6 months" (Ex. B (Rodriguez-Coss Dep.) at 81), but that is simply not accurate, as evidenced by the agreements themselves. See Ex. D. generally. Only one of the four signed agreements was for a period of 6 months. Id.

Plaintiff's Response:  Admit

(6) Every Flexiplace Agreement signed by Plaintiff during her tenure with the Division was for a set period of time (varying from about 2-6 months), after which it expired. See Ex. D (Flexiplace Agreements).

Plaintiff's Response: Deny.  Even if there is no "right" to a new Flexiplace agreement, the Human Capital official who was in charge of the Department of Justice's Criminal Division recognized that it should not be revoked in retaliation or as gender discrimination.  Caputo Depo. 57:9-18.  The Human Capital official assigned to Rodriguez-Coss' issues did not recall being aware of management's reasons for the non-renewal. Williams Depo. 40:4-16.

(7) The only other Capital Case Trial Attorney on a Flexiplace agreement during the relevant time period was a male Trial Attorney, who was permitted to telework one day per week from his home, in the Washington, D.C. area. Ex. E (Flexiplace Agreements) (redacted pursuant to the Privacy Act).

Plaintiff's Response:  Deny. The record shows that two males had Flexiplace agreements permitting them to work in part from their residence, Messrs. Kinsey and Burns.  Amanda Haines Decl., ¶ 14.

(8) When Plaintiff relocated to Connecticut, she was initially assigned to work on a capital trial scheduled to begin in the District of Connecticut in March 2011. Ex. B (Rodriguez-Coss Dep.) at 53. She was subsequently assigned to work on a capital case in the District of Vermont, U.S. v. Fell, around the summer of 2011. Id. at 58-59.

Plaintiff's Response:  Admit.

(9) On an unspecified date while Plaintiff was working from Connecticut, Plaintiff was assigned to work on the case U.S. v. Samuel Stone ("Stone") in the U.S. District Court for the Eastern District of California. Plaintiff told management at that time that she "can't try a capital case in the Eastern District of California. [She] can't be away for 3, potentially, 4 months at a time trying a capital case in the Eastern District of California. That's just crazy." Ex. B (Rodriguez-Coss Dep.) at 82. Nevertheless, Plaintiff was assigned the case and entered an appearance in the case on March 26, 2012.  Ex. F (Entry of appearance).

Plaintiff's Response:  Deny.  When Rodriguez-Coss received notice that the Stone case was pending in Fresno, California, she immediately contacted Carwile and said that she could not try the case.  Rodriguez-Coss Depo. 106:8-17.  Based on the conversation she had with Carwile at that point, Rodriguez-Coss Depo. Rodriguez-Coss was led to believe the case would be reassigned if it was going to trial.  Rodriguez-Coss Depo. 88:15-21.  She was asked to indict the case because there had been considerable preindictment delay.  Rodriguez-Coss Depo. 106:18-21.

(10) On February 5, 2013, Plaintiff attended an in-person hearing before U.S.D.J. John Coughenour in Stone. During that hearing, the Court noted the government's failure to timely respond to a motion, Plaintiff admitted that she made a mistake in assuming that the government had 30 days to respond, and that she should have read the Court's order. Ex. G (Feb. 5, 2013 transcript) at p. 14.

Plaintiff's Response:  Deny.  Rodriguez-Coss' performance was not deficient but related to her excessive workload.  The Homan Capital Office official believed it would have been relevant to know what Rodriguez-Coss'

competing assignments were prior to making a determination if she performed deficiently.  Williams Depo. 33:8-17. Even management concedes that Rodriguez-Coss had a lot of competing assignments during this time period.  Kinsey Depo. 93:3-9.  In 2013 Rodriguez-Coss had three complex death penalty cases for which she bore primary responsibility that were simultaneously active and required her to travel.  Rodriguez-Coss Depo. 162:21-163:2; 163:16-164:9; 166:2-4; 166:23-167:6; 168:10-19; 169:2-20; 169:23-170:23. With the possible exception of one attorney, no one else in the CCS had such an onerous caseload.  Rodriguez-Coss Depo. 171:10-13; see also Julie Mosley Decl., ¶ 11; Bruce Hegyi Decl., ¶ 16-17.  By comparison, at the time of Kinsey's deposition, he estimated the CCS had a total of 12 to 18 cases, trial and capital habeas matters combined, and 13 attorneys.  Kinsey Depo. 118:21-120:2.

CCS management concedes that section attorneys cannot get more than two or three cases because the dates and deadlines begin to create conflicts.  Kinsey Depo.  66:1-6.  In October 2013, Rodriguez-Coss advised her supervisors that she potentially had a full evidentiary hearing in a capital habeas case, United States v. Fell, scheduled for June 2014.  Kinsey Depo. 47: 21-48:21.  During that same meeting, Rodriguez-Coss told her supervisors that she had a trial scheduled in United States v. Stone for September 2014, and that the judge in Stone was maintaining tight control of the case schedule.  Kinsey Depo. 48:22-49:16. United States v. Fell in the District of Vermont, was being defended by a large law firm, Cleary Gottlieb, and a professor from Columbia Law School.  Kinsey Depo. 71:20-72:6; Carwile Depo. 73:12-21.  Rodriguez-Coss was also the only CCS attorney assigned to United States v. Pleau in the District of Rhode Island, a trial level capital case that was pending in 2012 and 2013.  Carwile Depo. 76:19-77:6.

Moreover, Stone had been neglected by the local United States Attorney's Office in Fresno. Kinsey Depo. 83:13-17. Different districts devote different amounts of resources to capital cases. Carwile Depo. 75:9-14. There also was significant turnover in the assigned prosecutor from the local United States Attorney's Office. Kinsey Depo. 77:1-7. At the time of this hearing, there was a newly assigned prosecutor who was unable or unwilling to do substantive work on the case until he had reviewed the documents. Kinsey Depo. 93:20-94:6.

No Stone pleading was stricken as a result of being untimely filed. Kinsey Depo. 169:4-11. Kinsey does not recall if the FRE 404(b) notice filed in Stone was any different than those typically filed in capital cases. 167:1-5. No one from the Eastern District of California United States Attorney's Office had complained about Rodriguez-Coss' performance. Carwile Depo. 83:5-11.

Moreover, in capital cases where the trial judge is anti-death penalty, it is not uncommon to have the judge put the prosecutor to the test. Rodriguez-Coss Depo. 155:5-13. The Stone judge was considered to be anti-death penalty. Kinsey Depo. 169:12-18.

(11) In an email dated February 26, 2013, Carwile sought approval from the Division to extend Plaintiff's Flexiplace agreement. In his email, Carwile noted that it was not a "perfect arrangement," and indicated that he was shortening the, duration of the agreement from the previous 6-month term. Ex. H (Feb. 26, 2103 email from Carwile to Buretta).

Plaintiff's Response: Deny. This attitude about the arrangement that permitted Rodriguez-Coss to remain a CCS attorney shows she was undervalued. As of February 2013, Kinsey's evaluations of Rodriguez-Coss were positive, and does not recall any negative comments, if any. Kinsey Depo. 22:22:3-9. Rodriguez-Coss had also received at least one outstanding rating prior to February 2013, and had in December 2012 received an Assistant

Attorney General Award.  Kinsey Depo. 22:10-23:12. On evaluations, Kinsey acknowledges he may have referred to Rodriguez-Coss as one of his best trial attorneys.  Kinsey Depo. 23:19-24:3. In fact, As of February 2013, Rodriguez-Coss was one of the few people in CCS who had obtained a death judgment as a member of the section.  Carwile Depo. 65:5-15.

 (12) During a call with Carwile and his Principal Deputy Chief Gwynn X. Kinsey on October 9, 2013, Plaintiff advised them that she would not be able to travel to California for the several months necessary to handle the trial in the Stone case. Ex. I (Gwynn X. Kinsey Deposition) at 48; Ex. X (Kinsey's handwritten notes from Oct. 9, 2013 meeting).

Plaintiff's Response:  Deny.  Rodriguez-Coss had a very good reason for her position re: the Stone trial.

Rodriguez-Coss told CCS supervision about the impact the Sandy Hook Elementary School shooting had on her family, since her husband, then an FBI Special Agent, was one of the first responders and became traumatized by the carnage, and her children's elementary school was where many of the surviving Sandy Hook Elementary students were transferred.  Rodriguez-Coss Depo. 117:10-14.  Her children went to school thereafter in a very tense and secure environment and lived in daily fear of a recurrence of the shooting tragedy. Rodriguez-Coss Depo. 117:14-16; 119:24-120:8.

Carwile cynically characterized Rodriguez-Coss' mention of the Sandy Hook tragedy as "part of a sort of string of things sort of thrown out as a justification for her resisting handling the Stone trial."  Carwile Depo. 111:17-112:15. In a related email, Carwile characterized Rodriguez-Coss as "squawking" about travel issues.  Caputo Depo. 81:6-18.

Rodriguez-Coss raised concerns about travel in early 2013 (shortly after Sandy Hook, which occurred on December 12, 2012).  Kinsey Depo. 58:1-5.

Kinsey acknowledges that Rodriguez-Coss told him her husband was a first responder to Sandy Hook Elementary School. Kinsey Depo. 61:12-21. Rodriguez-Coss possibly also mentioned something about her kids, and that many of the Sandy Hook kids were transferred to her kids' school. Kinsey Depo. 61:22-62:12.

Rodriguez-Coss went through appropriate channels and was not insolent. In the fall of 2013, when it became apparent that CCS supervision would not agree to reassign the case if it went to trial, Rodriguez-Coss complained to Karl Maschino, who was the Human Resource Director for the DOJ's Criminal division and sought his assistance. Rodriguez-Coss Depo. 108:3-109:9. In the meantime, Rodriguez-Coss continued to travel to California whenever she had to be there for the Stone case. Kinsey Depo. 153:22-154:4. Kinsey does not have any knowledge that Rodriguez-Coss missed any case meeting or activities due to her attitude about travel. Kinsey Depo. 107:4-17. Carwile could not identify a case or a report from any federal district that Rodriguez-Coss was not traveling enough. Carwile Depo. 96:4-97:2. Rodriguez-Coss had not refused to handle any of the hearings or case related events that had occurred in the Stone case up until the time she left the office. Carwile Depo. 34:16-36:19.

In addition to objecting being assigned the Stone case, Rodriguez-Coss also offered a compromise that she would assist in the jury selection phase and also try the penalty phase. Rodriguez-Coss Depo. 83:14-23; 175:19-176:6; Caputo Depo. 66:1-6. Rodriguez-Coss had cleared this proposal with the Eastern District United States Attorney's Office, and they had a conference call with CCS supervision to confirm. Rodriguez-Coss Depo. 90:3-10. Stone's guilt was easily provable based on the facts of the case, i.e., a prison murder in a locked cell where there was a confession. Rodriguez-Coss Depo. 176:7-15.

This proposal was rejected, even though Carwile in his deposition did not recall if Rodriguez-Coss was going to be the lead attorney for the Stone trial in any event, or if a lead counsel had even been designated. Carwile Depo. 78:20-79:11. Moreover, CCS had in the past agreed to arrangements where local Assistant United States Attorneys had primary responsibility for trying the guilt phase of capital cases. Carwile Depo. 23:6-25:9; 92:3-7. In some of those instances, the CCS Attorney had traveled to participate in jury selection, been absent for the trial of the guilt phase, and returned to try the penalty phase. Carwile Depo. 26:4-12. More recently a male CCS Trial Attorney, Michael Warbel, was not the lead trial attorney for the guilty phase of a Massachusetts federal capital trial, and returned to his home office during at least part of the guilt phase of the trial. Carwile Depo. 28:9-31:14. However, Carwile does not recall considering a similar arrangement on Stone as an alternative. Carwile Depo. 89:14-16.

While Rodriguez-Coss received no accommodation, male CCS attorneys received accommodations and exemption, either permanently or temporarily from case related travel, including Rothstein, Cox, and Michael Warble, the latter of whom received a concession that he would not be required to travel for an extended period after completing an extended trial in New Mexico. Rodriguez-Coss Depo. 173:11-174:1.

There were available attorneys to whom Stone could have been reassigned after it became obvious that the case could proceed to trial. Rodriguez-Coss Depo. 174:13-175:8. CCS management also concedes that when Stone was assigned to Rodriguez-Coss, there were no CCS attorneys who were incapable of handling that assignment, in terms of legal experience or ability. Carwile Depo. 37:17-40:19. Kinsey has frequently reassigned cases

based on calendar conflicts, but he claims it is considered a last resort.  Kinsey Depo. 67:18-68:7.

Two CCS attorneys, Julie Mosley and Amanda Haines were willing to take Stone and would have preferred to have had Rodriguez work on a concurrent Pennsylvania capital case, nearer to her home.  Amanda Haines Decl. ¶¶ 18; Julie Mosley Decl., ¶ 10.

The Human Capital official who drafted Rodriguez-Coss' reprimand believed she had to just "roll with the punches, change with the office."  16:20-17:12. However, this official never received any documentation regarding why Rodriguez-Coss had allegedly refused an assignment.  Williams Depo. 18:16-19. Moreover, CCS management did not make this official aware that Rodriguez-Coss' family had been significantly impacted by the Sandy Hook Elementary School shooting.  Williams Depo. 18:20-20:4. This same official had not received any information regarding whether other CCS employees had been accommodated in their assignments, which she conceded would be pertinent, if it existed, to determine whether CCS was being consistent.  Williams Depo. 21:19-22:9. This official would have expected CCS supervision, either the Chief or Deputy Chief, to provide this information if it existed.  Williams Depo. 22:10-16.  Human Capital also was erroneously told by management that Rodriguez-Coss had been offered as a compromise assignment that would not require travel, but out of DC.  Caputo Depo.  58:20-59:11.

(13) In an October 21, 2013 order relating to the defendant in the Stone case seeking an extension of time, Judge Coughenour noted that the government's response was filed more than three weeks late, that the government had "demonstrated a cavalier attitude towards obeying deadlines and other procedural requirements", and found the government's opposition to defendant's request for an extension of time to be "audacious at best." The

Court went on to state that "the inability of the attorneys representing the United States to obey court orders and deadlines has significantly lowered their credibility with the Court. Counsel are forewarned that the Court is seriously considering an order to show cause why government counsel should not be held in contempt for their flagrant disregard of the Court's orders." The Court identified six untimely filings in 2013 alone (January 7; January 9; August 22; September 30; October 4 and October 10), and noted that the government did not "offer an excuse or show good cause for the late filings." The Court also identified three deficient filings (a March 4 proposed protective order; June 3 FRE 404(b) notice; and June 28 response to discovery motion that he described as "deficient in a number of ways"). Ex. K (Oct. 21, 2013 Order in U.S. v. Stone) at 2-3.

Plaintiff's Response: Deny, for the reasons set forth in response to asserted fact 10, above.

(14) On November 8, 2013, U.S.M.J. Austin, assigned to the Stone case, noted in an order on the government's Motion for Reconsideration that the government had exhibited a "pattern of filing untimely motions and deficient responses." Ex. L (Nov. 8, 2013 Order in U.S. v. Stone) at 1 n 1.

Plaintiff's Response: Deny, for the reasons set forth in response to asserted fact 10, above.

(15) In a Supplemental Discovery Order issued on the same date, U.S.M.J. Austin noted that the government "failed to provide Bates stamped exhibits to the Court as ordered." Ex. M (Nov. 8, 2013 Order in U.S. v. Stone) at 2 n 1.

Plaintiff's Response: Deny, for the reasons set forth in response to asserted fact 10, above.

(16) On November 20, 2013, U.S.M.J. Austin issued an order granting the government's motion to accept an untimely filed motion. The Court granted the motion, but stated "the United States is again cautioned that future late filings in this case will not be tolerated and will likely result in the imposition of sanctions." (emphasis in original) Ex. N (Nov. 20, 2013 Order in U.S. V. Stone) at 2.

Plaintiff's Response: Deny, for the reasons set forth in response to asserted fact 10, above.

(17) On November 26, 2013, Carwile and Kinsey had a conference call with Plaintiff and the AUSA in Fresno assigned to Stone, along with Fresno Branch Chief Kevin Rooney. During that call, Rooney said that Plaintiff had previously indicated that her personal situation might preclude her from handling the trial, and related preparations, in the Stone case. Ex. I (Kinsey Dep.) at 88; Ex. R (Reprimand).

Plaintiff's Response: Deny.  The specific reason for the two-month renewal of Rodriguez-Coss' Flexiplace agreement in December 2013 were her complaints.  Rodriguez-Coss' Flexiplace was renewed for only two months mainly because of Rodriguez-Coss' position regarding trying the Stone case, and management's need to "buy some additional time."  Carwile Depo. 48:8-51:10. If Rodriguez-Coss did not agree to handle all aspects of the *Stone* case, one of the options that was then being considered was not entering into future Flexiplace agreements.  Carwile Depo. 52:11-20.

(18) Immediately following that conference call, during a call between Plaintiff and CCS management, Plaintiff reiterated that she would not handle the Stone trial unless the schedule changes. Ex. I (Kinsey Dep.) at 97; Ex. 0 (Dec. 19, 2013 email from Carwile regarding Plaintiff's litigation of Stone).

**Plaintiff's Response: Deny, for the reasons set forth in response to asserted fact 12, above.**

(19) On December 19, 2013, Kinsey advised Plaintiff that they were only offering the Flexiplace Agreement for two months, and that continuance beyond the two-month term was dependent on her "satisfactory completion of all pre-trial and trial litigation duties and other assigned work responsibilities." Ex. J (Dec. 19-20, 2013 email exchange between Carwile and Plaintiff). Allowing Plaintiff to work from Connecticut was "an unusual agreement"...The job responsibilities assigned to [Plaintiff] had to be fulfilled, and If for some reason that was not occurring, then [management] would need to consider whether this unusual arrangement would be continued." Ex. C (Carwile Dep.) at 45-46. After Plaintiff expressed her refusal to handle the Stone trial, management decided that, while they were working through the issue, it was best to offer the agreement for a period of two months. Id. at 47. On December 20, 2013, Plaintiff emailed CCS management, with a copy to then- Criminal Division Executive Officer Karl Maschino, in response to receiving Carwile's December 19, 2013 email discussing the two-month agreement. Ex. J. In the email, she acknowledged that the agreement is "discretionary" but did not believe it could be "withdrawn arbitrarily." Id.

**Plaintiff's Response: Deny, for the reasons set forth in response to asserted fact 6, above.**

(20) On December 23, 2013, then-Human Capital Director Renee Caputo responded on Mr. Maschino's behalf, noting that the travel requirement applied to all staff and had been proactively communicated. Caputo noted that the Flexiplace Agreement was not an entitlement, and that CCS's decision to shorten the agreement, and the requirement that she travel in conjunction with

her assigned cases, was permissible. Ex. P (Dec. 23, 2013 email from Caputo to Plaintiff).

Plaintiff's Response: Deny, for the reasons set forth in response to asserted fact 6, above.

(21) On January 6, 2014, Plaintiff emailed Caputo, along with various other management officials in the Division. Ex. Q (Jan. 6, 2014 email from Plaintiff to Caputo). In her email, Plaintiff says that her Flexiplace Agreement is "being used as a tool to coerce [her] into continuing with a case assignment" she had already indicated she "cannot handle." Id. Plaintiff stated that, although the mission of the Section changed to involve active litigation, her "personal situation" had not changed and she would not "absent herself" from her three children for the three to four months it would take to litigate the Stone case. Id. Plaintiff noted that she had been asking to have the case reassigned since 2012, because she was "not able to handle that trial." Id.

Plaintiff's Response: Deny, for the reasons set forth in response to asserted fact 10, above.

(22) On January 7, 2014, Carwile issued Plaintiff a letter of reprimand based upon her stated refusal to handle the trial in the Stone case. Ex. R.

Plaintiff's Response: Deny, for the reasons set forth in response to asserted fact 1, above.  Moreover, Carwile can neither confirm nor exclude that the January 6, 2014 reprimand was being considered at the time of the two-month renewal of the Flexiplace agreement.  Carwile Depo. 55:18-56:2.

(23) On January 14, 2014, Ms. Caputo hosted a meeting with Plaintiff, Carwile and Kinsey. Caputo's notes indicate that Plaintiff stated that the Section's travel requirements were not workable for her because she had three young children, and that management noted that every staff member has their own personal circumstances, but all are expected to cover their cases. The

notes also reflect that Section management explained that it was not viable for Plaintiff to only travel within her preferred geographic region. Ex. S (Caputo handwritten notes of January 14, 2014 meeting).

Plaintiff's Response: Deny, for the reasons set forth in response to asserted fact 12, above.

(24) On January 22, 2014, Plaintiff first contacted the Department's Equal Employment Opportunity (EEO) Staff alleging discrimination by CCS management. Ex. T (EEO Complaint). The EEO Staff first notified the Criminal Division of the complaint on February 3, 2014. Ex. U (EEO counselor's notes). Plaintiff had engaged in prior EEO activity while she worked in another component of the Department, but CCS management was not aware of it. Ex. B (Rodriguez-Coss Dep.) at 72-75.

Plaintiff's Response: Deny. The pertinent EEO activity in this case is Rodriguez-Coss' fall 2013 complaint that she was not being accommodated while males were. Rodriguez-Coss Administrative Statement, 17:8-23. This complaint was made directly to CCS supervision, and also to the Human Capital Officials assigned to that section, so all pertinent decision makers were undoubtedly and contemporaneously aware.

(25) On February 4, 2014, Plaintiff filed a motion asking the Court to accept yet another late filing in the Stone case, which had been due the previous day. Ex. V (Feb. 4, 2014 motion filed in US. v. Stone).

Plaintiff's Response: Deny, for the reasons set forth in response to asserted fact 9, above.

(26) On February 10, 2014, Kinsey received a call from AUSA Tracy Dayton to discuss issues relating to Plaintiff's performance in the Stone case. Ex. W (Feb 10, 2014 email from Kinsey to Carwile). Around the same time, United States Attorney for the Eastern District of California Ben Wagner also brought

issues relating to the Stone case to management's attention. Ex. I (Kinsey Dep.) at 160-161; Ex. C (Carwile Dep.) at 83.

Plaintiff's Response: Deny, for the reasons set forth in response to asserted fact 9, above.

(27) On that same date, Plaintiff sent an email to the entire staff of the C08, asking about whether they had responded to a motion alleging prosecutorial misconduct, preferably in the 9th Circuit (where the Stone case was located). Ex. W (Feb. 10, 2014 email from Plaintiff to CCS colleagues).

Plaintiff's Response: Deny.  Kinsey never determined that Rodriguez-Coss committed prosecutorial misconduct.  Kinsey Depo. 168:4-9.

(28) Carwile notified Plaintiff by email on February 24, 2014, that he would not be renewing her Flexiplace Agreement after its expiration on February 28, 2014, based on upon "revelations over the past 2 weeks that were brought to [his] attention which relate to missed deadlines and other deficiencies in court filings…" Ex. I (Kinsey Dep.) at 111-112. Kinsey stated that once "it was brought to our attention by two unrelated parties, that there were major concerns being raised by the district court about deadlines being missed, we felt that we had -- we felt compelled -- I felt personally compelled to exercise a much greater degree of supervision over an attorney in that situation." Id. Plaintiff was directed to return to her regular duty station in Washington, D.C. by March 31, 2014, by email dated February 24, 2014. Ex. Y (Feb. 24, 2014 email from Carwile to Plaintiff).

Plaintiff's Response: Deny.  While Carwile asserted that requiring Rodriguez-Coss to move to Washington DC would have facilitated closer supervision of her by enabling her to have daily personal interaction with her immediate supervisor, Carwile cannot say how frequently CCS staff meeting were held, other than that management tried to have them at least quarterly.

68:9-69:2; 69:12-71:13. However, Carwile can neither exclude nor confirm that entire years have passed at CCS during his tenure without a staff meeting being held. Carwile Depo. 69:4-11. At the time of requiring her to return to Washington, Carwile had never discussed Stone trial strategy with Rodriguez-Coss. Carwile Depo. 148:22-149:12. Carwile also had never gone to see Rodriguez-Coss conduct trial proceedings. Carwile Depo. 65:16-66:8. Kinsey also had never gone to any court where Rodriguez-Coss was conducting a trial or hearing while she was a member of CCS. Kinsey Depo. 130:3-7. Rodriguez-Coss also had not been required to obtain approval before filing documents, and there was no written policy requiring advance approval. Carwile Depo. 67:9-18.

There is also considerable doubt that CCS management was capable of supervising Rodriguez-Coss more closely. Carwile has never been the trial attorney who prosecuted a capital case, and he has never sat through a federal capital trial from start to finish. Carwile Depo. 80:14-21. Kinsey has never been an attorney of record in a capital trial proceeding. Kinsey Depo. 136:9-11. Kinsey has not appeared in court on any case since 2008 or 2009. Kinsey Depo. 136:12-14.

Numerous other CCS Trial Attorney confirm that supervision was infrequent and predominantly by email, and that there would have been little increased supervision of Rodriguez-Coss had she relocated to Washington DC. **Julie Mosley Decl.**, ¶¶ 8-9; Amanda Haines Decl., ¶¶ 16-17; Bruce Hegyi Decl. ¶¶ 10-15, 18; Jeffrey Zick Decl, ¶ 6.

Additionally, the decision not to offer another Flexiplace agreement was an adverse action, one that management knew would likely result in Rodriguez-Coss' separation. Carwile believed the only way Rodriguez-Coss would continue with CCS in 2011 was if he offered her a Flexiplace agreement. Carwile Depo. 109:14-111:3. Rodriguez-Coss had never mentioned the possibility of relocating

to DC. Carwile Depo. 112:16-20. Indeed, Rodriguez-Coss was rarely, if ever, had been required to go to Washington D.C. after she moved to Connecticut. Rodriguez-Coss Depo. 66:11-23.

(29) On March 24, 2014, Plaintiff emailed management seeking authorization to continue to work from Connecticut "until at least April 30." Ex. Y. That request was denied on the same date. Id.

Plaintiff's Response:  Admit

(30) On March 28, 2014, Kenneth Blanco, issued a decision in response to Plaintiff's grievance of the letter of reprimand. Blanco determined that the letter of reprimand was "fair and reasonable." Ex. 2 (Mar. 28, 2014 Blanco decision).

Plaintiff's Response: Admit

(31) Plaintiff did not return to her duty station on March 31, 2014. Instead, Plaintiff emailed management, stating that "the stress from the current disputes pertaining to the status of my flexi-place agreement has had a marked and detrimental effect" on her health, and that she "cannot act contrary to [her physicians'] advice and report for duty in Washington." She further indicates her intention to continue reporting to the USAO in Connecticut. Ex. AA (Mar. 31, 2014 email from Plaintiff to Carwile).

Plaintiff's Response: Admit

(32) On April 1, Kinsey advised Plaintiff that she was being placed in an absent without leave (AWOL) status starting the next day, April 2, 2014. Ex. AA (email exchange between Carwile, Kinsey and Plaintiff). Plaintiff was reminded that she was not authorized to continue working from the USAO in Connecticut, and that she would be charged AWOL for any further unauthorized absences from her duty station in Washington, D.C. Id.

Plaintiff's Response: Admit

(33) On April 2, Plaintiff again asserted that the expiration of her Flexiplace Agreement had caused stress and anxiety, and that she would provide medical documentation to that effect. Ex. AA. Later that day, she provided a note indicating she had seen a doctor on March 31, and sick leave was approved for that date. Ex. AA; Ex. BB (Plaintiff's Time and Attendance records from Mar. 23 to Apr. 5, 2014).

Plaintiff's Response: Admit.

(34) That same day, Kinsey responded to Plaintiff and asked that she submit medical documentation to support her additional absences by Wednesday, April 9, 2014. Kinsey also advised that her planned travel to the National Advocacy Center (NAC) in South Carolina for training the following week was cancelled, since she was in an AWOL status. Plaintiff argued that she could not be AWOL for that date (April 2) because she submitted a request for annual leave; however, her annual leave request was denied. Ex. AA (April 2, 2014 email exchange). Plaintiff was AWOL for April 2-3, 2014. Ex. BB.

Plaintiff's Response: Deny. The Human Capital office typically is involved with reviewing medical records and advising manages if sick leave or FMLA is warranted.  43:3-10.  The reviewing Human Capital official has no recollection of taking issue with any of Rodriguez-Coss' medical documentation.  Caputo Depo. 43:43:11-15.

(35) In response to Kinsey's email, Plaintiff asked Kinsey to reconsider his decision not to allow her to attend the training, since her medical condition only "prevents her from reporting to work on a daily basis in Washington, D.C." and she needed the continuing legal education credits to maintain good standing with her state bar. Ex. AA (April 2, 2014 email from Plaintiff).

Plaintiff's Response: Admit.

(36) Plaintiff requested, and management ultimately approved. sick leave requests for April 7-May 12', and annual leave under the Family and Medical Leave Act from May 13 through May 30. Ex. CC (April 29, 2014 letter); Ex. DD (Plaintiff's Time and Attendance records from Apr. 6 to May 31, 2014).

Plaintiff's Response: Admit.

(37) On May 6. 2014, Plaintiff filed a formal complaint of discrimination with the Department's EEO Staff. Ex. T (EEO Complaint).

Plaintiff's Response: Admit.

(38) Medical documentation submitted by Plaintiff indicates that she was suffering from chest pains. as well as stress and anxiety related to work over the course of several weeks in April, but nothing in the medical documentation references a disability or need for accommodation. Ex. 66 (medical records provided by Plaintiff during relevant time). On May 14, 2014, in connection with her request for leave under the Family and Medical Leave Act, a physician certified that Plaintiff was completely unable to perform the duties of her job as an attorney until further notice. Ex. HH (FMLA certification).

Plaintiff's Response: Deny. Rodriguez-Coss' stress related to the retaliation to which she was being subjected. Rodriguez-Coss Administrative Statement, 25:13-26:15.

(39) On May 20, 2014, Plaintiff sent an email to Carwile, Kinsey, Caputo, and Employee Relations Specialist Tiffani Williams notifying them that she had accepted a position in the USAO for the District of Connecticut and was resigning from the CCS. Ex. II (May 20, 2014 email from Plaintiff). Plaintiff indicated that she wished to remain in a leave status for the remainder of her tenure with the CCS. Id.

Plaintiff's Response: Admit

(40) On June 1, 2014, Plaintiff was converted from a Trial Attorney position in the Criminal Division to an AUSA position in the District of Connecticut. Ex. JJ (SF-50). She was never separated from her position with the Department of Justice, remaining continuously employed by DOJ. Id.; Ex. KK (reassignment email).

Plaintiff's Response: Admit

(41) Criminal Division travel records show that, from 2008-2010, travel in what was then the Capital Case Unit was minimal. However, beginning in 2011, extensive travel was undertaken by numerous staff members.4 For example, Trial Attorney Steve Mellin traveled 116 days in FY2011, 215 days in FY2012, 97 days in FY2013, and 247 days in FY2014; Trial Attorney Jeffrey Kahan traveled 35 days in FY2011, 62 days In FY2012, 59 days In FY2013, and 85 days in FY2014; Michael Warbel traveled 91 days in FY 2011, 65 days in FY2012, and 55 days in FY2013. Other female attorneys in the Section also had widely varying amounts of travel. For example, Bonnie Hannan traveled 7 days in FY 2011: 30 days in FY2012; 29 days in FY 2013, and 20 days in 2014; Julie Moseley traveled 53 days in FY2011, 222 days in FY2012; 61 days In FY2013: and 89 days In FY 2014. Id. Ex. MM (Summary of travel records).

Plaintiff's Response: Deny/Object. The travel summary is not a CCS document, so it does not qualify as a business or government record. See Carwile Depo. 13:11-16. Moreover, the underlying data has not been produced during discovery, and the summary is therefore inadmissible in accordance with Federal Rule of Evidence 1006.

(42) Stanley Rothstein is a former Trial Attorney with the CCU and CCS; he served in that capacity from September 2008 through September 2013. when he retired. Mr. Rothstein had not been responsible for handling litigation matters with the Department since 2003; however, as with other attorneys in the section.

his duties including assisting United States Attorneys' Offices which were litigating capital cases. Ex. NN (Rothstein affidavit); Ex. C. (Camila Dep.) at 1 1-12. Rothstein traveled to Vermont for two days in connection with a litigation matter in 2011. Ex. MM (Summary of travel records).

Plaintiff's Response: Deny/Object. The travel summary is not a CCS document, so it does not qualify as a business or government record. See Carwile Depo. 13:11-16. Moreover, the underlying data has not been produced during discovery, and the summary is therefore inadmissible in accordance with Federal Rule of Evidence 1006.

(43) Travel records reflect that Plaintiff traveled 12 days in FY2011; 30 days in FY2012 (three of the five hips were one-day trips to Providence, Rhode Island): and 55 days in 2013 (20 of the trips that year were one-day trips to Providence). Ex. MM (Summary of travel records).

Plaintiff's Response: Deny/Object. The travel summary is not a CCS document, so it does not qualify as a business or government record. See Carwile Depo. 13:11-16. Moreover, the underlying data has not been produced during discovery, and the summary is therefore inadmissible in accordance with Federal Rule of Evidence 1006.

(44) On an unspecified date, Carwile issued a letter of reprimand to a male employee In CCS for refusing to handle a case assignment Ex. C (Carwile Dep.) at 129-130.

Plaintiff's Response: Deny/Object. No supporting information has been provided that would enable this asserted fact to be corroborated or tested.

<u>**STATEMENT OF ADDITIONAL MATERIAL FACTS**</u>

**1.  <u>Under the supervision of Carwile and Kinsey, the personal issues of</u> <u>male CCS attorneys were accommodated; those of female attorneys were not</u>.**

According to the Declaration of former CCS Trial Attorney Amanda Haines:

> ¶14.   Mr. Carwile was more accommodating of the male attorneys and their personal circumstances than he was of the female attorneys. For example, then Trial Attorney Richard Burns and Principal Deputy Chief Charlie Kinsey were both permitted to telework one day or more per week. I was denied a similar request with the only explanation being that Mr. Carwile "didn't believe in telework." This situation was only rectified when Deputy Assistant Attorney General Sung-Hee Suh interceded. Mr. Carwile also asked Mr. Qureshi to independently verify my medical appointments to determine "what condition I had that required medical assistance" and "whether I really needed to take an entire day of sick leave for medical treatment." I am aware of other instances where Mr. Carwile questioned the sick leave of his female attorneys, even if medical documentation was provided, whereas I know of no instance where male attorneys were doubted or questioned about taking sick leave.

According to the Declaration of former CCS Trial Attorney Bruce Hegyi:

> ¶5.     In January of 2017, I resigned from CCS because of what I perceived as plainly unethical and improper conduct and actions of CCS Chief P. Kevin Carwile ("Carwile") and Principal Deputy Chief Gwynn-Charlie X. Kinsey ("Kinsey"), which I had raised earlier with Carwile/Kinsey and the Department.

> ¶6.     During my tenure at CCS, I became personally aware that two attorneys at CCS (John Cox and Stanley Rothstein), who are males, were not being required by Carwile/Kinsey to engage in overnight travel.  Neither Carwile, Kinsey, nor Rothstein ever indicated to me that Rothstein had any physical condition that limited or prohibited his ability to travel.  To the contrary, Carwile expressed to me that Rothstein was able to travel, but simply refused to so do.  Cox similarly refused to travel overnight.

According to the Declaration of former CCS Trial Attorney Ann Carrol:

¶5.    The Capital Case Section under Mr. Carwile's leadership also was more accommodating of male attorneys and their personal circumstances, as compared to similarly-situated female attorneys. For example, during much of my tenure in the section, Trial Attorney Richard Burns was the only Capital Case Section attorney regularly permitted to telework each week. At the same time, a female colleague, Amanda Haines, who had significant need for that accommodation, was repeatedly denied that opportunity.

¶6.    After a serious medical procedure, I requested an accommodation that would have permitted me to suspend travel in the aftermath of my surgery, and work at my office in Washington D.C. However, I was told the position for which I was hired required regular travel, and that they would not assign me to do case review work only. I was instructed on how to request an accommodation through Human Resources. I was surprised because, over the 20 years I had worked at the Department of Justice, I had never experienced a complete lack of sensitivity in the immediate aftermath of a serious medical illness. In addition, I was advised by other attorneys in the section that Mr. Carwile had previously given the same accommodation to a male attorney who was no longer in the section, John Cox, without requiring him to produce any medical documentation for his alleged need not to travel due to a gluten intolerance. Overall, I felt Mr. Carwile's response was arbitrary, and gender-based. This impression was confirmed when I learned that, at the same time I was requesting an accommodation, Mr. Carwile was hiring a male attorney with the understanding that the male attorney would not be required to travel, and would work exclusively on case reviews.

¶7.    The way my request for post-surgery accommodation was handled, and the overall management of the section, prompted me to leave the Capital Case Section in June 2016. Before I left I met with Deputy Assistant Attorney General Sung-Hee Suh in order to advise her of specific instances of ethical violations, mismanagement, and what I perceived as a hostile work environment. She subsequently initiated a "management review" of the section, and interviewed each member of the staff.

2.  **Carwile and Kinsey displayed obvious favoritism for males CCS**

**attorneys in a number of ways.**

**According to the Declaration of former CCS Trial Attorney Amanda Haines:**

¶4. I have personal knowledge of serious failures and deficiencies by male attorneys of the Capital Case Section during my tenure that did not result in any investigations or disciplinary proceedings despite the fact that these deficiencies were brought to management's attention.

¶5. Specifically, in December 2013, I was assigned as the trial attorney primarily responsible for a capital prosecution then pending in the Middle District of Pennsylvania, Unites States v. Hammer, Crim. No. 96-0239. Hammer had previously been handled primarily by one of my male colleagues in the Capital Case Section, Steven D. Mellin.

¶6. When Hammer was assigned to me, I received no electronic or paper files or copies of pleadings from Mr. Mellin, despite numerous requests for any and all documents in his possession. I also did not receive the customary transfer memorandum that formerly assigned attorneys typically draft to ensure that the transition to newly assigned counsel does not prejudice the government's interests. I also never received a prosecution memorandum, a document that is usually generated in every case to outline the investigation that led up to the indictment and the reasons for seeking the death penalty. Indeed, I believe that I was the first and only attorney to ever generate such a document.

¶7. Upon familiarizing myself with Hammer by reviewing thousands of pages of documents contained in boxes stored in Pennsylvania, I learned that significant deadlines had been missed and that important documents had not been reviewed or produced. The deadline for responding to a jury questionnaire filed by the defendant had passed; thousands of pages of transcripts had not been digested or summarized; key witnesses had never been interviewed; and none of the documents/paperwork had been organized or sorted into files. Moreover, there were dozens of boxes, containing hundreds of pages of discovery, that had not been reviewed or produced even though the case was on the eve of trial. This failure, in particular, significantly prejudiced the government's interests, because portions of the unreviewed and unproduced discovery contained exculpatory materials pertaining to key penalty phase witnesses. Despite years of litigation during which the Capital Case Section had acted as lead counsel, the new

prosecution team, of which I was a part, was unearthing dispositive Brady information only weeks before trial.

¶8. I brought all the aforementioned failures and deficiencies in Hammer to the attention of the Capital Case Section's supervisors, namely Capital Case Section Chief Kevin Carwile and Principal Deputy Chief Gwynn X. Kinsey, both of whom are male. Notwithstanding my disclosures, to my knowledge no investigation was instituted to determine whether discipline was appropriate nor was I ever interviewed as part of any investigation into the failures and deficiencies I cited. To the best of my knowledge, based upon my subsequent interaction with Messrs. Carwile, Kinsey and Mellin, there was never any investigation done nor any discipline imposed. In fact, the next year, Mr. Mellin was assigned as lead trial counsel for the government in a high-profile capital prosecution, United States v. Dzhokhar Tsarnaev, which arose from the 2013 Boston Marathon bombings.

¶9. In 2014, I was subsequently assigned to another capital prosecution that had been previously handled by two of my male colleagues in the Capital Case Section, United States v. Andrew Rogers, Dkt. No. 16-0018-WTL-CMM, pending in the Southern District of Indiana. Rogers had previously been assigned to Capital Case Section Trial Attorney James D. Peterson, who is male, during the protocol review stage.

¶10. After familiarizing myself with Rogers, I learned that Mr. Peterson had committed a fundamental error in judgment and a violation of the "Ogden Memo," by interviewing over a dozen witnesses without a law enforcement agent or other witness being present. These witnesses were suspected of having information that was potentially harmful to the government's penalty phase case. Mr. Peterson compounded this error by destroying his interview notes, a fact he initially falsely denied, neglecting to memorialize his conversations with the witnesses, and failing to keep records of what documents he showed them to refresh their recollections or lack thereof.

¶11. I again made my supervisors, Messrs. Carwile and Kinsey, aware of these serious issues, including the fact that some of what Mr. Peterson had discussed with the witnesses was arguably Brady impeachment material, which needed to be disclosed to the defense. Upon information and belief, Mr. Peterson's actions were also reported to then Deputy Assistant Attorney General Sung-Hee Suh, who was assigned to oversee the Capital Case Section. Again, to my knowledge and notwithstanding my disclosures, no

investigation was instituted to determine whether discipline was appropriate nor was I ever interviewed as part of any investigation into the failures and deficiencies I cited. I believe based upon my subsequent interaction with Messrs. Carwile, Kinsey, and Peterson, who has received numerous awards lauding his work, that there was never any investigation done nor any discipline imposed. To the contrary, the Rogers case was simply reassigned from me to other attorneys in the Section (it has been reassigned three times since then).

### According to the Declaration of CCS Trial Attorney Julie Mosley

¶5.     During my six-year tenure with the Capital Case Section, Mr. Carwile appeared to hold some disdain for women in general.  His attitude towards his female staff was reflected in the quality of the work that was assigned to the female attorneys. The more desirable and high-profile capital cases were assigned to male attorneys; generally female attorneys were given the bulk of the protocol work and less noteworthy cases, often in federal districts that did not support the death penalty, and which devoted less resources and personnel to capital prosecutions. Mr. Carwile would also circulate emails requesting assistance (for example, soliciting help writing articles) only to male Capital Case Section attorneys. I was told about the all-male emails, and although I did not actually see the emails, I observed male attorneys meeting at least once of two reported meetings for that purpose. I confirmed with a male attorney at a later time that the email invitation had not included any female attorneys in the section.

### According to the Declaration of former CCS Trial Attorney Bruce Hegyi:

¶7.     From my observations, it appeared that the vast majority of the high profile and more desirable cases were assigned to male Trial Attorneys at CCS.  For instance, I was assigned to the "La Tombola Massacre" (United States v. Alexis Candelario-Santana) case in Puerto Rico and the 26-defendant " Almighty Imperial Gangster Nation" (United States v. Juan Briseno) outside of Chicago. CCS Trial Attorney Steve Mellin, who is male, was assigned to the United States v. Kabone Savage case in Philadelphia and the "Boston Bombing" case (United States v. Tsarnaev) in Boston. Mellin, who was single, was also assigned to the United States v. Williams case in Hawaii.  However, the problematic prison murder case of United States v. John Travis Millner, in the Eastern District of Kentucky, initially was assigned to female CCS Trial Attorney Bonnie Hannan, then for a time it was assigned to me, and it was thereafter reassigned to female CCS Trial Attorney Amanda Haines.  The case was problematic both

because there were difficult travel connections (the case was slated to be tried at a remote location in Kentucky), and because the U.S. Attorney's Office in the Eastern District of Kentucky was extremely reluctant to support the prosecution, would not assign appropriate resources to the prosecution, and in my view, was openly hostile to the prosecution and became obstructionist. After many years, and while assigned to Haines, the Millner case was eventually "decertified," meaning it was no longer a capital case. Hannan, who was married and had small children, was also assigned the undesirable co-defendant prison murder case of United States v. Sablan and Guerrero in the Eastern District of California located in Fresno. In that case, the U.S. Attorney's Office was reportedly actively hostile, and obstructionist and the case was pending before a judge who was hostile to the death penalty. Not only was travel between Washington, D.C., and Fresno, California difficult in that case, but Hannan was required to travel for an extended period of time to Guam. After years of litigation, both Sablan and Guerrero were "decertified." Perhaps because I recruited Haines (a very experienced homicide prosecutor at USAO-DC) to come to CCU/CCS, when I observed that Carwile/Kinsey were assigning Haines "lesser" cases, I approached Carwile/Kinsey on more than one occasion when a new desirable case had come into CCS and requested that they consider assigning the desirable new capital case to Haines. They did not assign Haines to any of the desirable cases I had suggested. Generally, from what I observed, Haines was assigned undesirable cases such as the sentencing re-trial of the aged United States v. Hammer case in the Middle District of Pennsylvania.

According to the Declaration of Former CCS Trial Attorney Ann Carrol:

¶3.    During my one-year tenure with the Capital Case Section, it became obvious that Mr. Carwile treated male and female employees differently. This was reflected in his interpersonal communication within and outside the office, his case assignments, and his management decisions.

3.   **Carwile and Kinsey promoted a sexist, inappropriate, sexualized work environment**.

According to the Declaration of former CCS Trial Attorney Amanda Haines:

¶12.   During my four-year tenure with the Capital Case Section, Mr. Carwile distanced himself from his female attorneys, appeared to

hold some disdain for women in general, and expressed his derogatory opinion that "women only go to law school to find rich husbands." His attitude towards his female staff was reflected in the quality of the work that was assigned to the female attorneys. The more desirable and high-profile capital cases were assigned to male attorneys; female attorneys were given the bulk of the protocol work and less noteworthy cases, often in federal districts that did not support the death penalty, and which devoted less resources and personnel to capital prosecutions. Mr. Carwile would also circulate emails requesting assistance (for example, soliciting help writing articles) only to male Capital Case Section attorneys. Mr. Kinsey would also circulate jocular "male only" emails, copies of which were shown to me by a male colleague. Mr. Carwile would rarely acknowledge the accomplishments of female attorneys, even when they were recognized by officials outside the Capital Case Section, but was effusive in his praise of the similar accomplishments of male attorneys. In addition, during my four-year tenure in the Section, no woman was elevated to a position of supervisory authority, despite the fact that two of the women employed there, myself included, had been supervisors at the United States Attorney's Office for the District of Columbia.

¶13.    Mr. Carwile also promoted and condoned a hostile work environment in the Capital Case Section. By way of example, under Messrs. Carwile and Kinsey's watch, sexual harassment was rampant, including misconduct by Mr. Kinsey, which, at a minimum, involved turning a blind eye towards the male attorneys' unwanted sexual advances with respect to the female summer interns and female administrative staff. Indeed, during my tenure, four female administrative staff abruptly resigned because of the hostile work environment, sexual harassment, and disparate treatment. In addition, Mr. Carwile appeared to condone the on-the-road exploits of his male attorneys, including bragging about sexual conquests and showing naked pictures of women in the office to male colleagues during office hours. Moreover, on occasion, Mr. Carwile would invite only the male attorneys to go out drinking with him, even when it was an office-related celebration. And finally, Mr. Carwile repeatedly drew a "ball and chain" on the door of Office Assistant Steve Qureshi, when he was engaged to be married, with words to the effect that he was "going to jail," offending myself and other members of the female staff.

According to the Declaration of CCS Trial Attorney Julie Mosley

¶6.    Moreover, on occasion, Mr. Carwile would invite only the male attorneys to go out drinking with him, even when it was an office-related celebration. Mr. Carwile at least twice drew a "ball and

chain" on a dry board on the door of Office Assistant Steve Qureshi, while Mr. Qureshi was out on leave to be married, with words to the effect that he was "going to jail," offending myself and other members of the female staff. I erased it from Mr. Qureshi's dry board at least once and when it reappeared, I photographed it before I erased it again.

**According to the Declaration of former CCS Trial Attorney Bruce Hegyi:**

¶8.    During my tenure with the CCS, I became uncomfortable with misogynist behavior by Carwile and the environment that he tolerated and appeared to promote.  I had heard from others at CCS that Carwile liked to frequent "Girly" Bars.  On one occasion, in 2014, when I was trying a case in the Northern District of Indiana, Carwile traveled to Indiana to briefly observe a portion of the trial. During trial, Carwile asked for me to meet him for dinner.  With scores of restaurants from which to choose, Carwile directed me to meet him that night at an establishment where, I found, the waitresses were all scantily clad.  Carwile indicated he selected the establishment after consultation with a male Department Trial Attorney who previously resided in the Chicago area and knew the types of establishments Carwile would appreciate.

¶9.    From what I personally observed while at CCS, Carwile promoted what could properly be described as a sexualized environment at CCS.  In my presence, Carwile tolerated Mellin displaying in the CCS Conference Room (in the presence of males and females) during a CCS group meeting, a photograph on Mellin's mobile phone of a female reporter from Hawaii, naked. Mellin contemporaneously discussed having had sexual relations with the reporter in the picture.  I observed a hand-drawn picture of a "ball-and-chain" on the dry-eraser board on the office door of CCS Administrative Assistant Steven Qureshi following Qureshi's announcement of his marriage engagement.  The image was repeatedly erased from Qureshi's dry eraser board, only for a new "ball-and-chain" drawing thereafter to appear on Qureshi's door.  I observed how this drawing upset Qureshi and various females at CCS.

**According to the Declaration of former CCS intern Luke Woolman:**

¶4.    Last summer, I worked as an intern with the United States Department of Justice, Criminal Division, Capital Case Section in Washington D.C. I started my summer internship on May 16, 2017.

¶5.    I attended a happy hour on May 24, 2017 at the Proper 21 Restaurant and Bar in Washington D.C. Also present were Capital Case Section Chief Kevin Carwile, Capital Case Section Deputy

Chief Gwynn X. Kinsey, and other attorneys from the Capital Case Section.

¶6.     During the evening, both Mr. Carwile and Mr. Kinsey drank heavily. Mr. Kinsey, who is a married man, began to take what seemed very clearly to be unwelcome liberties of a physical, sexual nature with a Capital Case Section staffer, who, to preserve her privacy, I will refer to only as A.T.

¶7.     Mr. Kinsey repeatedly touched A.T. inappropriately, openly and obviously, in the presence of Proper 21 patrons, as well as Mr. Carwile and at least one Capital Case Section attorney who was still present and seated nearby. Mr. Carwile did not chide, warn or request that Mr. Kinsey desist in any way, although, as stated, what was occurring was obvious and inappropriate.

¶8.     Instead, at the end of the evening, Mr. Carwile approached me and asked me not to discuss anything that I witnessed. I initially laughed because I presumed Mr. Carwile was joking, but then he sternly reiterated his request, specifically stating that he was being serious.

¶9.     Investigations were conducted regarding this incident, and I was interviewed by James Mann, Chief of Staff to then-Assistant Attorney General Leslie Caldwell. During the course of my interview with Mr. Mann, another person was on the telephone listening. I was also interviewed by investigators from the Department of Justice, Office of the Inspector General.

According to the Declaration of former CCS Trial Attorney Ann Carrol:

¶4.     Mr. Carwile also permitted and at times promoted a hostile work environment in the Capital Case Section.  For example, Mr. Carwile and Mr. Kinsey both gave preferential treatment to a female intern who was young and attractive, and created opportunities to have face-to-face communication with the interns, while they gave less desirable assignments to and had minimal communication with the intern's more senior female co-worker. On another occasion, Mr. Carwile repeatedly drew a "ball and chain" on the door of Office Assistant Steve Qureshi when he was engaged to be married. Female attorneys within the Capital Case Section repeatedly complained that the message of the picture was offensive and erased it, only to have Mr. Carwile re-draw it.

Dated: December 22, 2017        Law Office of Kevin G. Little

Physical Address:
1225 East Divisadero Street
Fresno, California 93721

Mail and Delivery Address:
P.O. Box 8656
Fresno, CA 93747

Telephone:  (559) 342-5800
Facsimile:   (559) 420-0839
Email:        Kevin@kevinglittle.com


_____
**Kevin G. Little**
**Attorney for Plaintiff**
**Jacabed Rodriguez-Coss**