1                        SWORN STATEMENT

2

3    Verbatim Transcript of investigative examination in the

4    Complaint of Jacabed Rodriguez-Coss v. United States

5    Department of Justice, Justice Management Division

6

7

8

9    BEFORE:                      Cheryl Epps

10                           Contract EEO Investigator

11                           For JDG Associates, Inc.

12

13

14

15    OBD-2014-00281

16

17

18    EXAMINATION OF Jacabed Rodriguez-Coss

19

20

21

22    September 5, 2014

23

RC0677

1          MS. EPPS:  Today is September 5, 2014. This is

2    Cheryl Epps, Contract EEO Investigator for JDG

3    Associates, Inc., and I am interviewing Ms. Jacabed

4    Rodriguez-Coss for her complaint, which is No. OBD-2014-

5    00281, Department of Justice, Equal Employment

6    Opportunity Staff, Justice Management Division.  So Ms.

7    Rodriguez-Coss, do you swear or affirm that the following

8    information you will give is true and correct to the best

9    of your knowledge?

10          COMPLAINANT:  I do.

11          MS. EPPS:  Okay.  For the record, would you please

12    state and spell your name?

13          COMPLAINANT:  My name is Jacabed Rodriguez-Coss,

14    first name J-A-C-A-B (as in boy) E-D (as in David), last

15    name Rodriguez-Coss, R-O-D-R-I-G-U-E-Z – C-O-S-S.

16          MS. EPPS:  Thank you.  Are you currently employed by

17    the Department of Justice?

18          COMPLAINANT:  I am.

19          MS. EPPS:  Okay.  How long have you been employed by

20    the Department of Justice?

21          COMPLAINANT:  Since January of 1995.

22          MS. EPPS:  Okay.  Please state your position title,

23    series, grade, and work location.

24          COMPLAINANT:  I'm currently an Assistant United

25    States Attorney in the District of Connecticut.  I am

**Initials**

RC0678

1    physically located in their Bridgeport branch.  My grade,

2    we're not --- AUSAs are not on the grade pay scale, we're

3    on a different administrative appropriation.  I believe

4    I'm AD-29, but I'd have to say that I have not seen my

5    new SF-50 since my recent appointment as an AUSA, but

6    last I checked it should be AD-29.

7         MS. EPPS:  Okay, that's fine.  And what is the name

8    of your current first-line supervisor?

9         COMPLAINANT:  Stephen Reynolds.

10        MS. EPPS:  And would you spell that for us?

11        COMPLAINANT:  Stephen Reynolds, S-T-E-P-H-E-N,

12   Reynolds, R-E-Y-N-O-L-D-S.

13        MS. EPPS:  How long has this person served as your

14   first-line supervisor?

15        COMPLAINANT:  Since I began with the District of

16   Connecticut June 1, 2014.

17        MS. EPPS:  And what is the name of your current

18   second-line supervisor?

19        COMPLAINANT:  When you say second-line, you're

20   talking above Steve, correct?

21        MS. EPPS:  Yes.

22        COMPLAINANT:  So that would be Ray Miller.

23        MS. EPPS:  Okay.  Is that R-A-Y, M-I-L-L-E-R?

24        COMPLAINANT:  Correct.

Initials

4

1      MS. EPPS: And how long has this person served as

2  your second-line supervisor?

3      COMPLAINANT:  Same time.

4      MS. EPPS:  Okay.  So your claims have been accepted

5  for investigation on the basis of your sex, national

6  origin, disability status, parental status, and reprisal

7  based on your current prior EEO activity, so for the

8  record, please state your sex.

9      COMPLAINANT:  I'm female.

10     MS. EPPS:  Please state your national origin.

11     COMPLAINANT:  I'm Puerto Rican, Hispanic.

12     MS. EPPS: Do you have a physical or mental

13  impairment, or are you regarded as having such?

14     COMPLAINANT: Well, over the last, what, year or so,

15  I've been having --- I've been under --- I've been under

16  a lot of stress that led me eventually to seek

17  psychiatric treatment.

18     MS. EPPS:  Okay, so the nature of your impairment

19  would be a psychiatric impairment, is that what you're

20  saying?

21     COMPLAINANT:  A mental condition, correct.

22     MS. EPPS:  Okay. And you said how long has this been

23  going on?

24     COMPLAINANT:  I think it would be progressive over

25  the last year or so.

**Initials**

1         MS. EPPS:  Okay.  Over the last year or so?

2         COMPLAINANT:  Correct.

3         MS. EPPS:  Okay.  So does this impairment

4    substantially limit your ability to perform any major

5    life activity or bodily function?

6         COMPLAINANT:  Not at this time.

7         MS. EPPS:  Okay.  Did it ever?

8         COMPLAINANT:  Yes.

9         MS. EPPS:  Okay.  And in what way did it

10   substantially limit your ability to perform?

11        COMPLAINANT:  I mean at one point in time I was

12   barely sleeping.  I was suffering from recurring chest

13   pains, was unable to focus, and further than that, I

14   think I would rather rely on my medical record.

15        MS. EPPS:  Okay.  And so the onset of all of these

16   symptoms would have been a year or so, as you said?

17        COMPLAINANT:  I think so.

18        MS. EPPS:  So do you consider yourself recovered in

19   whole or in part from these?

20        COMPLAINANT:  Definitely in part.  I'm still seeing

21   my --- my psychiatrist and my condition has definitely

22   improved significantly, but I'm still under treatment [unclear].

23        MS. EPPS:  Okay.  Is there prognosis for whole ---

24   your recovery in whole?

Initials

1       COMPLAINANT:  I'm not sure how to answer that.  I

2    think that's a better question for my psychiatrist.

3       MS. EPPS:  Oh, okay.  And any of the medical

4    documentation that you provide, do you think there would

5    be a prognosis anywhere in there already written by your

6    psychiatrist?

7       COMPLAINANT:  I don't have that documentation in

8    front of me.  I do believe that there was a prognosis at

9    some point, and so I would just rely on the written

10   documentation that I've submitted.

11      MS. EPPS:  Okay, so when I review that, if I do not

12   see anything stating a prognosis, I'll get back to you on

13   that, okay?

14      COMPLAINANT: Sure.

15      MS. EPPS:  Okay.  Do you take any medication at this

16   time or previously for this impairment?

17      COMPLAINANT:  Yeah, I am taking medication.

18      MS. EPPS:  Okay.  What medications do you take?

19      COMPLAINANT:  I'm taking Zoloft, .50.

20      MS. EPPS:  Anything else?

21      COMPLAINANT:  No.

22      MS. EPPS:  Do the medications have any side-effects?

23      COMPLAINANT:  You mean negative side-effects or ---

24      MS. EPPS:  Any type of side-effects.

Initials

1       COMPLAINANT:  Well, I mean all medications have

2    side-effects.

3       MS. EPPS:  Yes.  And have you noticed any specific

4    side-effects?

5       COMPLAINANT:  Not off the top of my head right now.

6       MS. EPPS:  Okay.  So you will provide me with

7    medical evidence for the record to support your

8    statements about this impairment, correct?

9       COMPLAINANT:  I believe I have supported the --- I

10   have submitted already.

11      MS. EPPS: To the Agency?

12      COMPLAINANT:  Sure.

13      MS. EPPS:  Okay.  I will secure those --- that

14   documentation from them.  Who in your Agency know of this

15   impairment and when and how did they become aware?

16      REPRESENTATIVE:  Just to be clear, Ms. Epps, the

17   claims that my client has pertains to her prior

18   assignment in the Capital Case Section and I'm assuming

19   that your complaint is directed --- or your questions are

20   directed at that work setting as opposed to her current

21   work setting.

22      MS. EPPS:  Yes.

23      REPRESENTATIVE:  Okay.

Initials

1        MS. EPPS:  So in that --- in the previous setting,

2   who in that Agency knew of your impairment and when and

3   how did they become aware?

4        COMPLAINANT:  The documentation was forwarded to

5   Charlie Kinsey, who was my direct supervisor in the

6   Capital Case Section, and I believe we --- I believe I

7   might have been required to copy or forward documentation

8   to Human Resources, I want to say it was Rene Pudo^(Caputo) or

9   --- what's the name of the other person that was talking

10  to us --- do you remember was the last name Jackson?  It

11  might've been another individual in Human Resources that

12  was --- that might've requested some documentation.

13       MS. EPPS:  Okay. And can you recall approximately

14  when this was that you provided this documentation to

15  them?

16       COMPLAINANT:  I provided documentation to them on

17  various occasions as requested, I believe beginning April

18  of this year.

19       MS. EPPS:  Okay, April of 2014?

20       COMPLAINANT:  Correct.

21       MS. EPPS:  Okay.  And for the record, describe the

22  offense --- the essential, sorry, functions of your

23  position in that employment.

24       COMPLAINANT:  I'm sorry; could you repeat that?

25  Describe the what?

Initials

RC0684

1       MS. EPPS:  Essential functions.

2       COMPLAINANT:  ~~[Unclear]~~ Sure.

3       MS. EPPS:  Yeah, trial attorney position.

4       COMPLAINANT:  Initially as a trial attorney when I

5   was first hired by the Capital Case Unit, our functions

6   were really two-fold; to provide primarily capital review

7   to potential capital cases, and I'm not sure how familiar

8   you are with the process of capital litigation in federal

9   ~~form~~ Court, but all U.S. Attorney offices across the nation, if

10  they have a potential capital case, are required to brief

11  that case to the Capital Case Unit in Washington, we

12  would receive that documentation, we would review it,

13  evaluate it, pursue any additional factual information

14  that we thought the committee would need in order to make

15  its recommendation.  The Attorney General designates a

16  committee for the review of capital cases, the

17  documentation is forwarded to that committee, who will

18  come together, discuss the case, and issue a

19  recommendation to the Attorney General.  In cases where

20  the committee actually holds a committee conference ---

21  well, in all cases actually the committee issues a --- a

22  memo and we assist in the drafting of that memoranda,

23  other than that, we provided ~~litigations report~~ litigation support from

24  Washington to capital cases across the nation.  Once in a

25  while a particular district would request litigation

Initials

1    support more directly and there was one attorney in our

2    unit at the time who would provide that sort of --- that

3    sort of support.  In addition, once in a while we would

4    receive inquiries from Congress of various, you know,

5    natures, and we would assist in responding to those

6    inquiries, and we would also, at times, engage in

7    training in capital litigation.  And subsequently, over

8    the last couple of years, the unit became more and more

9    involved in litigation, and so added to our

10   responsibilities was the litigation --- actual litigation

11   of capital cases in different districts, which meant that

12   we would actually join the trial team and litigate

13   capital cases.

14        MS. EPPS:  Did your physical impairment affect your

15   ability to perform any of those functions?

16        COMPLAINANT:  Yes, definitely I think there came a

17   time where it did, yes.

18        MS. EPPS:  Okay.  You want to describe in what way

19   you were affected?

20        COMPLAINANT:  Again, you know, this stress [created]

21   I think by my work environment was affecting my ability

22   to sleep, my ability to focus.  I was experiencing

23   continuous chest pains that led me to seek medical

24   attention.  I had at least one anxiety attack that was

25   also addressed medically.

**Initials**

RC0686

1      MS. EPPS:  Okay.  And so at this particular point

2    you are recovering in part, so is it your statement that

3    you are able to perform all essential functions of your

4    position now?

5      COMPLAINANT: I am.

6      MS. EPPS:  Okay.  In your previous position, did you

7    request an accommodation in order to be able to perform

8    your essential functions?

9      COMPLAINANT:  I did.

10     MS. EPPS: Okay. What accommodations, specifically,

11   or accommodations did you request?

12     COMPLAINANT:  Well, as I stated before, I sought

13   medical attention when I perceived, you know, symptoms

14   that were, in my opinion, serious, that were seriously

15   affecting me.  My doctors recommended that I remain under

16   --- under their care. When I was instructed to report

17   back physically to Washington, D.C., I advised them of my

18   condition, I provided medical documentation of it, and

19   requested that I be allowed to continue working from

20   Connecticut as I had in the previous three years, and

21   that was denied.

22     MS. EPPS:  Okay, so the accommodation was to be able

23   to continue in Connecticut and that was denied?

24     COMPLAINANT:  Right, so that I could continue on

25   under the supervision of my doctors.

Initials

RC0687

1      MS. EPPS:  Okay.  And to whom did you make this

2 request?

3      COMPLAINANT:  I'd have to rely on the actual

4 electronic message that I sent, but I believe I addressed

5 it to Charlie Kinsey.  I might have copied Kevin Carwile

6 on it, or they might've both --- I would think that they

7 were both on the email.

8      MS. EPPS:  Okay.  And did you receive the negative

9 response or the denial from one or both of them?

10      COMPLAINANT:  You know, again, I would have to rely

11 on --- on the actual written record, but to the best of

12 my recollection, I believe I received it from Kevin

13 Carwile.

14      MS. EPPS:  Okay, so prior to the claims that are

15 being investigated in this case, were you involved in

16 prior EEO activity?

17      COMPLAINANT:  You mean like have I ever filed an EEO

18 complaint in the past?

19      MS. EPPS:  Yes, and also prior protected activity,

20 protecting any kind of discriminatory treatment or that

21 kind of thing in your job?

22      COMPLAINANT:  So I filed an EEO complaint against

23 the U.S. Attorney in the District of Maryland.  I want to

24 say that it was in 2002 for discriminatory action.  The

25 complaint was accepted for investigation and an

Initials 

1    investigation actually took place, but the department

2    took so long to actually issue an opinion in that case

3    that by the time they did, more than a year had

4    transpired and I was actually back in Puerto Rico working

5    as an AUSA, and quite honestly, you know, despite the

6    fact that I felt that, you know, my complaints were

7    legitimate and I --- I desisted, so I didn't follow up on

8    it.

9        MS. EPPS:  Okay, so was there no formal disposition?

10      COMPLAINANT:  I'm not sure what you mean by formal

11   disposition in that, you know, I didn't have anyone

12   representing me in that case; I was kind of handling it

13   myself ---

14      MS. EPPS:  Uh huh.

15      COMPLAINANT:  And it was all very --- was all very

16   new to me ---

17      MS. EPPS:  Uh huh.

18      COMPLAINANT:  And a little bit difficult to navigate

19   myself.  I did have a friend of mine, who is currently

20   the First Assistant in the District of Tampa, who came

21   and assisted me during a similar interview that I had in

22   that case ---

23      MS. EPPS:  Okay.

24      COMPLAINANT:  You know what, I'm mistaken.  It

25   wasn't --- I don't believe it was during an interview.

Initials

RC0689

1    We actually engaged in mediation and I think he assisted

2    me in the mediation process.  I had like a right to have

3    someone within the department assist me in the mediation

4    process and I remember him flying up for that.  And then

5    I know that eventually I received copies of the

6    depositions that had been conducted and after that, it

7    was --- I just remember it being a really long time

8    before I received [any sort of ~~unclear~~] decision by EEO ---

9         MS. EPPS:  Uh huh.

10        COMPLAINANT:  And I had the --- I had the option at

11   that point I think of appealing that or filing something

12   in court and I, quite frankly, I just --- I didn't follow

13   up on it.

14        MS. EPPS:  Okay.

15        COMPLAINANT:  Other than that, I think I, just for

16   the sake of completeness, you asked me this question ---

17        MS. EPPS:  Sure.

18        COMPLAINANT:  I'm not sure if this --- I'm not sure

19   if this applies or it's responsive, but back, back, back

20   in like I want to say 1998 I appealed a performance

21   evaluation through the procedure in the department, if

22   you will, for reviewing performance evaluations, and one

23   of the allegations that I made was discrimination based

24   on parental status.  I was being held responsible for

Initials

1    things that have taken place in my cases while I was on

2    maternity leave and that was resolved in my favor.

3         MS. EPPS:  Okay.

4         COMPLAINANT:  In the department.

5         MS. EPPS:  Okay.  But let me be clear about the

6    first activity --- EEO activity you listed.  There ---

7    you didn't follow up, so there was no official resolution

8    of it, is that what you're saying?

9         COMPLAINANT:  Again, I think there was a resolution

10   by the department at the conclusion of the investigation

11   ---

12        MS. EPPS:  And that was?

13        COMPLAINANT:  That they didn't agree that it was

14   based on discrimination.

15        MS. EPPS:  Okay.

16        COMPLAINANT:  The disciplinary actions that had been

17   taken by the district were not based on discrimination

18   because there wasn't anything blatantly clear, you know,

19   I don't necessarily agree with that, but I didn't follow

20   up, so I didn't appeal that decision.

21        MS. EPPS:  Okay.  Okay, I understand.  So was

22   management in the Capital Case Section aware of your

23   prior EEO activity?

24        COMPLAINANT:  The one back in like the District of

25   --- that I had in the District of Maryland?

Initials

1          MS. EPPS:  Any of your prior EEO activities, was the

2     Capital Case Section management aware of it?

3          REPRESENTATIVE:  Let me just clarify.  Our complaint

4     is alleging that the pertinent prior EEO activity where

5     Ms. Rodriguez-Coss's complaints directly to her --- her

6     supervisors regarding issues within the Capital Case

7     Section, not her prior EEO activity in other work

8     settings, but --- but ---.

9          MS. EPPS:  I assume she was --- yeah, yeah, I

10    understand.  I assumed she was getting to that ---

11         REPRESENTATIVE:  Okay.

12         MS. EPPS:  Yeah, that I assumed we were going there.

13         REPRESENTATIVE:  Okay.  Okay.

14         MS. EPPS:  Do you ---

15         COMPLAINANT:  Now I don't --- I don't know --- I

16    don't have any reason to believe that my supervisors at

17    the Capital Case Section were aware of a complaint I

18    filed with EEO back in 2002, I believe it was, if that's

19    what you're asking me.

20         MS. EPPS:  Oh, okay, yeah.  How about, as I said,

21    any prior activity or prior complaints that you made to

22    the Capital Case Section management, workload or those

23    kind of things?

24         COMPLAINANT:  I'm sorry.  [Unclear] can you ---

Initials

attorney Mr. Little

1        MS. EPPS:  That your [unclear] just said that in

2    this case your prior EEO activity is the complaint that

3    you made to the Capital Case Section ---

4        COMPLAINANT:  Right.

5        MS. EPPS:  Regarding --- so I want you to elaborate

6    on that a bit for the record, that prior EEO activity, or

7    protected activity as we [unclear].

8        COMPLAINANT:  Well, I mean --- okay, I'm just not

9    clear on where you want me to begin or what it is you

10    want me to address.  I mean yeah, the Capital Case

11    Section was aware of my complaints of I guess protected

12    EEO activity, I mean since at least what, 2012 --- summer

13    of 2012 I believe I complained about the fact that one of

14    my male counterparts at the Capital Case Section was

15    being accommodated and similar accommodations were being

16    denied to me, and I was clear in that why is Stan, who is

17    a White male, not being forced to travel or litigate

18    cases outside of Washington, D.C., and I am, and all I'm

19    asking is similar accommodation.  Is that what you mean?

20        MS. EPPS: Yes.  Yes.  Any other complaints or issues

21    you raised about any of your --- your treatment as

22    opposed to treatment of others there?  If not, we can go

23    on.

Initials

RC0693

1       REPRESENTATIVE:  You're talking about on any basis,

2   parental status, disability, any of the various protected

3   categories, correct?

4       MS. EPPS:  Any --- yes, any --- any complaint that

5   you are alleging as prior EEO activity in this complaint.

6       REPRESENTATIVE:  And just to further clarify,

7   whether it was a grievance, whether it was something even

8   more informal than a grievance, whether it was something

9   more formal ---

10      MS. EPPS:  More or less informal if there was a

11   protesting of a work practice directed towards ---

12      COMPLAINANT:  There was --- there was recurring and

13   consistent protesting of several work practices voiced by

14   me directly to my supervisors at the Capital Case Section

15   ---

16      MS. EPPS:  Okay.

17      COMPLAINANT:  With regards to unequal treatment in

18   the sense that, you know, a White male was being

19   accommodated and I was not.

20      MS. EPPS:  Yes.

21      COMPLAINANT:  There was clear voice of my complaints

22   to them with regards to the way that the cases were being

23   managed and the fact that they were being managed in such

24   a way that I believe it was preventing me from fairly

25   complying with my ethical obligations to represent the

Initials

1    interest of the United States.  I voiced complaints with

2    regards to the fact that, you know, I held a number of

3    personal responsibilities that were not being taken into

4    account in the case assignments.  Yes, I think that with

5    regards to the grievances and the complaints that I have

6    raised in my current formal complaint were all voiced to

7    management at CCU --- [unclear]. CCS

8        MS. EPPS:  Okay. And the names of the persons you

9    identified as the responsible officials in your prior EEO

10   activity there?

11       COMPLAINANT: Again, Charlie Kinsey and Kevin Carwile

12   are the two people in management at Capital Case Section.

13       MS. EPPS:  Okay. And you would identify them as

14   responsible for the discriminatory acts that you just

15   listed?

16       COMPLAINANT:  Yes.

17       MS. EPPS:  Okay.  The first claim that was accepted

18   for investigation states that for the previous three

19   years there was a flexi-place agreement in place that

20   allowed you to work in Connecticut since that was where

21   you and your family reside.  On December 19, 2013 the

22   Capital Case Section management offered, and you

23   accepted, a flexi-place agreement that provided for two

24   months extension of the agreement --- of the agreement to

25   February 28, 2014.  In the past, the agreements had been

**Initials**

RC0695

1    reviewed --- or renewed for six-month period.  So can you

2    describe the series of events which led up to you being

3    placed on the flexi-place agreement that allowed you to

4    work in Connecticut for those previous three years?

5        COMPLAINANT:  Again, I provided a more clear and

6    complete narrative in writing, but I would say in I think

7    it was September --- either August or September of 2010

8    my husband was awarded a supervisory position with the

9    FBI in Connecticut.  I provided notice --- it might've

10   been September --- it might've been a little --- I'm not

11   sure --- I would rely on the written record --- but ---

12       MS. EPPS:  Okay.

13       COMPLAINANT:  I provided notice to both of my

14   supervisors that I would be --- my family would be

15   relocating to Connecticut and initially I simply

16   requested some time to pursue a position in Connecticut

17   and I was --- that was granted, or least they --- they

18   didn't voice any objections at the time, and I think it

19   was about a week before I was to actually relocate to

20   Connecticut that Charlie Kinsey asked me if I would be

21   willing to litigate the case of the United States v.

22   Aquart, which was a capital case that was scheduled to

23   begin trial in March of 2011 in the District of

24   Connecticut, and I agreed, given the fact that I would be

25   relocating to Connecticut and I would be in the district,

Initials

RC0696

1 so arrangements were made for me to have an office at the

2 U.S. Attorney's office in Connecticut, specifically in

3 Bridgeport.  I joined the trial team of the United States

4 v. Aquart and began assisting the ~~assisting~~ *Assistant* United States [unclear]

5 Attorneys from Connecticut and preparing that case for

6 trial for both the guilt phase and the penalty phase of

7 the trial.  I think the understanding eventually that

8 reached was that I would continue to work as a trial

9 attorney for the Capital Case Section while I worked in

10 United States v. Aquart and at the conclusion of the

11 case, and I'm talking these are the expectations that we

12 had when the --- when that relationship began --- the

13 expectation was at the conclusion of the case I would

14 join the U.S. Attorney's Office for the District of

15 Connecticut.  During the course of the trial I had been

16 going through the interview process and was actually

17 offered a position, but it didn't meet my needs, so I

18 actually declined, so when the case ended in June of 2011

19 I called Kevin Carwile and I requested, you know, a

20 reasonable amount of time, I forget right now how much

21 time I might've requested, but it probably would have

22 been a couple of months, to seek other employment prior

23 to actually tendering my resignation to the Capital Case

24 Section, and it was at that time that Kevin Carwile said,

25 "Well, you know, we're still under hiring --- a federal

Initials

1    hiring freeze, and if I lose you, I will not be able to

2    replace you, and I would like you to consider ~~staring~~ staying on

3    with the Capital Case Section while telecommuting from

4    --- from Connecticut." And I accepted, and so that's

5    really the offer and acceptance that gave ~~[unclear]~~ rise to

6    the flexi-place agreement that was put in place that was

7    subsequently renewed every six months up to December of

8    2013.

9         MS. EPPS: Okay. And in this initial flexi-place

10   agreement, was there a provision or were there any

11   specific provisions for when and how it would be

12   extended?

13        COMPLAINANT: Well, yeah, I think it --- well,

14   obviously the document speaks for itself because it's a

15   written document, but it was extended every six months

16   and the agreement itself states that it cannot be

17   cancelled or withdrawn expect for a lack in performance,

18   but obviously, it's more specific than that, but

19   basically any reason to either cancel the agreement or

20   modify it had to be based on a lack of performance.

21        MS. EPPS: Okay. Was there an agreed upon amount of

22   time it would always be extended?

23        COMPLAINANT: Again, I think ---

24        MS. EPPS: A month, two months, or ---

Initials

RC0698

1       COMPLAINANT:  No, it was six months.  It was from

2    the time that it began to December of 2013, it was every

3    six months and it was very matter of course, you know,

4    here's the, you know, renewal of your agreement, I signed

5    it and I sent it back.

6       MS. EPPS:  Okay.

7       COMPLAINANT:  And can I just take this opportunity

8    to clarify something you stated earlier in one of your

9    questions, when you referred to the flexi-place agreement

10   that was extended in December 19, 2013 and that I

11   accepted, I would take issue with the words "I accepted"

12   in the sense that when I received that agreement and

13   noted that it was only a two-month extension, I

14   immediately questioned that to my immediate supervisor

15   Charley Kinsey and expressed my dissatisfaction with that

16   and also expressed the fact that there was no reason, as

17   envisioned by the agreement, that would or should've

18   caused the reduction in the term.  I had approved annual

19   leave, I believe I think it was a week because it was

20   nearing the holidays because I didn't get a response from

21   my immediate supervisor right away, and I received a

22   response, and again, this is --- I'm going on my memory

23   right here, so --- but I believe I received a response

24   from Human Resources, rather than my supervisor, about

25   the fact that they had discretion to reduce the term,

Initials

1    which I was disputing, and when I come back to the

2    office, I think it was January 2nd or 3rd, I get an email

3    from Kevin Carwile basically saying, "You haven't signed

4    your flexi-place agreement.  If you don't sign it, you

5    are not authorized to continue working from Connecticut."

6    And I don't recall the exact language that he used, but I

7    essentially felt like I either signed it or I would be

8    declared AWOL because I wasn't, you know, it was

9    something like if you don't sign it, your official

10   workstation then is 1331 F Street N.W., Washington, D.C.

11   So I didn't really have a choice in signing that

12   agreement.  I felt like it was what I needed to do in

13   order to continue the discussion with Human Resources

14   with regards to what was --- what was going on.

15         MS. EPPS:  So you signed it under duress, is that

16   what you're saying, because you ---

17         COMPLAINANT:  Yeah.

18         MS. EPPS:  Okay.  Okay.  And that was Mr. Carwile

19   that offered you the two-month extension?

20         COMPLAINANT:  Well, I think the email in December

21   came from Charlie.

22         MS. EPPS:  Okay.

23         COMPLAINANT:  But I assume it has, you know, Mr.

24   Carwile is the Chief of the Unit, so ---

25         MS. EPPS: So he would, yes, be involved.

Initials

1       COMPLAINANT: Right.

2       MS. EPPS:  And what was the reason given for the

3    two-month extension rather than the regular six months?

4       COMPLAINANT:  There was no reason given.

5       MS. EPPS:  Okay.  And so you signed that agreement

6    because you were under --- you felt you had no choice,

7    that you wanted to keep your position?

8       COMPLAINANT:  I had to continue working, right.

9       MS. EPPS: Yes.  Yes.  Okay.  And what adverse

10   effect did that two-month extension have on you?

11      COMPLAINANT:  What adverse effect?

12      MS. EPPS: Adverse.

13      COMPLAINANT:  I --- I --- I didn't get [unclear]  think it escalated...  .  I

14   mean I had been under an incredible amount of stress,

15   work-related stress to begin with, you know, I had in

16   that previous fall I was practically handling United

17   States v. Stone on my own because my co-counsel in the

18   Eastern District of California had resigned her position

19   as a Assistant U.S. Attorney, they assigned someone who

20   had just joined the U.S. Attorney's office as a federal

21   prosecutor, so I had basically a new federal prosecutor

22   assigned to my case with no prior capital experience, so

23   for the initial six months I was really handling all the

24   motion practice in that case.  At the same time, I'm

25   handling evidentiary hearing in Burlington, Vermont on

Initials

1    the other side of the country on a rather complicated ~~20~~ 2255

2    ~~to 55,~~ so I was already under, in addition to my Capital

3    Case review work, so I was already under a significant

4    work-related stress and now I'm looking --- I'm dealing

5    with the possibility that my Chief is contemplating

6    terminating my employment for --- for completely

7    unjustified reasons because the way I looked at it, if my

8    flexi-place agreement was cancelled, that would be a

9    constructive firing as I was physically unable to report

10    on a daily basis to Washington, D.C.  So it had an

11    incredible adverse effect on me and it's what then led me

12    to begin seeing my [generalist ~~unclear~~] because I wasn't sleeping, I

13    was having chest pressures, and not concentrating, I, you

14    know, it was --- yeah, it definitely had an adverse

15    effect on me.

16        MS. EPPS:  Okay, but you said they gave absolutely

17    no reason for changing the flexi-place agreement?

18        COMPLAINANT:  Right, I think that email is part of

19    the record in this case and it does not express a reason

20    for reducing the flexi-place agreement.  My --- yeah, no,

21    they gave no reason.

22        MS. EPPS:  Okay.  To your knowledge, has other

23    persons in --- in that Capital Case Section management,

24    or under that section been placed on flexi-place

25    agreements?

Initials

1    COMPLAINANT:  To my knowledge, the only person who

2    has a flex-place agreement is Rich Burns that I know of

3    --- as far as I know.

4    MS. EPPS:  Okay.

5    COMPLAINANT:  I know that Rich works from home at

6    least one day a week.

7    MS. EPPS:  And that's a flexi-place agreement?

8    COMPLAINANT:  That's a flexi-place agreement,

9    correct.

10   MS. EPPS:  Okay.  Do you have any idea how

11   frequently his --- is it reviewed, if it has been

12   extended, or any --- any information about how he's been

13   treated in the flexi-place agreement?

14   COMPLAINANT:  No, I don't.

15   MS. EPPS:  Okay, I was just wondering.  So you are

16   alleging those actions in claim 1 were taken based on

17   your sex?

18   COMPLAINANT:  I'm sorry. What ---

19   MS. EPPS: You allege on the basis of the first claim

20   that we just went through about the flexi-place agreement

21   and the change, claim 1, you allege that those actions

22   were taken based on your sex, your national origin, etc.

23   The bases that you allege those actions were taken.

24   REPRESENTATIVE:  Well, I --- I --- I think just to

25   clarify, I think the complaint says the initial grounds

**Initials** 

RC0703

1    that she complained were based on sex, parental status,

2    etc. ---

3         MS. EPPS:  Yes.

4         REPRESENTATIVE:  And that the flexi-place agreement

5    was not renewed and retaliation for those initial

6    complaints, I think that's --- that's what we have set

7    forth in our complaint.

8         MS. EPPS: All of the claims that were accepted, at

9    least the acceptance letter that I got said that they

10   were accepted on the basis of sex, national origin,

11   disability status, etc., etc., so I'm just asking about

12   if those are your allegations that that --- that the

13   actions in claim 1 were taken based on your client's sex,

14   national origin, etc. --- parental status, etc.  So that

15   is correct?

16        REPRESENTATIVE:  If we qualify that it was either

17   because of sex or in reprisal for her complaint about sex

18   ---

19        COMPLAINANT: Right.

20        REPRESENTATIVE: Right.

21        MS. EPPS:  Okay, so you allege that those actions

22   were taken in reprisal for complaints about being treated

23   differently based on your sex?

24        COMPLAINANT:  Right, in part, and for --- and for

25   other complaints, absolutely.  If you look at the email

Initials

1    where they forward the flexi-place agreement in December,

2    they offer no reasons for the reduction, and I challenge

3    that, and yeah, I would --- I would say that the reason

4    the agreement was reduced was because of my recurring

5    complaints about sex discrimination, about the fact that

6    I was not being permitted to --- my caseload was not

7    allowing me represent the government ethically or

8    effectively in all of my cases.  Just as an example, I

9    continuously complained that 60,000 pages of discovery

10   had been produced in United States v. Fell, the Vermont

11   case that I was handling and I'd not had time to review

12   that discovery.  I'm not sure if you're familiar with the

13   Stevens case, but you know, in the Stevens aftermath,

14   that was something that was weighing incredibly heavily

15   on my mind and that I was continuously raising to my

16   supervisors in Washington, so yes, definitely.

17        MS. EPPS:  Okay, here's the crux of making the ---

18   making a successful allegation is you say sex, national

19   origin, parental status, etc. is the bases for the

20   retaliation, you have to tell me how --- what was your

21   complaint based on sex?  Was that because a male was

22   treated differently, if so, who?  Someone of a different

23   national origin was treated differently, who?  So that's

24   what I'm trying to get to now.

Initials

1      COMPLAINANT:  I'm sorry; can you repeat that?  I'm
2  sorry; I apologize.
3      MS. EPPS:  Okay.  To make the allegations that the
4  basis for the reprisal was sex, was that what you just
5  said to me, that you cite those actions taken against you
6  in claim 1 that they were taken in retaliation for your
7  complaints and the bases for that retaliation was your
8  sex, your national origin, your parental status ---
9      COMPLAINANT:  Right.
10      MS. EPPS: Is that correct?
11      COMPLAINANT:  Right.
12      MS. EPPS:  How?  How does the --- how did your sex
13  play into that?  How did your national origin?  You're
14  saying someone was treated differently or you were
15  treated differently based on your sex?
16      COMPLAINANT:  Well, so I have a White male colleague
17  who has no minor children who is being accommodated and
18  not being obligated or required to travel across the
19  country and litigate capital cases, you know, anywhere,
20  while I was.
21      MS. EPPS:  Okay. And this person is?
22      COMPLAINANT:  Stan --- Stan Rothstein, I've
23  identified him previously in the papers.

**Initials**

1     MS. EPPS:  Okay.  Okay, any additional information

2    that you haven't already provided in support of those

3    allegations of discriminatory treatment?

4     COMPLAINANT:  Well, I believe that's what this

5    process is all about, right?  About uncovering additional

6    instances?

7     MS. EPPS:  Yes, is there anything else that you want

8    to provide now?  Yes, there will be a lot of documents

9    review, other interviews, etc.  I'm simply asking if

10   there's anything you want to provide in addition to what

11   has already been provided.  Oh, hold on one minute.  I

12   have to take another tape.  I'm sorry; hold on.  Okay.

13   Just after each claim I will ask if there is anything

14   additional that you want to add.

15    COMPLAINANT:  No, not at this time I think.

16    MS. EPPS:  I'm sorry; I didn't hear you.

17    COMPLAINANT:  No, not at this time.

18    MS. EPPS:  Hello, I'm sorry. Somehow I think I

19   must've hit a wrong number or something when I was

20   changing the tape.  Okay, so what I was saying that after

21   each claim, I'll just ask you if there's anything

22   additional you want to add.  That's the only ---

23    COMPLAINANT:  All right.  I guess the only other

24   thing that I would like to clarify my allegations is that

25   --- and the reason why I think Stan's treatment is so

Initials

RC0707

1    relevant is that both Stan and I were hired previously to

2    the new mission, or the new so-called mission of the

3    Capital Case Section.  In other words, we were both hired

4    on the --- I'm sorry; can we take just one brief second

5    because I'm getting a call from my daughter's school?

6         MS. EPPS: Oh, sure, you want to stop for a minute?

7         COMPLAINANT:  Two seconds, yes.

8         MS. EPPS:  Okay, we'll go off the record.

9         COMPLAINANT:  Are we back on the record?

10        MS. EPPS:  Now we are.

11        COMPLAINANT:  Yeah, sorry about that.  So is that we

12   were both hired under, you know, the Capital Case Unit

13   when there was no requirement that we travel.

14        MS. EPPS:  Oh, okay.  Okay.  And so he is like still

15   functioning under that agreement when ~~you are [unclear]~~ yours has been changed?

16        COMPLAINANT:  Correct.

17        MS. EPPS: Okay.  Okay, then claim 2 is on January 7,

18   2014 CCS management issued you a written reprimand, so

19   please describe, for the record, the nature or series of

20   events that resulted in CCS management issuing you this

21   reprimand.

22        COMPLAINANT:  Well, I don't know.

23        MS. EPPS:  Oh.

24        COMPLAINANT:  The reprimand was a complete shock to

25   me.

Initials 

RC0708

1      MS. EPPS:  Okay.

2      COMPLAINANT:  So my reaction is --- well, I can

3  surmise why CCS issued me a reprimand.  I think it was

4  retaliative in nature.  I am --- I am complaining rather

5  loudly, for lack of a better word, that my flexi-place

6  agreement has been reduced improperly and in violation of

7  the very terms of the agreement itself because no --- no

8  fault in my performance had been cited, no lack in my

9  performance had been cited, and what I do is when I'm ---

10  when I feel like I'm forced to sign on to this two-month

11  agreement is I reach out to Human Resources in an effort

12  to resolve the situation, if you will.  So I reach out to

13  Human Resources and I request their assistance, and what

14  I am expecting is to have someone from Human Resources,

15  and my supervisors, and myself sit down and discuss this

16  issue, and in anticipation of that meeting I forward a

17  written document, an email to the representative from the

18  Human Resources office.  I actually, you know, and I

19  think now that I'm refreshing my memory, I had actually

20  reached out to Carl --- what's his last name --- I

21  actually reached out to the head of --- or the person I

22  perceived to be the head of Human Resources --- I want to

23  say it was sometime in November, and I had made him aware

24  of the situation, made him aware of the fact that I was

25  being placed in a --- in a rather difficult position

Initials

34

1    professionally because I have assignments in opposite

2    sides of the country, I've had so much work that I felt I

3    was not being able to comply ethically with my

4    obligations, and I also had this assignment in California

5    that was difficult to manage, given my personal

6    situation, and he --- now I'm refreshing my memory ---

7    he agreed to speak to my management about that because

8    one of the options that we were exploring was my

9    transferring to another unit within the Criminal

10   Division, and Carl said "I" --- "I wouldn't want Kevin to

11   lose an attorney.  Let me see if --- let me reach out to

12   Kevin and see if we can work this out."  And it was

13   subsequent to that conversation that I get an email from

14   Rene Caputo in Human Resources, and I was initially happy

15   to hear from her, and I sent her basically an electronic

16   email setting forth the background of --- of the whole

17   situation and all of my concerns, and immediately after I

18   do that, that I'm reprimanded.

19        MS. EPPS:  Okay.  Okay. And were you given a reason

20   for this reprimand?

21        COMPLAINANT:  I think it's Carl Machino --- I'm

22   sorry; Carl Machino.  The reason stated in the reprimand,

23   and again, obviously that's a written document that will

24   speak for itself, but the reason provided on the

25   reprimand was my refusal to litigate United States v.

Initials

1    Stone, and I took great issue with that because I never

2    refused to litigate United States v. Samuel Stone. This

3    is the case out of the Eastern District in California.

4         MS. EPPS: Yes.

5         COMPLAINANT:  I requested that it be reassigned.  I

6    complained that it was difficult eventually to handle

7    that case and United States v. Fell in Vermont, but I

8    never refused to litigate the case.  I litigated the

9    case, I investigated it, I prepared witnesses, I

10   responded to every motion that I had to respond to, I

11   litigated the case as well as I would have had I not

12   complained, so there's a different between complaining in

13   the sense that I'm requesting that it be reassigned and

14   refusing to litigate the case, if you will.

15        MS. EPPS: Oh, okay.  So you're saying you didn't

16   refuse to litigate it because you did all the work, but

17   they said that you refused to go to California to

18   litigate it?

19        COMPLAINANT:  I never refused to go to California to

20   litigate the case, never.

21        MS. EPPS:  Okay.

22        REPRESENTATIVE:  Jackie, didn't you end up going [unclear] to

23   California on that case approximately half a dozen times?

Initials 

RC0711

1      COMPLAINANT:  I don't have the number in front of

2    me, but I would say that I went to California more than

3    half a dozen times.

4      REPRESENTATIVE:  Okay.

5      MS. EPPS:  Okay, and so was there a trial?  Did you

6    do a trial for this case?

7      COMPLAINANT: No, the trial was --- at the time, the

8    trial was scheduled for September of 2014, which is why

9    in the fall of 2013 I bring this --- I had been bringing

10    it up to my management since the case was assigned.

11      MS. EPPS:  I understand.  I understand.  Did you

12    litigate the case ---

13      COMPLAINANT:  I'm sorry.

14      MS. EPPS:  I was just asking if there was a trial

15    that you participated in.

16      COMPLAINANT:  No, the trial was scheduled for

17    September 2014.  I participated in status conferences and

18    so forth, but the trial has yet to be held in that case.

19      MS. EPPS:  Okay. And so you gave to the Capital Case

20    Section management a written response to that reprimand?

21      COMPLAINANT:  Yes, I did.

22      MS. EPPS: And they said --- and how did they

23    respond?

24      COMPLAINANT:  When you file a grievance to reprimand

25    that has been issued, it goes to the --- one of the

**Initials** 

1    Assistant --- one of the Deputy Assistant Attorney

2    Generals for the Criminal Division.  In this case it was

3    assigned to Kevin --- Ken Blanco ---

4         MS. EPPS:  Uh huh.

5         COMPLAINANT:  And he just denied my grievance in a

6    single page, one paragraph letter.

7         MS. EPPS:  Okay.  To your knowledge, has any other

8    persons under that Capital Case Section management

9    received reprimands for the same or similar offenses?

10        COMPLAINANT:  Have received reprimands?  I didn't

11   catch the last part of your ---

12        MS. EPPS:  Oh, I'm just --- under the same or

13   similar offenses that they alleged, the refusal to

14   litigate. [Unclear].

15        COMPLAINANT:  No.

16        MS. EPPS: Okay, so given this claim to the written

17   reprimand, you're saying as in claim 1 that that action

18   was taken in retaliation for your grievances based on

19   that national origin, parental status, etc. before?

20        COMPLAINANT:  Yes.

21        MS. EPPS:  Okay.  Anything additional you want to

22   add to that particular issue of the written reprimand?

23        COMPLAINANT:  No.

24        MS. EPPS:  Okay.  The third accepted claim was that

25   on February 24, 2013 the CCS management notified you that

Initials 

1    the flexi-place agreement would not be renewed and you

2    would be required to report to work in Washington, D.C.

3    beginning March 31, 2014.  So who notified you that the

4    agreement would not be renewed?

5         COMPLAINANT:  I believe it was Kevin Carwile.

6         MS. EPPS: Okay.  Did he give any reasons?

7         COMPLAINANT:  I don't have his email in front of me,

8    but I believe he said that I was --- that he viewed that

9    I was in need of more closer supervision.

10        MS. EPPS:  Okay.  And what was the adverse effect

11   that this had on you?

12       COMPLAINANT:  I was being fired, you know, and in

13   all --- in practical purposes, you know, I was being

14   fired.  I'm a resident of the State of Connecticut, you

15   know, this is where my family lives.  I have three minor

16   children.  I don't think that Mr. Carwile expected that I

17   be able to sell my house and relocate my family to

18   Washington, D.C. in 30 days, so I think he was

19   constructively firing me.

20       MS. EPPS:  Okay.  Do you have any knowledge ---

21       REPRESENTATIVE:  I'm sorry; Jackie, could you

22   address the issue of closer supervision that was

23   expressed and how you essentially --- your moving to D.C.

24   was made essentially no different than how you were

25   supervised?

Initials

1       COMPLAINANT:  Yeah, sure, I mean the other reason I

2     felt that that was essentially a constructive firing is

3     that what he would --- what he was doing made no sense.

4     He ended or terminated my flexi-place agreement, which

5     technically had only been extended through February 28th,

6     he is indicating that he is doing that because I'm in

7     need of closer supervision, but he allows me to stay in

8     Connecticut through the end of March so that I can go to

9     Burlington, Vermont and handle an incredibly important

10    evidentiary hearing in United States v. Fell without any

11    supervision and conclude a number of the ~~decisions~~ *depositions* that I

12    was conducting in New York without any supervision, and

13    as Kevin just said, you know, even if I --- what we do,

14    we do, you know, most of the work that I do when I'm in

15    my office or did when I was in my office with the Capital

16    Case Section I did on my desk on the computer, and what I

17    would do is write committee members, respond to motions,

18    conduct legal research, and I didn't have any direct

19    supervision in that sense from my --- from my immediate

20    supervisor Charlie Kinsey.  If Charlie wanted to look at

21    a draft of a motion, I would email it to him.  Even if I

22    was in Washington, D.C. sitting at a desk, I would email

23    him the motion.

24       MS. EPPS:  Okay.

Initials

1          COMPLAINANT:  There was no closer supervision that

2     he could provide to me if I were sitting at a desk in

3     Washington, D.C. as opposed to sitting at a desk in

4     Connecticut, so ---

5          MS. EPPS: Okay.

6          COMPLAINANT:  And the --- and the field work that I

7     do is --- it's somewhere else.  It's wherever I'm

8     assigned to a case; it's in Rhode Island, it's in

9     California, it's in Vermont. And in the years that I was

10    litigating cases in Rhode Island, in Vermont, in

11    California, and Connecticut, not a single time, not a

12    single day did --- did either one of my supervisors

13    travel to supervise me or observe my work.

14         MS. EPPS:  Okay.  So had you heard or do you have

15    any knowledge of other persons under his management that

16    had received similar treatment such as this, that their

17    flexi-place agreement would not be renewed?

18         COMPLAINANT:  I don't --- I don't know of any other

19    person that had a flexi-place agreement or they were

20    working from out of state.

21         MS. EPPS: Okay.

22         COMPLAINANT:  But I guess Rich technically was

23    working out of state because he lives in Virginia and

24    works in Washington, D.C.  But I don't know of anyone who

Initials 

RC0716

1    had a flexi-place agreement where they were telecommuting

2    100 percent of the time from another state.

3         MS. EPPS:  Okay.

4         COMPLAINANT:  At least with the [unclear] Section.
                                       Capital Case

5    I suspect there are a number of people in the department

6    in other sections who have done that.

7         MS. EPPS: Okay.  So you are also alleging that the

8    above --- that action was taken based in retaliation for

9    the complaints you based --- you made about differential

10   treatment based on your sex, national origin, parental

11   status?

12        COMPLAINANT:  Yes, absolutely.  By that time I had

13   filed a formal grievance that had not yet been decided, I

14   had filed an EEO complaint that was pending, and before

15   either one of those matters are addressed, my flexi-place

16   agreement is terminated.

17        MS. EPPS:  And you also allege that action was taken

18   in retaliation for grievances made based on your

19   impairment?  Is that part of the allegations?

20        REPRESENTATIVE:  Just --- just to be clear, I think

21   in our complaint we alleged that Ms. Rodriguez Coss

22   complained that she couldn't move to D.C. because of the

23   impairment and that --- those requests were disregarded.

24        MS. EPPS:  Okay.  It was about the move could not be

25   made because of her impairment?

**Initials**

1        COMPLAINANT:  Right.  Right.

2        MS. EPPS:  Okay.  Anything additional you want to

3    add about that?

4        COMPLAINANT:  No.  No.

5        MS. EPPS:  Okay.  The next claim was that CCS

6    management denied your request to use annual leave on

7    April 3, 2014 and placed you on AWOL status.  Also placed

8    --- management also placed you on AWO --- AWOL status on

9    April 3, 2014 even though you had worked part of the day

10   in Connecticut.  Who specifically denied your request to

11   use annual leave on April 1st?

12       COMPLAINANT:  All of the, if I remember correctly, I

13   think those communications came from Charlie Kinsey.

14       MS. EPPS:  Okay. And when did you make that request?

15       COMPLAINANT:  Those requests are made out

16   electronically.

17       MS. EPPS:  Okay.  But was ---

18       COMPLAINANT:  Of the new electronic system, so I

19   could --- I could go back and see when exactly the

20   requests were made, but it would've been close to the

21   date that I was requesting.

22       MS. EPPS:  Close to the date, but before the date?

23       COMPLAINANT:  Yeah, I think I made it before the

24   date, yeah.



Initials

1      MS. EPPS:  Okay.  And the denial came when?  When

2  did you receive the denial, before or after that date?

3      COMPLAINANT:  I really would have to go back and

4  just review the emails because whenever a request is

5  denied I get an email notification of the action taken by

6  my supervisor, so I, rather than speculate, I'd really

7  rather just rely on that record.

8      MS. EPPS:  Okay.  Go ahead.

9      COMPLAINANT:  I don't think it was denied right

10  away.

11      MS. EPPS:  By right away, you mean you don't believe

12  it was denied before April 1st?

13      COMPLAINANT:  Right, I'm trying to remember exactly

14  --- and I'd have to, if you want me to specifically

15  answer the questions, I can --- I'd have to go back to my

16  agenda.

17      MS. EPPS:  Well, ---

18      COMPLAINANT:  I believe [unclear] --- oh, I'm sorry.

19      MS. EPPS: Go ahead.

20      COMPLAINANT:  I know --- I know --- I know at least

21  that on March 31st I had a medical appointment and I

22  believe ---

23      MS. EPPS:  April 1st --- oh, March 31st?

24      COMPLAINANT:  Right.  Right, so on March 31st I had a

25  medical appointment I requested sick leave and it's for

**Initials**

1    April 1st that I request annual leave.  I don't remember

2    exactly when I received the denial of that annual leave

3    for April 1st.

4         MS. EPPS:  Okay.  I will --- I'm sure I can get that

5    information.  Do you recall what reasons were given for

6    the denial?

7         COMPLAINANT:  I think they declared me AWOL.

8         MS. EPPS: Yes.

9         COMPLAINANT:  Yeah, so I think ---

10        MS. EPPS:  And that's why they ---

11        COMPLAINANT:  My failure to report to Washington,

12   D.C. physically ---

13        MS. EPPS:  Oh, okay.

14        COMPLAINANT:  I think that's what --- but you know,

15   I had annual, I had --- not only did I have annual leave,

16   I had use or lose leave and I had comp time, and you

17   know, I've never before been denied annual leave.

18        MS. EPPS:  Okay.

19        COMPLAINANT:  You know, generally, and all were, the

20   way we --- the way it's handled is we're attorneys, you

21   know, we're professionals, we handle our cases, and we

22   understand we can take annual leave and it won't affect

23   our work, and we are generally permitted to do that.

24        MS. EPPS:  Okay.  So now on April 3rd you had worked

25   part of the day and they still placed you on AWOL status?

Initials 

1      COMPLAINANT:  Correct.

2      MS. EPPS:  So they knew you had worked part of the

3 day?

4      COMPLAINANT:  Correct.

5      MS. EPPS:  Were you authorized to work part of that

            in Connecticut

6 day [unclear]?

7      COMPLAINANT:  Well, again, if you ask CCS

8 management, they're going to tell you that I was not

9 authorized, but I was ordered to report to Washington,

10 D.C. on March 31st.

11      MS. EPPS:  Okay.

12      COMPLAINANT:  But there were some pending matters

13 that were of extreme importance that I was handling and

14 that's what I was dealing with.

15      MS. EPPS: Okay, so that was why you ---

16      COMPLAINANT:  I mean they knew I was in the --- they

17 knew I was in the office, so.

18      MS. EPPS:  Okay.  And you were there because of

19 these important matters that had to be taken care of?

20      COMPLAINANT:  That's right, just like a very

21 important telephone conference call the afternoon of

22 Thursday, April 3rd.

23      MS. EPPS:  And had that --- so you say they knew

24 that you were in the office and you had those issues to

25 take care of?

Initials

1        COMPLAINANT:  Absolutely.

2        MS. EPPS: Okay. And they just knew, because they

3    were supervising you in that case, how would they know?

4    How would you know that they knew?

5        COMPLAINANT: Well, they knew because there had been

6    communications back and forth and I had made them aware

7    of the things that I needed to take care of, so they were

8    aware.

9        MS. EPPS:  Okay.  Did this being placed on AWOL

10   status result in a loss of pay for you?

11       COMPLAINANT:  Yes.

12       MS. EPPS:  Okay. And what was the amount of the loss

13   of pay?

14       COMPLAINANT:  That I wasn't paid for those days.

15       MS. EPPS:  Okay.  And is there an amount that you

16   can attach to that?

17       COMPLAINANT:  Whatever my pay is.

18       MS. EPPS: Okay.

19       COMPLAINANT:  For that day. I don't know that I've

20   actually sat down and figured out my pay per day, but

21   whatever that that was [unclear]ᵂᵒʳᵏˢ ᵒᵘᵗ ᵗᵒ ᵇᵉ based on my annual

22   salary.

23       MS. EPPS:  Okay, so that would be two days, April 1,

24   2014 and April 3, 2014?

25       COMPLAINANT:  Right.

Initials 

RC0722

1   MS. EPPS:  Okay.  Were any further actions taken

2 that resulted from your being placed on AWOL status?

3   COMPLAINANT:  Yeah, I think --- I think initially

4 then I'm also denied leave, so the situation had an

5 incredibly adverse effect on my health, my physicians,

6 both my generalists and my cardiologist recommend that I

7 go on leave, so I request sick leave initially --- I want

8 to say it was initially denied. There was one other week

9 that was --- I'm not sure if it was April 7th, and again,

10 I'd have to go back and rely on my records, but I think

11 it was the week of April 7th that I was initially denied

12 and I don't receive that pay when I was supposed to, and

13 then it was subsequently approved.

14   MS. EPPS:  Okay, yeah, I saw that.  Okay.  Would you

15 have any knowledge of other persons under CCS management

16 that had been placed on AWOL status for the same or

17 similar reasons?

18   COMPLAINANT:  I don't.

19   MS. EPPS: Okay.  And are you also alleging that that

20 action --- those two actions were taken in retaliation

21 based on your --- for your complaints about differential

22 treatment based on your sex, national origin, parental

23 status, and impairments, and taken in retaliation for

24 those?

25   COMPLAINANT:  Yes, I am.

Initials 

RC0723

1      MS. EPPS:  Okay.  Anything you want to add?

2      COMPLAINANT:  Not in addition to the formal written

3 statement that I submitted.

4      MS. EPPS:  Okay.  Okay.  ~~With this~~ The Fifth claim is that on

5 April 2nd the CCS management cancelled your enrollment in

6 training at the National Advocacy Center in South

7 Carolina.  So what's the nature and purpose of that

8 Advocacy Center?

9      COMPLAINANT:  What's the nature of it?  The National

10 Advocacy Center is the organization on behalf of the

11 Department of Justice that organizes and provides

12 professional training for the Department of Justice

13 attorneys.  We are required annually to receive a certain

14 number of hours of training with regards to Discoveries,

15 sexual harassment, ethics, and there's some trainings

16 that we take, like computer security, like through the

17 computer.  We're also required to maintain good standing

18 with our individual Bar Association Bar Admissions.

19      MS. EPPS: Uh huh.

20      COMPLAINANT: So every year we have to sign a

21 certification I'm in good standing with my bar, and each

22 individual bar has continuing education requirements of

23 attorneys, and the Department of Justice facilitates that

24 training that help us comply with those requirements.  So

25 when you attend a training at the continuing --- at the

Initials

1    NAC, at the National Advocacy Center, they will ---

2    they're very well aware of the requirements of the

3    different bars for the different states, they facilitate

4    the forms, they provide those bars with the materials.

5    Most of the time the trainings that they provide are pre-

6    approved by those bars just to facilitate our compliance

7    with our bar requirements.

8        MS. EPPS: Okay.

9        COMPLAINANT:  And so in my particular bar, I have

10    every two years I need 24 hours of continuing legal

11    education.  I had been previously scheduled to attend

12    that training, which was pre-approved by my bar back in

13    July, I think it was, of 2013, but because --- I don't

14    know if you remember, we had that whole furlough

15    situation ---

16        MS. EPPS:  Uh huh.

17        COMPLAINANT:  Because of that, a number of trainings

18    were cancelled.  You know what?  I think it might've been

19    April, and then it was cancelled because of the furlough,

20    and then it was rescheduled at the end of July 2013 and I

21    could not attend because I believe I had pre-scheduled

22    annual leave, so this was the next time that it was being

23    held, and because I had been unable to attend previously

24    due to the cancellation, they were going to make sure

25    that I would get there, which they did, and I had all of

Initials 

RC0725

1    the travel plans ready to go.  And I think it was like

2    the Friday before April 7th or something I was told that I

3    would not be permitted to attend the training because I

4    had failed to report to Washington.

5         MS. EPPS:  Oh, okay.

6         COMPLAINANT:  And so if I wanted to attend the

7    training, I had to travel out of Washington, D.C.  I

8    couldn't travel out of Connecticut.

9         MS. EPPS:  Okay.  Did management enroll you, do you

10   enroll yourself; how does that happen?

11        COMPLAINANT:  I request enrollment and management

12   approves it.

13        MS. EPPS:  Okay.  And who specifically cancelled

14   your enrollment?

15        COMPLAINANT:  I believe I received an email from

16   Charlie Kinsey notifying me I would not be allowed to ---

17   that I would not be allowed to attend. But I think there

18   was a previous email from Kevin, essentially telling me,

19   "If you want to attend, you're going to have to travel

20   out of D.C. because that's now your official

21   workstation."  And I remember responding to him and

22   saying, "Kevin, I live in Connecticut.  I'm scheduled to

23   fly out Monday, April 7th.  It makes no sense for me to

24   travel down to D.C. to then get on a plane to South

Initials

RC0726

1    Carolina," but obviously that reconsideration request, if

2    you will, was denied.

3        MS. EPPS:  And so it was done --- it was cancelled

4    because you were not flying out of D.C.?  You weren't in

5    D.C. to fly out?

6        COMPLAINANT:  Exactly.

7        MS. EPPS:  Okay.

8        REPRESENTATIVE:  Jackie, can you --- can you speak

9    just briefly to the impact professionally that not being

10    able to attend that training had on you?

11        COMPLAINANT:  Oh, it placed me in default with my

12    bar, you know, I owed my bar 24 hours.  I think I had a

13    --- I had a balance I think of at least like 20 hours,

14    and I had anticipated complying with my requirement with

15    my bar by taking that course in April of 2013. When I was

16    unable to do that by my birthday in August 2013, I then

17    fell into default. So I had written to the Supreme Court

18    in Puerto Rico, which is the people who supervise our bar

19    membership, and had informed them of the situation.  "I

20    had been registered, it had been cancelled because of the

21    furlough, I'm requesting an extension, I'm registered in

22    this course in April of 2014, it will cover all of the

23    outstanding hours, it's a pre-approved course, please

24    grant me the extension" and I had been granted an

25    extension until the end of April of 2014 to comply with

Initials 

1    my hours, so not being able to attend the training was

2    --- placed --- placed me in an incredibly difficult

3    situation with my bar.

4        MS. EPPS:  Okay.  Did you know of anyone else in CCS

5    that --- in CCS that management had cancelled their

6    enrollment?

7        COMPLAINANT:  I --- I don't know.  I know that three

8    of the CCS attorneys recently attended that training.

9        MS. EPPS:  Okay.

10       COMPLAINANT:  Because [unclear] Senior Litigation

11   Counsel here in Connecticut teaches part of the evidence

12   section of it and was, you know, conveyed their ---

13       MS. EPPS:  Okay.

14       COMPLAINANT:  Greetings to me.

15       MS. EPPS:  Okay.  And you also allege that that

16   action was taken in retaliation based on your complaints

17   about differential treatment based on your sex, national

18   origin, etc.?

19       COMPLAINANT:  Yes.

20       MS. EPPS:  Okay.  Claim 6, you submitted a leave

21   request on April 13, 2014 for April 14 through 18 with

22   medical documentation from two doctors.  Management

23   denied that request and placed you on AWOL status due to

24   lack of medical documentation and this resulted in you

Initials 

1    only receiving one week's pay on April 25, 2014.  So to

2    whom did you submit that request for leave on April 13th?

3         COMPLAINANT:  Again, those requests for leave are

4    submitted electronically.

5         MS. EPPS:  Okay.

6         COMPLAINANT:  And I believe they go to Charlie

7    Kinsey because he's the first-line supervisor.

8         MS. EPPS:  Okay.  And was that sick leave, annual

9    leave, what --- what ---

10        COMPLAINANT:  It was sick leave.

11        MS. EPPS: Okay.  And so Charlie Kinsey would be the

12   one who denied that request?

13        COMPLAINANT:  I believe so.

14        MS. EPPS:  Okay. And that resulted in your being

15   placed on AWOL status.  Did they say why they considered

16   that a lack of medical documentation since it was

17   documentation from two doctors?

18        COMPLAINANT:  I want to say I received a request, so

19   I submitted the request before that week and it wasn't

20   until the end --- towards the end of the week that he

21   sent me an email requesting clarification on some of the

22   documentation that I had received --- that I had

23   submitted. But of course, by the time I received his

24   request, it was --- it was late in the week, so there's

**Initials** 

1 no way I would be able to comply before the following

2 Monday.

3   MS. EPPS:  Okay.

4   COMPLAINANT:  And eventually I did --- eventually I

5 do comply, I do submit whatever additional information it

6 was that they were requesting, and that week is

7 retroactively approved [unclear].

8   MS. EPPS:  [Unclear] you were --- go ahead.

9   COMPLAINANT:  But for a period of time I did not

10 receive pay for that week.

11   MS. EPPS: Okay, but when they retroactively approved

12 it you were retroactively put in a pay status for that?

13   COMPLAINANT:  Yeah.

14   MS. EPPS:  Okay.  Any other action taken --- taken

15 resulting from your being placed in that AWOL status for

16 that time?

17   COMPLAINANT:  Any other action?  You mean like ---

18   MS. EPPS:  Other than not being paid, any other kind

19 of ---

20   COMPLAINANT:  I mean it obviously didn't help my

21 mental condition.

22   MS. EPPS: Okay, yeah, yes.  And that was all Charlie

23 Kinsey and Carwile?

24   COMPLAINANT:  I believe so.

**Initials** 

RC0730

1      MS. EPPS:  Okay.  And would you have any knowledge

2  of anyone else being treated in that manner based on ---

3      COMPLAINANT:  I don't.  I don't know of any other

4  attorney at CCS that has been placed on AWOL status.  I

5  don't.

6      MS. EPPS:  Oh, okay.  Okay.  And do you allege that

7  that action was taken as retaliation for the complaints

8  of differential treatment you made based on your sex,

9  national origin, parental status, and your impairments?

10     COMPLAINANT:  I do.

11     MS. EPPS:  Okay.  Anything you want to add about

12  those actions?

13     COMPLAINANT:  No.

14     MS. EPPS: So what remedy --- oh, I'm sorry.

15     COMPLAINANT:  No, no, that's fine.

16     MS. EPPS:  What remedy are you seeking in the

17  resolution of this complaint?

18     COMPLAINANT:  Well, I'm seeking monetary

19  compensation and my attorney fees.

20     MS. EPPS:  Okay.

21     COMPLAINANT:  I'm seeking --- I'm also ---

22     MS. EPPS:  Go ahead.

23     COMPLAINANT:  As you know, although I'm an Assistant

24  United States Attorney now with the District of

25  Connecticut, I still have a personnel file with the

**Initials** 

1    Department of Justice, so I'm also seeking that the

2    reprimand, which I believe was completely unjustified, be

3    removed from my personnel file.

4        MS. EPPS: Okay.  Okay.  Anything additional?

5        COMPLAINANT:  Not at this time.

6        MS. EPPS:  Okay.  Are there persons that you believe

7    would be able to provide relevant, first-hand, and no

8    hearsay information in support of your claims and

9    statements in support of your claims that you suggest be

10   interviewed?

11       COMPLAINANT:  Well, yeah, I think my co-counsels and

12   the different cases I handled to corroborate the amount

13   of work that I was conducting in each of those cases, so

14   do you need me to actually name --- give you the names

15   right now?

16       MS. EPPS:  Yeah, I would prefer that you ---

17       COMPLAINANT:  [Unclear].

18       MS. EPPS: Yes, send me a list with their email

19   address or phone number, or some way for me to contact

20   them.

21       COMPLAINANT:  Okay, I can do that.

22       MS. EPPS:  Would that be okay?

23       COMPLAINANT:  That's fine.

Initials 

1          MS. EPPS:  Okay. And you would expect them to

2     corroborate the kind of work --- caliber of work, etc.

3     that you did on those cases at the time?

4          COMPLAINANT:  Yes.

5          MS. EPPS:  Okay.  Anything else that you expect ---

6     any other information you expect them to provide,

7     indicate that on the list that you send me with their

8     name.

9          COMPLAINANT:  Well, I think my --- I think my

10    colleagues would also be able to corroborate just a ---

11    the difficulty of litigating, you know, capital cases in

12    opposite coasts, the difficulty in managing the amount of

13    assignments that were being handed to trial attorneys in

14    the Capital Case Section.  With regards to the leave

15    requests, for example, you know, the fact that, you know,

16    we pretty much put in for leave and it's readily

17    approved, I mean I had never, in the five years or

18    however plus years I've been with the Capital Case

19    Section, I've never been denied leave if I had leave

20    available to take.

21         MS. EPPS:  Okay.

22         COMPLAINANT:  There was one time under Peggy Griffey

23    when I was undergoing continuous testing for really weird

24    medical episode that happened to me and I went, you know,

25    fell low on my sick leave hours, and so she requested me

Initials 

1    to check with her every time whenever I was requesting

2    sick leave, which, you know, I had no problem with, I

3    agreed, obviously I had documentation from my doctors

4    whenever I had an appointment, and you know, my leave

5    balance after that went up and we resolved it amicably.

6    There was no problem there.

7        MS. EPPS:  Okay.

8        COMPLAINANT:  What else --- obviously, I'll review

9    my statement again, and give it some thought, and see who

10   can provide relevant information, and I'll give you the

11   names and numbers.

12       MS. EPPS:  Okay, that --- that will be fine.  Yeah,

13   you can just email them to me.  When I send you the

14   transcript back, anything you want to add, of course

15   you'll be able to --- then so if you feel there's

16   anything you have not addressed, don't hesitate to add

17   it.

18       COMPLAINANT:  All right.

19       MS. EPPS:  Anything additional you want to add now

20   that has not been previously addressed?

21       COMPLAINANT:  I can't think of anything right now.

22       MS. EPPS: Okay, well, like I said, you can always

23   add later on.  So if there's nothing you or your counsel

24   would like to add?

Initials 

RC0734

1      REPRESENTATIVE:  No, I think that everything's been

2      covered.  We will get you a list of names and contact

3      information in the next couple of days, and other than

4      that, if we think of anything further that [unclear]

5      addition to the interview today and [unclear] be helpful,

6      we'll include that as well.

7      MS. EPPS: Great. Thank you so much for your

8      cooperation and for the interview of this morning.  If

9      there's nothing else to add, I will declare this

10     interview completed. Thanks again.

11     COMPLAINANT:  All right, thank you.

12     REPRESENTATIVE:  Thank you very much.

13     MS. EPPS:  Okay, bye-bye.

14     REPRESENTATIVE: Bye-bye.

15



**Initials**

1                            **COMPLAINANT STATEMENT CERTIFICATE**

2

3         I, Jacabed Rodriguez-Coss, have read the preceding

4  statement consisting of <u>59</u> pages and it is true and

5  complete to the best of my knowledge and recollection.  I

6  understand that the information I have given is not to be

7  considered confidential and that it may be shown to the

8  interested parties.  I have been given an opportunity to

9  review the statement and make any changes, corrections,

10  additions, or deletions.  I have initialed each page and

11  signed the statement below.

12

13

14  _____       10/29/14

15  Signature                         Date Executed

16

17  _____

18  Investigator Signature

19

20

21



Initials

RC0736

**TRANSCRIBER'S CERTIFICATE**

SWORN STATEMENT OF

JACABED RODRIGUEZ-COSS

CONDUCTED BY

CHERYL EPPS, CONTRACT EEO INVESTIGATOR

     I do hereby certify that the foregoing pages 2

through 59 inclusive are the true, accurate, and complete

transcript prepared from the audiotape recorded and

provided by the investigator in this case.

_____

MICHELLE BOERNER
Legal Transcriptionist
October 1, 2014

**Initials**

RC0737