## DECLARATION OF BRUCE R. HEGYI IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The undersigned, Bruce R. Hegyi, hereby declares, as follows:

1.      Unless otherwise indicated, I have personal knowledge of the facts set forth in this Declaration.  The facts set forth in this Declaration are not intended to be an exhaustive recitation of all of the relevant facts known to me, but rather are intended to relate some of the specific information of which I have personal knowledge.

2.      I am a citizen and resident of the Commonwealth of Virginia, and  I reside in Arlington County,  Virginia.

3.      I am an attorney duly licensed to practice law.  I was initially licensed in 1984 in the State of Texas.  In 1989, when I moved back to the Washington, D.C. area, I became licensed in the District of Columbia.  Following my licensure in Washington, D.C., I converted my Texas license to an "inactive" status.  At various times, I have been admitted *pro hac vice* in other jurisdictions, including, but not necessarily limited to, the federal bars of the District of Puerto Rico, the Northern District of

Indiana, the Eastern District of Kentucky, and the District of Vermont.  A true and accurate copy of my resume from 2016 is attached to this Declaration.

4.    As indicated in more specificity in my attached resume, from in or about April of 1993 to January of 2017, I was an attorney with the United States Attorney's Office for the District of Columbia ("USAO-DC"), which is a component of the United States Department of Justice, and thereafter with the United States Department of Justice itself ("Main Justice" or "the Department").  Beginning in or around August of 2012 I was employed as a Trial Attorney in the Department's Capital Case Unit ("CCU"), which later became re-titled as the Capital Case Section ("CCS").   While at CCU/CCS, among other things, I conducted three extended trials.

5.    In January of 2017, I resigned from CCS because of what I perceived as plainly unethical and improper conduct and actions of CCS Chief P. Kevin Carwile ("Carwile") and Principal Deputy Chief Gwynn-Charlie X. Kinsey ("Kinsey"), which I had raised earlier with Carwile/Kinsey and the Department.

6.     During my tenure at CCS, I became personally aware that two attorneys at CCS (John Cox and Stanley Rothstein), who are males, were not being required by Carwile/Kinsey to engage in overnight travel.  Neither Carwile, Kinsey, nor Rothstein ever indicated to me that Rothstein had any physical condition that limited or prohibited his ability to travel.  To the contrary, Carwile expressed to me that Rothstein was able to travel, but simply refused to so do.  Cox similarly refused to travel overnight.

7.     From my observations, it appeared that the vast majority of the high profile and more desirable cases were assigned to male Trial Attorneys at CCS.  For instance, I was assigned to the "La Tombola Massacre" (*United States v. Alexis Candelario-Santana)* case in Puerto Rico and the 26-defendant "Almighty Imperial Gangster Nation" (*United States v. Juan Briseno)* outside of Chicago.  CCS Trial Attorney Steve Mellin, who is male, was assigned to the *United States v. Kabone Savage* case in Philadelphia and the "Boston Bombing" case (*United States v. Tsarnaev)* in Boston.  Mellin, who was single, was also assigned to the *United States v. Williams* case in Hawaii.  However, the

problematic prison murder case of *United States v. John Travis Millner,* in the Eastern District of Kentucky, initially was assigned to female CCS Trial Attorney Bonnie Hannan, then for a time it was assigned to me, and it was thereafter reassigned to female CCS Trial Attorney Amanda Haines.  The case was problematic both because there were difficult travel connections (the case was slated to be tried at a remote location in Kentucky), and because the U.S. Attorney's Office in the Eastern District of Kentucky was extremely reluctant to support the prosecution, would not assign appropriate resources to the prosecution, and in my view, was openly hostile to the prosecution and became obstructionist.  After many years, and while assigned to Haines, the *Millner* case was eventually "decertified," meaning it was no longer a capital case.  Hannan, who was married and had small children, was also assigned the undesirable co-defendant prison murder case of *United States v. Sablan and Guerrero* in the Eastern District of California located in Fresno.  In that case, the U.S. Attorney's Office was reportedly actively hostile and obstructionist and the case was pending before a judge who was hostile to the death penalty.  Not only was travel between

4

Washington, D.C., and Fresno, California difficult in that case, but Hannan was required to travel for an extended period of time to Guam.  After years of litigation, both *Sablan* and *Guerrero* were "decertified."  Perhaps because I recruited Haines (a very experienced homicide prosecutor at USAO-DC) to come to CCU/CCS, when I observed that Carwile/Kinsey were assigning Haines "lesser" cases, I approached  Carwile/Kinsey on more than one occasion when a new desirable case had come  into CCS and requested that they consider assigning the desirable new capital case to Haines.  They did not assign Haines to any of the desirable cases I had suggested.  Generally, from what I observed, Haines was assigned undesirable cases such as the sentencing re-trial of the aged *United States v. Hammer* case in the Middle District of Pennsylvania.

8.     During my tenure with the CCS, I became uncomfortable with misogynist behavior by Carwile and the environment that he tolerated and appeared to promote.  I had heard from others at CCS that Carwile liked to frequent "Girly" Bars.  On one occasion, in 2014, when I was trying a case in the Northern District of Indiana, Carwile traveled to Indiana to briefly

5

observe a portion of the trial.  During trial, Carwile asked for me to meet him for dinner.  With scores of restaurants from which to choose, Carwile directed me to meet him that night at an establishment where, I found, the waitresses were all scantily clad.  Carwile indicated he selected the establishment after consultation with a male Department Trial Attorney who previously resided in the Chicago area and knew the types of establishments Carwile would appreciate.

9.     From what I personally observed while at CCS, Carwile promoted what could properly be described as a sexualized environment at CCS.  In my presence, Carwile tolerated Mellin displaying in the CCS Conference Room (in the presence of males and females) during a CCS group meeting, a photograph on Mellin's mobile phone of a female reporter from Hawaii, naked. Mellin contemporaneously discussed having had sexual relations with the reporter in the picture.  I observed a hand-drawn picture of a "ball-and-chain" on the dry-eraser board on the office door of CCS Administrative Assistant Steven Qureshi following Qureshi's announcement of his marriage engagement.  The image was repeatedly erased from Qureshi's dry eraser board, only for a

new "ball-and-chain" drawing thereafter to appear on Qureshi's door.  I observed how this drawing upset Qureshi and various females at CCS.

10.    From my experience at CCS, Carwile's normal means of interacting with CCS Trial Attorneys was via email. Occasionally, Carwile would communicate with me by telephone, but to my recollection those communications occurred almost exclusively when I was on extended business travel and they normally involved Carwile sending me an email requesting that I call him.  Although there were some occasions during which Carwile and I had in-person discussions about cases or schedules, on the whole, in-person meetings were very rare.  In fact, I often went weeks on end without speaking in-person with Carwile, and the majority of the in-person meetings that did occur came about only because I instigated the in-person meeting with Carwile and I was persistent in tracking Carwile down.  It was often hard to find Carwile at CCS, because (as was openly discussed during my tenure at CCS) Carwile often came to work late, left early from work, and/or spent around two hours in the afternoon at a local  gymnasium.

11.    In my opinion, Carwile had very little interest or capacity to provide meaningful supervision on substantive matters and he was generally resistant to engaging on administrative matters.  From my observations, Carwile displayed little interest in, or understanding of, individual cases. On the vast majority of the occasions that I sent Carwile an email or memorandum outlining strategies under consideration, Carwile would not respond.  Thereafter, if I pressed Carwile for an in-person meeting on an issue that (in my opinion) had particularly important ramifications, it was normally clear to me that Carwile did not understand or appreciate, and more than likely had never read, my earlier emails or memoranda.

12.    During my tenure at CCS, the vast majority of Kinsey's communications with me were via email as well.  It was a fairly unusual occurrence for Kinsey to initiate an in-person meeting.

13.    I do not recall Carwile ever requesting to review a pleading prepared by me and Kinsey did so  infrequently.

14.    From my observations, and in my experience, CCS supervision was generally accomplished by email or by telephone.  As a result, it does not seem plausible that

8

Carwile/Kinsey requiring Jacabed Rodriguez-Coss to move to Washington, D.C., from Connecticut, could realistically have resulted in any meaningful "closer supervision" by Carwile/Kinsey than that which could be accomplished with her in Connecticut.

I5.    In this regard, in addition to email and cellular telephone communications, CCS had readily-available videoconference and teleconference capability. I was present on multiple instances when Ms. Rodriguez-Coss participated in CCS (Washington, D.C.) staff meetings from a remote location.

16.    During my tenure in the CCS, I was never required to handle simultaneously three active capital matters with impending trial dates; and I am not aware of anyone other than Ms. Rodriguez-Coss who handled simultaneously that many active capital trial matters.  Over my tenure at CCS, there were times when a CCS Trial Attorney had no active capital trial matters, and it seemed to me that the norm was for CCS Trial Attorneys to have one, or at most two, active capital trial matters with impending trial dates.

17.    I think it is fair to say that federal capital prosecutions

9

are unlike any other type of federal litigation.  By their nature, the stakes in these cases is exceedingly high.  Both the law and the procedures are highly technical.  The federal capital defense bar is extremely well organized and financed.  During my tenure at CCS, it became clear to me that the federal capital defense bar is far better organized and has access to almost unlimited resources.  In every Federal Death Penalty Act (FDPA) case that involved CCS during my tenure, the federal capital defense counsel employed a "scorched Earth" litigation approach.  In my experience, most of the CCS cases that have gone to trial have in the neighborhood of 1,000 docket entries and/or pleadings.  Having handled and worked on many capital cases while at CCS, it was my experience that the demands on the CCS Trial Attorney are intensified exponentially when the litigation is pending before a District Judge who is hostile to the FDPA and/or when it is pending in a District where the U.S. Attorney's Office is either hostile to the capital prosecution or refuses to allocate sufficient resources and/or personnel to properly investigation, prepare, and try the case.

18.   On information and belief, neither Carwile nor Kinsey

have ever prosecuted a FDPA case; nor have they ever watched an entire FDPA trial.  From my interactions with Carwile and Kinsey and my personal observations of them, I am convinced that neither Carwile nor Kinsey have any real appreciation of -- or interest in -- what it actually takes to investigate, prepare, and try an FDPA case.

19.   In the summer of 2016, because of complaints initiated by CCS Trial Attorneys, including me, the Department initiated an investigation, which it later labeled a "Management Review," of Carwile/Kinsey/CCS.  On information and belief, during the summer of 2016, all of the CCS Trial Attorneys and all of the CCS Administrative Staff were individually interviewed by Deputy Assistant Attorney General Sung-Hee Suh ("Suh") (under whose purview CCS fell) together with James Mann ("Mann"), who was the Chief of Staff to then-Assistant Attorney General Leslie Caldwell. During Suh's and Mann's August 22, 2016 interview of me, I observed Mann taking voluminous contemporaneous notes. Prior to my interview, I had provided the Department with various written concerns with regard to Carwile/Kinsey, including but not limited to unethical and improper conduct by them and gender

bias.  Suh indicated she had received and had read all that I submitted to the Department.

20.    Following the conclusion of the Management Review, Suh came to CCS and met with a number of the CCS Trial Attorneys who were available at that time.   As the meeting was about to end, I asked Suh to please inform the assembled CCS Trial Attorneys of her three "take-aways" from the interviews that she and Mann had conducted with CCS personnel.   Suh responded: (1) that CCS Trial Attorneys should have a liberal "teleworking" policy -- which she indicated was now taking place; (2) that CCS Trial Attorneys should be able to choose whether they wanted to handle trial matters (requiring extensive travel) or else handle capital reviews (a strictly office practice with no required travel) -- and she indicated that such a dichotomy was being adopted; and (3) that Carwile and Kinsey needed to be receptive to bottom-up communications, rather than their formerly rigid top-down regime (or words to the effect) -- as to which Suh added her assurance that Carwile/Kinsey were (as a result of the Management Review) now doing their best.

21.    If called as a witness, I could truthfully and competently testify to the foregoing based on my personal knowledge.

22.    Sworn under penalty of perjury this 22nd day of December 2017, in the Commonwealth of Virginia, County of Arlington.

s/s *Bruce R. Hegyi*
**Bruce R. Hegyi**

███████████████████████

1331 F Street, N.W., Sixth Floor
Washington, D.C. 20530
(202) 616-4582 (office) • (703) 536-4774 (cell)

*Employment:*

● Aug. 2012 - Present   **United States Department of Justice**
                        *Criminal Division*
                        Capital Case Section
                        *Twelve Published Opinions*
                        *Assistant Attorney General's Exceptional Service Award (2015)*
                        *(Almighty Imperial Gangster Nation prosecution)*
                        *USAO-Puerto Rico Nominee for DOJ John Marshall Award*
                        *(2014) (La Tombola Massacre prosecution)*
                        *Assistant Attorney General Award Nominee (2013)*

                        **United States Attorney's Office for the District of Columbia**
● 2010-Aug. 2012        *Superior Court Division*
                        Homicide Section (South Capitol Street Massacre prosecution)
                        *EOUSA Director's Award (2013)*
                        *Special Achievement Award (2012)*
● 2003-2010             *Criminal Division*
                        Federal Major Crimes Section (2005-10)
                        *Fourteen Published Opinions*
                        *FBI Nominee for DOJ John Marshall Award (2011)*
                        *Special Achievement Award*
                        Transnational/Major Crimes Section (2003-05)
                        *One Published Opinion*
● 1998-2003             *Superior Court Division*
                        Homicide/Major Crimes Section (2000-03)
                        *One Published Opinion*
                        *EOUSA Director's Award (2004)*
                        *Numerous Special Achievement Awards*
                        Senior Felony Trial Section (2000)
                        Grand Jury Section (1999)
                        Misdemeanor Trial Section (1998-99)
● 1993-1998             *Civil Division*
                        *Twenty-four Published Opinions*
                        *Numerous Special Achievement Awards*
                        *Approx. 10 Letters of Commendation*

● 1989-1993             **Sutherland, Asbill & Brennan** (Litigation Group)
                        Washington, D.C.
                        *Two Published Opinions*
● 1984-1989             **Vinson & Elkins** (General Litigation Section)
                        Houston, Texas
● 1976-1981             **Arlington County Police Department**
                        Arlington, Virginia
                        *Law Enforcement Office of the Year (1980)*

*Education:*

| 1984 | J.D. | University of Tennessee College of Law |
|------|------|----------------------------------------|
| | | *Tennessee Law Review*; Order of the Coif; Phi Kappa Phi Honor Society; *Am. Jur.* Award Recipient |
| 1976 | B.A. | College of William & Mary in Virginia |
| | | Double Major:  Philosophy & Sociology Scholarship Athlete |
| 1972 | H.S. | Moses Brown School, Providence, RI |

*Experience:*

In August of 2012, I joined the Department of Justice's **Capital Case Section**, where I am charged with prosecuting federal death penalty cases around the United States and its territories.  In October 2012, I was assigned to a high-profile case in Puerto Rico known as the La Tombola Massacre (*United States v. Alexis Candelario-Santana, et al.*), in which one of the defendants was death-eligible.  The lead defendant, who had previously been convicted of 12 murders, was released on parole and shortly thereafter shot 29 people, killing 9 of them, in a single incident.  There were 502 pieces of ballistics evidence, including 335 spent shell casings recovered from the scene.  I successfully handled the extended *Atkins* hearing and was co-counsel with the U.S. Attorney's Office in Puerto Rico for the extended trial before District Judge Jose A. Fuste, which lasted some nine weeks (January-March 2013).  Approximately 80 witnesses were called to testify and over 1,000 pieces of evidence were introduced at trial.  Both defendants were convicted of all charges.  Despite the fact that the death penalty is against the Constitution of Puerto Rico and no one has been sentenced to death in Puerto Rico in approximately 100 years, in the penalty phase, the jury voted 11-1 for death.  As a result, both defendants were sentenced to life imprisonment without the possibility of release.  In January 2014, I tried before Chief Judge Philip P. Simon with the U.S. Attorney's Office for the Northern District of Indiana a case involving the sole-remaining non-capital defendant in a 24-defendant RICO/VICAR case (*United States v. Richard Reyes*.)  In January 2015, I tried before Chief Judge Simon the related capital case of *United States v. Juan Briseno*, who was convicted of RICO/VICAR charges together with five counts of murder and two counts of attempted murder.  In May of 2015, I was assigned responsibility for the capital re-trial of *United States v. Donald Fell* in the District of Vermont.  The case is scheduled to begin trial in February 2017.  In addition, I have handled hearings in capital cases in the Eastern District of Kentucky (*United States v. John Travis Millner*) and the Northern District of Oklahoma (*United States v. Lorrel Battle, et al*).

From 2010-12, I returned to the **Homicide Section** where I devoted a majority of my time to a high-profile case (*United States v. Orlando Carter, et al*) that became known as the "South Capitol Street Massacre."  The case involved six defendants who, over an 8-day span, shot 13 people, killing five of them.  The investigation involved the interview of approximately 250 potential witnesses, over 100 of whom were presented before the grand jury, and as to which a 54-count superseding indictment was returned on April 20, 2011.  In the *Carter* trial, which lasted some 3 months (February - May 2012), a total of 131 witnesses testified and more than 1,000 pieces of evidence were introduced.  In May of 2012, the jury convicted all of the defendants.  Three of the trial defendants were sentenced to life imprisonment without the possibility of release, one defendant was sentenced to more than 50 years in prison, and the fifth trial defendant was sentenced to 30 years in prison.  In addition, the *Carter* investigation resulted in a guilty pleas and cooperation agreements with the five individuals who conspired to kill the lead defendant (Orlando Carter) and who attempted to murder him.  The attempted murder of Orlando Carter was the catalyst for reciprocal retaliation that resulted in the majority of the murders and various Assaults With Intent to Kill that followed.  In the course of the investigation, we instituted with ATF and DEA an undercover drug and gun operation in the area of 6th Street, S.E., and Chesapeake Street, S.E., which produced various witnesses for the homicide trial as well as numerous long-time drug dealers in the area.

From 2003-10, my docket in the **Transnational/Major Crimes Section** and in the **Federal Major Crimes Section** included both international and domestic investigations and prosecutions. In 2009, I was lead counsel in a 10-week, seven co-defendant, hostage-taking resulting in death case that arose in the Republic of Trinidad & Tobago (*United States v. Anderson Straker, et al.*) This prosecution involved numerous novel domestic and international legal issues and has resulted to date in six published opinions by District Judge John D. Bates. At trial, 87 witnesses were called and hundreds of pieces of evidence were introduced. Each of those seven defendants was convicted on all counts and was sentenced to life imprisonment without the possibility of release. In 2015, the convictions and sentences were affirmed by the District of Columbia, and in 2016, the Supreme Court recently denied *certiorari*. In 2007, I tried before Judge Bates one of the minor conspirators in the Trinidadian hostage-taking scheme (*United States v. David Suchit*.) Also in 2007, I was lead counsel in the trial of a major Middle Eastern alien smuggler who pled guilty in the early stages of a projected 6-8 week trial before District Judge Rosemary Collyer in which a majority of the Government's witnesses were native Arabic and/or Chaldean-speakers (*United States v. Neeran Zaia*.) In that case, defendant Zaia was sentenced to 15 years in prison. Previously, Ms. Zaia's co-defendant husband *(Thaer Asaifi)* was sentenced seven years in prison for his role in the alien smuggling scheme. In addition, I handled a wide variety of matters, including *inter alia* hostage-takings in Haiti, Columbia, and the Dominican Republic; assaults on foreign dignitaries in the United States; was successor lead counsel in the murder of two Capitol Police Officers in the United States Capitol (*United States v. Russell Eugene Weston*); Export Enforcement; aggravated identity theft; money structuring; bank robbery/extortion matters, MLAT litigations; and I served as "taint" counsel on various matters.

In 2000-03, when I was in the **Homicide Section**, I investigated, indicted, and successfully tried numerous homicides arising in Southeast, Washington, D.C., including the high-profile trials of *United States v. John Travis Millner* (the first defendant in Superior Court to be sentenced to life imprisonment without possibility of release), and a six co-defendant murder trial *(United States v. Raq Baxter, et al.)*

From 1993-98, I was in the **Civil Division**, where I represented the United States and various of its Agencies in District Court. While in the Civil Division, I handled several high-profile matters (*e.g., Judicial Watch v. Department of Commerce*), and I was the sole counsel in twelve trials, including the first civil Medicare-Medicaid False Claims Act case tried in the United States (*United States v. George Krizek, et al.*), which is a frequently-cited case in civil FCA law and has been included as a chapter in a legal textbook, Johnson, S.H., Health Law and Bioethics, ch.9, at 187-205 (Aspen Press 2009), and as a case study in Wolper, L.F. Heath Care Administration, at 157-58 (Jones & Bartlett 5th ed. 2011). Among other things, I tried a 17-plaintiff Title VII case for the Government Printing Office alleging both discriminatory treatment and discriminatory impact (*Bailey v. DiMario*); a wrongful death and survivorship action for the United States Park Police (*Roberts v. United States*); a false imprisonment, false arrest and excessive force case for the United States Secret Service (*Johnson v. United States*); and a multi-million Federal Tort Claims Act case (*Treakle v. United States*.) In addition, I handled a wide variety of cases, including but not limited to Title VII, Age Discrimination in Employment Act, Rehabilitation Act, Administrative Procedure Act, Federal Tort Claims Act, *Bivens*, Freedom of Information Act, Privacy Act, Government Contracts, Social Security Act, and Constitutional cases. Further, I prepared and argued in excess of a dozen Temporary Restraining Order/Preliminary Injunction matters (primarily Government Contracts cases). I handled scores of appeals, including arguing four appeals before the United States Court of Appeals for the District of Columbia Circuit.

While in private practice with **Vinson & Elkins** (Houston, Texas) and **Sutherland, Asbill & Brennan** (Washington, D.C.), I defended scores of civil cases, including, among other subject matters, medical

-3-

malpractice, psychiatric malpractice, legal malpractice, breach of contract, will contests, wrongful death and survivorship, reinsurance, insurance coverage, eminent domain, defamation, products liability, and premises liability cases. Additionally, I handled several plaintiff's cases involving medical malpractice, wrongful death and survivorship, eminent domain, and Workers' Compensation Act. Among other things, I tried a medical malpractice case, a psychiatric malpractice case, a premises liability case, and several eminent domain case (both for the condemnor and the condemnee). I generally handled the appeals of the cases assigned to me and I argued an appeal before the Texas Court of Civil Appeals in Houston.

Published Opinions

To date, there are 51 published opinions in cases that I handled.