# DECLARATION OF AMANDA HAINES IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The undersigned, Amanda Haines, hereby states and declares as follows:

1. I am a citizen and resident of the State of Massachusetts, County of Barnstable.

2. I am an attorney duly licensed to practice in the State of New York. A true and accurate copy of my most current curriculum vitae is included as an attachment to this declaration.

3. Between 1995 and 2017, I was an attorney with the United States Department of Justice. From August 2013 until my retirement in October 2017, I was employed as a Trial Attorney in the Department's Criminal Division, Capital Case Unit, which later became the Capital Case Section.

4. I have personal knowledge of serious failures and deficiencies by male attorneys of the Capital Case Section during my tenure that did not result in any investigations or disciplinary proceedings despite the fact that these deficiencies were brought to management's attention.

5. Specifically, in December 2013, I was assigned as the trial attorney primarily responsible for a capital prosecution then pending in the Middle District of Pennsylvania, *Unites States v. Hammer*, Crim. No. 96-0239. *Hammer* had previously been handled primarily by one of my male colleagues in the Capital Case Section, Steven D. Mellin.

6. When *Hammer* was assigned to me, I received no electronic or paper files or copies of pleadings from Mr. Mellin,

despite numerous requests for any and all documents in his possession. I also did not receive the customary transfer memorandum that formerly assigned attorneys typically draft to ensure that the transition to newly assigned counsel does not prejudice the government's interests. I also never received a prosecution memorandum, a document that is usually generated in every case to outline the investigation that led up to the indictment and the reasons for seeking the death penalty. Indeed, I believe that I was the first and only attorney to ever generate such a document.

7. Upon familiarizing myself with *Hammer* by reviewing thousands of pages of documents contained in boxes stored in Pennsylvania, I learned that significant deadlines had been missed and that important documents had not been reviewed or produced. The deadline for responding to a jury questionnaire filed by the defendant had passed; thousands of pages of transcripts had not been digested or summarized; key witnesses had never been interviewed; and none of the documents/paperwork had been organized or sorted into files. Moreover, there were dozens of boxes, containing hundreds of pages of discovery, that had not been reviewed or produced even though the case was on the eve of trial. This failure, in particular, significantly prejudiced the government's interests, because portions of the unreviewed and unproduced discovery contained exculpatory materials pertaining to key penalty phase witnesses. Despite years of litigation during which the Capital Case Section had acted as lead counsel, the new prosecution team, of which I was a part, was unearthing dispositive *Brady* information only weeks before trial.

8.  I brought all the aforementioned failures and deficiencies in *Hammer* to the attention of the Capital Case Section's supervisors, namely Capital Case Section Chief Kevin Carwile and Principal Deputy Chief Gwynn X. Kinsey, both of whom are male. Notwithstanding my disclosures, to my knowledge no investigation was instituted to determine whether discipline was appropriate nor was I ever interviewed as part of any investigation into the failures and deficiencies I cited. To the best of my knowledge, based upon my subsequent interaction with Messrs. Carwile, Kinsey and Mellin, there was never any investigation done nor any discipline imposed. In fact, the next year, Mr. Mellin was assigned as lead trial counsel for the government in a high-profile capital prosecution, *United States v. Dzhokhar Tsarnaev*, which arose from the 2013 Boston Marathon bombings.

9.  In 2014, I was subsequently assigned to another capital prosecution that had been previously handled by two of my male colleagues in the Capital Case Section, *United States v. Andrew Rogers*, Dkt. No. 16-0018-WTL-CMM, pending in the Southern District of Indiana. *Rogers* had previously been assigned to Capital Case Section Trial Attorney James D. Peterson, who is male, during the protocol review stage.

10. After familiarizing myself with *Rogers*, I learned that Mr. Peterson had committed a fundamental error in judgment and a violation of the "*Ogden Memo*," by interviewing over a dozen witnesses without a law enforcement agent or other witness being present. These witnesses were suspected of having information that was potentially harmful to the government's penalty phase case. Mr.

Peterson compounded this error by destroying his interview notes, a fact he initially falsely denied, neglecting to memorialize his conversations with the witnesses, and failing to keep records of what documents he showed them to refresh their recollections or lack thereof.

    11.   I again made my supervisors, Messrs. Carwile and Kinsey, aware of these serious issues, including the fact that some of what Mr. Peterson had discussed with the witnesses was arguably *Brady* impeachment material, which needed to be disclosed to the defense. Upon information and belief, Mr. Peterson's actions were also reported to then Deputy Assistant Attorney General Sung-Hee Suh, who was assigned to oversee the Capital Case Section. Again, to my knowledge and notwithstanding my disclosures, no investigation was instituted to determine whether discipline was appropriate nor was I ever interviewed as part of any investigation into the failures and deficiencies I cited. I believe based upon my subsequent interaction with Messrs. Carwile, Kinsey, and Peterson, who has received numerous awards lauding his work, that there was never any investigation done nor any discipline imposed. To the contrary, the *Rogers* case was simply reassigned from me to other attorneys in the Section (it has been reassigned three times since then).

    12.   During my four-year tenure with the Capital Case Section, Mr. Carwile distanced himself from his female attorneys, appeared to hold some disdain for women in general, and expressed his derogatory opinion that "women only go to law school to find rich husbands." His attitude towards his female staff was reflected in the quality of the work that was assigned to the female attorneys. The

more desirable and high-profile capital cases were assigned to male attorneys; female attorneys were given the bulk of the protocol work and less noteworthy cases, often in federal districts that did not support the death penalty, and which devoted less resources and personnel to capital prosecutions. Mr. Carwile would also circulate emails requesting assistance (for example, soliciting help writing articles) only to male Capital Case Section attorneys.  Mr. Kinsey would also circulate jocular "male only" emails, copies of which were shown to me by a male colleague.  Mr. Carwile would rarely acknowledge the accomplishments of female attorneys, even when they were recognized by officials outside the Capital Case Section, but was effusive in his praise of the similar accomplishments of male attorneys.  In addition, during my four-year tenure in the Section, no woman was elevated to a position of supervisory authority, despite the fact that two of the women employed there, myself included, had been supervisors at the United States Attorney's Office for the District of Columbia.

13.   Mr. Carwile also promoted and condoned a hostile work environment in the Capital Case Section.  By way of example, under Messrs. Carwile and Kinsey's watch, sexual harassment was rampant, including misconduct by Mr. Kinsey, which, at a minimum, involved turning a blind eye towards the male attorneys' unwanted sexual advances with respect to the female summer interns and female administrative staff.  Indeed, during my tenure, four female administrative staff abruptly resigned because of the hostile work environment, sexual harassment, and disparate treatment.  In addition, Mr. Carwile appeared to condone the on-the-road exploits of

his male attorneys, including bragging about sexual conquests and showing naked pictures of women in the office to male colleagues during office hours. Moreover, on occasion, Mr. Carwile would invite only the male attorneys to go out drinking with him, even when it was an office-related celebration. And finally, Mr. Carwile repeatedly drew a "ball and chain" on the door of Office Assistant Steve Qureshi, when he was engaged to be married, with words to the effect that he was "going to jail," offending myself and other members of the female staff.

14. Mr. Carwile was more accommodating of the male attorneys and their personal circumstances than he was of the female attorneys. For example, then Trial Attorney Richard Burns and Principal Deputy Chief Charlie Kinsey were both permitted to telework one day or more per week. I was denied a similar request with the only explanation being that Mr. Carwile "didn't believe in telework." This situation was only rectified when Deputy Assistant Attorney General Sung-Hee Suh interceded. Mr. Carwile also asked Mr. Qureshi to independently verify my medical appointments to determine "what condition I had that required medical assistance" and "whether I really needed to take an entire day of sick leave for medical treatment." I am aware of other instances where Mr. Carwile questioned the sick leave of his female attorneys, even if medical documentation was provided, whereas I know of no instance where male attorneys were doubted or questioned about taking sick leave.

15. Based on complaints raised by several of the female attorneys of the Capital Case Section, an investigation, later deemed to be a "management review," was conducted in the summer of 2016.

Attorneys and other Capital Case Section staff were interviewed by Deputy Assistant Attorney General Sung-Hee Suh and James Mann, Chief of Staff to then-Assistant Attorney General Leslie Caldwell. During my interview, I raised the above-stated instances of gender discrimination, disparate treatment, and hostile work environment, as well as other instances of what I believed to be unethical conduct. During my interview, Mr. Mann appeared to be taking copious notes and writing extensively. After this investigation was completed, attorneys in the section were given a choice between doing protocol review work, which very rarely requires any travel, or litigation assignments, which are more travel intensive.

16. Based on my four years in the Capital Case Section, I am not aware of any closer supervision that would have resulted from Jacabed Rodriguez-Coss' being required to move from Connecticut to Washington, D.C. Capital Case Section supervision was rarely done in-person, despite the small size of the office, and was overwhelmingly accomplished through e-mail correspondence, if at all. Moreover, the office had readily available videoconference and teleconference capability, and Ms. Rodriguez-Coss had meaningfully participated in our rare staff meetings during the time that we both worked at the Capital Case Section. Furthermore, intermittent travel to attend staff meetings in person would not require someone to relocate their residence.

17. Despite giving lip-service to an "open door policy," both Messrs. Carwile and Kinsey kept largely to themselves in their offices, interacted only with each other, and communicated to their staff almost exclusively by e-mail, at least with myself and other Capital

Case Section female attorneys with whom I interacted. Even when I was not traveling and worked out of the Washington, D.C. Office, I would go days or even weeks without seeing Mr. Carwile or Mr. Kinsey, even in passing. It was extremely rare for either of them to schedule a meeting with me to discuss substantive matters or stop by my office. On the rare occasions when I, or others with whom I worked, did seek them out, both Messrs. Carwile and Kinsey were often difficult to locate. Unlike other offices where I have worked, both supervisors would simply disappear without any notice: whether it was to attend a meeting, telework, or take vacation. Overall, I never received much, if any, indication that Mr. Carwile or Mr. Kinsey were engaged in hands-on supervision, at least regarding substantive matters. To the contrary, both Mr. Carwile and Mr. Kinsey, in particular, seemed far more interested in administrative matters rather than case-specific issues or trial strategy.

    18. During the pendency of *United States v. Samuel Stone* in the Eastern District of California, I was willing to undertake the trial attorney assignment given to Ms. Rodriguez-Coss. I did not have any children or other family commitments keeping me at home, given that my husband was on frequent, international travel – a fact of which management was aware. No one from management ever discussed the *Stone* case with me, my travel preferences, or why I was being assigned two cases on the East Coast: *Hammer* in the Middle District of Pennsylvania and the case of *United States v. John Milner* in the Eastern District of Kentucky. Over my objection, I continued to be assigned cases in the Middle District of Pennsylvania after *Hammer*. I am unaware of any reason to assign me to *Hammer*, as opposed to

*Stone*, given that Ms. Rodriguez, who was never offered the *Hammer* case, had young children and a family that required her attention.

19. If called as a witness, I could truthfully and competently testify to the foregoing based on my personal knowledge.

Sworn under penalty of perjury this 21st day of December 2017 in the State of Massachusetts, County of Barnstable.

                                                  /s/ Amanda Haines
                                                      Amanda Haines

# Amanda Haines



## EXPERIENCE

**CAPITAL CASE SECTION, CRIMINAL DIVISION, DEPARTMENT OF JUSTICE, WASHINGTON, D.C.**
**Trial Attorney** 2013 – October 2017
Partnered with United States Attorneys' Offices in all phases of litigation including providing discovery, interviewing civilian and law enforcement witnesses, presenting evidence to the grand jury, drafting and arguing complex motions, and preparing and presenting penalty phase evidence.  Responsible for developing sources of information and obtaining, analyzing and organizing voluminous documents, including Bureau of Prison files, medical and mental health records, criminal case histories, and other records relevant to prospective litigation.  Extensive interaction with federal offenders, defense attorneys, Bureau of Prison legal counsel, and various law enforcement agencies at a nationwide level.  Also responsible for assisting and providing counsel to the Attorney General's Review Committee on Capital Cases in its evaluation of potential cases, to include preparing memoranda for the Attorney General's review, and providing legal, procedural, and policy guidance to various United States Attorneys' Offices handling capital investigations and prosecutions.

**UNITED STATES ATTORNEY'S OFFICE, WASHINGTON, D.C.**
**Assistant United States Attorney** 1998 - 2013
Successfully investigated and prosecuted over 150 criminal cases in both federal and local courts, including acting as lead counsel in over forty felony jury trials, involving charges of murder, conspiracy, obstruction of justice, perjury, and violations of narcotics trafficking and firearm possession statutes.  Served as one of three prosecutors assigned to the Specialized Case Unit, a successful initiative created in 2007 to target the most notorious unsolved homicide cases in the District of Columbia.  Extensive experience managing and prioritizing a sizeable caseload, handling all aspects of discovery, conducting complex grand jury investigations, interviewing civilian and law enforcement witnesses from federal and local agencies, and analyzing difficult legal issues.  Specialized experience preparing and presenting expert witnesses. Regularly called upon to conduct training for junior prosecutors regarding all areas of trial practice.

## AWARDS AND SPECIAL RECOGNITION

Special Achievement Award (thirteen awards from 1999-2012)
Chief of Police Medal of Merit (2009, 2010)
Executive Office for U.S. Attorneys Director's Award (2010)
John Evans & Victor Caputy Outstanding Advocacy Award (2010)
Senior Litigation Counsel (2005)
Deputy Chief Homicide Section (2006-2007)

**UNITED STATES ATTORNEY'S OFFICE, DISTRICT OF NEW JERSEY**
**Assistant United States Attorney**, Appeals Unit, 1995-1998
Regularly argued criminal matters before the Third Circuit Court of Appeals. Researched and wrote over 75 appellate briefs pertaining to all aspects of criminal law, including, tax evasion, public corruption, statutory construction, sentencing guidelines issues, and evidence.

## TEACHING EXPERIENCE

**GEORGE WASHINGTON UNIVERSITY SCHOOL OF LAW, WASHINGTON, D.C.**
**Adjunct Professor of Law**, Homicide: Advanced Problems in Criminal Law, Spring Semester, 2010

**FORDHAM UNIVERSITY SCHOOL OF LAW, NEW YORK, NEW YORK**
**Adjunct Professor of Legal Writing**, Fall and Spring Semesters, 1996-1998

**BROOKLYN LAW SCHOOL, BROOKLYN, NEW YORK**
**Adjunct Professor**, Legal Writing, 1991-1992

## ADDITIONAL EXPERIENCE

**HOWARD, DARBY & LEVIN, NEW YORK, NEW YORK**
**Associate**, Litigation Department, 1994-1995: General litigation and white collar criminal defense work.

**THE HONORABLE SHIRLEY WOHL KRAM, UNITED STATES DISTRICT JUDGE, S.D.N.Y.**
**Law Clerk**, 1992-1994

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM, NEW YORK, NEW YORK**
**Associate**, Products Liability Department, 1990-1992: General litigation and pro bono assignments.

## EDUCATION

**BROOKLYN LAW SCHOOL, NEW YORK, NEW YORK**
**J.D. CUM LAUDE, 1990**
**Honors:** Richardson Scholar, 1987-1990; Joan Offner Touval Memorial Scholarship Award; Alexander and Emily Mehr Memorial Prize; Louis Rosenthal Scholarship; Best First Year Brief Award; Moot Court Honor Society; Philip C. Jessup International Law Moot Court Competition: Eastern Regional Finalist, Winner Best Memorial, 2nd Place Best Oralist and International World Cup Participant; National Appellate Advocacy Moot Court Competition; American Jurisprudence Award Legal Writing; Dean's List.

**UNIVERSITY OF PENNSYLVANIA, PHILADELPHIA, PENNSYLVANIA**
**B.A. CUM LAUDE, 1983**
**Honors:** English Honors Program, Dean's List

**MEMBER N.Y. STATE BAR**