# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JACABED RODRIQUEZ-COSS | : | |
| | : | |
| *Plaintiff* | : | **CIVIL ACTION NO.:** |
| | : | **3:16-cv-00633-VLB** |
| v. | : | |
| | : | **July 29, 2018** |
| JEFF B. SESSIONS, ATTORNEY | : | |
| GENERAL, UNITED STATES | : | |
| DEPARTMENT OF JUSTICE | : | |
| | : | |
| *Defendant* | : | |
| | : | |

## MEMORANDUM OF DECISION GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. 35]

Plaintiff Jacabed Rodriquez-Coss ("Plaintiff" or "Rodriquez-Coss") brings this action raising claims of retaliation and sex discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and discrimination due to perceived or actual disability under the Rehabilitation Act of 1973, 29 U.S.C. § 791, *et seq.*, arising from her employment at the Department of Justice. Defendant moves for summary judgment pursuant to Federal Rule of Civil Procedure 56. [Dkt. 35]. For the reasons that follow, the Court GRANTS Defendant's motion.

## Background

The following facts are taken from the Local Rule 56 statements of material facts and evidence cited by the parties, and they are read in the light most favorable to the non-movant. In 2008, Rodriquez-Coss joined the Department of

Justice's Criminal Division, as an attorney in the Capital Case Unit ("CCU") in Washington D.C. [Dkt. 35-2 (D. Conn Civ. L. R. 56(a)(1) Stmt.) ¶ 1; Dkt. 47 (D. Conn. Civ. L. R. 56(a)(2) Stmt.) ¶ 1].[1] Initially, when Rodriquez-Coss first joined the CCU, members of the CCU were not required to travel to the regional United States Attorney Offices ("USAO"). [Dkt. 46-2, Ex. B (Rodriquez-Coss Dep.) at 40:8–11]. One of the primary reasons that Rodriquez-Coss accepted the position at the CCU was the promise from the previous chief of the CCU that there was no travel requirement. *Id.* at 23:6–9.

In 2010, Kevin Carwile became Chief of both the CCU and the Capital Case Section ("CCS"). [Dkt. 46-5, Ex. E (Carwile Dep.) at 166:1–167:14]. Carwile expanded the unit's mission to include the active litigation of cases with the local USAOs. *Id.* This expansion meant attorneys in the unit were required to travel to the venues where their assigned cases were pending.

In the months following this meeting, Rodriquez-Coss's husband accepted a job in Connecticut, leading Rodriquez-Coss to resign from her position at the CCS. [Dkt. 46-2 at 53:3–9]. A week before her employment ended with the CCS, Gwynn "Charlie" Kinsey, the Deputy Chief of the CCS, offered Rodriquez-Coss the opportunity to continue working with the CCS remotely on a capital case pending in Connecticut, *United States v. Aquart*, which was then pending in Connecticut. *Id.* at 53:10–16. Rodriquez-Coss accepted and signed her first Flexiplace Agreement on November 8, 2010, which enabled her to work remotely

---

[1] Prior to joining the CCU, Rodriquez-Coss previously served as an Assistant U.S. Attorney in the District of Maryland and the District of Puerto Rico. [Dkt. 35-2 ¶ 1; Dkt. 47 ¶ 1].

for the CCU from the USAO in Bridgeport, Connecticut. [Dkt. 35-4, Ex. D (Flexiplace Agreements) at 71 of PDF]. The term of this agreement lasted until February 28, 2011. *Id.* As the agreement detailed, "[d]uring the period of this arrangement, the employee will be assigned to assist in the pretrial preparation of <u>U.S. v. Azibo Aquart, et al.</u> . . . as well as conduct case review and policy work as assigned by CCU. At the end of the agreement period, the Chief of the Capital Case Unit will evaluate if extension is warranted, and a new agreement will be required if extension is granted." *Id.* Rodriquez-Coss initially believed that this assignment was only a temporary measure until she was able to find other employment in Connecticut. [Dkt. 46-2 at 29:21–25].

After the *Aquart* trial concluded in July 2011, Carwile contacted Rodriquez-Coss to inform her that she could continue working for the CCS from Connecticut based on continually updated Flexiplace Agreements. *Id.* at 29:16–30:2; [Dkt. 35-2 ¶ 5; Dkt. 47 ¶ 5]. Thereafter, until February 2014, Rodriquez-Coss worked for the CCS in Connecticut under Flexiplace Agreements of varying duration on cases pending in New England primarily. [Dkt. 35-2 ¶ 5; Dkt. 47 ¶ 5].

After the conclusion of the *Aquart* trial, during the summer of 2011, Rodriquez-Coss was assigned to litigate a § 2255 habeas case, *United States v. Fell*, in Vermont. [Dkt. 35-2 ¶ 8; Dkt. 47 ¶ 8; Dkt. 35-5, Ex. Q (Email 1/6/14)].

Months later, near the end of 2011 or at the beginning of 2012, Rodriquez-Coss was assigned an additional case, *United States v. Stone*, pending before the Eastern District of California in Fresno. [Dkt. 46-2 at 58:21–59:3]. When Rodriquez-Coss received this assignment, she immediately called Carwile to

inform him that it would be very difficult for her to litigate the case, since it would require her to be away from her family for three to four months at a time. *Id.* at 82:9–17. Rodriquez-Coss did not resign from her position and proceeded to litigate the case; however, she continually requested a reassignment, and even proposed alternative solutions, so that she could assist with the case without acting as the lead prosecutor. *Id.* at 83:14–23. Despite her misgivings, Rodriquez-Coss entered her appearance in the case on March 26, 2012. [Dkt. 35-5, Ex. F (Not. Appearance)].

In addition to *Fell* and *Stone*, Rodriquez-Coss was also assigned a case pending in Rhode Island, *United States v. Pleau*, in 2012. [Dkt. 35-5, Ex. Q]. All three of these cases—*Fell*, *Stone*, and *Pleau*—remained active until the summer of 2013, when the defendant in *Pleau* pled guilty. [Dkt. 46-2 at 162:24–164:1].

Several AUSAs submitted affidavits opining that the number of cases assigned to Rodriquez-Coss was abnormal. [Dkt. 46-6, Ex. F (Mosley Decl.) ¶ 11; Dkt. 46-7, (Hegyi Decl.) ¶ 16]. According to Kinsey, at the time his deposition was taken the CCS currently had an estimated total of eight to 12 capital cases and 15 to 25 § 2255 cases, with a total of 13 attorneys. [Dkt. 46-5 at 118:21–120:2]. Based on Kinsey's estimate of a range of 23-38 cases and 13 AUSAs, there could not be an equal number of cases assigned to each AUSA in the unit. There is no evidence in the record showing the number of active criminal cases, criminal trials or habeas cases pending in the unit during the time Rodriguez-Coss was employed. Nor is there any evidence of the number of AUSAs in the unit, their background and experience, their reporting relationships or their caseloads.

During the summer of 2012, Rodriquez-Coss complained of discriminatory accommodations to her supervisors. [Dkt. 46-1, Ex. A (Rodriquez-Coss EEOC Stat.) at 17:12–13]. Rodriquez-Coss complained that a white male coworker, Stanley Rothstein, was not required to travel or litigate cases outside of Washington, D.C. *Id.* at 17:13–19. Rothstein confirmed that, between 2008 and 2013, he was only assigned one case. [Dkt. 46-11, Ex. K (Rothstein Decl.) ¶ 4]. During that case, Rothstein was not an active litigator and only made two short trips to the regional USAO. *Id.*

In late 2012, Rodriquez-Coss's family was impacted by the tragic mass shooting at Sandy Hook Elementary School, located five minutes away from where Rodriquez-Coss lived. [Dkt. 46-2 at 117:10–12]. Rodriquez-Coss testified that, given the proximity of this shooting, there was an emotional impact on Rodriquez-Coss's family, particularly her school-age children. *Id.* at 117:12–13, 119:24–120:8. Because of this turmoil, Rodriquez-Coss expressed concerned to Carwile and Kinsey about leaving her family for months to conduct a lengthy trial. *Id.* at 117:17–20. As Rodriquez-Coss informed Kinsey, the combined stress of three active cases alongside her family's struggles made it increasingly difficult to adequately litigate each case. *Id.* at 117:24–118:2.

On February 26, 2013, Carwile wrote in an email:

> As you know, we have Jackie Rodriquez-Coss on our payroll but working out of the USAO in Connecticut. Not a perfect arrangement but I prefer, at this point, to continue the arrangement until mid-summer and see where we stand at that point as a result of hiring additional attorneys, etc. Her prior Flexiplace Agreement has expired. . . . I would like to [renew] this asap because she recently received her mid-year review and started squawking when she was told she needed to be more proactive in traveling to cover her

litigation matters. Before I raise this matter with her again, I want to get an updated agreement in place. I shortened the duration of the agreement in the event this turns into a larger problem.

[Dkt. 35-5, Ex. H (Email 2/26/13)]. Rodriquez-Coss was subsequently issued a four-month Flexiplace Agreement on February 27, 2013 with an expiration date of June 29, 2013. [Dkt. 35-4 at 75 of PDF]. Rodriquez-Coss was later offered a six-month Flexiplace Agreement that was signed on June 30, 2013, and ended December 31, 2013. *Id.*

As Rodriquez-Coss continued to litigate *Stone* in 2013, she encountered numerous hurdles. She testified that the previous prosecutors had apparently "neglect[ed]" the case before Rodriquez-Coss was assigned. [Dkt. 46-2 at 83:13–17]. Moreover, the local AUSA assisting Rodriquez-Coss was inexperienced and completely unfamiliar with the case. *Id.* at 93:20–94:1. The federal judge in *Stone* was also considered to have negative feelings about the death penalty. *Id.* at 169:12–17. The record is devoid of any evidence of tardy filings in the *Stone* case before it was assigned to Rodriquez-Coss. Nor is there any evidence on the record of judicial bias on the part of the presiding judge(s) or that Rodriquez-Coss filed a motion to recuse or to disqualify the judge.

On February 5, 2013, Judge John C. Coughenour noted that Rodriquez-Coss filed a tardy response to a discovery motion in *Stone*. [Dkt. 35-5, Ex. G (*Stone* Tr. 2/5/13) at 13]. In the months that followed, Rodriquez-Coss missed numerous other deadlines. *See* [Dkt. 35-5, Ex. K (*Stone* Order 10/21/13) (noting six untimely filings on January 7, January 9, August 22, September 30, October 4, and October 10)].

On October 9, 2013, Rodriquez, Carwile, and Kinsey discussed Rodriquez-Coss's litigation assignments over a conference call. [Dkt. 46-4, Ex. D (Kinsey Dep.) at 48:4–9]. During this call, Rodriquez-Coss informed Carwile and Kinsey that she could not travel to California for several months in order to prosecute *Stone*. *Id.* at 53:6–7, 53:14–19. Either during this conversation or during one similar, Rodriquez-Coss characterized the local AUSA as busy and less active with the case. [Dkt. 46-2 at 169:9–170:23]. Nevertheless, Rodriquez-Coss asked Carwile to reduce her workload by reassigning the guilt phase of *Stone* to the inexperienced local AUSA, leaving her to try the penalty phase only. [Dkt. 46-2 at 83:14–23, 175:19–22]. Rodriquez-Coss believed that "the evidence [in *Stone*] was pretty overwhelming for the government" and thus "felt that was something that a regular prosecutor didn't need capital experience in order to handle the guilt phase of the trial." *Id.* at 176:1–15. This proposed reassignment was rejected. *Id.* at 84:20–22. Carwile admitted that he allowed similar arrangements for other CCS attorneys. [Dkt. 46-5 at 24:1–5].

Nearly two years after the case was assigned to her, on October 21, 2013, Judge Coughenour again reprimanded the prosecution, headed by Rodriquez-Coss, for failing to meet deadlines. [Dkt. 35-5, Ex. K at 2–3]. In a written order, the court remarked that:

> [T]he government has demonstrated a cavalier attitude towards obeying deadlines and other procedural requirements, and thus its demand that the Court refuse to grant Defendant an extension of time after a timely motion is audacious at best. The inability of the attorneys representing the United States to obey court orders has significantly lowered their credibility with the Court. Counsel are forewarned that the Court is seriously considering an order to show

> cause why government counsel should not be held in contempt for their flagrant disregard of the Court's orders.

*Id.* The magistrate judge assigned to *Stone*, Magistrate Judge Gary S. Austin, also noted the "government's pattern of filing untimely motions and deficient responses" on November 8, 2013. [Dkt. 35-5, Ex. L (*Stone* Order 11/8/13) at 1 n.1]. A few weeks later on November 20, 2013, Magistrate Judge Austin cautioned the government "that future late filings in this case will not be tolerated and will likely result in the imposition of sanctions." [Dkt. 35-5, Ex. N (Order 11/20/13) at 2].

On November 26, 2013, there were two conference calls between Rodriquez, Carwile, and Kinsey. [Dkt. 46-4 at 88:17–22, 93:11–15]. The first call was a case review that included the Fresno USAO Branch Chief Kevin Rooney and the Fresno AUSA, Mike Fry, assigned to *Stone*. *Id.* at 88:17–22. During the call, Rodriquez-Coss claimed that her work in *Stone* was impairing her ability to work on *Fell*. *Id.* at 91:7–10. Immediately afterwards, Rodriquez, Carwile, and Kinsey held a conference call. *Id.* at 93:11–15. Kinsey's notes indicate Rodriquez-Coss complained about the "fundamentally unfair" travel requirements and said she would not try the *Stone* case as scheduled. *Id.* at 96:3–97:11.

A few weeks later, on December 19, 2013, Rodriquez-Coss was given a two-month, instead of a six-month, Flexiplace Agreement, which was effective from January 1, 2014 to February 28, 2014. [Dkt. 35-5, Ex. D]. In an email sent alongside the new agreement, Kinsey informed Rodriquez-Coss that subsequent agreements were "dependent on your satisfactory completion of all pre-trial and trial litigation duties and other assigned work responsibilities." [Dkt. 35-5, Ex. J (Email 12/19/13)]. In response, Rodriquez-Coss noted that, in her situation,

ending her Flexiplace Agreement "would be tantamount to a constructive firing" and "our current disagreements are stressful enough without adding to them the uncertainty, every two months, of whether my Flexiplace agreement will be renewed." *Id.* Carwile later testified that the period for Rodriquez-Coss's Flexiplace was reduced in response to Rodriquez-Coss's objections to travel and to "buy additional time" to resolve this issue. [Dkt. 46-5 at 48:8–49:1].

Soon thereafter, on January 7, 2014, Carwile issued an official reprimand to Rodriquez. [Dkt. 35-5, Ex. R (Official Reprimand)]. Carwile wrote:

> This is an official reprimand for your refusal to handle a case assignment given to you by your supervisors. You informed Capital Case Section (CCS) that you are unwilling to litigate the case of *United States v. Samuel Stone* (E.D. Cal.) due to the travel required to adequately prepare and prosecute this matter. You cannot unilaterally refuse to handle a case or change your work assignments to accommodate your personal preferences. This conduct is unacceptable and will not be tolerated. You are expected to accept all assignments from your supervisors.

*Id.* The reprimand was "intended to be constructive in nature" and was added to Rodriquez-Coss's personnel file. *Id.* Later that month, on January 22, 2014, Rodriquez-Coss contacted the Department of Justice's Equal Employment Opportunity Commission ("EEOC"), [Dkt. 35-5, Ex. T (EEOC Compl.)], and she filed an internal grievance regarding her official reprimand, [Dkt. 35-5, Ex. Z (Grievance Response 3/28/14). CCS was later notified of the EEOC contact on February 4, 2017. [Dkt. 35-5, Ex. U (EEO Letter Excerpt 6/4/14)]. The reprimand was later upheld by the Department of Justice's Grievance Official, who called the reprimand "fair and reasonable." [Dkt. 35-5, Ex. Z].

Around February 10, 2014, Carwile and Kinsey learned of the deficient filings in *Stone*. [Dkt. 46-4 at 159:22–160:22]. At this time, the U.S. Attorney for the Eastern District of California alerted Carwile and Kinsey to the reprimands issued by the *Stone* judges. *Id.* at 160:18–22; [Dkt. 46-5 at 82:19–83:4]. Two weeks later, on February 24, 2014, Carwile notified Rodriquez-Coss that he would not renew her Flexiplace Agreement after it expired on February 28, 2014. [Dkt. 35-5, Ex. Y (Email 2/24/14)]. Carwile explained his decision was based on "revelations over the last 2 weeks that were brought to my attention which relate to missed deadlines and other deficiencies in court filings." *Id.* Moreover, Carwile also "determined that more direct supervision of [Rodriquez-Coss's] work is needed" and instructed Rodriquez-Coss to resume working from the CCS office in D.C. beginning March 31, 2014. *Id.* On March 24, 2014, Rodriquez-Coss emailed Carwile seeking authorization to continue working from Connecticut until April 30 in preparation for an evidentiary hearing in *Fell*. *Id.* This was denied. *Id.*

Rodriquez-Coss did not return to the CCS office on March 31, 2014. [Dkt. 35-2 ¶ 31; Dkt. 47 ¶ 31]. Instead, on March 31 at 10:35 pm, she emailed Carwile and Kinsey, explaining:

> Unfortunately, the stress from my current disputes pertaining to the status of my flexi-place agreement has had a marked and detrimental effect on my health, to the point where I am now under the continuing care of physicians and taking medication. While I am suffering medically from this situation and under the care of physicians, I simply cannot act contrary to their advice and report for duty in Washington. I will be providing you with medical documentation that the requested transfer is detrimental to my health and that I can only continue working with the limitation that I remain in their care.

[Dkt. 35-5, Ex. AA (Email 3/31/14)]. Rodriguez-Coss also indicated that she would continue working out of the Connecticut USAO. *Id.* The following afternoon, Kinsey replied and informed Rodriquez-Coss that she would be placed on "AWOL status" starting April 2, 2014 unless she provided medical documentation, since she did not report to the D.C. office. *Id.* On April 2, 2014 Rodriquez-Coss was declared AWOL and, because of her AWOL status, Kinsey cancelled Rodriquez-Coss's enrollment in a training that was necessary for her to stay in good standing with her state bar. *Id.*; [Dkt. 35-2 ¶ 33; Dkt. 47 ¶ 33].

Rodriquez-Coss provided medical documentation from her general practitioner on April 3, 2014. [Dkt. 35-5, Ex. AA]. After receiving the documentation, Kinsey informed Rodriquez-Coss that she was still on AWOL status and could not work from the Connecticut USAO. *Id.* In the days that followed, Rodriquez-Coss supplied further medical documentation indicating that she had suffered chest pains and an anxiety attack induced by the "stress of her present situation." [Dkt. 35-5, Ex. GG (Medical Records)]. Rodriquez-Coss was eventually granted sick leave from April 4, 2014 to May 12, 2014 and annual leave under the Family and Medical Leave Act from May 13, 2014 to May 30, 2014. [Dkt. 35-2 ¶ 36; Dkt. 47 ¶ 36; Dkt. 35-5, Ex. BB (Leave 3/23/14 to 4/5/14); Dkt. 35-5, Ex. CC (Sick Leave Grant)].

On May 6, 2014, Rodriquez-Coss filed a formal complaint of discrimination with the Department of Justice's EEO staff. [Dkt. 35-2 ¶ 37; Dkt. 47 ¶ 37].

Then, on May 20, 2014, Rodriquez-Coss informed CCS management that she had accepted a position with the USAO in Connecticut and was resigning

from the CCS. [Dkt. 35-2 ¶ 39; Dkt. 47 ¶ 39]. Rodriquez-Coss also indicated that she intended to remain on leave for the remainder of her time with CCS. [Dkt. 35-2 ¶ 39; Dkt. 47 ¶ 39]. Rodriquez-Coss's position was converted from a Trial Attorney to an AUSA in the District of Connecticut on June 1, 2014. [Dkt. 35-2 ¶ 40; Dkt. 47 ¶ 40]. This was effectively a transfer and Rodriquez-Coss remained continuously employed by the Department of Justice. [Dkt. 35-2 ¶ 40; Dkt. 47 ¶ 40].

On March 23, 2016, the DOJ EEOC granted Rodriquez-Coss the right to a file a complaint within 30 days. [Dkt. 1 (Compl. and Exs.) at 105 of PDF]. This case was timely filed on April 21, 2016. *Id.* at 1.

### Standard of Review

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no factual issues exist. *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). "In determining whether the burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). This means that "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000); *see Welch-*

*Rubin v. Sandals Corp.*, No. 3:03-cv-481, 2004 WL 2472280, at *4 (D. Conn. Oct. 20, 2004) ("At the summary judgment stage of the proceeding, [p]laintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient.") (citing *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996)). Put another way, "[i]f there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315-16 (2d Cir. 2006) (quotation omitted). In addition, "the court should not weigh evidence or assess the credibility of witnesses" on a motion for summary judgment, as "[t]hese determinations are within the sole province of the jury." *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).

A party who opposes summary judgment "cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb*, 84 F.3d at 518. "Summary judgment cannot be defeated by the presentation . . . of but a 'scintilla of evidence' supporting [a] claim." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010) (quoting *Anderson*, 477 U.S. at 252). Rather, a party opposing summary judgment "must come forth with evidence sufficient to allow a reasonable jury to find in [its] favor." *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001). The evidence such as affidavits offered in opposition to a motion for summary judgment must be both admissible and must be sufficient to raise a genuine issue of material fact. *See* Fed. R. Civ. P.

56(c); *H. Sand & Co. v. Airtemp Corp.*, 934 F.2d 450, 454-55 (2d Cir. 1991); *Beyah v. Coughlin*, 789 F.2d 986, 989 (2d Cir. 1986); *Martinez v. State of Connecticut*, 817 F. Supp. 2d 28, 37 (D. Conn 2011); *Hollander v. Am. Cyanamid Co.*, 999 F. Supp. 252, 256 (D. Conn. 1998) (citing *John Hancock Prop. and Cas. Ins. Co. v. Universal Ins. Co., Ltd.*, 147 F.R.D. 40, 45 (S.D.N.Y. 1993); *Welch–Rubin*, 2004 WL 2472280, at *1.

"Each statement of material fact by a movant in a Local Rule 56(a)1 Statement . . . must be followed by a specific citation to (1) the affidavit of a witness competent to    testify as to the facts at trial, or (2) other evidence that would be admissible at trial." D. Conn. L. Rule 56(a)3; *see also* Fed. R. Civ. P. 56(e).  The Local Rules also points out,

> Failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming admitted certain facts that are supported by the evidence in accordance with Local Rule 56(a)1, or in the Court imposing sanctions, including, when the movant fails to comply, an order denying the motion for summary judgment, and when the opponent fails to comply, an order granting the motion if the motion and supporting materials show that the movant is entitled to judgment as a matter of law.

*Id.;* Fed. R. Civ. P. 56(e).  Where there is no admissible evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712, 727 (2d Cir. 2010).  "The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated.

There is no need to make a separate motion to strike." Fed. R. Civ. P. 56, advisory committee's note to 2010 amendment.

<u>Analysis</u>

Defendant moves for summary judgment on all three grounds: (1) retaliation for conduct protected by Title VII; (2) sex discrimination in violation of Title VII; and (3) discrimination due to disability protected by the Rehabilitation Act. Defendant addresses the retaliation and disparate treatment claims under a single analysis, presumably because they both utilize the *McDonnell Douglas* framework and have overlapping facts. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). The Court will address disparate treatment first.

I.   <u>Title VII Sex Discrimination Based on Disparate Treatment</u>

The Complaint asserts a combined claim for discrimination on the basis of sex and parental status. [Dkt. 1 ¶¶ 31–32]. Defendant moves for summary judgment on two grounds. First, Defendant argues that the Court lacks jurisdiction over the claim of parental status discrimination because parental status is not actionable under Title VII and, instead, is only covered by Executive Order 13152. Exec. Order No. 13,152, 65 Fed. Reg. 26,115 (May 2, 2000). Importantly, the executive order explicitly states, "This Executive Order does not confer any right or benefit enforceable in law or equity against the United States or its representatives." *Id.* As a representative of the United States, Defendant thus argues that the Court lacks subject matter jurisdiction over this issue. [Dkt. 35-1 (Mot. Summ. J.) at 18]. In response, Plaintiff recognizes that "discrimination on the basis of parental status *per se* is not actionable under Title VII," but

nonetheless argues that forms of gender discrimination can target female parents. [Dkt. 45 (Corrected Opp'n) at 2 n.1]. Therefore, Plaintiff has not contested the lack of jurisdiction over her claim of parental status. The Court construes this as a waiver of that claim and any evidence presented of disparate treatment on the basis of Plaintiff's parental status will be considered in the analysis of Plaintiff's sex discrimination claim.

Second, Defendant moves for summary judgment against Plaintiff's gender discrimination claim by contesting her prima facie case and articulating a number of legitimate nondiscriminatory reasons for its actions. Disparate treatment claims under Title VII are analyzed under the *McDonnell Douglas* framework: (1) Plaintiff must demonstrate a *prima facie* case of sex discrimination; (2) Defendant must then offer legitimate nondiscriminatory reason(s) for its adverse employment actions; and (3) Plaintiff then bears the burden to prove that Defendant's stated reasons were pretext for discrimination. *See McDonnell Douglas*, 411 U.S. at 803–05. The parties' arguments under the sex discrimination claim will be analyzed below under this framework.[2]

Notably, Plaintiff barely addresses the sex discrimination claim at all, relying on the arguments and evidence from the retaliation claim in only one, short paragraph. Plaintiff has failed to comply with Rule 56 by filing a rule-compliant Local Rule 56(a)(2) Statement and has submitted inadmissible material

---

[2] Plaintiff neglected to include any citations to the record in the section of her memorandum supporting her sex discrimination claim. Therefore, the Court will only consider the evidence cited in support of her retaliation claim.

in support of her opposition to summary judgment. The Court has assessed the evidence Plaintiff cites and applies it to the appropriate discrimination standard.

A. Prima Facie *Case of Discrimination*

In order to establish a prima facie case of sex discrimination, Plaintiff must demonstrate: "(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)). Defendant only contests the third and fourth elements.

1. *Adverse Employment Action*

For an action to be adverse in a claim of discrimination it must amount to a "materially adverse change in the terms and conditions of employment." *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (internal quotation marks omitted) (citing *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 446 (2d Cir. 1999)). Moreover, "[a]n adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003) (internal quotation marks omitted). For example, actions that are materially adverse include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Sanders v. New York City Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (quoting

*Terry*, 336 F.3d at 141).  In the end of the day, "[a]n adverse employment action may or may not entail economic loss, but there must be a link between the discrimination and some tangible job benefits such as compensation, terms, conditions or privilege of employment."  *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002).

Defendant contends that neither Plaintiff's work and travel assignments, AWOL status, reduction and non-renewal of her Flexiplace Agreement, nor her letter of reprimand constitute adverse employment actions.[3]  Plaintiff challenges each position and argues that "[a] denial of a requested accommodation can constitute an adverse employment action."  [Dkt. 45 at 7].  The Court views Plaintiff's argument to be essentially the same as Defendant's workload and

---

[3] Of note, Plaintiff does not expressly assert a constructive discharge claim in the Complaint.  *See* [Dkt. 1].  She did, however, claim Defendant's conduct resulted in her constructive discharge in the Joint Rule 26(f) Report, which was signed by both parties.  *See* [Dkt. 26 at 2].  Constructive discharge is one example of a materially adverse action.  *See Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 359 (2d Cir. 1993).  "An employee is constructively discharged when [her] employer, rather than discharging [her] directly, intentionally creates a work atmosphere so intolerable that [s]he is forced to quit involuntarily."  *Terry*, 336 F.3d at 151–52.  Intolerable working conditions are those that "when, viewed as a whole, they are 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'"  *Id.* at 152 (quoting *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir. 1996)).  The discrepancy between the two filings elucidates how murky these claims are.  The Court surmises the constructive discharge has been subsumed into the argument that the non-renewal of the Flexiplace Agreement is an adverse action and that Plaintiff intended not to raise a separate constructive discharge claim.  This conclusion is also necessitated by the fact that a pleading can only be amended by re-pleading and not in a memorandum of law or other document filed in a case.  *See Doe v. Torrington Bd. of Educ.*, 179 F. Supp. 3d 179, 189 n.3 (D. Conn. 2016); *Auguste v. Dep't of Corrs.*, 424 F. Supp. 2d 363, 369 (D. Conn. 2006).

travel argument and will assess these positions together. The Court will then address Defendant's other arguments.

### i. Workload and Travel Assignments

First, Plaintiff argues that Defendant did not accommodate her travel and workload. Plaintiff submitted several declarations from Plaintiff's coworkers, who opine without reference to any facts that Plaintiff was assigned more cases than other attorneys and was required to travel more than certain male attorneys. [Dkt. 46-6, Ex. F ¶ 11; Dkt. 46-7, Ex. G ¶ 16; Dkt. 46-11, Ex. K ¶ 4; Dkt. 46-1, Ex. A at 17:12–13].

Defendant presented a summary of various CCS attorneys' travel. [Dkt. 35-5, Ex. MM (Travel Summary Data)].[4] These records reveal that Rodriquez-Coss traveled approximately as often as, and even less often than a few, other CCS attorneys. *See id.* However, Defendant has not presented evidence that challenges the claim that her workload was burdensome.

The Second Circuit has clearly held that "the assignment of a disproportionately heavy workload can constitute an adverse employment action." *Vega*, 801 F.3d at 85 (internal quotation marks omitted). The key, however is *disproportionate*. Courts within this circuit have held that unfavorable

---

[4] Plaintiff objects to the admission of this summary chart on the basis that it is not a CCS document and does not qualify as a business or Government record, and it was not produced during discovery. *See* [Dkt. 47 ¶ 41]. The Court agrees with Defendant that this chart is admissible as a summary chart under Rule 1006 of the Federal Rules of Civil Procedure, as it is authenticated by Chief Financing Officer Stacey Bass and the original can presumably be inspected if the Court were to order the production. *See* [Dkt. 35-5, Ex. LL (Bass Decl.)]. The Court need not do so, however, because Plaintiff never requested to inspect the originals and does not object on Rule 1006 grounds.

schedules, work assignments, or excessive work are not *per se* adverse employment actions, and a plaintiff must show more than just these actions. *See Linell v. New York City Dep't of Educ.*, No. 15-cv-5085 (CBA) (ST), slip op. at 6–7 (E.D.N.Y. Mar. 30, 2018) (granting summary judgment in age- and disability-discrimination case for failure to show more); *Johnson v. Long Island Univ.*, 58 F. Supp. 3d 211, 224 (E.D.N.Y. 2014) (finding a disproportionate workload in a race and gender discrimination case when the plaintiff was assigned seven weeks of duty while other employees were only assigned two weeks). Plaintiff must therefore demonstrate a triable issue of fact that her workload was disproportionate in order to survive summary judgment.

From 2012 through the summer of 2013, Rodriguez handled three capital cases: *Stone*, a criminal trial in the Eastern District of California; *Fell*, a habeas case in the District of Vermont; and *Pleau*, a criminal trial in the District of Rhode Island. *See* [Dkt. 46-2 at 162:21–164:16]. Rodriguez-Coss relies on affidavits submitted by her colleagues Bruce Hegyi and Julie Mosley as evidence of her disproportionate workload. *See* [Dkt. 45 at 7–8]. Attorney Mosley stated,

> During my six-year tenure in the Capital Case Section, I do not recall handling three active litigation matters simultaneously. Based on my experience, the demands of a capital litigation matter are intensified when it is pending in a district that is not particularly supportive of the death penalty and when the local United States Attorney's Office does not allocate sufficient personnel or resources to the case.

[Dkt. 46-6 ¶ 11]. Bruce Hegyi also attested to similar matters:

> During my tenure in the CCS, I was never required to handle simultaneously three active capital matters with impending trial dates; and I am not aware of anyone other than Ms. Rodriguez-Coss who handled simultaneously that many active capital trial matters. Over my tenure at CCS, there were times when a CCS Trial Attorney

had no active capital trial matters, and it seemed to me that the norm was for CCS Trial Attorneys to have one, or at most two, active capital trial matters with impending trial dates.

***

In every Federal Death Penalty Act (FDPA) case that involved CCS during my tenure, the federal capital defense counsel employed a "scorched Earth" litigation approach. In my experience, most of the CCS cases that have gone to trial have in the neighborhood of 1,000 docket entries and/or pleadings.

[Dkt. 46-7 ¶¶ 16–17]. He then went on to describe the increasing demands when a capital case is before a district judge "who is hostile to the FDPA" or the USAO does not adequately assist the CCS attorney. *Id.* ¶ 17.

The Court finds that this evidence is insufficient for a jury to conclude Rodriguez-Coss's workload was disproportionate. First, Attorneys Mosley and Hegyi submitted declarations that are speculative and not quantitative. They are devoid of any facts which would allow their hypotheses to be tested. The only facts offered to establish the disproportionality of Plaintiff's workload was that there were 23-38 cases and only 13 attorneys, meaning that the caseload was necessarily disproportionate. There is also no evidence of the relative experience of the attorneys in the unit or the complexities of their caseloads. The proffered declarations represent the opinions of a small percentage of the 12 or more attorneys who worked for the CCS during 2012 and 2013.[5] Rodriguez-Coss had the opportunity to discover both from public records and the discovery process

---

[5] The record shows that 12 attorneys traveled for the CCS in fiscal year 2012 and 14 attorneys traveled for the CCS in fiscal year 2013. *See* [Dkt. 35-5, Ex. MM]. The Court recognizes this may not be reflective of the entire CCS attorney list. Kinsey testified that there were approximately 13 attorneys working for CCS at the time of his deposition on August 2, 2017. *See* [Dkt. 46-4 at 118:21-120:2].

the information to make a factual showing of the relative workload of the attorneys in the unit during the relevant time frame. After all, Defendant provided the Court with a data sheet of all the attorneys' travel broken down by fiscal year, and it is likely they would have kept documentation of the caseloads in order to approve travel. The Court therefore cannot conclude, based on attorneys' affidavits, that Rodriguez-Coss's workload was disproportionate when compared to the entire office.

Second, Rodriguez-Coss's workload does not even appear disproportionate in comparison to the workload referenced in the affidavits. Attorney Hegyi stated he "was never required to handle simultaneously three active capital matters with impending trial dates," *see* [Dkt. 46-7 ¶ 16], but neither was Rodriguez-Coss. Rather, she was assigned two active criminal trial matters and one active § 2255 habeas petition. The Court cannot conclude Rodriguez-Coss's workload to be disproportionate based on Attorney Hegyi's testimony as he appears to have misunderstood her caseload as three active *criminal trials*. That Attorney Mosley never worked on three active litigation matters is of no moment because there is no basis to conclude all other CCS attorneys would testify to the same fact (i.e. that they did not have three active cases). Plaintiff cites no evidence in the record leading a reasonable jury to conclude two active criminal trials and one active habeas petition is disproportionate.

Third, the evidence indicates Rodriguez-Coss complained to her managers only of her travel requirements, not the alleged excessive workload itself. For example, on January 6, 2014, Rodriguez-Coss sent an email to Renee Caputo

regarding the shortening of her Flexiplace Agreement. *See* [Dkt. 35-5, Ex. Q]. She indicated she could not work on *Stone* because she could not be away from home for three to four months. *See id.* Of note, she expressly stated her "concerns relate primarily to [her] inability to travel, particularly to California, on a regular basis." *Id.* When explaining her case assignments with the CCS, she stated the following: "In November 2011 I received a call from Chief Carwile during which he asked whether I was willing to litigate another case. I told him that as long as the case was 'not in Alaska,' meaning not far away from my home, I would be willing to do so." *Id.* In this same email, she indicated she "agreed" to take on *Pleau* in 2012 and see *Fell* to its conclusion. *See id.*

The Court concludes that Plaintiff has not presented a triable issue of fact that her workload was excessive notwithstanding the fact that Defendant did not present any evidence speaking to her workload which is a function of more than just the number of cases. At this stage of the litigation, Plaintiff has had the opportunity to conduct discovery and present facts establishing the disproportionality of her workload. She has failed to raise a triable issue of fact. Therefore, in light of the authenticated summary chart showing Rodriguez-Coss traveled the same or less than most CCS trial attorneys, the Court finds that her assigned workload and travel did not constitute an adverse action.

Plaintiff's main argument is that Defendant's failure to accommodate her travel needs constituted an adverse action. *See* [Dkt. 45 at 7]. She cites *Little v. Nat'l Broad. Co., Inc.*, 210 F. Supp. 2d 330, 337 (S.D.N.Y. 2002), a Title VII

discrimination action on the bases of race and sex.  In defining "adverse action," the district court stated,

> While there is no exhaustive list of what constitutes an adverse employment action, courts have held that the following actions, among others, may qualify: discharge or demotion, denial of a provisional or permanent promotion, addition of responsibilities, involuntary transfer that entails objectively inferior working conditions, <u>denial of a requested employment accommodation</u>, denial of training that may lead to promotional opportunities, and a shift assignment that makes a normal life difficult for the employee.

*Id.* (internal citations omitted, emphasis added).  The district court cited *Pomilio v. Wachtell Lipton Rosen & Katz*, No. 97 Civ. 2230 (MBM), 1999 WL 9843, at *9 (S.D.N.Y. Jan. 11, 1999), in stating that a denial for a requested employment accommodation is an adverse action.  *Pomilio* is inapposite here as it addresses a plaintiff's discrimination claim in violation of the Americans with Disabilities Act ("ADA") and corresponding New York state provision.  An individual's need for a reasonable accommodation is decidedly different in the context of the ADA where "reasonable accommodation" is a statutory requirement.  *See* 42 U.S.C. § 12112(a)(5)(A).  Rodriguez-Coss does not assert any entitlement to relief for an ADA violation or for another basis in which a reasonable accommodation is statutorily required to be given.  Furthermore, Rodriguez-Coss has provided no legal basis for the Court to extend an ADA case to this Title VII case based on these facts in evidence.  She is essentially asking the Court to rule that a supervisor must give case assignments based on the requests of the employees without any legal support.  The Court should not and will not usurp the role of the employer to manage its workload and employees.  The Court finds that the

decision not to accommodate Rodriguez-Coss's travel request and case assignments is not an adverse action.

### ii. AWOL status

Second, it is disputed whether Plaintiff's AWOL status from April 2, 2014 to April 3, 2014 constitutes an adverse action. Generally, AWOL designation is not an adverse action when employees are absent without any documented reason. *See, e.g., Pierre v. Napolitano*, 958 F. Supp. 2d 461, 479 (S.D.N.Y. 2013) (finding that plaintiff's AWOL status was not an adverse employment action because it "was the direct result of his failure to provide [medical] documentation" in support of his request for medical leave); *Lucas v. Potter*, No. 3:08CV480, 2010 WL 148451, at *8 (D. Conn. Jan. 11, 2010) (finding that AWOL status was not an adverse employment action because plaintiff neglected to provide the required medical documentation until one month after his request for sick leave). Although there are few decisions on this issue, other courts in this circuit have found that AWOL status coupled with ignorance of a request for sick leave with medical documentation qualifies as an adverse action. *See Krishnapillai v. Donahoe*, No. 09–CV–1022, 2013 WL 5423724, at *12–13 (E.D.N.Y. Sept. 25, 2013) (finding that AWOL status and wrongful denial of sick leave constitutes an adverse employment action); *Jordan v. Potter*, No. 05-CV-3005, 2007 WL 952070, at *6, *21–22 (E.D.N.Y. Mar. 29, 2007) (on a motion to dismiss, finding an adverse employment action in a Rehabilitation Act claim—analyzed under the *McDonnell Douglas* framework—where plaintiff was wrongly declared AWOL and denied sick leave).

In this case, Plaintiff did not provide medical documentation until the day after she was declared AWOL. [Dkt. 35-5, Ex. AA]. After providing the information, she was ultimately granted sick leave from April 4 through May 12 after which she took annual FMLA leave until May 30. *See* [Dkt. 35-2 ¶ 36; Dkt. 47 ¶ 36; 35-5, Ex. AA, Ex. BB, Ex. DD (Leave 4/6/14 to 5/31/14)]. The physicians' letters indicate that Rodriguez-Coss had medical appointments for March 31, April 4, and April 7. *See* [Dkt. 35-5, Ex. GG]. Her cardiologist signed a letter dated April 8, 2014, indicating that she should not return to work until cardiac testing is completed and reviewed. *See* [Dkt. 35-5, Ex. EE (Physician Letter 4/8/14)]. The record therefore supports Defendant's conclusion in giving Rodriguez-Coss retroactive sick leave for all days except April 2 and 3 of 2014.

Alternatively, Plaintiff argues she was denied the opportunity to attend a continuing legal education class because of her AWOL status, which "she needed urgently to maintain her law license." [Dkt. 45 at 9]. She does not allege, however, that she lost her license. Given the nearly constant stream of continuing legal education courses offered to attorneys, the Court surmises that she could have taken (and possibly did take) another course in lieu of the one she missed. *See* [Dkt. 46-1 at 51:8–52:3]. The Court finds this set back was a mere inconvenience but did nothing to materially alter the conditions of her employment or cause some other loss of tangible job benefits, given that she was not suspended and did not lose her license. *See Terry*, 336 F.3d at 138.

Moreover, Defendant withdrew Rodriguez-Coss from the training after she represented that her physician advised her to remain in Connecticut under care

and not travel to Washington D.C.  The Court is in a quandary how, under those facts, she could allege she was harmed by her inability to attend a training in North Carolina when she was advised to remain under her doctor's care.  *See* [Dkt. 35-5, Ex. EE].  For these reasons, Rodriguez-Coss's AWOL status does not qualify as an adverse employment action.

### iii.    Letter of Reprimand

Third, it is Defendant's position that Rodriguez-Coss's letter of official reprimand did not constitute an adverse action.  "Reprimands or negative evaluation letters may, in some circumstances, constitute adverse employment action, and whether they do is typically a question of fact for the jury." *Lawrence v. Melhman*, 389 F. App'x 54, 56 (2d Cir. 2010) (Title VII discrimination case citing Second Circuit cases); *see McKinney v. Dep't of Transp.*, 168 F. Supp. 3d 416, 423 (D. Conn. 2016) (recognizing in a Title VII race discrimination case that an adverse employment action includes reprimand) (citing *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999) (First Amendment retaliation), *abrogation recognized on other grounds by Montero v. City of Yonkers*, 196 F.3d 102, 110 (2d Cir. 1999)); *Abraham v. Potter*, 494 F. Supp. 2d 141, 147 (D. Conn. 2007) (acknowledging a reprimand may constitute an adverse action in a Title VII discrimination suit); *see generally Sanders*, 361 F.3d at 756 (recognizing in a Title VII discrimination case that a negative job evaluation may cause an adverse action).

Typically, district courts in this circuit have held that reprimands, without more, are not adverse actions in employment discrimination suits.  *See Abraham v. Potter*, 494 F. Supp. 2d 141, 147 (D. Conn. 2007) (applying the "reprimand plus

other negative results standard"); *Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 248 (S.D.N.Y. 2001) (holding that no adverse employment action occurred where plaintiff was unfairly scrutinized and informally reprimanded for tardiness, when monitoring and reprimands did not result in decrease in pay, probation, or other negative consequence); *c.f. Stembridge v. City of New York*, 88 F. Supp. 2d 276, 283 (S.D.N.Y. 2000) (finding a reprimand was not an adverse action because it did not indicate "any planned discipline or further action," but acknowledging "[a]n adverse employment decision is actionable under Title VII when it relates to an employee's '[c]ompensation, terms, conditions, or privileges of employment,' or involves a classification which '[w]ould deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee.'") (quoting 42 U.S.C. § 2000e-2(a)).

Defendant issued the official reprimand on January 6, 2014 in which it cited Plaintiff's refusal to litigate and travel for the *Stone* trial as the basis for the reprimand. [6] [Dkt. 35-5, Ex. R]. Rodriguez-Coss previously discussed this issue with her supervisors on multiple occasions. *See, e.g.,* [Dkt. 46-4, Ex. D at 48:4–9, 53:6–19, 91:7–10]. The Court observes that Plaintiff did not experience any changes in her terms of conditions directly after receiving the letter of reprimand. The letter was deemed to be "constructive in nature" and cautioned that "future misconduct may lead to more formal disciplinary action being proposed against you, up to and including removal from the federal office." [Dkt. 35-5, Ex. R]. The

---

[6] The reprimand does not reference her delinquent filings in the *Stone* case, as her supervisors did not find out about that issue until February 10, 2014. *See* [Dkt. 46 at 159:22–160:13-22].

Court questions the letter of official reprimand was an adverse action. However, in light of the previous discussions (leading the Court to conclude this was not the first time Plaintiff was made aware of the issue), the subsequent non-renewal of her Flexiplace Agreement, and in consideration of the prevailing case law, the Court assumes without deciding the letter of reprimand was an adverse action.

### iv. Flexiplace Agreement Denial

The remaining actions addressed by Defendant is the reduction and subsequent non-renewal of Plaintiff's Flexiplace Agreements. The Second Circuit has not addressed whether the denial or non-renewal of work-from-home status or telecommuting privileges constitutes an adverse action. *See Martinez-Santiago v. Zurich N. Am. Ins.*, No. 07 Civ. 8676, 2010 WL 184450, at *7 (S.D.N.Y. Jan. 20, 2010). In *Martinez-Santiago*, the plaintiff was pregnant and received telecommuting status for the few weeks leading up to her due date. She took leave after giving birth and then sought permission to telecommute a few days per week "in order to observe the level of care being given to her son by the new caretaker." *See id.* at *3. The plaintiff maintained that the accommodation would be temporary to resolve the unanticipated day care problem. *Id.* Her employer denied the request, which gave rise to the litigation. In ruling that the telecommuting denial did not constitute an adverse employment action, the district court stated the denial "was a short term inconvenience that did not rise to the level of an adverse employment action." *Id.* at *7. The district court cited numerous cases finding such denied requests did not constitute an adverse

action, but it nonetheless acknowledged that "there may be some situation where the denial of a request to work from home qualifies as an adverse action. . . ." *Id.*

The Court has assessed these cases and finds they differ in one key respect: unlike the plaintiffs in those cases, the plaintiff in this case had been working remotely for over three years prior to the non-renewal of her Flexiplace Agreement. After electing not to renew the Flexiplace Agreement, Defendant gave her only one month to return to D.C. *See* [Dkt. 35-5, Ex. Y]. This would have forced her to quickly relocate herself, her small children and husband; leave them behind; or quit her job. Indeed, over the span of three years, Plaintiff lived in Connecticut and established deep roots to her home. Her young children spent three years growing accustomed to their school and her husband's career was based in Connecticut. CCS management was patently aware of Plaintiff's familial situation; after all, Plaintiff began working in Connecticut as a direct result of her husband's work transfer and her requests for accommodation frequently referenced her children. On the other hand, she knew from the onset it was a temporary arrangement.

It is worth noting that Carwile initially offered her the Flexiplace Agreement in 2010 to keep her with the CCS. *See* [Dkt. 46-5 at 109:14–110:6]. He explained, "I believed that she was leaving to move to Connecticut and that the only way that I would be able to, perhaps, have a discussion with her about having a long distance work arrangement for some period of time would be pursuant to some sort of arrangement like this." *Id.* at 110:20–111:3. His knowledge that a

Flexiplace Agreement was necessary to keep her with the CCS suggests Defendant foresaw her resignation should the non-renewal be issued.

Clearly, this non-renewal is more than just an "inconvenience or an alteration of job responsibilities." *Terry*, 336 F.3d at 138. Given Carwile's motivation in issuing the Flexiplace Agreement and the length of time she worked remotely, a reasonable jury could determine it is a material change in the terms and conditions of her employment if not a calculated effort to squeeze Rodriguez-Coss out of employment. *See Galabya*, 202 F.3d at 640.

### 2. *Inference of Discriminatory Intent*

The Court now addresses whether Defendant's actions surrounding the letter of reprimand or the non-renewal of the Flexiplace Agreement gives rise to discriminatory intent.

With respect to the fourth element of the *prima facie* case, all that is needed is "some minimal evidence suggesting an inference that the employer acted with discriminatory motivation. . . ." *Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015) (internal quotation marks omitted); *Walsh v. New York City Hous. Auth.*, 828 F.3d 70, 75 (2d Cir. 2016) (stating the *prima facie* burden is minimal). "Because an employer who discriminates is unlikely to leave a 'smoking gun' attesting to a discriminatory intent, a victim of discrimination is seldom able to prove his claim by direct evidence, and is usually constrained to rely on

circumstantial evidence." *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).[7]

Examples of circumstantial evidence giving rise to a discriminatory inference include, "but [are] not limited to, the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Littlejohn*, 795 F.3d at 312 (internal quotation marks omitted); *Chambers*, 43 F.3d at 37; *c.f. Vill. of Freeport v. Barrella*, 814 F.3d 594, 601 n.9 (2d Cir. 2016) ("But we have nonetheless suggested that a plaintiff may be able to plead a prima facie case under Title VII even without showing that the defendant favored someone outside of the plaintiff's protected class."). Plaintiff lists general principles about Defendant's discriminatory motive without alerting the Court to specific evidence.

First, she alleges Carwile and Kinsey are sexist and "biased in favor of male and against female CCS attorneys." This appears to be an argument that similarly situated male employees were treated more favorably. *See Littlejohn*, 795 F.3d at 312. "An employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct." *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 493–94 (2d Cir. 2010).

---

[7] Plaintiff argues "the declarations of the present and former CCS attorney declarants in many instances constitute direct evidence of discrimination." [Dkt. 45 at 10]. Plaintiff does not, however, point the Court to any such direct evidence.

A plaintiff makes a *prima facie* case for an inference of discrimination "by showing that a similarly situated individual not in [plaintiff's] protected group . . . was treated differently." *Tramble v. Columbia Univ.*, No. 97 Civ. 1271 (RWS), 1999 WL 61826, at *5 (S.D.N.Y. Feb. 10, 1999) (citing *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 63 (2d Cir. 1997). In order to be similarly situated, plaintiff must be similarly situated in all material respects to her comparator. *Shumway*, 118 F.3d at 64. One measure of whether two employees are similarly situated is whether they have comparable experience. *See Bandhan v. Lab. Corp. of Am.*, 234 F. Supp. 2d 313, 317-18 (S.D.N.Y. 2002); *Shumway*, 118 F.3d at 64; *Ralkin v. New York City Transit Auth.*, 62 F. Supp. 2d 989, 999 (S.D.N.Y. 1999). Plaintiff does not identify any individuals, compare herself to any particular individual or individuals, or provide any legal argument allowing the Court to assess those who were similarly situated.

Without any evidence speaking to the CCS attorneys' performance evaluations, discipline standards, experience, or their caseloads, the Court will not make assumptions on behalf of Plaintiff. *See Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) ("Fed. R. Civ. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute."); D. Conn. Civ. L. R. 56(a)3 ("Failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming admitted certain facts that are supported by the evidence in accordance with Local Rule 56(a)1, or in the Court imposing sanctions, including, when the movant fails to comply, an order denying the

motion for summary judgment, and when the opponent fails to comply, an order granting the motion if the motion and supporting materials show that the movant is entitled to judgment as a matter of law."). The Court will not consider the attesting attorneys' qualified opinions that male attorneys were often given more desirable and high profile cases, whereas female attorneys were more likely to be assigned to cases in remote districts before courts that were hostile to the death penalty. *See* [Dkt. 46-6 ¶ 5; Dkt. 46-7 ¶ 7; Dkt. 46-8 ¶ 12]. The affidavits do not elucidate who these male attorneys were, whether they should properly be considered similarly situated, and the basis on which the profile or desirability of a case can be evaluated. For the same reason, the Court will not conclude discriminatory intent based solely on Plaintiff's statement that in the summer of 2012 she complained that her male coworker was given a travel accommodation while she was not, because she does not assert he was similarly situated. *See* [Dkt. 45 at 6; Dkt. 46-1 at 17:8-19; *see* Dkt. 35-5, Ex. Q (email from 01/06/2014 documenting his travel accommodation)].

Second, she alleges "comments by the decision maker" were made against her protected group. *See* [Dkt. 45 at 10]. The central question in evaluating remarks is whether they have a "tendency to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class." *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 116 (2d Cir. 2007), *abrogated on other grounds by Vogel v. CA, Inc.*, 662 Fed. App'x. 72, 75 (2d Cir. 2016) (emphasis added) (age discrimination); *see Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010) (citing *Tomassi* in a Title VII discrimination case). In other words,

"the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination." *Tomassi*, 478 F.3d at 115. A helpful framework to consider is "(1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)." *Henry*, 616 F.3d at 149 (establishing these factors in the context of determining the probative value under Fed. R. Evid. 403).

The Court finds instructive *Norris v. New York City Housing Auth.*, No. 02 Civ. 6933 (RJH), 2004 WL 1087600, at *10 (S.D.N.Y. May 14, 2004). In this Title VII disparate treatment and retaliation case, the plaintiff, an African American woman, submitted an affidavit from a former supervisor who averred that the director of the office "disparaged [the plaintiff's] Afrocentricity, manner of dress, hairstyles, and reading materials. . . ." *Id.* The district court held that the allegations failed to "identify the content, place, or time of the remarks, and is devoid of details from which such animus could be inferred." *Id.* In support, the court cited several cases in this circuit that find a "stray remark" remote from any connection to the adverse action is insufficient to show an inference of discrimination. *See id.* (citing *Eastman v. United Parcel Serv.*, 194 F. Supp. 2d 256, 264–65 (S.D.N.Y. 2002); *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 136 (2d Cir. 2000); *Campbell v. Alliance Nat'l Inc.*, 107 F. Supp. 2d 234, 247 (S.D.N.Y.

2000); *Sanders v. Mount Sinai Med. Ctr.*, No,. 98 Civ. 828, 1999 WL 1029734 (S.D.N.Y. Nov. 10, 1999)). Affidavits submitted on behalf of Rodriguez-Coss must likewise provide some specificity linking the comments to the adverse action in a way where discriminatory intent may be inferred—otherwise, they are mere stray remarks.

Rodriguez-Coss generally cites the affidavits she submitted without pointing the Court to the particular comments made or, at times, who made them. A number of Plaintiff's coworkers testified that CCS management gave male attorneys preferential treatment and, at least once, expressed a derogatory opinion of women. AUSA Haines recalled that Carwile once said that "women only go to law school to find rich husbands." [Dkt. 46-8 ¶ 12]. Carwile once attempted to conceal an incident where Kinsey groped a female employee. [Dkt. 46-12 ¶¶ 6–8]. The Court has evaluated these affidavits and finds they fail to (a) specify the time period when any alleged invidious comment was made and/or (b) come from a decision-maker. *See, e.g.,* [Dkt. 46-6 ¶ 6; Dkt. 46-7 ¶ 9; Dkt. 46-8 ¶ 12; Dkt. 46-10 ¶ 4]. Nor do these comments rise to the legal of invective held to be sufficient to constitute discriminatory intent in this circuit. *See Norris*, 2004 WL 1087600, at *10; *Nurse v. Lutheran Med. Ctr.*, 854 F. Supp. 2d 300, 316–17 (E.D.N.Y. 2012); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001) (finding in an age discrimination case that stray remarks of a decision-maker, without more, is insufficient to show an inference of discrimination); *Tomassi*, 478 F.3d at 114–15 (distinguishing stray remarks from comments evincing a discriminatory state of mind). The Court cannot conclude,

based on the evidence submitted, that the comments show the letter of reprimand or the non-renewal of the Flexiplace Agreement were motivated by discrimination. *See Tomassi*, 478 F.3d at 116.

Accordingly, Plaintiff has failed to show that Defendant acted with a discriminatory intent when it issued the letter of reprimand and did not renew the Flexiplace Agreement.

### B. *Legitimate Nondiscriminatory Reason*

Assuming *arguendo* Plaintiff had met her burden, the Court will now address Defendant's proffered legitimate nondiscriminatory reason for the adverse actions detailed above.

The Court first addresses the letter of official reprimand. The letter is based on Rodriguez-Coss's refusal to litigate *Stone* and it states, "You cannot unilaterally refuse to handle a case or change your work assignments to accommodate your personal preferences." [Dkt. 35-5, Ex. R]. Essentially, Defendant explained that its actions were a response to Plaintiff's unwillingness to perform the same work as every other CCS attorney. Defendant contends that Plaintiff's work assignments and travel were no more burdensome than any other CCS attorney. *See* [Dkt. 35-1 at 24]. Refusal to do work assignments constitutes a legitimate, non-discriminatory reason for an adverse action. *See Becker v. Ulster Cty., NY*, 167 F. Supp. 2d 549, 554 (N.D.N.Y. 2001) ("Defendants assert that Becker was terminated for excessive absenteeism and refusal to work on January 2 and 12, 2000. This suffices for defendants to meet their burden at the second step."); *see generally Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001) ("An

employer's dissatisfaction with even a qualified employee's performance may, of course, ultimately provide a legitimate, non-discriminatory reason for the employer's adverse action.").

The Court next addresses the non-renewal of the Flexiplace Agreement. On February 24, 2014, Carwile emailed Rodriguez-Coss informing her that he would not be renewing her Flexiplace Agreement set to expire in four days. He stated,

> As you know, use of the flexiplace agreement is within management's discretion and is not an entitlement. Due to revelations over the last 2 weeks that were brought to my attention which relate to missed deadlines and other deficiencies in court filings, I have determined that more direct supervision of your work is needed. As a result, I do not intend to renew your flexiplace agreement upon its expiration.

[Dkt. 35-5, Ex. Y]. Indeed, approximately two weeks prior Kinsey was notified for the first time of Rodriguez-Coss's late filings in the *Stone* case. [Dkt. 35-5, Ex. I (Kinsey Dep. Excerpt) at 159:22–162:8; Dkt. 35-5 Ex. W (Email 2/10/14)].

The late filings were numerous and resulted in several strongly-worded reprimands from federal judges. On February 5, 2013, Magistrate Judge Austin addressed one of the defendant's discovery motions during an in-person hearing and the government's late response. Magistrate Judge Austin stated, "There was a delay, a tardy delay of about five or so days. And I would just like an explanation at the end of these proceedings as to why that happened. Because I don't want to let either side think that deadlines that the court set will simply be not considered seriously by the Court." [Dkt. 35-5, Ex. G, at 14:3–8]. When Rodriguez-Coss stated the late filing was a mistake, Magistrate Judge Austin

responded, "Which tells me that you missed reading the orders that emanated from the Court. Because it distinctly gave you a date set for the response." *Id.* at 14:9–17.

On October 21, 2013, Judge Coughenour issued a ruling that granted the defendant's motion for extension of time. *See* [Dkt. 35-5, Ex. K]. The government filed its response late, and Judge Coughenour stated the following:

> [T]he Court cannot take the government's arguments demanding that Defendant comply with the "established deadline" seriously when the government made those arguments in a document filed more than three weeks late. Indeed, the government has demonstrated a cavalier attitude towards obeying deadlines and other procedural requirements, and thus its demand that the Court refuse to grant Defendant an extension of time after a timely motion is audacious at best. The inability of the attorneys representing the United States to obey court orders and deadlines has significantly lowered their credibility with the Court. Counsel are forewarned that the Court is seriously considering an order to show cause why government counsel should not be held in contempt for their flagrant disregard of the Court's orders.

*Id.* Judge Coughenour cited nine instances in 2013 in which Plaintiff's performance fell below an acceptable standard. He cited six late filings in 2013 for which the government did not show good cause and three deficient filings in 2013. *See id.*

The next month, Magistrate Judge Austin also issued an order acknowledging the government's pattern of untimely filings, *see* [Dkt. 35-5, Ex. L], issued a discovery order noting a deficient submission to the court, *see* [Dkt. 35-5, Ex. M (Supp. Disc. Order 11/8/13)], and granted a late filing, *see* [Dkt. 35-5, Ex. N]. With respect to the order granting the late filing, Magistrate Judge Austin stated, "[T]he United States is *again* cautioned that future late filings in this case

will not be tolerated and will likely result in the imposition of sanctions." *See* [Dkt. 35-5, Ex. N, at 2 (emphasis in original)]. Magistrate Judge Austin also acknowledged that both he and Judge Coughenour have noted the government's pattern of late filings. *See id.* at 2 n.2.

Notwithstanding these admonitions, Rodriguez-Coss missed another deadline set by the court and on February 4, 2014, she filed a motion *nunc pro tunc* requesting court's permission to file a document after the deadline. *See* [Dkt. 35-5, Ex. V (Mot. 2/4/14)].

It is well-settled that poor performance is a legitimate, nondiscriminatory reason for an employer's adverse action. *See Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014) (reversing on the grounds of sufficient pretext, but acknowledging district court held defendant had "seemingly legitimate, non-discriminatory reasons for firing [plaintiff]—primarily, poor performance reviews and affidavits from three regional managers whom [plaintiff] supervised"); *Jain v. McGraw-Hill Cos., Inc.*, 506 F. App'x. 47, 48 (2d Cir. 2012) (stating plaintiff's poor work performance was a legitimate, non-discriminatory reason for terminating plaintiff's employment in an FMLA case); *see also Forrester v. Prison Health Servs.*, No. 12 CV 363(NGG)(LB), 2015 WL 1469521, at *15 (E.D.N.Y. Jan. 5, 2015) ("Misconduct, excessive lateness, and poor performance are legitimate, non-discriminatory reasons for defendants' adverse actions."). In this case, Rodriguez-Coss's clear and repeated failures to timely and properly submit court filings was egregious and caught the attention of not just one, but two federal judges. It is a rare case in which this Court observes an attorney's failure to

comply with deadlines is as consistent as that of the government in *Stone*. Such a performance would clearly warrant closer monitoring from a supervised attorney.

### C. *Pretext for Discrimination*

Because Rodriguez-Coss could not show an inference of discriminatory intent, she also cannot show Defendant's legitimate, nondiscriminatory reasons are pretext.

The Court also notes that the supervisors' apparent absentee-style of working does not mean that the non-renewal of the Flexiplace Agreement was pretext for discrimination. *See* [Dkt. 45 at 8]. There is no basis to conclude the supervisors, in light of Rodriguez-Coss's persistent delinquency in the *Stone* case, would not have supervised her more closely if she was working in Washington, D.C. than they did when she was working in Connecticut. At the very least, changing her duty station to Washington, D.C. would have enabled them to discern the amount of hours she was devoting to the performance of her duties.

## II. Retaliation for Conduct Protected by Title VII

In support of her retaliation claim, Plaintiff has put forward two theories of retaliatory conduct: (i) retaliation by creating a hostile work environment and (ii) retaliation directly in response to plaintiff's grievances.

### A. *Retaliatory Hostile Work Environment*

With respect to the hostile work environment theory, Defendant argues that Plaintiff has not provided evidence of any conduct that rises above the level of

"ordinary workplace conflicts."  [Dkt. 35-1 at 35].  In support, Defendant draws the Court's attention to numerous cases that support the general proposition that a claim of retaliatory hostile work environment requires repeated instances of severe harassment that create an abusive workplace environment.  *Id.* at 11, 34; *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) ("Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct."); *Fairbrother v. Morrison*, 412 F.3d 39, 48 (2d Cir. 2005) (requiring that "the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" to establish a hostile work environment), *abrogation recognized on other grounds by Chung v. City Univ. of New York*, 605 F. App'x 20 (2d Cir. 2015); *Carrero v. New York City Hous. Auth.*, 890 F.2d 569, 577 (2d Cir. 1989) ("The incidents [of harassment] must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.").  Although the Plaintiff makes passing references to the legal standard of a hostile work environment, she does not provide any legal or factual analysis as to this type of retaliation claim.  [*See* Dkt. 45 at 3–4, 5–11].  The Court has reviewed the evidence and finds Plaintiff has not provided any evidence of repeated workplace harassment targeting her because of her grievances.  Therefore, Plaintiff has not met her burden to bring forward evidence supporting her hostile work environment claim and has not established a genuine dispute of fact on this claim.

## B. *Discrete Retaliatory Actions*

Under Title VII, it is unlawful for an employer to retaliate against employees who oppose discriminatory practices or file complaints of discriminatory treatment. 42 U.S.C. § 2000e-3(a) (2012). When analyzing retaliation claims, courts apply the *McDonnell Douglas* burden-shifting framework. *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010); *see also McDonnell Douglas*, 411 U.S. at 802–05. Initially, the plaintiff must establish a prima facie case by demonstrating "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Hicks*, 593 F.3d at 164 (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)). Thereafter, there is a presumption of retaliation that the defendant must rebut by articulating "a legitimate, non-retaliatory reason for the adverse employment action." *Jute*, 420 F.3d at 173. Finally, if the defendant proffers such a reason, "the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action. A plaintiff can sustain this burden by proving that a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause[;] if the employer was motivated by retaliatory animus, Title VII is violated even if there were objectively valid grounds for the [adverse employment action]. *Hicks*, 593 F.3d at 164–65 (alterations in original) (internal quotations omitted).

### 1.    Prima Facie Case *of Retaliation*

Defendant contends that Plaintiff has failed to establish a prima facie case primarily because her protected activity occurred well after the actions she argues constitute retaliation.  [Dkt. 35-1 at 22].

Defendant argues that Rodriguez-Coss does not have a valid retaliation claim because she filed her EEOC complaint in January of 2014, her employer became aware of the filing in February 2014, and there is no adverse action that is causally connected to the filing.  [Dkt. 35 -1 at 22].  Plaintiff does not dispute this but rather asserts that the protected activity is different: that in the summer of 2012 she complained Defendant gave a travel accommodation to a white male, Stanley Rothstein, but not to her.  *See* [Dkt. 45 at 6].  Defendant's response to this position is that she did not actually complain of discriminatory treatment, but rather was only attempting to get a travel accommodation for herself.  [Dkt. 48 at 10–14].

Assuming Rodriguez-Coss's alleged complaint in the summer of 2012 was a protected activity, she cannot show any causal connection to an adverse action.  The adverse action standard for Title VII retaliation is slightly different from that of discrimination.  The Supreme Court in *Burlington N. & Santa Fe R.R. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006), expanded the definition of an adverse action for Title VII retaliation claims to include changes in employment outside the terms and conditions of employment.  *See id.* at 64.  The Supreme Court held that an adverse action in the retaliation context means "the employer's actions must be harmful to the point that they could well dissuade a

reasonable worker from making or supporting a charge of discrimination." *Id.* at 57. The Court must thus consider alleged adverse actions that would not necessarily be cognizable under a discrimination claim.

Most of the alleged adverse employment actions—namely, the letter of reprimand, the Flexiplace Agreement non-renewal, and the AWOL status—were issued more than 1.5 years after the summer of 2012. When temporal proximity alone is used to show causation, the proximity must be "very close" in order to support a *prima facie* case of retaliation. *Clark Cty. School Dist. v. Breeden*, 532 U.S. 268, 273, 121 S. Ct. 1508, 149 L. Ed.2d 509 (2001) ("Action taken (as here) 20 months later suggests, by itself, no causality at all."); *McCormick v. Donovan*, 365 F. App'x 247, 249 (2d Cir. 2010) (affirming district court's dismissal of *pro se* Title VII retaliation claim where the 1.5 years delay between the alleged protected activity and adverse action was "insufficient to suggest a causal relationship"); *Ofoedu v. St. Francis Hosp. & Med. Ctr.*, No. 3:04cv1707 (PCD), 2006 WL 2642415, at *25 (D. Conn. Sept. 13, 20106) (finding 13 months to be insufficient to show causal connection between the complaint and the termination); *Ghaly v. U.S. Dept. of Agric.*, 739 F. Supp. 2d 185, 200 (E.D.N.Y.2010) (nine month period between protected conduct and retaliation did not support causation); *see generally Wanamaker v. Town of Westport Bd. of Educ.*, 11 F. Supp. 3d 51, 75 (D. Conn. 2014) (finding a 15 month delay to be insufficient to support a causal connection in an FMLA case); *but see Summa v. Hofstra Univ.*, 708 F.3d 115, 128–29 (2d Cir. 2013) ("The seven-month gap between Summa's filing of the instant lawsuit and the decision to terminate her employment privileges is not

prohibitively remote."). Therefore, these actions are too temporally remote to warrant a causal connection.

The only alleged adverse action that is close in time to the summer of 2012 is the alleged excessive workload and failure to accommodate travel and workload needs. The evidence shows that Rodriguez-Coss took on the *Fell* case in the District of Vermont and the *Stone* case in California in 2011, which is before she complained to the CCS about the travel accommodations.[8] [Dkt. 35-5, Ex. Q]. She admits that she agreed to take on *Pleau* in June of 2012. *Id.* The Court notes that she could have taken all three assignments before she complained about Rothstein's travel accommodations, but it will put this possibility aside for now. The fact of the matter is there is simply no evidence supporting a conclusion that her workload assigned in the summer of 2012 could be causally connected to her alleged protected activity given that she was asked and agreed to take on the case. The Court will not consider the failure to accommodate her as she has not shown a legal basis for concluding a requested accommodation is a cognizable adverse action in the context of her particular Title VII discrimination and retaliation claim. Rodriguez-Coss therefore fails to establish a *prima facie* case.

The Court need not address the second and third prongs because Rodriguez-Coss willingly took on the third assignment.

### C. Rehabilitation Act of 1973

The Rehabilitation Act of 1973 provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or

---

[8] Indeed, her assignment to the *Stone* case is what gave rise to her need for a lighter travel requirement.

his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination . . . under any program or activity conducted by any Executive agency . . . ."  29 U.S.C. § 794(a) (2012).  Furthermore, the Act instructs that claims of discrimination are interpreted in accordance with the standards applied under the Americans with Disabilities Act.  29 U.S.C. § 794(d).  Accordingly, the standard for a prima facie case of discrimination under the Rehabilitation Act requires Rodriguez-Coss to show:

> (1) that she is a 'qualified individual' with a disability; (2) that the defendants are subject to one of the Acts; and (3) that she was 'denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of her disability.

*Dean v. Univ. at Buffalo Sch. of Med. & Biochemical Scis.*, 804 F.3d 178, 187 (2d Cir. 2015) (quoting *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 85 (2d Cir. 2004)).  However, in Plaintiff's memorandum in opposition to summary judgment, Plaintiff neglected to designate which facts in the voluminous record support her claim under the Rehabilitation Act.  Instead, Plaintiff baldly claims "[t]he record also shows that Rodriguez-Coss was perceived to have a temporary disability" without a single citation to the record, nor even reference to facts that might support her claim.  [Dkt. 45 at 12].  Vague references to the record are not enough; Federal Rule of Civil Procedure 56 makes quite clear that a party must cite "particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A).  Moreover, Rule 56 also warns counsel that a court need only consider the materials cited to decide the motion.  Fed. R. Civ. P. 56(c)(3).

Plaintiff's Rehabilitation Act claims falls at the first hurdle, since none of the facts cited in her memorandum support a finding of disability. Plaintiff did not produce a scintilla of evidence demonstrating the medical conditions alleged in her complaint. *See* [Dkt. 1 ¶¶ 21–22]. Therefore, Plaintiff has failed to establish a *prima facie* case and there is no genuine dispute of fact in regards to her Rehabilitation Act Claim.

Even if she was disabled, the only adverse action taken after she claimed to have been ill was the cancellation of her attendance at a training program in North Carolina. However, Plaintiff informed Defendant that she could not travel to Washington, D.C. because she needed to remain in Connecticut under the care of her doctors. Because Plaintiff was required to remain in Connecticut she has failed to show that the cancellation of her trip to North Carolina was an adverse employment action.

<u>Conclusion</u>

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED. The Clerk is directed to close this case.


IT IS SO ORDERED.

_____/s/_____

Hon. Vanessa L. Bryant
United States District Judge


Dated at Hartford, Connecticut: July 29, 2018